1                    IN THE UNITED STATES DISTRICT COURT

2               FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3

4    IN RE:  WAWA, INC. DATA SECURITY   : CIVIL ACTION NO.
     LITIGATION                         :    19-6019
5                                       :
     Related to Consumer Track          :
6
                                - - - - -
7
                          PHILADELPHIA, PA
8
                          JANUARY 26, 2022
9
                                - - - - -
10
     BEFORE:       THE HONORABLE GENE E.K. PRATTER, J.
11
                        FINAL SETTLEMENT HEARING
12
     APPEARANCES:
13
                     CHIMICLES SCHWARTZ KRINER & DONALDSON-SMITH LLP
14                   BY:  BENJAMIN F. JOHNS, ESQUIRE
                     SAMANTHA E. HOLBROOK, ESQUIRE
15                   361 W. Lancaster Avenue
                     Haverford, PA  19041
16                   For Consumer Plaintiffs

17
                     NUSSBAUM LAW GROUP, P.C.
18                   BY:  LINDA NUSSBAUM, ESQUIRE
                     1211 Avenue of the Americas
19                   New York, NY  10036
                     For Consumer Plaintiffs
20

21                   BERGER MONTAGUE PC
                     BY:  SHERRIE R. SAVETT, ESQUIRE
22                   JON J. LAMBIRAS, ESQUIRE
                     1818 Market Street
23                   Suite 3600
                     Philadelphia, PA  19103
24                   For Consumer Plaintiffs

25
                          (CONT.)

```
 1   APPEARANCES:  (CONT.)

 2
                     FINE, KAPLAN AND BLACK, R.P.C.
 3                   BY:  GERARD A. DEVER, ESQUIRE
                     ROBERTA D. LIEBENBERG, ESQUIRE
 4                   One South Broad Street
                     Philadelphia, PA  19107
 5                   For Consumer Plaintiffs

 6
                     HAVILAND HUGHES LLC
 7                   BY:  DONALD E. HAVILAND, JR., ESQUIRE
                     WILLIAM H. PLATT, II, ESQUIRE
 8                   201 S. Maple Avenue
                     Suite 110
 9                   Ambler, PA  19002
                     For Employee Track Plaintiffs
10

11                   HAMILTON LINCOLN LAW INSTITUTE
                     CENTER FOR CLASS ACTION FAIRNESS
12                   BY:  ADAM SCHULMAN, ESQUIRE
                     1629 K Street, NW, Suite 300
13                   Washington, DC  20006
                     For Objector Theodore Frank
14

15                   MORGAN LEWIS & BOCKIUS LLP
                     BY:  GREGORY T. PARKS, ESQUIRE
16                   KRISTIN M. HADGIS, ESQUIRE
                     TERESE M. SCHIRESON, ESQUIRE
17                   1701 Market Street
                     Philadelphia, PA  19103-2921
18                   For Defendant

19

20
                     KATHLEEN FELDMAN, CSR, CRR, RPR, CM
21                   Official Court Reporter
                     Room 1234 - U.S. Courthouse
22                   601 Market Street
                     Philadelphia, PA  19106
23                   (215) 779-5578

24        (Transcript produced by mechanical shorthand via C.A.T.)

25
```

1                    (Deputy Clerk opened court)

2              THE COURT:  Okay, hello, everybody.  Please take

3        your seats.  Make yourselves comfortable.

4              Let's take attendance for this hearing on the

5        settlement in the Wawa Data Security Litigation on behalf of

6        the Consumer Track Plaintiffs.  The case actually is docketed

7        at 19-6019.

8              All right, those of you who are here in the

9        courtroom, we'll start with you, and as long as those with

10       whom you are seated and are near you are okay with this, you

11       can remove your masks.  It's a lot easier for the court

12       reporter and me.  You don't have to, and just make sure you're

13       all comfy, but it's fine if you wish to remove your mask as

14       far as I'm concerned.

15             Okay, let's start.

16             MR. JOHNS:  Good morning, Your Honor.  Ben Johns for

17       the Consumer Plaintiffs.

18             THE COURT:  Okay, Mr. Johns.  I'll say hello to you

19       all at once.

20             MS. HOLBROOK:  Good morning, Your Honor.  Samantha

21       Holbrook also for the Consumer Plaintiffs.

22             MS. SAVETT:  Good morning, Your Honor.  Sherrie

23       Savett for the Consumer Plaintiffs.

24             MR. PARKS:  Good morning, Your Honor.  Greg Parks of

25       Morgan Lewis & Bockius for Defendant Wawa, Inc. joined at

1    counsel table by my colleagues who I'll ask to introduce

2    themselves.

3            MS. HADGIS:  Good morning, Your Honor.  Kristin

4    Hadgis, also Morgan Lewis & Bockius, for Defendant Wawa, Inc.

5            MS. SCHIRESON:  Good morning, Your Honor.  Terese

6    Schireson, also Morgan Lewis & Bockius, for Defendant Wawa,

7    Inc.

8            THE COURT:  Okay.

9            MR. HAVILAND:  Good morning, Your Honor.  Don

10   Haviland from Haviland Hughes for the Employee Track

11   Plaintiffs and I see my partner Bill Platt in the lower right.

12   He's introduced himself.

13           THE COURT:  On video or joining us remotely we have

14   who?

15           MS. LIEBENBERG:  Thank you.  Good morning, Your

16   Honor.  Bobbie Liebenberg for the Consumer Track Plaintiffs.

17           MR. PLATT:  Good morning, Your Honor.  This is Bill

18   Platt here for the Employee Plaintiffs.

19           MS. NUSSBAUM:  Good morning, Your Honor.  This is

20   Linda Nussbaum for the Consumer Class Plaintiffs.

21           MR. LAMBIRAS:  Good morning, Your Honor.  Jon

22   Lambiras for the Consumer Plaintiffs.

23           MR. DEVER:  Good morning, Your Honor.  Gerry Dever

24   also for the Consumer Plaintiffs.

25           MR. SCHULMAN:  Good morning, Your Honor.  Adam

1    Schulman for objector Theodore Frank.

2            THE COURT:  All right, it seems that we have full

3    employment here.  So I understand that there is a new

4    submission on behalf of the Employee Track Plaintiffs, is that

5    right?

6            MR. HAVILAND:  Your Honor, it's just a presentation

7    material that summarizes our position, but -- and we won't use

8    the PowerPoint, just the handout, but that's been shared with

9    all counsel.

10           THE COURT:  Okay.  Well, if there's going to be an

11   issue about the PowerPoint or the material, keep it to a

12   minimum so that we don't spend a lot of time on that kind of a

13   tertiary squabble.

14           The order of play here would be, I'd like to hear

15   the presentation as to why the settlement meets all the

16   obligations that it should meet under these circumstances.  I

17   have a couple of questions based on the phone call we had

18   recently as to what the status is of any drafting or revision.

19   You all probably know me well enough to know that I'm not shy

20   about interrupting you, I'll apologize ahead of time for

21   throwing you off your script, but it's probably more efficient

22   for everyone if I just get answers to the questions I have

23   when they crop up.

24           Speaking of timing -- oh, and then after I hear that

25   presentation supplemented by counsel for Wawa, if you wish to,

1    under those circumstances, then I will hear from Mr. Haviland

2    and then finally --

3                         (Phone ring)

4              MR. PARKS:  Pardon me.

5              THE COURT:  As long as it's a melody that I can

6    recognize is fine -- almost.  Then we'll hear from or on

7    behalf of Mr. Frank.  I have to conclude this today by about

8    12:20.  I will not break into tears if it ends before then

9    and neither should you.

10             Okay.  Mr. Johns, is it you or one of your

11   colleagues?

12             MR. JOHNS:  Yes, Your Honor.  May I use the podium?

13             THE COURT:  You certainly may.

14             MR. JOHNS:  Good morning again, Your Honor, and may

15   it please the Court.  As far as housekeeping and the order of

16   presentations, I'm going to be addressing the fairness and

17   final approval of the settlement as well as certification of

18   the Settlement Class and the adequacy of the notice.

19             With the Court's permission, my colleague, Ms.

20   Holbrook, is going to address with more specificity the

21   remaining objections lodged by Mr. Haviland.

22             THE COURT:  Okay.

23             MR. JOHNS:  And, finally, my colleague, Ms. Savett,

24   is going to address the attorneys' fee issues as well as

25   expenses and incentive awards.

1              As I was preparing for this hearing today and
2    reading off the materials, it seemed to me that setting aside
3    the issues about the release and obviously the attorneys'
4    fees, it seems to me there's no other pending objections to
5    the fairness of the settlement or at least approvability of
6    the settlement itself.  The issue there is, of course, under
7    23 and Girsh, whether it's fair, reasonable, and adequate.
8    I'd also point out, as Your Honor recognized at preliminary
9    approval, the 2018 amendments to Rule 23 really frontload a
10   lot of this analysis.  The standard at preliminary approval is
11   whether the Court is likely to grant final approval of the
12   settlement.  It also recognizes that sending notice to
13   thousands and thousands and millions of people is an important
14   event.  So that's all things that were factored in at
15   preliminary approval and we submit that we've more than
16   satisfied the threshold for the settlement being fair,
17   reasonable and adequate and, of course, if the Court grants it
18   and approves it, nearly $3 million in benefits will be
19   directly distributed to almost 600,000 consumers.  That's in
20   addition to the injunctive relief, the security enhancements,
21   which go beyond what Wawa is required to do under relevant
22   standards and law and will also be binding for a period of two
23   years pursuant to the Settlement Agreement.
24              Analyzing these factors in the context of Girsh and
25   Rule 23(e), particularly the risks associated with litigating

1    this case, both class certification risks, judgment risks,

2    which Your Honor is familiar with from having had some of

3    these data breach cases before, we think this is a good result

4    here and I would also hasten to add that something we

5    learned --

6              THE COURT:  Do you choose the word good deliberately

7    on some continuum of between lousy and great?

8              MR. JOHNS:  No, Your Honor, I wouldn't read anything

9    into that.  The standard here is fair, reasonable and adequate

10   and I guess on the continuum, I would put good above that.

11   Frankly, I think it's an excellent result given the risks

12   here.

13             THE COURT:  Now that I've asked you that question.

14             MR. JOHNS:  But one thing, what I was going to say,

15   the one thing that we learned after we filed this case, which

16   there was no way for us to learn before we filed the case, is

17   the incidence of fraud here were very low, people that

18   actually had misuse and fraud on their credit cards.  So I

19   think given that, given the law, given the risks that we've

20   talked about in our brief that I'll go into if you'd like, but

21   I thought they were pretty comprehensive, this is a very good

22   and sensible result, too, and it gives an opportunity for

23   these Class Members to get an amount certain delivered now as

24   opposed to an uncertain amount or perhaps no recovery at some

25   point in the future.  And, of course, to reach that phase

1    further on, we would have to win Class Certification, and as

2    Your Honor is aware, particularly in the context of these data

3    breach cases as you wrote about in Fulton-Green, it's very

4    risky and it's -- there are plenty of cases that are

5    unfavorable for plaintiffs in these cases.  So the response

6    that we received from the Class Members has been very

7    positive.  As I mentioned, the settlement will have nearly

8    600,000 people getting relief.  There's been no objectors by

9    the Attorney Generals -- Attorneys General, excuse me, and

10    that's not just a throwaway line because we have to provide --

11            THE COURT:  Going back to the note, you've got

12    almost 600,000.  It's about 575,000.

13            MR. JOHNS:  Right.

14            THE COURT:  Is there any overlap between that group

15    and the, what, 6700 claims in the Tier One group?

16            MR. JOHNS:  I don't know if they figured that out

17    yet, but they certainly will and it won't be any material

18    overlap.  I don't know if any of my colleagues have the answer

19    to that question, but certainly we're not going to send people

20    two $5 gift cards.  We'll sort that out, but I don't think

21    it's going to be --

22            THE COURT:  Well, what does that mean we'll sort it

23    out?

24            MR. JOHNS:  Well, what that means is KCC, the Claims

25    Administrator, will crosscheck it before the distribution goes

1    out.

2            THE COURT:  So we don't know what the total number

3    of Tier One recipients is?

4            MR. JOHNS:  I don't think so, but I don't think it's

5    any different materially from the numbers that you just

6    mentioned, Your Honor.  The point I was making about the

7    Attorneys General I think is an important one.  They do get

8    these, basically as I understand it, every settlement gets

9    scrutinized now and they look for things like disproportionate

10   attorneys' fees and other flaws in settlements.  Obviously, we

11   didn't hear from the AGs here.  So pursuant to a case we cite

12   in the brief, that's a factor that favors granting final

13   approval.  There were no opt-outs by any employees.  We think

14   that's significant as well.  And so what we're left with is

15   Mr. Frank --

16           THE COURT:  Are you addressing the opt-out issue or

17   is one of your colleagues?

18           MR. JOHNS:  I'm happy to --

19           THE COURT:  Okay.

20           MR. JOHNS:  -- touch --

21           THE COURT:  Well, did any of the six opt-outs

22   actually explain why they were opting out?  Just a matter of

23   curiosity.

24           MR. JOHNS:  No, we did get some letters and it runs

25   the gamut, Your Honor, everything from we hate class action

1  lawyers, we hate class actions, those sorts of things, but

2  nothing like substantively that would warrant bringing it to

3  the Court's attention.  If you'd like, we can certainly put

4  those on the docket.

5         THE COURT:  There's only six of them.  You should be

6  able to kind of run through that fairly quickly.

7         MR. JOHNS:  Yes, but I think that's the upshot of

8  it, they just don't like class actions or they love Wawa.

9  We've seen some of that, too.

10        So what we're left with is Mr. Frank and Mr.

11 Haviland and out of the 22 million Class Members, those were

12 the only two people that objected and I use the word object

13 carefully here because I know there's some dispute about

14 whether Mr. Haviland's response to our Final Approval brief

15 qualifies as an objection for purposes of the settlement.  And

16 as I said, Ms. Holbrook, my colleague, is going to talk about

17 the release issue in just a moment, but it seems to me that

18 that is just meritless on the face of it particularly with the

19 recent change we made that further clarifies that the

20 consumer, the release is only releasing claims of consumers to

21 the extent they're walking and talking like consumers and that

22 includes employees that are walking and talking like

23 consumers.  That's clear as day we think from the Settlement

24 Agreement and it's also, for what it's worth, clear from

25 Wawa's most recent submission.  At the end of the day, the

1    issue here vis-a-vis the employees is whether they're going to

2    be able to continue to pursue their employee claims which was

3    the whole reason we had the three separate tracks initially

4    created and Wawa's brief makes very clear that they're going

5    to be able to do that.  So --

6              THE COURT:  As I understand in terms of the tiers,

7    some of the tiers' claims are still being investigated, right?

8              MR. JOHNS:  Right.

9              THE COURT:  When might that be finally determined or

10    when will that rate, the final claims rate be determined?

11             MR. JOHNS:  Expeditiously, Your Honor.  We were

12    waiting for today to have this hearing, but we've conferred

13    with Wawa about the Tier Three claims and what we're going to

14    do is to have KCC go through and a lot of them didn't have an

15    actual monetary amount that was requested on the form.  I

16    don't think it actually asked for the monetary amount.  So

17    what we've agreed with Mr. Parks to do is to go through them.

18    Any of those claims that does have a dollar amount associated

19    with the claim that you can figure out from looking at the

20    documents, that will be paid obviously within the construct of

21    the $500 cap for Tier Three, but those will be paid.  For the

22    other folks who it's not apparent what they're asking for, we

23    will send deficiency letters and that's a common procedure

24    process that's used in these cases and give them an

25    opportunity to cure their claim essentially.  And if they can

1  do that within a reasonable period of time, they'll be paid.

2  If they can't, they won't.

3          THE COURT:  Well, I guess it all depends on the

4  clarity of what's in the "deficiency letter" and then what is

5  a "reasonable time" for responding.

6          What is your thinking on that?

7          MR. JOHNS:  30 days is typically a reasonable period

8  of time.

9          THE COURT:  30 days from receipt of the

10  communication?

11          MR. JOHNS:  Probably 30 days from when it's mailed,

12  but we can certainly account for --

13          THE COURT:  Have you gotten any mail recently?

14          MR. JOHNS:  Yes, Your Honor, and that's a good

15  point.  That's a fair point.  We'll account for the post

16  office delays I'll call it.  We'll add a little bit more time.

17          MR. PARKS:  Actually, I think those will go by

18  e-mail, Your Honor.  The claimants were required to provide an

19  e-mail address in connection with making a claim and so I

20  think our plan is to send out the deficiency notices by e-mail

21  and the Settlement Agreement does expressly say the claimants

22  have 30 days in which to supplement their deficient claim.

23          THE COURT:  Obviously, my concern has to do with if

24  it is by regular first class mail, there really has to be some

25  realistic tinkering, but if it's by e-mail, you know, assuming

 1   that people haven't preset their e-mail to send things to

 2   junk, which I just recently experienced, my communications to

 3   somebody else was going straight into junk, which is really a

 4   very warm and fuzzy feeling, but e-mails are probably pretty

 5   good.

 6             MR. PARKS:  Yeah, and especially these are Class

 7   Members who signed up and are expecting to hear about their

 8   claims.

 9             THE COURT:  Okay.

10             MR. PARKS:  So I think that's particularly --

11             THE COURT:  Well, thanks for the response on that.

12             Can I move you to Tier Two, though.

13             MR. JOHNS:  Sure, Your Honor.

14             THE COURT:  Those claims at least thus far seem to

15   be pretty low, at least well under the cap.  Does that relate

16   or suggest some sort of problem with notice?

17             MR. JOHNS:  I don't think so, Your Honor.

18             THE COURT:  Why not?

19             MR. JOHNS:  I'm sorry, were you finished with your

20   question?

21             THE COURT:  Yes.

22             MR. JOHNS:  I think the answer is no.  I think this

23   ties into one of the things I started with was we found that

24   the incidence of actual fraud was low and, of course, to be

25   eligible for Tier Two, those are folks that had to have had at

1    least some attempt of fraudulent activity.  So I think that

2    accounts for the numbers we see here which are about 683,

3    that's the number I see in front of me, but it doesn't have

4    anything to do with notice and, frankly, the notice here far

5    exceeded our expectations.  I think we told you at preliminary

6    approval that we expected there were going to be something

7    like 64 million impressions made with the notice, and as you

8    can see from the two declarations that Wawa submitted,

9    along -- which, frankly, were in large part brought about

10   because of some of the changes we made, some of the

11   improvements we made over the course of this process, the

12   impressions and the visibility of this was massive.  It was in

13   the hundreds of millions counted by media impressions, counted

14   by store transactions, people coming into the store.  We had

15   the signs, we had Wawa put them up for three more weeks.  We

16   think that's significant.  We think that also is very relevant

17   to the extent Mr. Haviland still has objections about

18   employees because, obviously, it was employees that were told

19   about the settlement and put the signs up and then took the

20   signs down.  They got more notice about the settlement than

21   anyone else.

22           So, in sum, with respect to the approvability of the

23   settlement, we do think it's fair, reasonable and adequate,

24   unless you have any questions on that.

25           THE COURT:  Well, I have a burning question.

1           MR. JOHNS:  Sure.

2           THE COURT:  Why is there a difference of three in

3    the briefing for the Tier One gift cards?  One set of briefs

4    gives me the number of 575,162 and another brief says 575,159.

5           That basically is to prove that Ms. Myers is a very

6    close reader.

7           MR. JOHNS:  Your Honor, those numbers, they come

8    from the KCC declaration and, of course, as Your Honor knows,

9    we were initially going to send this to 600,000 of them and

10   then they did their thing and narrowed it down.  The number I

11   have from that declaration is 575,159, but I don't know -- I

12   don't know the reason behind any discrepancy there.

13          THE COURT:  Well, somebody can put it on their list

14   just to nail that down --

15          MR. JOHNS:  Sure.

16          THE COURT:  -- in the final analysis, in the final

17   attention.

18          MR. JOHNS:  Okay.  So that was all I wanted to say

19   unless you have any questions for me about the provability of

20   the settlement.

21          THE COURT:  Well, as I understand it, in Tier Three,

22   the Administrator approved 185 out of --

23          MR. JOHNS:  921.

24          THE COURT:  That's 921.

25          MR. JOHNS:  Right.

 1              THE COURT:  And that has to do with proof of

 2    out-of-pocket expenses I guess.

 3              MR. JOHNS:  Right.

 4              THE COURT:  What are the nature of deficiencies that

 5    the Claims Administrator has focused on?

 6              MR. JOHNS:  No documents, irrelevant documents

 7    because that -- particularly because that's cash and there's

 8    fraud sometimes in these settings.  There was a proof

 9    requirement and so that --

10              THE COURT:  And what was the standard of proof used?

11              MR. JOHNS:  It's set forth in the Settlement

12    Agreement, just some reasonable proof that you had a

13    fraudulent transaction.  So --

14              THE COURT:  Do you know what kind of, of those that

15    have been approved, what were they teeing up as opposed to

16    those who have not been approved?

17              MR. JOHNS:  Bank statements and the like, but I can

18    just tell you as a general matter, Your Honor, our standard of

19    review, if you will, of these claims has been very lenient and

20    pro consumer so we've erred on the side of rubber stamping, so

21    to speak, and approving these claims.

22              THE COURT:  Yes, but I can't err on the side of

23    rubber stamping.  That's why I'm asking.

24              MR. JOHNS:  Understood.  Understood.

25              THE COURT:  Okay.

1          MR. JOHNS:  I also wanted to address the

2    certification of the Settlement Class, but I will note that

3    obviously Your Honor wrote about that thoroughly at

4    preliminary approval and we briefed it, so unless you want me

5    to make a record on that and go through that, I'm happy to

6    rest on our brief.

7          THE COURT:  No, as long as there hasn't been any

8    change in terms of your thinking or -- it's only really tied

9    back into the release as far as I'm concerned.

10          MR. JOHNS:  All right.  And last, but not least, is,

11    at least as far as I'm concerned, was the notice issue which

12    we've already talked about a little bit and, again, we went

13    far beyond what was required.  We think this more than

14    adequately satisfies due process and the relevant case law

15    and, frankly, this is going to be I think at the end of the

16    day a good example of a case where the parties can use things

17    like earned media and press to help effectuate notice and

18    that's more efficient than doing it the old-fashioned way

19    because as you can see from one of the Wawa declarations, in

20    order to get this volume of impressions, it would have cost

21    seven figures to do that and we were able to do that and we

22    predicted accurately that that was going to happen.  So we're

23    very pleased with how that played out.  There's 22 million

24    Class Members.  The standard from a federal judiciary study

25    that Your Honor cited in the preliminary approval was

1  70 percent is the bare minimum, the floor, and we far exceeded

2  that.

3          THE COURT:  Did you or any of your colleagues sign

4  onto or listen to the Data Breach PLI roundtable that was last

5  week?

6          MR. JOHNS:  I did not, Your Honor.  I don't know if

7  my colleagues --

8          THE COURT:  On cyber security.

9          MR. JOHNS:  Ms. Holbrook was too busy working.  She

10  was not allowed to do that.

11          THE COURT:  Okay.  It was very interesting.  A lot

12  of observations and panels and, of course, it was supposed to

13  be out in San Francisco on data security, data breach cases.

14  We ended up doing it on Zoom and it was very interesting, much

15  of which focused on how do judges think about these cases, but

16  the most interesting part was the fraud side and then cyber

17  terrorism of which there is no reason to be concerned in this

18  case, right?

19          MR. JOHNS:  Right.

20          THE COURT:  So in all of the investigation of all

21  the claims and particularly when you say that there's been

22  even very little evidence of fraud, no one has any extra

23  concerns about the ramifications of the breach in this case,

24  is that right?

25          MR. JOHNS:  That's right, Your Honor, and, of

1    course, the way Rule 23 is set up is if somebody did have

2    that, if somebody had gone to Best Buy and bought $10,000

3    worth of merchandise, they could have opted out and pursued

4    that case individually.  We didn't see anything like that.

5    Again, there's only six opt-outs.  None of them claimed

6    anything like that and we haven't seen any evidence of

7    widespread fraud or significant fraud.

8              THE COURT:  Or any demand -- maybe this is best

9    addressed to Wawa -- or any demand for any kind of ransom or

10   any kind of hassle on that score.

11             MR. JOHNS:  No.  Fortunately, no.

12             THE COURT:  Not that I've seen any evidence of it in

13   this case or any squawking about it, but I want to make sure

14   that nothing is lurking.

15             MR. JOHNS:  Nope.

16             THE COURT:  All right, do you want to transfer

17   the --

18             MR. JOHNS:  Sure.  Can I make just one last quick

19   point --

20             THE COURT:  Yes.

21             MR. JOHNS:  -- about the claims rate because I know

22   that's something Mr. Haviland and perhaps Mr. Schulman have

23   raised.  In addition to again having nearly 600,000 people

24   getting this direct benefit plus the injunctive relief, I

25   would also note that the claims rates here are comparable to

1  similar settlements you might have heard about on the CLE you

2  just referenced and I have a chart here that I'm happy to hand

3  to your deputy that sets this out.  But just by way of

4  example, there's a case called Chipotle.  I was actually

5  involved with that in Colorado.  It was .1 percent.  That was

6  another payment card breach.  Target, .2 percent.  Home Depot,

7  .3 percent.  And those are all payment card cases where, like

8  in this case, like in Fulton-Green, it was a claims made

9  settlement where people had to affirmatively come forward and

10  say, yes, I was impacted by this in one way or another.

11         So we weren't -- I think the bottom line is the

12  results here are consistent with, if not much better than,

13  frankly, particularly with the recent amendment to push out

14  the gift cards, it's not inconsistent with these other cases

15  and it's, frankly, much better when you account for that.

16         So unless Your Honor has any more questions for me,

17  I will turn it over to my colleague, Ms. Holbrook.

18         THE COURT:  Great.  Go ahead.

19         MS. HOLBROOK:  Good morning, Your Honor.  May it

20  please the Court, Samantha Holbrook on behalf of the Consumer

21  Plaintiffs.

22         While their objections have been narrowed, the

23  Employee Track seeks to tread old ground in asking this Court

24  to once again consider arguments that the employees are

25  somehow compromised by the settlement.  Their objections

1    should be overruled for three primary reasons:

2            First, the Dittman holding was not limited to the

3    employer/employee relationship as they contend;

4            Second, the settlement release expressly carves out

5    the employee-specific claims; and,

6            Third, all consumers, including employees acting as

7    consumers, are adequately represented by the settlement.

8            I'm going to start with that first point.  Dittman

9    does not establish a bright line rule that is limited

10   exclusively to the employer/employee relationship.  The

11   Employee Track continues to narrowly misread the holding in

12   Dittman, a fact of which I know this Court is very, very well

13   familiar.  There, Justice Baer writing for the majority

14   concluded that UPMC's affirmative conduct in collecting and

15   storing personal financial information without reasonable

16   security created a foreseeable risk of a data breach so,

17   therefore, UPMC owed a duty to exercise reasonable care.  What

18   the Dittman Court did not do was create new duties based

19   exclusively on the employer/employee relationship.  Rather, it

20   imposed already existing common law duties to facts based on

21   "the defendant's affirmative risk-causing conduct."  Your

22   Honor, here, Wawa's affirmative risk-causing conduct in

23   accepting payment cards without adequate security measures

24   applies equally to all consumers.  And notably this Court has

25   reached that same conclusion.  Your Honor wrote in the motion

1    to dismiss the Financial Institution Track opinion that "the

2    Court is not convinced at this time that Dittman is strictly

3    limited to the employer/employee context."  And in reaching

4    your conclusion, Your Honor looked to Chief Justice Saylor's

5    concurring opinion in that case and you found that that

6    concurring dissenting opinion urged that the scope of the

7    majority's holding was most likely not limited to the

8    employer/employee relationship because Justice Saylor wrote

9    separately about the special relationship between the

10   employers and the employees.  Significantly, Your Honor

11   ultimately concluded that you were persuaded that

12   "Pennsylvania law post Dittman imparts on companies an

13   independent duty to reasonably secure payment systems."  And

14   this view is shared by districts and state courts throughout

15   the Third Circuit.

16           One of those decisions, another data breach action

17   in the Middle District of Pennsylvania in which Mr. Johns and

18   myself are also serving as co-lead counsel, is the In Re

19   Rutter's Data Breach Security Litigation.  That case was

20   decided at the beginning of 2021.  And there Rutter's took a

21   similar position to the Employees Track here arguing that the

22   Dittman duty of care was limited to just the

23   employer's relationship.  A retired Chief Judge Jones

24   disagreed with that.  They found that Rutter's reading of

25   Dittman was too limited, that the duty did not extend to

1    consumers in the context of a data breach and instead the

2    Court found "Defendant's affirmative act of retaining credit

3    and debit card information which created a risk of foreseeable

4    harm from unscrupulous third parties is enough to recognize a

5    legal duty," and notably Chief Judge Jones shared Your Honor's

6    view of Justice Saylor's concurrence in that opinion as

7    convincing him that because Chief Justice Saylor wrote

8    separately to address the preferred formulation of the duty,

9    he was persuaded that the majority opinion, in fact, relied

10   primarily on the affirmative conduct of UPMC, not solely on

11   the employer/employee relationship.  And as Your Honor's

12   familiar, we have cited a host of other cases that have

13   followed in these footsteps throughout the Third Circuit and I

14   need not go through them now, but I'll just rattle off a few

15   names with which this Court is already familiar.  Baptiste v.

16   Bethlehem Landfill, Feleccia v. Lackawanna College and Chand

17   v. Merck & Company which Your Honor decided in 2019.  Your

18   Honor did not reach a different conclusion in deciding the

19   motion to dismiss the Employee Track's complaint.  There the

20   inquiry was focused solely on the sufficiency of the

21   pleadings.  You did not reach a determination on the

22   employees' Dittman argument but, rather, concluded under the

23   Walton analysis that the employee claims related to stolen

24   payment card information were not legally duplicative because

25   it did not involve the case where a plaintiff was trying to

1    file duplicative complaints to circumvent the Federal Rules.

2    Importantly, you did not conclude that the employees somehow

3    have stronger rights under Dittman, a position that Employee

4    Track now urges.  Significantly, this Dittman analysis only

5    applies in the context of the negligence claims under

6    Pennsylvania law and as we discussed at the preliminary

7    approval hearing, liability on negligence was assumed for

8    purposes of mediation and Mr. Parks made clear at the

9    preliminary approval hearing that it would not really have

10   mattered how strongly Mr. Haviland argued this at mediation

11   were he present because Wawa assumed for purposes of mediation

12   that that same duty of care applied to all consumers.

13           THE COURT:  Well, as I see it, the issue that really

14   merits being focused on is the language in the release.

15           MS. HOLBROOK:  Yes.

16           THE COURT:  When it comes down to it, the difference

17   between the Consumer Track Plaintiffs' settlement and what I

18   think would be an authentic understandable concern by the

19   Employee Track Plaintiffs, that is, what's the reach of your

20   settlement?  The latest that we -- we just talked recently

21   about the release language.  As far as I know, the last

22   briefing really gave me a piecemeal kind of a presentation.

23   This third amendment that you all have been working on is

24   really a standalone kind of document that's been presented to

25   the Court.  So at some point I'm going to need the last

1    iteration of your agreement in one document, but why don't you

2    bring me up to speed as to what you all decided finally to do

3    about the release language.

4         MS. HOLBROOK:  Yes, Your Honor, and thank you, that

5    does lead me right to my second point which is that the

6    release here carves out those employee-specific claims that

7    they are free to pursue in the Employment Track.  The intent

8    of the settlement has been all along to preserve

9    employee-specific claims relating to employee personal

10   identifying information, which the Employee Track contends was

11   compromised, for litigation or resolution in the Employee

12   Track.  The Court established three separate tracks to account

13   for the different theories here.  The consumers dealt with

14   solely payment card information, employees allege that they

15   also had employee personal identifying information, and then

16   there was the Financial Institution Track.  The employee

17   claims related to their sole exclusive employee personal

18   identifying information are still free to be litigated.  The

19   intent of the settlement release has always been to solely

20   encompass claims relating to payment card data and the parties

21   have attempted to make that crystal clear to the Court through

22   the various iterations.  As Your Honor mentioned, prior to

23   preliminary approval, we submitted the Amended Settlement

24   Agreement which added the language to expressly carve out

25   employee-specific claims, reserving only payment card

1    information as part of the settlement release.  Just

2    yesterday, we submitted a proposed Final Approval Order again

3    adding to parentheses in the release language to further

4    clarify the intent of what exactly this settlement should

5    cover and I submit to you that that is the final language of

6    the release that the parties have agreed upon.  Wawa and Class

7    Counsel went back and forth to make sure that we had the scope

8    of the release crystal clear to be very transparent in what

9    the settlement does cover and what it doesn't cover.

10            THE COURT:  I have a practical question and this is

11    as a result of just having been around for a while.  After

12    this is done and when the Employee Track Plaintiffs pursue

13    their claims and there becomes an issue as to whether or not

14    their claims have or have not been subsumed in your

15    settlement, who as between you and Wawa are going to be the

16    folks that go to battle with Mr. Haviland?  Who do I have to

17    listen to?  In other words, who do I have to listen to again

18    on this issue and are you, the Consumer Track Plaintiffs'

19    counsel, gone and it's going to be up to Wawa counsel to then

20    fight the good fight on this particular point?

21            MS. HOLBROOK:  Well, Your Honor, I'm hopeful, as I'm

22    sure my colleagues are, too, that there won't be a battle,

23    there won't be an ensuing battle because the release is very

24    clear as what claims are going to remain in the Employee

25    Track.

1                THE COURT:  Okay, humor me.

2                MS. HOLBROOK:  Okay, so if there is an issue, I

3        think that this Court can very clearly look to the language in

4        the release, look to the claims that are presented in the

5        Employee Track, and see which claims have been resolved by the

6        settlement, i.e., the ones involving strictly the payment card

7        data.

8                THE COURT:  And who's going to be arguing that?  I

9        just want to know, are you -- maybe this is really for Ms.

10       Savett because she's talking about the attorneys' fees, et

11       cetera, but assuming there is final approval here and then

12       assuming that there is a continued focus on the scope of your

13       settlement, would I be correct in assuming I'm going to be

14       hearing from Mr. Parks and his colleagues, not you all again?

15               MS. HOLBROOK:  Yes, Your Honor, to the extent there

16       are remaining claims in the Employee Track that are litigated,

17       resolved, et cetera, yes, that would be between Wawa and the

18       Employee Track.

19               THE COURT:  All right, and as I said, maybe that's

20       really for Ms. Savett to answer.  But having been convinced

21       that now you all have written the release in as clear a way as

22       is humanly possible using the English language, I still am

23       going to be asking for one final clean document for the

24       Settlement Agreement.

25               MS. HOLBROOK:  Yes, Your Honor, and to just add a

 1  further point of clarity, Wawa really makes crystal clear in
 2  its Final Approval reply, which I'm sure Mr. Parks will
 3  elaborate on further, but to the extent that Wawa Employees
 4  allege that they suffered unique injuries attributable to
 5  their status as employees rather than as consumers, such
 6  claims are preserved for litigation in the Employee Track.
 7  So, therefore, that signals that Wawa does anticipate that
 8  there are going to be separate employee claims that are
 9  reserved for litigation in that separate track and the
10  resolution of this case, this settlement does not make those
11  claims go away.  The settlement, rather, addresses harm that
12  the employees suffered when they were walking and talking like
13  consumers as we've talked about before in this court.  And
14  significantly, Your Honor, no employees opted out despite the
15  Court's invitation in the Preliminary Approval Order to do so.
16  If they were dissatisfied with the settlement, they were free
17  to opt out and significantly no employees did.
18          So the release, just to sum it up, this release
19  addresses any concerns the employees may have with their right
20  to pursue their unique claims in the Employee Track.
21          And that brings me to my last and final point.  All
22  consumers, including employees acting as consumers, are
23  adequately represented by the settlement.  Taking into
24  consideration the fact that Dittman puts all consumers and
25  employees on equal footing in terms of Wawa's duty and looking

1    at the scope of the release as expressly carving out the
2    employee-specific claims, employees acting as consumers here
3    are adequately represented by the settlement.  Consumer Track
4    Counsel settled the claims of all individuals who used payment
5    cards during the data breach period regardless of their
6    employment status, regardless of whether they were on or off
7    the clock.  If they used the payment card at Wawa during the
8    period of the data breach settlement, Consumer Track
9    Plaintiffs zealously advocated for those Class Members at the
10   mediation table.  And this is not really a case where the
11   analysis in Amchem comes into play.  There, as Your Honor
12   knows, that was a radically different factual scenario.
13   There, there were different Class Members who were exposed to
14   different asbestos-containing products.  They had different --
15   different exposures.  Some were exposed, some weren't,
16   different periods of time, different degrees of harm.  Here,
17   all Class Members suffered the same harm when they used their
18   payment card at Wawa during the data breach period.  This
19   Class has that sufficient unity that the Amchem Class is
20   lacking.  There's no conflict of interest between the
21   plaintiffs and the class that they seek to represent.
22   Employees did not need to be differentiated from consumers for
23   purposes of this settlement.  They are consumers for purposes
24   of this settlement.  And significantly, as we discussed before
25   at the preliminary approval hearing, employees were not

1    required to use a payment card while they were employed at

2    Wawa.  They -- sure, they got a discount, but they could

3    presumably pay in cash, use a gift card, use the Wawa app.

4    There was nothing that required them to use the payment card.

5    There was nothing that required them that they had to shop at

6    Wawa during -- while they were on the clock.  They could go

7    across the street, they could pack a lunch, they could bring

8    something from home.  So recognizing that Wawa owed the same

9    duty to safeguard the payment card data to all consumers,

10   Class Counsel negotiated the best possible settlement they

11   could for all consumers, including employees acting as

12   consumers.

13            And for those reasons, Your Honor, we respectfully

14   request that this Court overrule any remaining objections by

15   the Employee Track and grant Final Approval.

16            THE COURT:  Well, I will be hearing from Mr.

17   Haviland and then you can pop up again.

18            MS. HOLBROOK:  Okay, that sounds great.  Unless the

19   Court has further questions, I will turn my time to Ms.

20   Savett.

21            THE COURT:  That's great.  Okay.

22            MS. HOLBROOK:  Thank you, Your Honor.

23            THE COURT:  Righto.

24            MS. SAVETT:  Thank you, Your Honor.  I'm Sherrie

25   Savett of Berger & Montague, a co-lead counsel for the

1    Consumer Class, and I would like to address our motion for

2    attorneys' fees and expenses first and then Mr.

3    Frank's objections at the end.  I'd like to give a high level

4    overview of the fee request.  Counsel --

5        THE COURT:  High level, you're looking for fees,

6    expenses, and service awards of about 3.2 million, right?

7        MS. SAVETT:  Yes, Your Honor.

8        THE COURT:  That's the big picture.

9        MS. SAVETT:  That is the big picture.

10       THE COURT:  Okay, next.

11       MS. SAVETT:  Okay.  So Wawa has agreed to pay this

12   $3.2 million lump sum of which out of that, $3,040,060 is for

13   attorneys' fees.

14       THE COURT:  And what's the 60 for -- sorry, never

15   mind.

16       MS. SAVETT:  That's what it turns out to be when the

17   expenses and the settlement administration and the service

18   awards are subtracted.

19       THE COURT:  I know.

20       MS. SAVETT:  It's because the expense number is odd.

21   That's how it came out.

22       THE COURT:  Sorry, I was not -- it's always very

23   interesting when we know that these numbers are calculated on

24   the basis of a math problem and then the final number turns

25   out to have something that sticks out like $60.

1          Okay, go ahead.

2          MS. SAVETT:  I was just trying to be very precise --

3          THE COURT:  No, I know.

4          MS. SAVETT:  -- because we had a precise number on

5    the expenses.  So Wawa's paying this amount and the payment

6    will not reduce any settlement benefit of the Class.  The

7    $3.2 million figure was negotiated with the assistance of a

8    highly experienced mediator, Judge Welsh, only after all

9    substantive terms of the settlement were agreed to.  Only one

10   Class Member has objected to the fee request out of a Class of

11   22 million and that is Mr. Frank.  The fee request is

12   reasonable under the lodestar method, the percentage of the

13   benefit crosscheck, and the Third Circuit's Gunter and

14   Prudential factors.  Each of these considerations is discussed

15   at length in the fee brief.  I'm just going to hit high points

16   here.

17         THE COURT:  Okay.

18         MS. SAVETT:  First, the fee is reasonable under the

19   lodestar method.  The Court should employ the lodestar method

20   here.  This is the preferred method whereas here the

21   settlement does not involve a traditional common fund.  This

22   settlement is not a typical common fund.  It is a claims made

23   settlement with injunctive relief.  This method is normally

24   used in data-breach breach cases and, in fact, this Court used

25   the lodestar method as the primary method of evaluating the

1   fees in the Fulton-Green versus Accolade data breach case.

2   Class Counsel's total lodestar is $4,188,295 through the end

3   of last year.  That was submitted to chambers in the final

4   quarterly report which was submitted on January 15, 2022.

5   Class Counsel spent 6,418 hours on this case through 12-31-21.

6   These hours were spent on tasks necessary to the litigation

7   and settlement.  A very detailed account of our tasks is set

8   forth in the fee brief at pages 8 to 9, but I do want to point

9   out some of the main examples of what we did.  First, we

10  drafted and filed 25 pre-consolidation Complaints with 50

11  Collective Plaintiffs.  We filed briefs seeking consolidation

12  and leadership appointments.  We performed much legal research

13  around the issues of standing, damages, causation, class

14  certification, legal counts in each state where Wawa did

15  business, that was nine different states and the District of

16  Columbia, and other issues.  We corresponded with over 1,000

17  Class Members who contacted us about the case prior to

18  settlement.  We vetted dozens of potential Class

19  Representatives for inclusion in the consolidated Complaint.

20  To do so, we conducted lengthy phone interviews on at least

21  each occasion with each of the named plaintiffs.  We also

22  worked closely with them to gather their documents.  We

23  drafted a 97-page 13-count Complaint with plaintiffs from all

24  the states in which Wawa operates.  We retained a data

25  security expert.  We retained a private investigator.  We

1    negotiated a protective order and ESI protocol with Wawa and

2    counsel in the other track.

3          THE COURT:  Excuse me for interrupting.  In the

4    expenses, in the litigation expenses, and your reference to

5    the experts reminded me of this question, what are the

6    professional services that are listed in your Joint

7    Declaration?  Are they separate from the expert fees and the

8    mediation expenses?

9          MS. SAVETT:  The bulk of the expenses were for the

10   experts who advised us on this data breach, data breach

11   standards.  What really happened here, they were able to

12   analyze it in a much more technical level.

13         THE COURT:  I didn't ask that.  I know what experts

14   typically do.  I'm simply trying to understand the line items

15   and what they cover.  There's a reference in your joint

16   declaration which is for those of you who have big notebooks

17   here, it's Document Number 259, and the reference is to

18   professional services.  I'm just asking is that something

19   other than the experts and mediation fees?

20         MS. SAVETT:  I think we also hired an investigator

21   who -- to dig into a lot of the facts such as what was going

22   on in the dark web.  So I guess that could also be considered

23   an expert.

24         THE COURT:  If you don't know, you can say it.  It's

25   okay to say you don't know.  I mean --

1            MS. SAVETT:  I just know what we did include and it

2       was -- I don't know if there was anything other than the

3       private investigator and we actually consulted with two data

4       breach experts and they had slightly different expertise.  I

5       don't think it was anything else.

6            THE COURT:  Okay, and is there a declaration, a

7       separate declaration for your firm's assignment fees?

8            MS. SAVETT:  Yes, Your Honor, it's part of the

9       record.

10           THE COURT:  All right.

11           MS. SAVETT:  Each of the lead counsel took their own

12      individual declaration of their firm's efforts.

13           THE COURT:  Yes, I'm really focused on the question

14      of knowing what's under the heading of the professional

15      services and whether this was somebody your firm hired or

16      somebody else, one of the other counsel.

17           MS. SAVETT:  I believe that in the end, we jointly

18      worked with others and we as a group hired two different

19      experts to advise us on the technical aspects of data breach

20      and this data breach and a private investigator.  I don't

21      think there were any others.

22           THE COURT:  Okay.  As I understand it, this is still

23      on the question of the expenses, you still, understandably so,

24      I'm not being critical here, but the ultimate fee owed to KCC

25      is not yet known obviously?

 1              MS. SAVETT:  Not precisely, but we had a range.

 2              THE COURT:  I know.  You're using an expectation of

 3    your fee for them or their fee is going to be about $100,000?

 4              MS. SAVETT:  Yes, Your Honor, and if it's more, it

 5    will come out of our fee.

 6              THE COURT:  Okay.

 7              MS. SAVETT:  We will pay it to them out of the

 8    portion that was allocated --

 9              THE COURT:  So counsel will be absorbing any

10    overage?

11              MS. SAVETT:  Yes.

12              THE COURT:  Okay.  Go ahead, sorry.

13              MS. SAVETT:  So getting back to the various tasks

14    that we performed, we did engage in informal discovery.  We

15    issued document requests to Wawa.  They produced 3,596 pages

16    of documents in several waves which we reviewed all prior to

17    the mediation.  We wanted to be fully informed at the

18    mediation and we had to produce from the named plaintiffs'

19    documentation, it was 212 pages of documents that we produced

20    from our named plaintiffs to the defendant.  We prepared

21    Rule 26 initial disclosures.  We engaged in mediation efforts

22    which included preparing a 20-page single-spaced mediation

23    statement, developing counterpoints to the defendant's

24    mediation statement, and we participated in a 12-hour

25    mediation with Judge Welsh.  And then we undertook the post

1  mediation steps of drafting settlement agreements and

2  exhibits, drafting three amendments, subsequent amendments to

3  the settlement agreement, drafting preliminary approval

4  briefing, implementing the notice plan, and overseeing the

5  notice and claims process.

6        THE COURT:  And I imagine that all of this can be

7  divined from your declaration concerning your records, right?

8  I'm going to need you to give me another copy of your

9  declaration because it may not have made it through in the

10  piles of materials we got.

11        MS. SAVETT:  And when you say -- do you mean my

12  firm's declaration or all the declarations?

13        THE COURT:  Yes -- no.  No, yours, Berger

14  Montague's.

15        MS. SAVETT:  We'll gladly do that.  I do believe

16  it's on the record, but I'm happy to submit -- do you want me

17  to submit it just to you in chambers?  We'll point to you

18  where it is on the docket and we'll submit it to you.

19        THE COURT:  You can do that and then if we can't

20  find it, Ms. Savett -- not that you really would want to, but

21  you'd have to see what it's like to deal with the docket in

22  cases like this.

23        MS. SAVETT:  I can only imagine.

24        THE COURT:  No, it will keep you awake at night if

25  you really wanted to imagine that.

1                    MS. SAVETT:  I want to make the point, though --

2                    THE COURT:  Get me another copy.

3                    MS. SAVETT:  -- that we combined the expenses

4        together so on my firm's personal declaration, it may be that

5        we paid a portion of some of those experts.

6                    THE COURT:  I know, but you were just now going

7        through the work, the professional terms --

8                    MS. SAVETT:  Um-hum.

9                    THE COURT:  -- that you and your colleagues at the

10       firm performed.  It reminded me that we have not easily found

11       your firm's declaration and merely I'm not questioning it, I'm

12       just asking for another copy.

13                   MS. SAVETT:  Gladly.

14                   THE COURT:  Great.

15                   MS. SAVETT:  No problem.  We weren't aware that it

16       somehow --

17                   THE COURT:  No, I understand.  That's why I'm

18       asking.

19                   MS. SAVETT:  -- wasn't available so we'll get that

20       to you.

21                   THE COURT:  Can I turn, focus your attention on

22       answering the question, why did you all feel that you had to

23       have 14 Class Reps?

24                   MS. SAVETT:  Well, first of all, we wanted one or

25       two from every state where Wawa did business and I believe it

1    was nine states and maybe -- I forget if it was nine plus the

2    District of Columbia or including the District of Columbia

3    because they did have different standards and different

4    statutes sometimes and if we had to fully litigate it or if we

5    had to litigate subclasses, we felt we needed a representative

6    from each state where Wawa did business, and then for the sake

7    of insurance, if we had two good representatives from the

8    state, we thought, well, if one of them was imperfect or

9    failed in their deposition or couldn't show up, it was better

10    to have two.  So that was the thinking of the plaintiffs'

11    counsel because if this case really went all the way, they

12    would have each had to be deposed and shown that they had

13    standing and we also tried to get --

14            THE COURT:  Standing is a very, very interesting

15    issue in these cases, probably the most intellectually

16    stimulating in these data breach cases, and we're not going to

17    really have a little tutorial on that, but it just seems to me

18    that those of you who practice in this area can never stop

19    thinking about standing as an issue because if the cases do

20    actually go into full dispute mode, standing at some point in

21    the case is actually, from a judge's standpoint you all should

22    know, very interesting.

23            MS. SAVETT:  Well, Your Honor --

24            THE COURT:  And a very big snag, actually.

25            MS. SAVETT:  -- it certainly is and you're making

1    one of our main points which was that there was a really big

2    risk in this case.  There was a very low incidence of fraud.

3    So what constitutes standing is constantly being revisited in

4    these data breach cases all over the country and so the reason

5    we had to vet all these plaintiffs and pick them very

6    carefully is that we wanted to find people that had at least

7    some kind of a concrete harm.  They had to go to a lot of

8    trouble to get a new credit card.  They had to go to the bank

9    and get it.  They had to park.  They had a credit freeze they

10    had to undo.  Are the hours that somebody spends mitigating,

11    is that enough to give standing?  All these are questions that

12    are not fully resolved in these cases that might have had to

13    be litigated if we didn't settle.  And also there was a huge

14    causation risk in this case.  Our opponents, Wawa, said that

15    the rate of fraud here was so low that it was a normal rate of

16    fraud that you could find in any large institution where

17    people used credit cards to pay and it would be very hard to

18    link it to this data breach.  That would have been a very big

19    substantive issue and debate had this case been fully

20    litigated.  And as Ms. Holbrook said, we represented our

21    position as vigorously as we could for all the consumers in

22    the mediation and we got the best settlement that we could get

23    knowing that there were a lot of risks, the risk of Class

24    Certification is very great in these cases as has been

25    indicated.  I think there's only two cases in the country

1    right now that went all the way on Class Certification and it

2    was granted.  There's many more where it wasn't granted.  So

3    these were some of the risks that we encountered, but I don't

4    want to get back into the settlement territory, but it is

5    actually relevant to the fees because that's why we spent so

6    much time vetting all these plaintiffs.  We wanted to make

7    sure that we had people with standing that could stand up to a

8    deposition and I don't think 14 was so many to have.

9              THE COURT:  I'm just asking what --

10             MS. SAVETT:  That was our strategy and our thinking.

11             THE COURT:  And you have answered it.  I don't have

12   any other questions for you on the fees and expenses issue.

13   Perhaps after I hear from either Mr. Haviland or on behalf of

14   Mr. Frank, there will be something more for you to say, but,

15   at this point, I don't have any other questions for you.

16             MS. SAVETT:  Okay.  So just to go forward on what we

17   did and why the fee is fair and reasonable under the

18   circumstances and our hours are, we made enhancements to the

19   Settlement Agreement and notice plan as time went along.  Like

20   when we finally signed the Settlement Agreement, our work

21   didn't end at all.  And one of the big enhancements was

22   sending an e-mail to the 575,000 Wawa app holders notifying

23   them that they would automatically receive the $5 gift card.

24   We also supplemented the notice plan.  We were very much on

25   the alert trying to get the largest response to the settlement

 1    possible, the most people to enjoy the benefits of the

 2    settlement.  So we kept the -- we advocated with Wawa that

 3    even though originally the store signs were only supposed to

 4    be up for four weeks, they kept them up for seven weeks.  We

 5    had the video message in the pumps.  We issued a second press

 6    release reminding Class Members about the settlement.  We

 7    increased the prominence of the settlement announcement on

 8    Wawa's home page and we also negotiated with Wawa to forego

 9    the one-year expiration date on the gift cards.  We were very,

10    very lenient and waived the right to audit the Tier One and

11    Tier Two claims.  The Tier Three claims are still being

12    audited and processed, but out of I think 921 claims, I think

13    185 have already been approved and the others are in process

14    as has already been discussed.  Throughout the case, we also

15    drafted many briefs, mostly regarding issues raised by the

16    Employment Track Plaintiffs, and we prepared for and argued at

17    six court hearings:  The initial status conference, the

18    hearing on the leadership application, the hearing on

19    defendant's motion to stay or dismiss the Employee Track case,

20    the hearing on preliminary approval of the settlement, the

21    motion to quash the employee plaintiffs' subpoena to KCC, and

22    today's hearing on Final Approval.  In performing these

23    collective tasks, we took steps to make sure that the work was

24    done efficiently and avoid duplication and you can see how

25    we're assigning the different positions.  We tried to make it

1   as efficient as we possibly could and we had a monthly billing

2   protocol in which all plaintiffs' counsel, including lead

3   counsel, submitted monthly time and expense reports.  We

4   scrutinized them to ensure that the time was reasonable, not

5   excessive, and consistent with the assignments from co-lead

6   counsel.  We didn't have all the other 20 firms going off

7   willy-nilly and doing things.  They did not.  Only specific

8   assignments they were given.  In exercising billing judgment

9   and conservatism, we reduced each co-lead's counsel time by

10  25 percent and for all the other counsel we reduced their time

11  by 30 percent.  So the hours that we submitted are with those

12  reductions.  As a reflection of the reasonableness of the

13  hours we incurred, our 6,400 hours were lower than hours

14  incurred in several similar payment card breach cases that

15  settled in relatively early stages of the litigation.

16          THE COURT:  Was there any change in the hourly rates

17  that you've applied over the life of the case?

18          MS. SAVETT:  We used historical rates.  In other

19  words, if there was a change, we took all the rates during the

20  period.  We didn't just use current rates.

21          THE COURT:  The answer is yes.

22          MS. SAVETT:  We did not just take the last rate.

23          THE COURT:  No, I understand that.

24          MS. SAVETT:  The case wasn't so long lived, you

25  know, it just was from 2019, '20 and now, but we just used

1   historical --

2            THE COURT:  Of those three years, were there firm,

3   as in the law firm, rate changes?  That's obviously a simple

4   question.

5            MS. SAVETT:  We took the rates as they were at the

6   time.  So there were some changes --

7            THE COURT:  The answer would be yes?

8            MS. SAVETT:  I think in my firm there were changes.

9   I know that.

10           THE COURT:  That's all I'm asking.

11           MS. SAVETT:  But we used historical rates.

12           THE COURT:  Whatever the rates were at the time --

13           MS. SAVETT:  They did the work.

14           THE COURT:  -- they expended, that is the rate that

15   applied as to that hour.

16           MS. SAVETT:  Exactly, Your Honor, that was the way

17   it was done.

18           THE COURT:  Okay.

19           MS. SAVETT:  So just to compare the 6,400 hours that

20   we reported and that was with the deductions, in Target, which

21   all these three cases were decided -- were settled in early

22   stages of the litigation like ours, so Target, they had 20,000

23   hours, in Home Depot, they had 10,000 hours, and in TJX, 7,400

24   hours.  So our hours were lower.  And Home Depot and TJX were

25   settled before the motion to dismiss was decided and Target

1    was settled right after the motion to dismiss was decided

2    three months later.  So they were --

3            THE COURT:  Was that before or after the Eighth

4    Circuit reversed on totally different issues?  Do you know the

5    timing of that, before or after the reversal?

6            MS. SAVETT:  I -- I don't.

7            THE COURT:  Okay.  I was just wondering.

8            MS. SAVETT:  Class Counsel's hourly rates are

9    reasonable.  Our collective rates for attorneys ranged from

10   $275 to $1,005 per hour.  These are consistent with rates that

11   this Court accepted in several prior Class Actions, including

12   Accolade, Imprelis, and Processed Eggs Antitrust, and some of

13   the same lawyers were in those cases that are the lead counsel

14   here.  Many other courts in this district have approved rates,

15   hourly rates, similar to ours and we cite those cases in our

16   fee brief at pages 12 to 13.  Our blended hourly rate is $652.

17   Many courts within the Third Circuit have approved higher

18   blended rates.  We cite those cases in our Final Approval

19   brief at page 40, footnote 20.  Our fee request results in a

20   negative multiplier of .74.  This multiplier is much lower

21   than those commonly awarded within the Third Circuit.  The

22   mean multiplier in the Third Circuit is 1.4 to 2.

23           THE COURT:  Well, that assumes that every case can

24   be compared to itself.  I'm a huge fan of treating every case

25   as a tailor-made piece of litigation.  I'm not into

1    commodities.

2              MS. SAVETT:  I agree.

3              THE COURT:  I understand what you're saying, Ms.

4    Savett.

5              MS. SAVETT:  I'm just giving you certain measures.

6              THE COURT:  I get it.  Listen, I have no more

7    questions for you.

8              MS. SAVETT:  The fee is also reasonable -- oh, let

9    me just make this point about the negative multiplier.  Of

10   course, it would be even lower if we included the time that we

11   didn't deduct and our time is not over because we still have

12   obligations even if the settlement is approved today and the

13   fees to oversee the distribution process and monitor the

14   injunctive relief for two years.  The fee is also reasonable

15   under the percentage of the benefit crosscheck.  The fee

16   request, and I'm now deducting the other expenses, so it's the

17   3,040,000 represents 24.9 percent of the $12.2 million

18   settlement value without considering the valuable injunctive

19   relief obtained.  The 12.2 million settlement value consists

20   of the 9 million in gift cards and cash offered to the Class

21   plus the 3.2 million lump sum payment for attorneys' fees and

22   expenses.  The two components of the crosscheck that I'd like

23   to address are attorneys' fees paid directly by the defendant

24   should be included in the settlement value.  Many courts hold

25   this, including in Pennsylvania, and we cite those cases in

1  our fee brief between pages 16 and 18.  The objector, Mr.

2  Frank, concedes that attorneys' fees should be included and be

3  added to the settlement value for this calculation.  So he

4  doesn't dispute that point.  The rationale is that attorneys'

5  fees are part of the constructive common fund achieved for the

6  benefit of the Class.

7         Second, the settlement value should be measured by

8  the benefits offered to the Class regardless of the claims

9  rate.  Many courts hold this, including the Supreme Court,

10  Third Circuit, Pennsylvania, and other appellate courts, and

11  we have a large amount of authorities to support this point,

12  11 cases cited at pages 19 to 22.

13         Judge Shapiro in the Fickinger case explained why

14  this makes sense.  She said, "It is immaterial to an award of

15  attorneys' fees whether beneficiaries claim or accept the

16  benefits obtained on their behalf.  The benefit to the

17  Plaintiff Class in this litigation must be determined from the

18  amount that would have been recovered if every Class Member

19  had exercised their rights under the Settlement Agreement.

20  Counsel should not be penalized because members of the Class

21  failed to exercise their vested right to collect from the

22  fund."  And notably this Court employed a similar concept in

23  Accolade where it evaluated the fee request based on the, and

24  I'm quoting, "potential cash compensation" to the Class if all

25  Class Members were to submit claims in the claims made

1  settlement.

2          THE COURT:  That's why it's all related to the

3  notice, by the way.

4          MS. SAVETT:  Sure.

5          THE COURT:  Ms. Savett, truly, I don't have any

6  other questions for you on this point.

7          MS. SAVETT:  Okay.  So --

8          THE COURT:  Or any other point relating to the fee

9  position.

10         MS. SAVETT:  Oh, you do not?

11         THE COURT:  Right.  That's what I've been saying.

12         MS. SAVETT:  Okay, I thought you just meant on that

13  particular aspect.  So --

14         THE COURT:  I'll tell you what, how about --

15         MS. SAVETT:  I was going to --

16         THE COURT:  Same deal I offered for your colleagues.

17  After I hear from Mr. Haviland or on behalf of the objector,

18  if there is some focused issue about the fee application or

19  the expenses, then we'll have a more targeted conversation.

20         MS. SAVETT:  Okay, so I'm going to directly address

21  the objections of Mr. Frank.  Do you want me to do it now or

22  after he finishes?

23         THE COURT:  Well, it depends upon whether you're

24  going to ask to speak again.

25         MS. SAVETT:  Well, I might ask for a rebuttal.

1          THE COURT:  Well, why don't we wait and hear what he

2   has to say.

3          MS. SAVETT:  Thank you, Your Honor.

4          THE COURT:  That will be great.  Again, I'm

5   husbanding the time that we've got for this morning, okay?

6          MS. SAVETT:  Thank you.

7          THE COURT:  Righto.  Well, thank you very much.

8          THE COURT:  Mr. Parks, anything you want to add?

9          MR. PARKS:  Yes, Your Honor, if I may?

10          THE COURT:  Sure.

11          MR. PARKS:  Your Honor, Wawa agrees that this

12   settlement is fair, reasonable and adequate, it meets the

13   requirements of Rule 23 and ought to be approved.

14          I want to make four kind of separate points, many of

15   which go to some of the questions Your Honor asked earlier.

16          First is, this settlement is fair and reasonable to

17   employees because the harm that they are releasing is the

18   theft of payment card information and that is crystal clear

19   from the release that we resubmitted to the Court yesterday in

20   Docket Number 294 where we submitted a new proposed Final

21   Order that has the revised release in it with the

22   parenthetical that Your Honor requested.

23          THE COURT:  I'm just a fan of parentheticals.

24          MR. PARKS:  It works, Your Honor.  I hear Your Honor

25   saying you'd like a new Settlement Agreement, what would be a

1    Fourth Amended Settlement Agreement that has everything in it

2    and I think the parties can work together to do that, but I

3    think as it exists, it very clearly says, Plaintiffs and the

4    Class are releasing only information, only theft of credit

5    card information, and then beyond that, it has a separate

6    carve-out that says if there are employees, former employees

7    or dependents of those people who claim that their employment

8    information, like social security numbers, bank account

9    information for direct deposit, if they claim that was stolen,

10   that's not released and so --

11            THE COURT:  And that was on the instructions of

12   these signs that were posted?

13            MR. PARKS:  It was part of the -- on the sign, if

14   someone had clicked on the link on the sign or used the QR

15   code, they would have gotten to the Settlement Administrator's

16   website which would have had that information in it.

17            THE COURT:  Well, maybe I should ask the question

18   differently.  Did all Wawa employees, not just those that were

19   working on site like the checkout counter or whatever, did

20   they all get the instructions pursuant to what was posted on

21   the notice sign?

22            MR. PARKS:  Anybody who went into a Wawa store,

23   including Wawa employees, saw those signs --

24            THE COURT:  Okay.  All right.

25            MR. PARKS:  -- but there was no separate additional

1    notice to employees and Your Honor addressed that at

2    preliminary approval and said there would be no need to send

3    direct mail to former employees.  Current employees obviously

4    go in the store, they see it, they know it.  Current employees

5    at headquarters, very aware that this is all going on.  It's

6    the former employees who maybe didn't, and as to that point,

7    we submitted we don't have e-mail addresses for former

8    employees and so the question came up at preliminary approval,

9    we might have mailing addresses, some of them might be old for

10   former employees, but do we need to do that and Your Honor

11   very clearly held at preliminary approval that, no, mailing

12   first class notices to all former and current employees

13   appears to be overinclusive because there is no data on the

14   number of employees who used the payment card at Wawa.  That,

15   you know, it could be there were former employees who never

16   used the payment card at Wawa during this period of time, they

17   used cash or they did something else, and so you cited the

18   Carlough opinion as saying there's no need to send to an

19   overinclusive group of people just because some small number

20   of those people might be Class Members and there's no reason

21   to revisit that decision now.

22          THE COURT:  If somebody used the Wawa mobile app, do

23   they automatically get the $5 gift card?

24          MR. PARKS:  If they -- yes, if they had signed up

25   for the Wawa mobile app before this data incident was

1    uncovered and contained, then, yes, they would automatically

2    get an e-mail and they would automatically be getting a $5

3    gift card.

4         THE COURT:  So it's not just that they are

5    automatically eligible, they automatically get it.

6         MR. PARKS:  They automatically get it, that's right.

7    No claim required.  That was part of the Second Amended

8    Settlement Agreement.

9         So with that construct, we think it is fair to

10   employees because the only thing we're asking them to release

11   is payment card information and what could have happened to

12   them is what could have happened to any consumer who used the

13   payment card at Wawa and that's one of four things.

14        One, they could have heard about this data incident

15   and said, Hmm, I'd better check my credit card statement.

16   Checked their credit card statement, no problem, they spent a

17   couple of extra minutes doing that.  For their troubles, they

18   get a $5 gift card.

19        Two, there's a possibility they actually found a

20   fraudulent charge.  They look at that and go, Hmm, I wasn't in

21   Bangladesh yesterday, that charge isn't me.  They called their

22   bank, they said, Not me, the bank says, Sorry about that,

23   we'll take that off your charge.  They probably had to spend

24   ten minutes on hold in order to be able to have that

25   conversation.  For that ten minutes, they get $15, pretty good

1    deal.

2            The third possibility is that they actually

3    experienced the fraudulent charge and they were asleep at the

4    switch.  The charge showed up on their credit card statement,

5    the $123 charge from Bangladesh, they didn't notice it, they

6    didn't see it.  Three months later, they see it, they call the

7    credit card company and say, Hey, I just saw this thing and

8    the credit card company, which not all of them would say this,

9    but some of them would have the right to say at that point,

10   Tough luck, you're on the hook for $123.  If that was the

11   case, that person falls into our Tier Three.  They could apply

12   and get the $123 in cash.

13           Or the fourth thing, and this is actually the vast

14   majority of the Class and this is the thing that I think is

15   key to understanding the settlement, is that for the vast

16   majority of this Class, nothing happened.  We know that fraud

17   rates were low.  They were below the standard 1 to 3 percent

18   fraud rate that exists on all cards.  That means of the 22

19   million people, 21.6 or maybe as few as 21.2 million didn't

20   experience fraud and --

21           THE COURT:  Do you think that might be -- this is

22   more sort of a systemic question.  Do you think that the low

23   rate of fraud is a direct result of the type of breach that

24   occurred?

25           MR. PARKS:  Yes.

1          THE COURT:  How else could you explain it I suppose?

2          MR. PARKS:  Yeah, and because before the credit card

3    companies and the security that increased -- we now all have

4    chips on our cards and everything else.  Back in Target and

5    Home Depot days, the bad guys could steal a bunch of credit

6    cards and sell them for a lot of money.  These days, that

7    can't happen any more and, in fact, what we saw with this

8    incident interestingly enough is the bad guys went out and

9    they put 25,000 cards on sale in the dark market and they

10   didn't sell them and then they put another 25,000, they didn't

11   sell out of all of those, they put another 25,000 and they

12   didn't sell out of those and they stopped.  So only 75,000

13   ever went out and interestingly enough, this threat group,

14   which is a financially-motivated threat group, not one like

15   Your Honor was talking about that's out there trying to engage

16   in espionage, they stopped.  Like this group has not attacked

17   another retailer post Wawa because it's just not financially

18   suitable for them to steal credit cards anymore.  Instead,

19   they're now doing the other thing you heard Wawa talk about --

20   or Your Honor talked about which is ransom attacks and so

21   that's what those of us who have worked in this field have

22   been doing for the last two years is dealing with ransom

23   attacks.

24          THE COURT:  Yes, which what astonishes me is the

25   rate of paying the ransom.  It's almost breathtaking.

1          MR. PARKS:  It is although --

2          THE COURT:  I know there are some possibilities that

3     Congress could be enticed to actually make it a violation of

4     law to pay the ransom.

5          MR. PARKS:  That's correct, Your Honor.  That's

6     being discussed.

7          THE COURT:  Right.

8          MR. PARKS:  And it's a tough thing when you're a

9     company, though, and the bad guys have your information.

10          THE COURT:  Yes, tell it to Congress.

11          MR. PARKS:  Right.  Understood.  I'll address that

12     to the other branch of Government as I frequently do.

13          THE COURT:  It's just an interesting phenomenon.

14          MR. PARKS:  Totally.  The ransomware incidents are

15     fascinating, but given that low rate of fraud, this is a fair

16     settlement and I think it also explains and, in fact, kind of

17     puts a different lens on the relatively low claims rate, that

18     that makes sense given the fact that only 200,000 to maybe

19     600,000 people really had any kind of claim here.  The vast

20     majority, the other 21.6 million are like my neighbor Judy who

21     goes to Wawa all the time, uses her credit card there, loves

22     Wawa ice tea.  She knew nothing about this until she saw a

23     sign and I was talking to her last week and I told her I have

24     to go to court physically in person, and she said why, and I

25     said for this, and she says, Oh, yeah, I saw those signs, but

1  I never heard anything about it before that.  I think that's

2  probably the vast majority of the Class Members, who nothing

3  happened to them, nothing bad, they don't have a claim, they

4  don't have standing to really assert a harm, and so that was

5  the challenge to us as counsel to come up with a settlement.

6           THE COURT:  That depends upon how one

7  philosophically addresses the question of one's privacy.

8           MR. PARKS:  Correct, although I think the vast

9  majority of the case law these days, you know, post the Spokeo

10 decision says there has to be some concrete tangible harm.

11 The mere fact that my information is out there --

12          THE COURT:  So why settle?  Why not fight the fight,

13 fight the good fight?

14          MR. PARKS:  Because there were some people who did

15 suffer some harm and Wawa didn't want to fight with its

16 customers.  Wawa didn't want to go through a long litigation

17 with the people that it loves and that love Wawa and so Wawa

18 decided and it was the Chairman of the Board, one of the

19 owners of Wawa, who very clearly said we're not going to fight

20 with our customers on this.  We're going to settle.

21          THE COURT:  You can now buy a copy of your

22 transcript.

23          MR. PARKS:  I will send that to Dick Wood.

24          THE COURT:  Good news for Ms. Feldman.

25          MR. PARKS:  He'll love that.  But I think that does

1    point out, as Your Honor said, these cases are really all

2    about harm and Dittman and the thing that the Employee Class

3    and Mr. Haviland wants to push here is because we had Dittman,

4    we had a stronger claim to duty, but these cases aren't about

5    duty and they've never resolved about duty and as a defense

6    lawyer who defends them, I would never defend it on the basis

7    of saying Wawa didn't have a duty to protect consumer

8    information or credit card information.  I would defend it on

9    the fact that there was no causation of harm and there

10    actually was no harm.  And as to those issues, the consumer

11    issues and the employee issues are exactly the same.

12           To answer Your Honor's question about who is it that

13    has to fight about the scope of this --

14           THE COURT:  Right.

15           MR. PARKS:  -- employee release, I think that

16    probably is me and Mr. Haviland.  I do think that if I got a

17    little too aggressive, the Plaintiffs' Class Counsel here

18    would probably take a position on that because they do have a

19    fiduciary duty to the Class and so I think they, if I got

20    wild, they would probably be there to check me, but I'm not

21    going to do that and I also think that Mr. Haviland and I have

22    a pretty good understanding of what's within the scope of the

23    release and not.  He and I have talked frequently about when

24    the hackers got into this system, did they go left or did they

25    go right, did they go straight for the payment card

1    information, straight for the point of sale systems so that

2    they could steal credit card information, or did they turn

3    left?  And the analogy I sometimes use is a bank.  The bad

4    guys got into the bank, they broke into the front door, they

5    have a limited period of time before the alarm goes off.

6    These particular bad guys, they want to go straight for the

7    payment card information so we might say they go for the

8    drawers in the bank tellers' drawers, they go for the cash

9    there, they don't go for the vault, the vault being the

10   employee information.  Mr. Haviland disagrees.  Mr. Haviland

11   believes that the bad guys got social security numbers and

12   other information about Wawa employees and he and I are going

13   to live to fight another day on that, and as Your Honor

14   suggested at preliminary approval, they will go on their merry

15   way and we will still have to litigate whether Wawa employee

16   information, purely employee information, was captured here

17   and we'll do that.

18          The third point I want to make about the claims made

19   process here and the potentially low class or participation

20   rate is that some form of that was going to be required if the

21   plaintiffs succeeded beyond their wildest dreams, that even if

22   they got class certification and they went to trial and Ms.

23   Savett and her colleagues cleaned our clocks and proved that

24   Wawa was liable for this breach, that Wawa caused harm and

25   just completely won everything, okay, great, they've now

1    proven some amount of money is due, but there would still need

2    to be a claims made process because we have no idea who those

3    people are without having the claims made process and without

4    people coming forward.  So that part of this process would

5    have to happen and would have probably the same result

6    regardless of whether there was a settlement or not in the

7    best case scenario that could work out for the plaintiffs.

8              And my fourth and final point is about notice.  We

9    already talked about notice to employees and how that was

10   covered.  I just wanted to add that in preliminary approval,

11   Your Honor approved notice not in a preliminary sort of way,

12   but in a final way.  There were some things on preliminary

13   approval Your Honor said, Look, I'll deal with that at final

14   approval like, you know, this issue about the scope of

15   release, you said later for that, but because notice was going

16   out then, it was very appropriate for Your Honor to say notice

17   was either good or bad.  You said notice was good and you said

18   that based on us coming to you and saying, Hey, people in the

19   store, there will be about 64 million people that will see the

20   sign in the store and about 99 million people will see the

21   press release based on the previous press releases.  When we

22   put it in our reply brief, we showed that we actually vastly

23   outperformed that.  It actually ended up being 130 million

24   people saw it in the store and 136 million people saw the

25   coverage of the settlement itself after Wawa released that

1    press release.  So close to 300 million people altogether got

2    some form of notice from those things.  So I think as the

3    Court looks at it and says, all right, I approve notice based

4    on that, how did it do?  In fact, it vastly exceeded our

5    expectations so that's reason why the Court should look at

6    that and say notice was good, nice job, parties, and that

7    meets the best practicable standard.

8            Those are all the points I had.  I'd like to reserve

9    time to address anything as the others did, if I may, but I'm

10   happy to answer any questions Your Honor has.

11           THE COURT:  Sure.  No, you answered the question I

12   had for you.

13           MR. PARKS:  Yes, Your Honor.

14           THE COURT:  Thank you.

15           MR. PARKS:  Thank you.

16           THE COURT:  Mr. Haviland, you're up.

17           MR. HAVILAND:  Good morning, Your Honor.  I'm going

18   to take this off --

19           THE COURT:  Sure.  No problem.

20           MR. HAVILAND:  -- and not exercise my Villanova

21   lineage there, but may it please the Court, Don Haviland from

22   Haviland Hughes, Interim Class Counsel for the Employee Track

23   Plaintiffs.  I do want to reorient the analogy that Mr. Parks

24   used because I liked it.  The bank is the corporate

25   headquarters of Wawa.  What will come about and what has been

1    I think conceded, but not fully so because we're still

2    discovering it, is that the bad guys went into the bank.  Now,

3    the issue before the Court is they went out to the ATM machine

4    and they started pirating the credit card information.  We

5    don't have the final solution what happened.  They were in the

6    bank a long time, a really long time.  In fact, Wawa admitted

7    that they went into the bank in 2019 of March, but they

8    actually went in in 2018, and so that's a significant issue

9    which -- and now I'm going to get to the May 15 discussion we

10   had and I reread it, Your Honor, because I thought your

11   colloquy with both Consumer Track counsel and Wawa about the

12   dual capacity of employees and we cited to you, you asked

13   Class Counsel, Well, why do you care, why does it matter?  Why

14   don't you let them go on their merry way?  It's a known

15   quantity, 50,000-plus people, 34 active, 11 inactive.  Why do

16   you care so much?  And I keep asking myself that question,

17   too, because we are in active litigation and I find it

18   interesting that the CEO wants to fight with its employees

19   because there's plenty of money left over from what hasn't

20   been disseminated by the 30-plus thousand or I guess it's

21   100,000 claims made.  I will point out that I found it

22   interesting that after much discussion and debate about our

23   suggestion that there were other utilities like the app, that

24   the parties agreed to use the app.  The problem with the app,

25   Judge, it wasn't compromised.  The app was a secure

1    environment and now the parties are pushing 2.9 million out to

2    nonclass members, but I'm not here to critique their deal.

3    I'm not here to talk about attorneys' fees.  I have respect

4    for the lawyers for the plaintiffs as I do for Mr. Parks and

5    his colleagues.  That's not the issue, Judge.  It's the --

6             THE COURT:  Well, what -- I mean not to short

7    circuit the discussion --

8             MR. HAVILAND:  Absolutely.

9             THE COURT:  -- but what is your issue with the

10   settlement?

11            MR. HAVILAND:  Well, it's really two headline

12   issues, Your Honor.

13            THE COURT:  Why do you have "standing" to try and

14   throw up a yellow light on the settlement?

15            MR. HAVILAND:  Well --

16            THE COURT:  Now, in what ways, to get down to it, in

17   what ways does the current release as edited, in what way is

18   that language not sufficient to address your client's

19   concerns?

20            MR. HAVILAND:  So the current iteration as I

21   understand it, I know it's still in process, creates a

22   sweeping release and a carve-out and it's the devil of the

23   details.  The carve-out is what Wawa has been speaking to

24   about the Employee Track claims since the beginning.  Social

25   security numbers, specific items of PII.  If we were crafting

1    it, we would say that it would be narrowed to the consumer

2    payment card claims only and the fulsome nature of employee

3    claims which include payment cards and Your Honor, in your

4    decision on the motion to dismiss, made clear that as to the

5    payment card claims, I'm allowing them to go forward because

6    the McGlades are somewhere between Tier Two, maybe Tier Three

7    in terms of their experience, but clearly alleged that there

8    was a compromise temporally, it happened in September during

9    the window, and that they suffered from identity theft, not

10   just the effects of the data breach where the card was

11   utilized, and that's the reason why they brought the case.

12   And they were found to have standing, they alleged harm.

13          Now, why we have standing to object and I remember

14   telling Your Honor that I was fortunate to work with the late

15   Herb Newberg in the late '80's and, in fact, if I told him

16   today I'd be objecting to a consumer class settlement, he'd

17   wonder what I'm doing for a living, but we're made to this

18   position because we're brought to the Class.  We're subsumed

19   in the language of what the consumer said months ago.  It

20   doesn't have to be that way.  It didn't have to be that way.

21   It's a subclass, but it's a unique class of -- and I want to

22   be careful about the language.  When I said that employees --

23   and I try to be, and, Your Honor, I appreciate your style

24   because you invite and see what you must and Justice Scalia

25   said that.  I can see that consumers are folks who purchase

1    goods, right, and in that sense, employees consume goods at

2    Wawa, but they're very differently situated.  See, they're on

3    the other side of the counter serving customers and that gets

4    to an important point.  We have standing because we're in that

5    definition, which is broadly consumers, but the notice, Judge,

6    and I looked real hard through all the notices and it's not

7    just the notice that you approved.  See, they did make

8    changes.  They did use the app.  They did do more placard

9    notice.  They did things because the claims rate was low.

10   When I was a very, very young lawyer, the first thing I worked

11   on, Newberg on Class Actions, a 1992 edition, claims rates.

12   That's what Mr. Newberg had me work on and I remember coming

13   away --

14            THE COURT:  That was before the actual nature of

15   claims became so inventive.

16            MR. HAVILAND:  Yes.  Well, I just remember having

17   this feeling that if you're less than 10 percent, you're doing

18   something right, but in this environment, we're looking at sub

19   one-tenth of one percent.  It's a really low claims rate.  And

20   I'm just focused on --

21            THE COURT:  Yes, but that's the result of the math.

22            MR. HAVILAND:  I agree.  If you have a huge

23   denominator, then you're going to -- sure.

24            THE COURT:  Which is a little bit why I --

25            MR. HAVILAND:  My problem, Judge, is there are

 1    50,000 known people, okay, and we argued for the Mullane-type

 2    notice and Mr. Parks freely conceded, he's a good advocate,

 3    that they have the names and addresses, they just didn't want

 4    to do it.  It would have been 11,000 mailings.  And the

 5    problem we have is, and I looked very carefully at the notice

 6    in the order, the use of the word customers, it's your order,

 7    Your Honor, at Docket 234 from July 30, 2021, and if you just

 8    looked at the headline of it, five times it says, The

 9    settlement resolves claims on behalf of all customers.

10    Settlement Class consists of all customers.  Tier One

11    customers sue, Tier Two customers sue, and Tier Three.

12    Employees aren't customers.  I spoke to the McGlades, do you

13    consider yourself a customer?  No, I was a manager.  I managed

14    the employees who serviced customers.  We make the sizzlies

15    and the hoagies and serve the coffee to the customers.  So

16    there's a disconnect in terms of what the notice was doing.

17    Yes, those employees put those placards up, but we would have

18    expected an expert to come forward and say that that notice

19    program not only told employees their rights, but we expected

20    that everyone, all 50,000, why wouldn't they take the five

21    bucks?  But I look at the 6,000 and I say that even if they

22    were all employees, the 44,000 that didn't get anything and I

23    looked at this practically, right, so we're going to push out

24    2.9 million through the app, well, Wawa sends payments for

25    salaries to a dedicated bank account.  Why don't they just add

1    the five bucks to that?  We're talking about $250,000 and I'm

2    just focused on the five bucks.  I'm going to get to that I

3    don't think the five bucks adequately compensates because we

4    didn't get a chance to advocate for that and I -- it's always

5    good to hear defense counsel say how they would concede --

6              THE COURT:  But that goes right back to my question.

7    In what way are the employees under the current iteration of

8    the release, in what way do they lose the footing for saying

9    that they have a different claim both in terms of quality and

10   quantity?

11             MR. HAVILAND:  They are giving up the part of the

12   dual capacity and I accept that description, but not the

13   reality.  It's one -- one plaintiff, one cause of action, one

14   defendant.

15             THE COURT:  Well, I'm not sure.  I understand that

16   metaphysically it's one person --

17             MR. HAVILAND:  Yeah, and I get the colloquy, but

18   we're giving up that payment card piece of the claim.

19             THE COURT:  One person can have a bouquet full of

20   claims --

21             MR. HAVILAND:  Sure.  Yeah.

22             THE COURT:  -- causes of action.  I mean a person in

23   a car accident, okay, has a personal injury claim and a

24   property claim for the wrecked car.

25             MR. HAVILAND:  Certainly.

1          THE COURT:  So that's one person --

2          MR. HAVILAND:  Um-hum.

3          THE COURT:  -- but has two different claims and, in

4    fact, might lose -- the property claim may evaporate

5    because --

6          MR. HAVILAND:  The insurance subrogation.

7          THE COURT:  -- because the insurance policy kicks in

8    on the property, but the surgery hasn't finished on the, you

9    know, pick a vertebrae that's hurt.

10          MR. HAVILAND:  Yes.

11          THE COURT:  And so the personal injury claim isn't

12    known yet.

13          MR. HAVILAND:  Right.

14          THE COURT:  So one claim keeps going and the other

15    claim has been wrapped up.

16          MR. HAVILAND:  Except that that one claim is used

17    also to value the second claim.  You look at the damage, you

18    look at the out-of-pocket expenses, the specials, and then you

19    figure out what the personal injury is going to be in the

20    larger sense of pain and suffering and I see the analogy,

21    Judge, but the problem with that is we're not there yet in

22    terms of the employee experience.

23          THE COURT:  Well, the question is by accepting the

24    money to fix the fender on the car --

25          MR. HAVILAND:  Um-hum.

1          THE COURT:  -- you're not giving up the claim to get

2     the pain and suffering on your vertebrae injury.

3          MR. HAVILAND:  Well, I guess I have to recalibrate

4     back to the beginning.  We were never in the room with Judge

5     Welsh to talk about the employee experience, their rights,

6     Dittman, what it meant.  It was all before it was litigated.

7     Now it's been litigated and Your Honor found that Dittman

8     applied to employees and, yes, you did expand it to the

9     Financial Institution Plaintiffs.  You didn't say anything

10    about the consumer experience and I don't believe any

11    appellate court has gone that far yet.  Dittman was a very

12    careful decision in terms of talking about the plaintiff

13    vis-a-vis the defendant and that experience, and, yes, there's

14    a discussion of duty, but what I keep hearing is that Wawa

15    assumed liability.  Okay, that's great, that got them in the

16    room, but it doesn't deal with what Amchem addresses and Judge

17    Ginsburg, it's not just about asbestos with all due respect.

18    Amchem has a progeny to it that really speaks to how we as

19    lawyers represent zealously with each other and against each

20    other.  There were future claims being compromised in the

21    present, but they weren't adequately represented.  Here we

22    have employees with a different experience.  They weren't

23    represented.  The consumers don't have an employee, never

24    professed to represent the employees.  In fact, never

25    advocated the position we did on Dittman.  You'll recall Ms.

1    Savett stood up and joined with Wawa saying dismiss with

2    prejudice our claims, and I'm only pointing out that if you're

3    not in that room, there's no assurance of the structural

4    assurances and that's what Amchem speaks to.  And, Judge, I

5    gave you a PowerPoint and I'm just tearing through it because

6    I quoted Amchem that speaks to the issue of structural

7    assurances and the need to have -- and in that case, it was

8    subclassing because there's a larger group of asbestos-exposed

9    people.  Here we have a large group of exposed people to a

10   data breach.  So whether you treat it as a separate class or a

11   subclass, it has to be treated.  And the one size fits all --

12          THE COURT:  Well, and that's the nature of my

13   question.

14          MR. HAVILAND:  Yes.

15          THE COURT:  It has to be treated, but at what point?

16   There's never just one time when it has to be treated.

17          MR. HAVILAND:  I agree and the plaintiffs went --

18   and in my presentation, I'm thinking about the part where the

19   plaintiffs went right to mediation.  We didn't, okay, nor did

20   the Financial Institution Plaintiffs.  We went right to motion

21   to dismiss.  So we argued to a different milestone.  And when

22   I hear that these cases are difficult and they -- but they get

23   better or worse as it goes on, well, our case got better after

24   we survived Rule 12 because, as I recall my days at Kline &

25   Specter, you only get three shots at it, Rule 12, summary

1  judgment, and settle or --

2          THE COURT:  From your lips to God's ears.  There's

3  never just three chances.

4          MR. HAVILAND:  They're the big ones.

5          THE COURT:  That just means it's three times three

6  times three.

7          MR. HAVILAND:  Yeah, and class cert's a major one

8  obviously, but --

9          THE COURT:  No, they just keep coming.

10          MR. HAVILAND:  So but those issues, it gets more

11  finite for the defense because at some point you are getting

12  to a point where you've got to decide are you going to try the

13  case and if you haven't prevailed on Rule 12, you're going

14  through discovery and that's where we are right now and we're

15  not speaking to that because that's for another day.  I'm

16  trying to make sure that we have --

17          THE COURT:  Let me put it this way, what do you

18  want?

19          MR. HAVILAND:  I want to maintain the full panoply

20  of our rights at the time that that comes.  It hasn't come --

21          THE COURT:  Why do you think it's not?

22          MR. HAVILAND:  Because we're having our claims

23  compromised for five bucks.  I don't believe that's fair,

24  reasonable or adequate in relation to the employee's experience.

25          I get why it was compromised because these cases are

1    difficult, there's standing issues and there's all that.  We

2    didn't believe we were in that position because of Dittman.

3    The employees we believe are at a higher echelon, they're in a

4    different place, and if we had been in the room, we would have

5    said to Mr. Parks, with all due respect, if it's five bucks to

6    Joe Smith, Your Honor's hypothetical back at the hearing,

7    Well, Joe Smith is here, but the employee is someone

8    different.  He's on the other side of the counter.  You owe

9    him a duty.  And to the extent you didn't protect that

10   employee from their experience of using the payment card,

11   there's so many things Wawa could have done to protect the

12   situation knowing what was coming.

13            THE COURT:  Looking at it -- so in response to my

14   question what is it you want, you essentially want Joe Smith,

15   the employee, who may on his break or on the weekend have gone

16   to a different Wawa store than where he worked and bought a

17   cup of coffee with his plain old credit card, you want, simply

18   because he is an employee, for him not to be participating in

19   the settlement as a consumer because he should, you think,

20   have a different shot at Wawa for the data breach as a

21   consumer because he's different.

22            MR. HAVILAND:  So you've created a terrific type of

23   hypothetical.  So that situation where he's going somewhere

24   else and he's simply -- he's probably doing that because he's

25   getting employee discount.  Mr. Parks said that.

1          THE COURT:  Who knows why.

2          MR. HAVILAND:  But he is going out there and using

3    his debit card.

4          THE COURT:  I'll bet he doesn't have to show any

5    kind of bona fides when he gets his cup of coffee at the Wawa

6    in the neighborhood.

7          MR. HAVILAND:  To get the discount, I'm sure he has

8    some, but the bottom line is, Judge, there's a subset of that

9    6,000 I suggest that's probably fairly low of folks that agree

10   with you that the deal is a good deal.  What I'm concerned

11   about is you're waiving the rights of 50,000 people --

12         THE COURT:  But what right?

13         MR. HAVILAND:  They have the same rights, better

14   rights today to litigate it with the data breach than the

15   consumers.  The consumers settled for 22 million people.  They

16   got 8,000 claimants and they're going to push out $3,000 to

17   the app, fine, that's their deal.  The employees have a

18   greater right in the payment card situation and otherwise

19   because we're not there yet in terms of the bank.  We just

20   know that Wawa conceded that the ATM got compromised and

21   our position --

22         THE COURT:  I still don't quite understand why

23   should somebody who is an employee be treated as some sort of

24   more special consumer?

25         MR. HAVILAND:  Wawa owes them a duty.

1            THE COURT:  Well, as an employee.

2            MR. HAVILAND:  Yes.

3            THE COURT:  But where does a bigger duty come from?

4    Say if you work for us, you're going to be a super consumer,

5    you get more rights than the consumer?

6            MR. HAVILAND:  I don't know that they have to be a

7    super consumer.  It's the issue of if we were all litigants,

8    okay, and let's take the settlement out, let's look at it from

9    just a Rule 23 standpoint.  You're lumping a bunch of people,

10   employees and consumers alike, in the same place and if Wawa

11   were fighting, I suspect Wawa would not freely admit that

12   Dittman goes as far, it would have to concede what the case

13   says, but would say this 22 million-size Class, they don't

14   have standing because we don't owe them a duty and there's no

15   causation of harm.  We don't get there because Wawa through

16   settlement has taken that issue out, but the Court still has

17   to look at it that way because you're treating everybody the

18   same.  There's a line they use in the order, Judge, I think

19   it's paragraph 10e, that says that everyone is being treated

20   equally and fairly.  That's not so because there's never been

21   an effort to account for the employee's status and their

22   legally distinct claim.  Using the language in the order, it's

23   not duplicative, it's not duplicative, but that gives them a

24   distinct position in the law that had to be addressed at some

25   point in time and nowhere in the record has it been addressed.

1    That's our position is that --

2              THE COURT:  Back to the McGlades.

3              MR. HAVILAND:  Yes.

4              THE COURT:  Did they submit a Tier 2 or a Tier 3

5    claim?

6              MR. HAVILAND:  None.

7              THE COURT:  They have submitted no claim?

8              MR. HAVILAND:  And they haven't opted out.

9              THE COURT:  And they have not opted out.  One might

10    rhetorically ask why did they not opt out if the money was not

11    sufficient?

12              MR. HAVILAND:  Because it's not sufficient.  The

13    only standing they have to object --

14              THE COURT:  That's why they opt out.

15              MR. HAVILAND:  No, no, if they opt themselves out,

16    then they leave behind the Class that they represent.  If they

17    stay in, they can object and they continue to work to improve

18    the employee piece of the consumer experience.  As I said,

19    under Amchem, it can be treated as a subclass.  It should be

20    an enhanced value to them.

21              So I want to go through my quick points, Judge, and

22    I'm mindful of the hour.  There was no direct notice to

23    employees.  The notice speaks about customers.  There's no

24    affidavit and I have a world of respect for the KCC folks, we

25    have an active engagement with them, and we would have

1    expected some type of analytic that said that we know that our
2    charge from this Court is to tell employees as well as the Joe
3    Smiths with the orange Crush, the other hypothetical, but we
4    didn't get a chance to ask Carla Peek or her colleague.  So if
5    it was just about employees, what would we have done?  You
6    would have said to Wawa, how do I notify those people?  We
7    always start with names and addresses.  And they say they
8    don't have e-mails, but we know that they do have e-mails
9    because they communicate with the employees by e-mails.  Mr.
10   McGlade got contacted by e-mails all the time.  So they
11   clearly have that form, it just wasn't used, and you asked the
12   question, I think, Judge, did the employees know about the
13   placard?  Well, you know, they hung them, they put them out
14   there, but when did Wawa say to its group of 34,000, Hey,
15   folks, you're in, you've got to do something here because
16   you're part of this.  We know in the year that you've been
17   here you probably used your card because you're behind the
18   counter and you wanted to have a pretzel or get yourself a
19   slushy, okay, so you're in and we want you to get the five
20   bucks.  We're going to make it easy.  We're going to push that
21   money out to your salary.  We love you.  That didn't happen.
22   We know it didn't happen because the numbers tell us it didn't
23   happen.  Only 6,000 people are getting this, okay.  Take the
24   Wawa app people out.  I would have expected with all the work
25   on the app, how many employees have the app?  Because the app

1    doesn't give you the ability to take the employee discount.

2          So, Judge, this is an evidentiary hearing where at

3    some point evidence matters and I respect that the colleagues

4    in the bar will make representations, but I'm just looking at

5    the evidence.  KCC didn't say this percentage of Wawa people

6    are employees.  In fact, they said the opposite.  We have no

7    idea.  We're now hearing that they're going to crosswalk names

8    and addresses from Your Honor's question about the 8,000 in

9    the group so they can do that.

10          THE COURT:  Why would you then not be arguing as the

11    Employee Track case goes forward -- why do you think you

12    cannot even utter the position that the McGlades of the world

13    continue to have their inextricably entwined dual capacity

14    alive and well to fight another day?

15          MR. HAVILAND:  I would love for the release to say

16    that and the way it says that is that the employee released or

17    the release carves out the employees.  I think I offered two

18    alternatives, Your Honor.  I tried to get to the proposed

19    ruling.  It's on Slide 31.  Right to the end.

20          THE COURT:  Do you think that as currently

21    configured, the release does not even allow you to make the

22    argument as your case --

23          MR. HAVILAND:  I don't, Your Honor.

24          THE COURT:  You don't?  You do think that?

25          MR. HAVILAND:  I do not think that it allows me to

1    make that argument because it is narrowed to --

2           THE COURT:  Are you sure you don't want to preserve

3    the possibility of making the argument?

4           MR. HAVILAND:  Well, I'll argue that --

5           THE COURT:  You don't want to concede at this point.

6           MR. HAVILAND:  But I'd like it to be clear because I

7    know it will be Mr. Parks arguing that the door got shut just

8    like they were arguing that at preliminary approval we

9    reserved the argument for today that we can't make the

10   argument today.

11          So the two -- the two things I suggested, Your

12   Honor, one was a statement Your Honor made and that was at the

13   May 5th hearing, why don't you just carve out the employees

14   and let them go on their merry way in their own track.  I

15   don't hear anyone enamored of that idea even though, as Your

16   Honor said, it's a very narrow group, it's a finite group.

17   It's 50,000 in the scheme of the hundreds of thousands getting

18   money through the app.  None of whom I know are the employees

19   where you can walk in and have a general manager offer five

20   bucks right in the store and take care of the entire book.

21   The alternative is to remove from the release the employee

22   plaintiffs' claims related to, and this is where the consumers

23   want to have it include payment card information, but we need

24   to have the right to argue about even if it's duplicative,

25   because Your Honor said it's not legally duplicative, but

1    there's some overlap, but it ties into some other experience à

2    la the McGlades.  I want that full array of rights on the

3    personal injury case conceding the subro case on the property

4    damage because the insurance company's covering that anyway

5    and I don't know that we've gotten that on the release.  We

6    want to be able to make the argument at the time.  We have the

7    facts.  And maybe Mr. Parks and the CEO will decide that with

8    the 6 million they have left over from the 9 that they didn't

9    spend, they want to make it right with the employees.  I don't

10   know that yet.  I know that FI Plaintiffs are in mediation,

11   but we will be fighting another day.  We're in discovery and

12   we're finding out a lot of interesting stuff that I won't talk

13   about today, but today is the Fairness Hearing on the Consumer

14   Track settlement and they wanted the employees in.  I don't

15   know that that was ever mentioned or discussed with Judge

16   Welsh.  It came out later that we were advocating for them,

17   there was a representative of that group, we had tracks, but

18   we had gotten to this place that they want to include that

19   group, consumer qua consumer, and I just don't think that

20   they've protected the employee rights in the -- concede the

21   subro piece of it, but not give up the right to argue down the

22   road that that release didn't fairly protect them for their

23   whole array of claims on the personal injury side.

24            I'm trying to --

25            THE COURT:  I know you're trying.

1          MR. HAVILAND:  -- put it into your hypothetical.
2    It's kind of hard with the car and the accident and -- but I
3    think it's a good way to look at it.  The bank analogy is one
4    way as well.  We're in the bank arguing about all the things
5    that happened in the Wawa computer systems.  They happened to
6    go out the door into the ATM, but that's really what we're
7    discovering, where we're spending the balance of our effort is
8    to understand that and so it's one thing that they got into
9    the door and they had access to all this.  Whether or not they
10   utilized it or they're waiting, these are pretty smart actors.
11   The ham-handed ones go out and do the credit card stuff, but
12   that's not happening as much, but they were in this system for
13   quite a while, Judge, more than a year, and that's a concern
14   for us and we're tracking that down.

15          So I'll end where I started is that I hope to leave
16   here with the rights intact that we felt we had when we filed
17   the complaint.  Your Honor denied the motion to dismiss.  The
18   consumers can certainly get what they were -- what the lawyers
19   negotiated for, what they got and what some agreed to, and the
20   impressions and all that was directed to the consumer
21   experience, but if you read the PowerPoint, I did walk through
22   there were other ways to notify employees if you really wanted
23   to get the employees.

24          THE COURT:  I do have one actually -- it probably
25   has nothing to do with the substance of the settlement, but

1    you've got an objection here, Objection Number 4 --

2            MR. HAVILAND:  Um-hum.

3            THE COURT:  -- has to do with the notion that the

4    credit card information included in the app was not subjected

5    to the 2019 data breach.

6            MR. HAVILAND:  Yeah.  Your Honor, I --

7            THE COURT:  Where's that coming from?

8            MR. HAVILAND:  That's in a pleading.  I saw that

9    this morning.  I was actually taking the train down.  There's

10    attribution for that.  I don't remember whose paper, but I

11    seem to recall reading one of the parties pointed out that the

12    app was a secure environment, the Wawa app, and so that card

13    information unlike the POS where folks were actually swiping

14    their cards, the app allows you -- I know this because my

15    partner Bill is on the phone.  He sits at his desktop, goes on

16    the app, orders lunch and goes and picks it up.  There's never

17    a transaction with the credit card and somewhere I read that

18    that book of business, if you will, was not subjected to this

19    data breach because, again, it was a point of sale terminal

20    breach.

21            THE COURT:  Although normally the way that works is

22    you've given the credit card information to the vendor --

23            MR. HAVILAND:  Yeah.

24            THE COURT:  -- and you're just running and they're

25    doing the debit sort of off --

1              MR. HAVILAND:  Right.

2              MR. PARKS:  Your Honor, actually, the Wawa app works

3    differently than that.  A consumer loads a gift card onto the

4    Wawa app and that's what runs through the app is a gift card,

5    not a credit card.

6              THE COURT:  They're running a tab essentially.

7              MR. PARKS:  That's correct.  And this point of sale

8    system that was compromised here didn't include the app.  So

9    that's correct --

10             MR. HAVILAND:  Did not.

11             MR. PARKS:  What we decided to do with the e-mail to

12   the Wawa app members to say automatically you get this was the

13   plaintiffs' lawyers kept pushing us on that issue.  They kept

14   saying, Hey, can't we give somebody some rights to have a

15   claim without having to make a claim?  Can't we agree that

16   people who use the Wawa app were also likely to use a credit

17   card during this period of time and we said, Yeah, all right,

18   we agree with that so that's why they got included, but Mr.

19   Haviland is absolutely correct that if someone only ever used

20   the Wawa app, their information was not compromised.

21             THE COURT:  All right, let me ask another question.

22   Let me just run through --

23             MR. HAVILAND:  That's the attribution I was looking

24   for.  I knew it was somewhere.

25             MR. PARKS:  It's in the stipulation we submitted

1    with the Third Amended -- I'm sorry, with the Second Amended

2    Settlement Agreement.

3                THE COURT:  Okay.

4                MR. HAVILAND:  It's in my thick binder I know.

5                THE COURT:  Mr. Haviland, you say and you just

6    argued here as well that Wawa doesn't love your clients enough

7    to have put five bucks into their paycheck.

8                MR. HAVILAND:  Yeah.

9                THE COURT:  But do you really mean to suggest that

10   no employee is receiving the $5 gift card?

11               MR. HAVILAND:  I'm not going to suggest that, Judge.

12   I would be confident that someone did, which is why we

13   pressed.  KCC admitted they didn't have that information, but

14   it's a knowable thing I think because the employee --

15               THE COURT:  Well, they're not excluded.  I mean if

16   an employee qua consumer exists --

17               MR. HAVILAND:  Yes.

18               THE COURT:  Don't they get the five bucks?

19               MR. HAVILAND:  No.

20               THE COURT:  Really?

21               MR. HAVILAND:  If they're an app user which, again,

22   I'm not sure they would be because they don't --

23               THE COURT:  What if they're a credit card user?

24               MR. HAVILAND:  They're a credit card user, but

25   they'd have to sign up.

1          THE COURT:  Okay, but they're not forbidden to sign

2     up.

3          MR. HAVILAND:  Correct.

4          THE COURT:  All right.

5          MR. HAVILAND:  But it goes back to the placards

6     talking about customers and not -- again, Judge, there's a

7     very simple way that I'm sure KCC, if charged to do so, would

8     have come up with a vehicle to tell employees, Hey, you're in

9     and you've really got to do something to make the claim.

10    Simply relying upon employees to say, Oh, I'm a customer --

11    and that's why I'm key to the language of Your Honor's order.

12    It says customers.  And that's a distinction with a

13    difference.

14         THE COURT:  On that point, my last question on your

15    Objection Number 2 --

16         MR. HAVILAND:  Yes.

17         THE COURT:  I am -- it does give me some pause here

18    when you assert that Shawn McGlade has taken the position in

19    the complaint --

20         MR. HAVILAND:  Yeah.

21         THE COURT:  -- that Wawa employees were told by Wawa

22    that they were not affected by the data breach so they had no

23    reason, employees had no reason to believe they'd be included

24    in the Consumer Class settlement.  There's nothing other than

25    your reference to the complaint.

1          MR. HAVILAND:  Yeah, so the attribution is a

2    paragraph -- a series of paragraphs.  Mr. McGlade's complaint

3    discusses when he was told as a manager about this.  He was

4    brought in on a Sunday and there was a conference call.

5          THE COURT:  You're missing the point.

6          MR. HAVILAND:  Yes.

7          THE COURT:  Where's the evidence of that?

8          MR. HAVILAND:  Just his attesting complaint --

9          THE COURT:  The truth of that.  There's no

10   declaration now, there's no affidavit, there's no

11   cross-examination.  There's --

12         MR. HAVILAND:  I agree.  That's the issue of

13   evidence, but it's the burden of the proponent saying that the

14   Class Settlement's fair, reasonable and adequate as it

15   concerns consumers.

16         THE COURT:  Well, who has the burden with respect to

17   an objection?

18         MR. HAVILAND:  Well, we certainly do, but we've

19   raised the objection that they have not demonstrated that

20   employees were notified and that they participated in any

21   significant level in the claims.  I wanted to cross-examine

22   the experts on that.

23         THE COURT:  Well, no, no, but I'm really talking

24   about the statement in this objection that there was --

25   awkward -- an affirmative negative representation.

1          MR. HAVILAND:  Yes.  It's in the plaintiffs'

2    complaint.

3          THE COURT:  Okay.  Anywhere else?

4          MR. HAVILAND:  No.  No.  He would attest to what he

5    was told by management at the time of the breach as one of 850

6    managers as the position is, This has happened to customers,

7    here's how we're going to deal with it.

8          THE COURT:  Okay.

9          MR. HAVILAND:  And McGlade, Your Honor, if I may,

10   never thought that he was part of it.

11         THE COURT:  The reason I am asking this and

12   following up on it and drilling down on it is in connection

13   with your argument that the notice would somehow have either

14   misled or not registered with an employee --

15         MR. HAVILAND:  Um-hum.

16         THE COURT:  -- because an employee has been told

17   they're not a consumer.

18         MR. HAVILAND:  Customer, yes.

19         THE COURT:  Right.  I'm merely following up on this.

20   I'm looking at --

21         MR. HAVILAND:  Yeah, and that's all I have at this

22   point, Your Honor, other than what we're doing in discovery

23   through ROGs and RAs and such is to clarify the experience of

24   the employees in the larger sense, but McGlade is a

25   representative of 1 of 850 managers.  In his complaint, he

1    talks about that conference call with his superiors about how

2    they were going to handle the data breach.  So --

3           THE COURT:  Okay, you've answered my second question

4    which is really one of evidence.

5           MR. HAVILAND:  Yeah, and it's currently our burden

6    on an objection.  Our larger objection is that the plan as

7    approved, but then modified to accommodate concerns about

8    claims rates and that's in the pleadings and that came

9    December 27th.

10          THE COURT:  Okay.

11          MR. HAVILAND:  There was a concern about the low

12   claims rate and something had to happen.  What didn't happen

13   was a mailing to the employees or some direct communication or

14   just simply push out the money.

15          I'd be in a very different position, Judge, if they

16   had just pushed out $250,000 today.

17          THE COURT:  Okay.

18          MR. HAVILAND:  Thank you.  I appreciate your time.

19          THE COURT:  Absolutely.  Speaking of time, I will

20   give either the Class Counsel for the Consumers or Mr. Parks a

21   couple of minutes if you think anything has just been part of

22   the exchange that you really must admit you've not been able

23   to cover in your filings or in your statements here today.  So

24   if you're willing to say you've missed something, then you can

25   stand up and say something more.  Otherwise, I'm going to turn

1    to Mr. Frank.  I put it that way because usually lawyers are

2    hesitant to say they missed something.

3              MS. HOLBROOK:  Just very briefly, Your Honor.

4              THE COURT:  So you did miss something.  What did you

5    miss?

6              MS. HOLBROOK:  Well, I didn't miss something, but I

7    just wanted to follow up as a point of clarification.  Your

8    Honor, Mr. Haviland made the point about employee claims

9    submissions and we just wanted to note for the record that we

10   did confirm with KCC that his client, Mrs. McGlade, is one of

11   the recipients of the Tier 1 gift cards pursuant to that

12   e-mail distribution list.

13             So I just wanted to make that point.  Thank you.

14             THE COURT:  Did you ever tell him that?

15             MR. HAVILAND:  Not until now.

16             THE COURT:  Well, I'm making the observation.

17             MS. HOLBROOK:  Presumably she would have gotten an

18   e-mail, Your Honor.

19             THE COURT:  That wasn't my question.  Always I find

20   remarkable that lawyers get to talk to each other only when

21   they come into the courtroom.  Okay.

22             MR. PARKS:  Your Honor, I missed one thing --

23             THE COURT:  Okay, there you go.

24             MR. PARKS:  -- which is I didn't have on me.

25             THE COURT:  A self-defacing order.

1          MR. PARKS:  When I stood up, the proposed Final

2    Order and Judgment, which if I could hand up to the Court --

3          THE COURT:  Yes.

4          MR. PARKS:  -- and I also have a copy for Your

5    Honor's close reading clerk, that actually has the release and

6    Mr. Haviland suggested that the release is broad and sweeping

7    and then carved out employees and that's not true.

8          The release itself in paragraph 16, which I've

9    tabbed and highlighted here, the release itself only releases

10   claims related to the theft of payment card data.  Full stop.

11   That's it.  To add clarity, we then do also have this release

12   does not bar claims.

13          So it's not a broad-sweeping release, it is a

14   targeted release, just the payment card information.  So it's

15   like the analogy Your Honor used, it's a targeted release.

16   Just as the damage to your car, you still have your claim for

17   bodily damage.  They still have their claim if they want to

18   prove it and if Mr. Haviland wants to say they were in there

19   for nine months, they must have gotten social security

20   numbers, he and I will be in this courtroom another day to

21   have that discussion.

22          Thank you, Your Honor.

23          THE COURT:  Thank you.  How about Mr. Schulman

24   briefly?

25          MR. SCHULMAN:  Good afternoon, Your Honor, and

1    please direct me to any questions you have about our filing,

2    but I wanted to start by returning to a colloquy you had with

3    Mr. Johns asking him where on the continuum he felt this

4    settlement fell between lousy and excellent and if I might

5    give you our answer.  Our answer is that it's barely passable

6    if the Court and only if the Court's willing to reduce the

7    excess fees and thereby reallocate those funds to the Class

8    and I wanted --

9            THE COURT:  But, Mr. Schulman, that's not the way

10    this deal was constructed.  As I understand it, there was

11    no -- it wasn't that there was a gross dollar amount and then

12    surgically a portion of it removed on behalf of counsel.

13            MR. SCHULMAN:  Your Honor, that's the economic

14    reality that -- for example, the Third Circuit recognizes in

15    GM Trucks, the constructive common fund, when there's an

16    agreed amount for fees and a separate agreed amount which no

17    longer exists because of the third amendment -- the third

18    amendment which, in our view, that unlocks the value.  That

19    fixes the structure such that the Court can give the Court the

20    tools to exercise its fiduciary duties to the Class to

21    reallocate such that the settlement is proportional.

22            THE COURT:  Well, your economic reality argument is

23    basically that money is fungible and what does Wawa care,

24    they're out X dollars and what do they care where it goes, and

25    you're saying more of it should go to the Class because Wawa

1   shouldn't care.

2          MR. SCHULMAN:  And I think that -- that's not just a

3   theory, it's proven by the fact that -- by the third amendment

4   to the settlement that Wawa agreed.

5          THE COURT:  Is there not actually in every

6   settlement of a Class nature an inherent -- it's not a

7   conflict from a technical standpoint, but the reason for the

8   Court's involvement is to think about the Class even where

9   experienced, conscientious and very, very ethical and

10  professionally responsible lawyers are involved on behalf of

11  the Class just because the nature of the world would argue

12  that maybe somebody has a slight conflict in terms of how

13  money gets whacked up and that's what the judge's job is.  But

14  you think it's your job too?

15         MR. SCHULMAN:  We do think definitely under

16  Rule 23(h), there's a role for objectors to come in.

17         THE COURT:  Right.

18         MR. SCHULAN:  Good faith public-interest-minded

19  objectors to come in and raise the issue of a disproportion

20  and we've had a track record of success doing that.  It's in

21  Mr. Frank's declaration laying that out.  But we certainly

22  agree with the point that there is this inherent conflict,

23  though the Third Circuit did suggest that one way to avoid

24  that is to have a separate Class settlement and then after

25  that is approved, a litigated attorneys' fee or a settlement

1    of the attorneys' fee issue separate and apart such that it

2    doesn't become part of the constructive common fund.  That was

3    the --

4             THE COURT:  Has any circuit actually bought that

5    construct?

6             MR. SCHULMAN:  Which construct in particular?

7             THE COURT:  The idea of separately negotiating.

8             Frankly, the other way of doing it is to say there

9    should be two sets of lawyers.  What a nightmare.

10            MR. SCHULMAN:  You could have -- right.  You could

11   appoint a guardian ad litem to represent the Class at the fee

12   stage against Class Counsel, yes, that's a possibility.  But I

13   would say the Third Circuit has recognized that approach.  If

14   you look at the Community Bank case, which I believe we cite,

15   if you look at GM Trucks, Pick-Up Truck from 1995, Judge

16   Becker's decision, they suggest doing it that way.  So we

17   don't think that the settlement is per se unfair just because

18   you have either a constructive common fund or a common fund

19   approach, though.  We think that as long as the fee at the end

20   of the day is proportional, you can have either structure.

21            The problem with the initial settlement until the

22   third amendment is any reduction the Court would have made for

23   the access fee would have gone back into Wawa's pocket and the

24   Class would have been deprived of that component of the gross

25   settlement value.

1          THE COURT:  How can anybody ever actually reverse

2     engineer the calculation or what the dollars, what would have

3     happened to them?  I mean run that by me.  How would anybody

4     ever know?

5          MR. SCHULMAN:  Well, I would say that you look at it

6     from the perspective of Wawa had a dollar value in mind where

7     they wanted to get rid of the entire case, the attorneys' fee

8     obligation, the Class's obligation, and that amount, that

9     dollar value is -- under their accounting, I have no idea how

10    they're accounting the $5 gift card valuation, but assume

11    that's 100%, which is not a correct assumption, but if it was,

12    then they're thinking in their mind this is a $6.4 million

13    case.  They know what -- they know that the expected claims

14    rate is going to be miniscule.  In this case, I think -- I

15    think, and that's one point I wanted to make and I can get

16    back into this in a second, but the claims rate here is even

17    amongst consumer claims rates that are low, the claims rate

18    here, three-hundredths of one percent, is unusually low.  Even

19    Mr. Johns presenting the Target and Home Depot rates of

20    .2 percent and .3 percent, that's seven times -- that's ten

21    times higher than the rate here, and in other cases, Yahoo

22    Data Breach, it was .6 percent, in Anthem Data Breach, it was

23    1.6 percent, and in the Consumer settlement that Wawa's

24    defense counsel negotiated before Judge Kearney, it was

25    3.3 percent.

1          THE COURT:  How does that tie into your objection?

2    Are you just saying that --

3          MR. SCHULMAN:  Because it relates to the quality of

4    the product that Class Counsel produced.  They should not be

5    getting --

6          THE COURT:  Why do you think it relates to that as

7    opposed to lack of interest by the injured folks?

8          MR. SCHULMAN:  Because Class Counsel had already

9    submitted into the record in this case their knowledge that a

10   simple claim form was going to be necessary.  Instead, what

11   they produced was a claims process that required documentary

12   evidence for any level of claim and, you know, it can't -- it

13   can't entirely -- Mr. Parks tried to explain the claims rate

14   because of the fact that there was a lack of fraud, but that

15   can't entirely explain it because the Tier 1 didn't require

16   showing of fraud at all, yet the claims rate there is where it

17   was .3 -- three-hundredths of one percent.  So it wasn't a

18   sort of -- this was known.  We anticipated in our objection

19   that the claims rate would be one-tenth of one percent and, in

20   fact, we were 2 or 3 times too high, but it was -- it was a

21   certainty given the hurdle that the claims process established

22   that it was going to be low.  You know --

23         THE COURT:  Okay.  Well, you originally objected to

24   the reversion issue.  That's been taken care of so that

25   resolves that concern, right?

1          MR. SCHULMAN:  Yes.

2          THE COURT:  Okay.  So you still object to the ratio

3    between the claims being made and the attorneys' award and

4    you're basically arguing that the low rate of claims is

5    somehow the fault of the lawyers or the quality of the

6    lawyering.

7          MR. SCHULMAN:  In part, yes.  Certainly.

8          THE COURT:  I mean how can I interpret this other

9    than that from your standpoint?

10         MR. SCHULMAN:  I don't think there's a way to --

11   this -- the attorneys on both sides in this case are

12   sophisticated counsel.  They've been -- they know what claims

13   rates look like.  The last counsel, like I said, had a -- and

14   we cite this in the objection, there was a representation in

15   front of Your Honor that a simple claims process was going to

16   be necessary.  That's not what happened and that's why the

17   ultimate rate was three-hundredths of one percent.  Now, of

18   course, they amended it to send out 575,000 mobile app users

19   $5 gift cards without having to submit a claim.  And we think

20   that that improved the ratio, obviously, but it still was,

21   even with that $3 million lump sum there, even if you assume

22   again 100% redemption rate, which I think is not a valid

23   assumption given that the evidence in front of Your Honor was

24   that the redemption rate for gift cards was based on people

25   who had loaded up gift cards, not based on people who were

1    sent out e-mails randomly, hopefully not into their junk

2    folder as you mentioned, and then would have to -- then have

3    to redeem at that point.  But even assuming the 100%, 3

4    million versus 3.2 to the attorneys is not fair even if the

5    result was excellent, but here I don't think the result is

6    excellent, and I think the claims rate shows that the Class

7    isn't that interested in the relief.  No offense to Wawa, I

8    love their pretzels and products, but --

9          THE COURT:  Okay.  Well, I certainly understand

10   where everybody's coming from, and as I said, I really have to

11   wrap this up now.  I am not going to be issuing an order from

12   the bench.  I don't know that I'm really expecting any

13   additional information other than a clean copy of the

14   Settlement Agreement intact.  I'm loathe to do this, but I

15   will give you each a week to send me anything of a brief

16   nature, brief as in length.  I mean I've gone to so many

17   judicial conferences where the big laugh line has to do with

18   the use of the word brief.  Try to keep it to five pages or

19   under if you want to send me anything more.  I will get a

20   resolution or at least attempt a resolution briefly after a

21   brief time of reviewing any additional submissions you have.

22   I very much appreciate everything you had to say.  Those of

23   you who could not join us directly, I hope everything is well

24   enough on your end.

25         Mr. Parks.

1            MR. PARKS:  Yes, Your Honor, could I just note that

2   the date, time and place of this hearing were part of the

3   Class notice.  Counsel for the McGlades appeared in person.

4   Counsel for objector Theodore Frank appeared by Zoom.  No

5   other objector or Class Member has shown up here.  They're not

6   present in the courtroom to make any objections so I just

7   wanted to make sure that was clear for the record.

8            THE COURT:  It is indeed on the record.  Thank you.

9            MS. SAVETT:  Your Honor, may I have like two or

10  three minutes just to make a couple quick points?

11           THE COURT:  Something you forgot?

12           MS. SAVETT:  No, it was addressing what Mr. Frank

13  said.

14           THE COURT:  Briefly and you can do it from there.

15           MS. SAVETT:  First of all --

16           THE COURT:  Ms. Savett, keep it to like a minute.  I

17  mean I'm dead serious about my obligation.

18           MS. SAVETT:  I will.  The claims rate he says is way

19  off, it's lower than other cases.  He's omitting the 575,000

20  in his calculations.  If you take approximately 600,000, you

21  take all the claims that were made plus the 575, it's 600,000

22  against 22 million which is 2.7 percent, which is ten times

23  more than the claims rate in the other cases that were cited

24  which was like .2 and .3, and he's incorrect that the Court

25  should calculate attorneys' fees just based on the actual

1    claims rate as opposed to what was offered.  The cases are

2    legion that say that it's based on what was offered.  And he

3    criticizes the fact that the attorneys' fee awards shouldn't

4    exceed the amount of the funds actually distributed to the

5    Class and it's 3 million versus 3 million approximately.  They

6    don't exceed, but Judge Brody in Comcast dealt with this.  She

7    approved a $1.1 million fee in a claims made settlement where

8    Class Members filed claims totalling like 500,000.  So she

9    said that they did the work, it was a difficult case, and it

10   was a reasonable result.  So there's -- and there are other

11   examples.  Like another really good example, he only cites

12   cases from the Seventh Circuit, but they were overruled by a

13   subsequent Seventh Circuit case decided by Judge Posner in the

14   Sears Roebuck Washer Loading case.  In that case, the fee

15   awarded was 2.7 million and the benefits to the Class was

16   $900,000 and the rationale of Judge Posner was that there was

17   extensive time and effort by Class Counsel devoted to a

18   difficult case against a powerful corporation entitling them

19   to the fee.  So there's a lot of precedent for even in

20   situations where the claims are very low, the fee could be

21   more, but here it's about equal.

22              I will adhere to my one or two minutes.  Thank you.

23              THE COURT:  Okay, thank you very much.

24              Okay, five pages.  One week.  Five pages, one side,

25   double spaced, one-inch margins, type large enough to be able

1  to be read by a human being.  No footnotes, no appendices.  I

2  don't know what else I have to warn you about.

3          Thank you very much.  Take care.  Have a good rest

4  of your day.

5          MR. PARKS:  Yes, Your Honor.

6          ALL COUNSEL:  Thank you, Your Honor.

7          THE COURT:  Good-bye everybody.

8                  (Court adjourned)

9

                 C E R T I F I C A T E

10

11      I certify that the foregoing is a correct transcript

12  from the record of the proceedings in the above-entitled

13  matter.

14

15

16          _____*Kathleen Feldman*_____

17          Kathleen Feldman, CSR, CRR, RPR, CM
           Official Court Reporter

18

19  Date:  ____2/7/2022_____

20

21

22

23

24

25

**$**

**$1,005** [1] - 46:10
**$10,000** [1] - 20:2
**$100,000** [1] - 37:3
**$123** [3] - 54:5, 54:10, 54:12
**$15** [1] - 53:25
**$250,000** [2] - 67:1, 87:16
**$275** [1] - 46:10
**$3,000** [1] - 73:16
**$3,040,060** [1] - 32:12
**$4,188,295** [1] - 34:2
**$500** [1] - 12:21
**$60** [1] - 32:25
**$652** [1] - 46:16
**$900,000** [1] - 98:16

**'**

**'20** [1] - 44:25

**1**

**1** [5] - 21:5, 54:17, 86:25, 88:11, 94:15
**1,000** [1] - 34:16
**1.1** [1] - 98:7
**1.4** [1] - 46:22
**1.6** [1] - 93:23
**10** [1] - 65:17
**10,000** [1] - 45:23
**100%** [1] - 93:11, 95:22, 96:3
**100,000** [1] - 62:21
**10036** [1] - 1:19
**10e** [1] - 74:19
**11** [2] - 48:12, 62:15
**11,000** [1] - 66:4
**110** [1] - 2:8
**12** [4] - 46:16, 70:24, 70:25, 71:13
**12-31-21** [1] - 34:5
**12-hour** [1] - 37:24
**12.2** [2] - 47:17, 47:19
**1211** [1] - 1:18
**1234** [1] - 2:21
**12:20** [1] - 6:8
**13** [1] - 46:16
**13-count** [1] - 34:23
**130** [1] - 60:23
**136** [1] - 60:24
**14** [2] - 39:23, 42:8
**15** [2] - 34:4, 62:9

**16** [2] - 48:1, 89:8
**1629** [1] - 2:12
**1701** [1] - 2:17
**18** [1] - 48:1
**1818** [1] - 1:22
**185** [2] - 16:22, 43:13
**19** [1] - 48:12
**19-6019** [2] - 1:4, 3:7
**19002** [1] - 2:9
**19041** [1] - 1:15
**19103** [1] - 1:23
**19103-2921** [1] - 2:17
**19106** [1] - 2:22
**19107** [1] - 2:4
**1992** [1] - 65:11
**1995** [1] - 92:15

**2**

**2** [7] - 21:6, 46:22, 75:4, 84:15, 93:20, 94:20, 97:24
**2.7** [2] - 97:22, 98:15
**2.9** [2] - 63:1, 66:24
**20** [2] - 44:6, 46:19
**20,000** [1] - 45:22
**20-page** [1] - 37:22
**200,000** [1] - 56:18
**20006** [1] - 2:13
**201** [1] - 2:8
**2018** [2] - 7:9, 62:8
**2019** [4] - 24:17, 44:25, 62:7, 81:5
**2021** [2] - 23:20, 66:7
**2022** [2] - 1:8, 34:4
**21.2** [1] - 54:19
**21.6** [2] - 54:19, 56:20
**212** [1] - 37:19
**215** [1] - 2:23
**22** [8] - 11:11, 18:23, 33:11, 48:12, 54:18, 73:15, 74:13, 97:22
**23** [5] - 7:7, 7:9, 20:1, 50:13, 74:9
**23(e** [1] - 7:25
**23(h** [1] - 91:16
**234** [1] - 66:7
**24.9** [1] - 47:17
**25** [2] - 34:10, 44:10
**25,000** [2] - 55:9, 55:10, 55:11
**259** [1] - 35:17
**26** [2] - 1:8, 37:21
**27th** [1] - 87:9
**294** [1] - 50:20

**3**

**3** [12] - 7:18, 21:7, 54:17, 75:4, 93:20, 94:17, 94:20, 95:21, 96:3, 97:24, 98:5
**3,040,000** [1] - 47:17
**3,596** [1] - 37:15
**3.2** [5] - 32:6, 32:12, 33:7, 47:21, 96:4
**3.3** [1] - 93:25
**30** [6] - 13:7, 13:9, 13:11, 13:22, 44:11, 66:7
**30-plus** [1] - 62:20
**300** [2] - 2:12, 61:1
**31** [1] - 77:19
**34** [1] - 62:15
**34,000** [1] - 76:14
**3600** [1] - 1:23
**361** [1] - 1:15

**4**

**4** [1] - 81:1
**40** [1] - 46:19
**44,000** [1] - 66:22

**5**

**5** [8] - 9:20, 42:23, 52:23, 53:2, 53:18, 83:10, 93:10, 95:19
**50** [1] - 34:10
**50,000** [4] - 66:1, 66:20, 73:11, 78:17
**50,000-plus** [1] - 62:15
**500,000** [1] - 98:8
**575** [1] - 97:21
**575,000** [4] - 9:12, 42:22, 95:18, 97:19
**575,159** [2] - 16:4, 16:11
**575,162** [1] - 16:4
**5th** [1] - 78:13

**6**

**6** [2] - 79:8, 93:22
**6,000** [3] - 66:21, 73:9, 76:23
**6,400** [2] - 44:13, 45:19
**6,418** [1] - 34:5
**6.4** [1] - 93:12
**60** [1] - 32:14

**600,000** [8] - 7:19, 9:8, 9:12, 16:9, 20:23, 56:19, 97:20, 97:21
**601** [1] - 2:22
**64** [2] - 15:7, 60:19
**6700** [1] - 9:15
**683** [1] - 15:2

**7**

**7,400** [1] - 45:23
**70** [1] - 19:1
**74** [1] - 46:20
**75,000** [1] - 55:12
**779-5578** [1] - 2:23

**8**

**8** [1] - 34:8
**8,000** [2] - 73:16, 77:8
**80's** [1] - 64:15
**850** [2] - 86:5, 86:25

**9**

**9** [3] - 34:8, 47:20, 79:8
**921** [3] - 16:23, 16:24, 43:12
**97-page** [1] - 34:23
**99** [1] - 60:20

**A**

**ability** [1] - 77:1
**able** [9] - 11:6, 12:2, 12:5, 18:21, 35:11, 53:24, 79:6, 87:22, 98:25
**above-entitled** [1] - 99:12
**absolutely** [3] - 63:8, 82:19, 87:19
**absorbing** [1] - 37:9
**accept** [2] - 48:15, 67:12
**accepted** [1] - 46:11
**accepting** [2] - 22:23, 68:23
**access** [2] - 80:9, 92:23
**accident** [2] - 67:23, 80:2
**Accolade** [3] - 34:1, 46:12, 48:23
**accommodate** [1] -

**87:7
**account** [8] - 13:12, 13:15, 21:15, 26:12, 34:7, 51:8, 66:25, 74:21
**accounting** [2] - 93:9, 93:10
**accounts** [1] - 15:2
**accurately** [1] - 18:22
**achieved** [1] - 48:5
**act** [1] - 24:2
**acting** [4] - 22:6, 29:22, 30:2, 31:11
**action** [4] - 10:25, 23:16, 67:13, 67:22
**ACTION** [2] - 1:4, 2:11
**actions** [2] - 11:1, 11:8
**Actions** [2] - 46:11, 65:11
**active** [3] - 62:15, 62:17, 75:25
**activity** [1] - 15:1
**actors** [1] - 80:10
**actual** [4] - 12:15, 14:24, 65:14, 97:25
**ad** [1] - 92:11
**Adam** [1] - 4:25
**aDAM** [1] - 2:12
**add** [7] - 8:4, 13:16, 28:25, 50:8, 60:10, 66:25, 89:11
**added** [2] - 26:24, 48:3
**adding** [1] - 27:3
**addition** [2] - 7:20, 20:23
**additional** [3] - 51:25, 96:13, 96:21
**address** [11] - 6:20, 6:24, 13:19, 18:1, 24:8, 32:1, 47:23, 49:20, 56:11, 61:9, 63:18
**addressed** [4] - 20:9, 52:1, 74:24, 74:25
**addresses** [9] - 29:11, 29:19, 52:7, 52:9, 57:7, 66:3, 69:16, 76:7, 77:8
**addressing** [3] - 6:16, 10:16, 97:12
**adequacy** [1] - 6:18
**adequate** [8] - 7:7, 7:17, 8:9, 15:23, 22:23, 50:12, 71:24, 85:14
**adequately** [6] -

18:14, 22:7, 29:23, 30:3, 67:3, 69:21
**adhere** [1] - 98:22
**adjourned** [1] - 99:8
**administration** [1] - 32:17
**Administrator** [3] - 9:25, 16:22, 17:5
**Administrator's** [1] - 51:15
**admit** [2] - 74:11, 87:22
**admitted** [2] - 62:6, 83:13
**advise** [1] - 36:19
**advised** [1] - 35:10
**advocate** [2] - 66:2, 67:4
**advocated** [3] - 30:9, 43:2, 69:25
**advocating** [1] - 79:16
**affected** [1] - 84:22
**affidavit** [2] - 75:24, 85:10
**affirmatively** [1] - 21:9
**afternoon** [1] - 89:25
**aggressive** [1] - 58:17
**ago** [1] - 64:19
**agree** [8] - 47:2, 65:22, 70:17, 73:9, 82:15, 82:18, 85:12, 91:22
**agreed** [9] - 12:17, 27:6, 32:11, 33:9, 62:24, 80:19, 90:16, 91:4
**agreement** [2] - 26:1, 38:3
**Agreement** [14] - 7:23, 11:24, 13:21, 17:12, 26:24, 28:24, 42:19, 42:20, 48:19, 50:25, 51:1, 53:8, 83:2, 96:14
**agreements** [1] - 38:1
**agrees** [1] - 50:11
**AGs** [1] - 10:11
**ahead** [4] - 5:20, 21:18, 33:1, 37:12
**alarm** [1] - 59:5
**alert** [1] - 42:25
**alike** [1] - 74:10
**alive** [1] - 77:14
**ALL** [1] - 99:6
**allege** [2] - 26:14, 29:4

**alleged** [2] - 64:7, 64:12
**allocated** [1] - 37:8
**allow** [1] - 77:21
**allowed** [1] - 19:10
**allowing** [1] - 44:5
**allows** [2] - 77:25, 81:14
**almost** [4] - 6:6, 7:19, 9:12, 55:25
**alternative** [1] - 78:21
**alternatives** [1] - 77:18
**altogether** [1] - 61:1
**Ambler** [1] - 2:9
**Amchem** [7] - 30:11, 30:19, 69:16, 69:18, 70:4, 70:6, 75:19
**amended** [1] - 95:18
**Amended** [5] - 26:23, 51:1, 53:7, 83:1
**amendment** [6] - 21:13, 25:23, 90:17, 90:18, 91:3, 92:22
**amendments** [3] - 7:9, 38:2
**Americas** [1] - 1:18
**amount** [14] - 8:23, 8:24, 12:15, 12:16, 12:18, 33:5, 48:11, 48:18, 60:1, 90:11, 90:16, 93:8, 98:4
**analogy** [5] - 59:3, 61:23, 68:20, 80:3, 89:15
**analysis** [5] - 7:10, 16:16, 24:23, 25:4, 30:11
**analytic** [1] - 76:1
**analyze** [1] - 35:12
**Analyzing** [1] - 7:24
**AND** [1] - 2:2
**announcement** [1] - 43:7
**answer** [9] - 9:18, 14:22, 28:20, 44:21, 45:7, 58:12, 61:10, 90:5
**answered** [3] - 42:11, 61:11, 87:3
**answering** [1] - 39:22
**answers** [1] - 5:22
**Anthem** [1] - 93:22
**anticipate** [1] - 29:7
**anticipated** [1] - 94:18
**Antitrust** [1] - 46:12

**anyway** [1] - 79:4
**apart** [1] - 92:1
**apologize** [1] - 5:20
**app** [30] - 31:3, 42:22, 52:22, 52:25, 62:23, 62:24, 62:25, 65:8, 66:24, 73:17, 76:24, 76:25, 78:18, 81:4, 81:12, 81:14, 81:16, 82:2, 82:4, 82:8, 82:12, 82:16, 82:20, 83:21, 95:18
**apparent** [1] - 12:22
**aPPEARANCES** [1] - 2:1
**APPEARANCES** [1] - 1:12
**appeared** [2] - 97:3, 97:4
**appellate** [2] - 48:10, 69:11
**appendices** [1] - 99:1
**application** [2] - 43:18, 49:18
**applied** [4] - 25:12, 44:17, 45:15, 69:8
**applies** [2] - 22:24, 25:5
**apply** [1] - 54:11
**appoint** [1] - 92:11
**appointments** [1] - 34:12
**appreciate** [3] - 64:23, 87:18, 96:22
**approach** [2] - 92:13, 92:19
**appropriate** [1] - 60:16
**approvability** [2] - 7:5, 15:22
**approval** [24] - 6:17, 7:9, 7:10, 7:11, 7:15, 10:13, 15:6, 18:4, 18:25, 25:7, 25:9, 26:23, 28:11, 30:25, 38:3, 43:20, 52:2, 52:8, 52:11, 59:14, 60:10, 60:13, 60:14, 78:8
**Approval** [7] - 11:14, 27:2, 29:2, 29:15, 31:15, 43:22, 46:18
**approve** [1] - 61:3
**approved** [13] - 16:22, 17:15, 17:16, 43:13, 46:14, 46:17, 47:12, 50:13, 60:11, 65:7, 87:7, 91:25, 98:7

**approves** [1] - 7:18
**approving** [1] - 17:21
**area** [1] - 40:18
**argue** [4] - 78:4, 78:24, 79:21, 91:11
**argued** [5] - 25:10, 43:16, 66:1, 70:21, 83:6
**arguing** [7] - 23:21, 28:8, 77:10, 78:7, 78:8, 80:4, 95:4
**argument** [9] - 24:22, 77:22, 78:1, 78:3, 78:9, 78:10, 79:6, 86:13, 90:22
**arguments** [1] - 21:24
**array** [2] - 79:2, 79:23
**asbestos** [3] - 30:14, 69:17, 70:8
**asbestos-containing** [1] - 30:14
**asbestos-exposed** [1] - 70:8
**aside** [1] - 7:2
**asleep** [1] - 54:3
**aspect** [1] - 49:13
**aspects** [1] - 36:19
**assert** [2] - 57:4, 84:18
**assigning** [1] - 43:25
**assignment** [1] - 36:7
**assignments** [2] - 44:5, 44:8
**assistance** [1] - 33:7
**associated** [2] - 7:25, 12:18
**assume** [2] - 93:10, 95:21
**assumed** [2] - 25:7, 25:11, 69:15
**assumes** [1] - 46:23
**assuming** [5] - 13:25, 28:11, 28:12, 28:13, 96:3
**assumption** [2] - 93:11, 95:23
**assurance** [1] - 70:3
**assurances** [2] - 70:4, 70:7
**astonishes** [1] - 55:24
**ATM** [3] - 62:3, 73:20, 80:6
**attacked** [1] - 55:16
**attacks** [2] - 55:20, 55:23

**attempt** [2] - 15:1, 96:20
**attempted** [1] - 26:21
**attendance** [1] - 3:4
**attention** [3] - 11:3, 16:17, 39:21
**attest** [1] - 86:4
**attesting** [1] - 85:8
**Attorney** [1] - 9:9
**attorneys** [3] - 46:9, 95:11, 96:4
**Attorneys** [2] - 9:9, 10:7
**attorneys'** [18] - 6:24, 7:3, 10:10, 28:10, 32:2, 32:13, 47:21, 47:23, 48:2, 48:4, 48:15, 63:3, 91:25, 92:1, 93:7, 95:3, 97:25, 98:3
**attributable** [1] - 29:4
**attribution** [3] - 81:10, 82:23, 85:1
**audit** [1] - 43:10
**audited** [1] - 43:12
**authentic** [1] - 25:18
**authorities** [1] - 48:11
**automatically** [8] - 42:23, 52:23, 53:1, 53:2, 53:5, 53:6, 82:12
**available** [1] - 39:19
**Avenue** [3] - 1:15, 1:18, 2:8
**avoid** [2] - 43:24, 91:23
**awake** [1] - 38:24
**award** [2] - 48:14, 95:3
**awarded** [2] - 46:21, 98:15
**awards** [4] - 6:25, 32:6, 32:18, 98:3
**aware** [3] - 9:2, 39:15, 52:5
**awkward** [1] - 85:25

**B**

**bad** [9] - 55:5, 55:8, 56:9, 57:3, 59:3, 59:6, 59:11, 60:17, 62:2
**Baer** [1] - 22:13
**balance** [1] - 80:7
**Bangladesh** [2] - 53:21, 54:5
**Bank** [1] - 92:14

**bank** [16] - 17:17, 41:8, 51:8, 53:22, 59:3, 59:4, 59:8, 61:24, 62:2, 62:6, 62:7, 66:25, 73:19, 80:3, 80:4
**Baptiste** [1] - 24:15
**bar** [2] - 77:4, 89:12
**bare** [1] - 19:1
**barely** [1] - 90:5
**based** [11] - 5:17, 22:18, 22:20, 48:23, 60:18, 60:21, 61:3, 95:24, 95:25, 97:25, 98:2
**basis** [2] - 32:24, 58:6
**battle** [3] - 27:16, 27:22, 27:23
**became** [1] - 65:15
**Becker's** [1] - 92:16
**become** [1] - 92:2
**becomes** [1] - 27:13
**BEFORE** [1] - 1:10
**beginning** [3] - 23:20, 63:24, 69:4
**behalf** [10] - 3:5, 5:4, 6:7, 21:20, 42:13, 48:16, 49:17, 66:9, 90:12, 91:10
**behind** [3] - 16:12, 75:16, 76:17
**believes** [1] - 59:11
**below** [1] - 54:17
**Ben** [1] - 3:16
**bench** [1] - 96:12
**beneficiaries** [1] - 48:15
**benefit** [6] - 20:24, 33:6, 33:13, 47:15, 48:6, 48:16
**benefits** [5] - 7:18, 43:1, 48:8, 48:16, 98:15
**bENJAMIN** [1] - 1:14
**bERGER** [1] - 1:21
**Berger** [2] - 31:25, 38:13
**Best** [1] - 20:2
**best** [5] - 20:8, 31:10, 41:22, 60:7, 61:7
**bet** [1] - 73:4
**Bethlehem** [1] - 24:16
**better** [7] - 21:12, 21:15, 40:9, 53:15, 70:23, 73:13
**between** [11] - 8:7, 9:14, 23:9, 25:17,

27:15, 28:17, 30:20, 48:1, 64:6, 90:4, 95:3
**beyond** [4] - 7:21, 18:13, 51:5, 59:21
**big** [9] - 32:8, 32:9, 35:16, 40:24, 41:1, 41:18, 42:21, 71:4, 96:17
**bigger** [1] - 74:3
**Bill** [3] - 4:11, 4:17, 81:15
**billing** [2] - 44:1, 44:8
**binder** [1] - 83:4
**binding** [1] - 7:22
**bit** [3] - 13:16, 18:12, 65:24
**BLACK** [1] - 2:2
**blended** [2] - 46:16, 46:18
**Board** [1] - 57:18
**Bobbie** [1] - 4:16
**BOCKIUS** [1] - 2:15
**Bockius** [3] - 3:25, 4:4, 4:6
**bodily** [1] - 89:17
**bona** [1] - 73:5
**book** [2] - 78:20, 81:18
**bottom** [2] - 21:11, 73:8
**bought** [3] - 20:2, 72:16, 92:4
**bouquet** [1] - 67:19
**branch** [1] - 56:12
**breach** [35] - 8:3, 9:3, 19:13, 19:23, 21:6, 22:16, 23:16, 24:1, 30:5, 30:8, 30:18, 33:24, 34:1, 35:10, 36:4, 36:19, 36:20, 40:16, 41:4, 41:18, 44:14, 54:23, 59:24, 64:10, 70:10, 72:20, 73:14, 81:5, 81:19, 81:20, 84:22, 86:5, 87:2
**Breach** [4] - 19:4, 23:19, 93:22
**break** [2] - 6:8, 72:15
**breathtaking** [1] - 55:25
**brief** [6] - 8:20, 10:12, 11:14, 12:4, 16:4, 18:6, 33:15, 34:8, 46:16, 46:19, 48:1, 60:22, 96:15, 96:16, 96:18, 96:21
**briefed** [1] - 18:4
**briefing** [3] - 16:3,

25:22, 38:4
**briefly** [4] - 88:3, 89:24, 96:20, 97:14
**briefs** [3] - 16:3, 34:11, 43:15
**bright** [1] - 22:9
**bring** [2] - 26:2, 31:7
**bringing** [1] - 11:2
**brings** [1] - 29:21
**Broad** [1] - 2:4
**broad** [2] - 89:6, 89:13
**broad-sweeping** [1] - 89:13
**broadly** [1] - 65:5
**Brody** [1] - 98:6
**broke** [1] - 59:4
**brought** [4] - 15:9, 64:11, 64:18, 85:4
**bucks** [10] - 66:21, 67:1, 67:2, 67:3, 71:23, 72:5, 76:20, 78:20, 83:7, 83:18
**bulk** [1] - 35:9
**bunch** [2] - 55:5, 74:9
**burden** [3] - 85:13, 85:16, 87:5
**burning** [1] - 15:25
**business** [4] - 34:15, 39:25, 40:6, 81:18
**busy** [1] - 19:9
**buy** [1] - 57:21
**Buy** [1] - 20:2
**BY** [6] - 1:14, 1:21, 2:3, 2:7, 2:12, 2:15
**bye** [1] - 99:7

---

**C**

**C.A.T** [1] - 2:24
**calculate** [1] - 97:25
**calculated** [1] - 32:23
**calculation** [2] - 48:3, 93:2
**calculations** [1] - 97:20
**cannot** [1] - 77:12
**cap** [2] - 12:21, 14:15
**capacity** [3] - 62:12, 67:12, 77:13
**captured** [1] - 59:16
**car** [5] - 67:23, 67:24, 68:24, 80:2, 89:16
**card** [63] - 21:6, 21:7, 24:3, 24:24, 26:14, 26:20, 26:25, 28:6,

30:7, 30:18, 31:1, 31:3, 31:4, 31:9, 41:8, 42:23, 44:14, 50:18, 51:5, 52:14, 52:16, 52:23, 53:3, 53:11, 53:13, 53:15, 53:16, 53:18, 54:4, 54:7, 54:8, 55:2, 56:21, 58:8, 58:25, 59:2, 59:7, 62:4, 64:2, 64:5, 64:10, 67:18, 72:10, 72:17, 73:3, 73:18, 76:17, 78:23, 80:11, 81:4, 81:12, 81:17, 81:22, 82:3, 82:4, 82:5, 82:17, 83:10, 83:23, 83:24, 89:10, 89:14, 93:10
**cards** [20] - 8:18, 9:20, 16:3, 21:14, 22:23, 30:5, 41:17, 43:9, 47:20, 54:18, 55:4, 55:6, 55:9, 55:18, 64:3, 81:14, 88:11, 95:19, 95:24, 95:25
**care** [11] - 22:17, 23:22, 25:12, 62:13, 62:16, 78:20, 90:23, 90:24, 91:1, 94:24, 99:3
**careful** [2] - 64:22, 69:12
**carefully** [3] - 11:13, 41:6, 66:5
**Carla** [1] - 76:4
**Carlough** [1] - 52:18
**carve** [5] - 26:24, 51:6, 63:22, 63:23, 78:13
**carve-out** [3] - 51:6, 63:22, 63:23
**carved** [1] - 89:7
**carves** [3] - 22:4, 26:6, 77:17
**carving** [1] - 30:1
**case** [56] - 3:6, 8:1, 8:15, 8:16, 10:11, 18:14, 18:16, 19:18, 19:23, 20:4, 20:13, 21:4, 21:8, 23:5, 23:19, 24:25, 29:10, 30:10, 34:1, 34:5, 34:17, 40:11, 40:21, 41:2, 41:14, 41:19, 43:14, 43:19, 44:17, 44:24, 46:23, 46:24, 48:13, 54:11, 57:9, 60:7, 64:11, 70:7, 70:23, 71:13, 74:12,

77:11, 77:22, 79:3, 92:14, 93:7, 93:13, 93:14, 94:9, 95:11, 98:9, 98:13, 98:14, 98:18
**cases** [35] - 8:3, 9:3, 9:4, 9:5, 12:24, 19:13, 19:15, 21:7, 21:14, 24:12, 33:24, 38:22, 40:15, 40:16, 40:19, 41:4, 41:12, 41:24, 41:25, 44:14, 45:21, 46:13, 46:15, 46:18, 47:25, 48:12, 58:1, 58:4, 70:22, 71:25, 93:21, 97:19, 97:23, 98:1, 98:12
**cash** [7] - 17:7, 31:3, 47:20, 48:24, 52:17, 54:12, 59:8
**causation** [4] - 34:13, 41:14, 58:9, 74:15
**caused** [1] - 59:24
**causes** [1] - 67:22
**causing** [2] - 22:21, 22:22
**CENTER** [1] - 2:11
**CEO** [2] - 62:18, 79:7
**cert's** [1] - 71:7
**certain** [2] - 8:23, 47:5
**certainly** [11] - 6:13, 9:17, 9:19, 11:3, 13:12, 40:25, 67:25, 80:18, 85:18, 91:21, 96:9
**Certainly** [1] - 95:7
**certainty** [1] - 94:21
**Certification** [3] - 9:1, 41:24, 42:1
**certification** [5] - 6:17, 8:11, 18:2, 34:14, 59:22
**certify** [1] - 99:11
**cetera** [2] - 28:11, 28:17
**Chairman** [1] - 57:18
**challenge** [1] - 57:5
**chambers** [2] - 34:3, 38:17
**chance** [2] - 67:4, 76:4
**chances** [1] - 71:3
**Chand** [1] - 24:16
**change** [4] - 11:19, 18:8, 44:16, 44:19
**changes** [5] - 15:10, 45:3, 45:6, 45:8, 65:8
**charge** [7] - 53:20,

53:21, 53:23, 54:3,
54:4, 54:5, 76:2
    **charged** [1] - 84:7
    **chart** [1] - 21:2
    **check** [2] - 53:15,
58:20
        **checked** [1] - 53:16
    **checkout** [1] - 51:19
    **Chief** [4] - 23:4,
23:23, 24:5, 24:7
    **CHIMICLES** [1] -
1:13
    **Chipotle** [1] - 21:4
    **chips** [1] - 55:4
    **choose** [1] - 8:6
    **Circuit** [12] - 23:15,
24:13, 46:4, 46:17,
46:21, 46:22, 48:10,
90:14, 91:23, 92:13,
98:12, 98:13
    **circuit** [2] - 63:7,
92:4
    **Circuit's** [1] - 33:13
    **circumstances** [3] -
5:16, 6:1, 42:18
    **circumvent** [1] - 25:1
    **cite** [6] - 10:11,
46:15, 46:18, 47:25,
92:14, 95:14
        **cited** [6] - 18:25,
24:12, 48:12, 52:17,
62:12, 97:23
    **cites** [1] - 98:11
    **CIVIL** [1] - 1:4
    **claim** [33] - 12:19,
12:25, 13:19, 13:22,
48:15, 51:7, 51:9,
53:7, 56:19, 57:3,
58:4, 67:9, 67:18,
67:23, 67:24, 68:4,
68:11, 68:14, 68:15,
68:16, 68:17, 69:1,
74:22, 75:5, 75:7,
82:15, 84:9, 89:16,
89:17, 94:10, 94:12,
95:19
    **claimants** [3] -
13:18, 13:21, 73:16
    **claimed** [1] - 20:5
    **claims** [91] - 9:15,
11:20, 12:2, 12:7,
12:10, 12:13, 12:18,
14:8, 14:14, 17:19,
17:21, 19:21, 20:21,
20:25, 21:8, 22:5,
24:23, 25:5, 26:6,
26:9, 26:17, 26:20,
26:25, 27:13, 27:14,
27:24, 28:4, 28:5,
28:16, 29:6, 29:8,

29:11, 29:20, 30:2,
30:4, 33:22, 38:5,
43:11, 43:12, 48:8,
48:25, 56:17, 59:18,
60:2, 60:3, 62:21,
63:24, 64:2, 64:3,
64:5, 65:9, 65:11,
65:15, 65:19, 66:9,
67:20, 68:3, 69:20,
70:2, 71:22, 78:22,
79:23, 85:21, 87:8,
87:12, 88:8, 89:10,
89:12, 93:13, 93:16,
93:17, 94:11, 94:13,
94:16, 94:19, 94:21,
95:3, 95:4, 95:12,
95:15, 96:6, 97:18,
97:21, 97:23, 98:1,
98:7, 98:8, 98:20
    **Claims** [2] - 9:24,
17:5
    **clarification** [1] -
88:7
    **clarifies** [1] - 11:19
    **clarify** [2] - 27:4,
86:23
    **clarity** [3] - 13:4,
29:1, 89:11
    **CLASS** [1] - 2:11
    **class** [14] - 8:1,
10:25, 11:1, 11:8,
13:24, 30:21, 34:13,
52:12, 59:19, 59:22,
64:16, 64:21, 70:10,
71:7
    **Class** [75] - 4:20,
6:18, 8:23, 9:1, 9:6,
11:11, 14:6, 18:2,
18:24, 27:6, 30:9,
30:13, 30:17, 30:19,
31:10, 32:1, 33:6,
33:10, 34:2, 34:5,
34:17, 34:18, 39:23,
41:23, 42:1, 43:6,
46:8, 46:11, 47:20,
48:6, 48:8, 48:17,
48:18, 48:20, 48:24,
48:25, 51:4, 52:20,
54:14, 54:16, 57:2,
58:2, 58:17, 58:19,
61:22, 62:13, 64:18,
65:11, 66:10, 74:13,
75:16, 84:24, 85:14,
87:20, 90:7, 90:20,
90:25, 91:6, 91:8,
91:11, 91:24, 92:11,
92:12, 92:24, 94:4,
94:8, 96:6, 97:3, 97:5,
98:5, 98:8, 98:15,
98:17

    **Class's** [1] - 93:8
    **CLE** [1] - 21:1
    **clean** [2] - 28:23,
96:13
        **cleaned** [1] - 59:23
    **clear** [13] - 11:23,
11:24, 12:4, 25:8,
26:21, 27:8, 27:24,
28:21, 29:1, 50:18,
64:4, 78:6, 97:7
        **clearly** [6] - 28:3,
51:3, 52:11, 57:19,
64:7, 76:11
    **clerk** [1] - 89:5
    **Clerk** [1] - 3:1
        **clicked** [1] - 51:14
    **client** [1] - 88:10
        **client's** [1] - 63:18
        **clients** [1] - 83:6
    **clock** [2] - 30:7, 31:6
    **clocks** [1] - 59:23
    **close** [3] - 16:6, 61:1,
89:5
        **closely** [1] - 34:22
    **CM** [2] - 2:20, 99:17
    **co** [4] - 23:18, 31:25,
44:5, 44:9
    **co-lead** [3] - 23:18,
31:25, 44:5
        **co-lead's** [1] - 44:9
    **code** [1] - 51:15
    **coffee** [3] - 66:15,
72:17, 73:5
    **colleague** [5] - 6:19,
6:23, 11:16, 21:17,
76:4
    **colleagues** [13] - 4:1,
6:11, 9:18, 10:17,
19:3, 19:7, 27:22,
28:14, 39:9, 49:16,
59:23, 63:5, 77:3
    **collect** [1] - 48:21
        **collecting** [1] - 22:14
    **collective** [2] -
43:23, 46:9
    **Collective** [1] - 34:11
    **College** [1] - 24:16
    **colloquy** [3] - 62:11,
67:17, 90:2
    **Colorado** [1] - 21:5
    **Columbia** [3] -
34:16, 40:2
    **combined** [1] - 39:3
    **Comcast** [1] - 98:6
    **comfortable** [1] - 3:3
    **comfy** [1] - 3:13
    **coming** [8] - 15:14,
60:4, 60:18, 65:12,
71:9, 72:12, 81:7,
96:10

    **commodities** [1] -
47:1
    **common** [9] - 12:23,
22:20, 33:21, 33:22,
48:5, 90:15, 92:2,
92:18
    **commonly** [1] -
46:21
    **communicate** [1] -
76:9
    **communication** [2] -
13:10, 87:13
    **communications** [1]
- 14:2
    **Community** [1] -
92:14
    **companies** [2] -
23:12, 55:3
    **company** [3] - 54:7,
54:8, 56:9
    **Company** [1] - 24:17
    **company's** [1] - 79:4
    **comparable** [1] -
20:25
    **compare** [1] - 45:19
    **compared** [1] - 46:24
    **compensates** [1] -
67:3
    **compensation** [1] -
48:24
    **Complaint** [2] -
34:19, 34:23
    **complaint** [8] -
24:19, 80:17, 84:19,
84:25, 85:2, 85:8,
86:2, 86:25
    **Complaints** [1] -
34:10
    **complaints** [1] - 25:1
    **completely** [1] -
59:25
    **component** [1] -
92:24
    **components** [1] -
47:22
    **comprehensive** [1] -
8:21
    **compromise** [1] -
64:8
    **compromised** [9] -
21:25, 26:11, 62:25,
69:20, 71:23, 71:25,
73:20, 82:8, 82:20
    **computer** [1] - 80:5
    **concede** [4] - 67:5,
74:12, 78:5, 79:20
    **conceded** [3] - 62:1,
66:2, 73:20
    **concedes** [1] - 48:2
    **conceding** [1] - 79:3

    **concept** [1] - 48:22
    **concern** [5] - 13:23,
25:18, 80:13, 87:11,
94:25
    **concerned** [5] - 3:14,
18:9, 18:11, 19:17,
73:10
    **concerning** [1] -
38:7
    **concerns** [5] - 19:23,
29:19, 63:19, 85:15,
87:7
    **conclude** [2] - 6:7,
25:2
    **concluded** [3] -
22:14, 23:11, 24:22
    **conclusion** [3] -
22:25, 23:4, 24:18
    **concrete** [2] - 41:7,
57:10
    **concurrence** [1] -
24:6
    **concurring** [2] -
23:5, 23:6
    **conduct** [4] - 22:14,
22:21, 22:22, 24:10
    **conducted** [1] -
34:20
    **conference** [3] -
43:17, 85:4, 87:1
    **conferences** [1] -
96:17
    **conferred** [1] - 12:12
    **confident** [1] - 83:12
    **configured** [1] -
77:21
    **confirm** [1] - 88:10
    **conflict** [4] - 30:20,
91:7, 91:12, 91:22
    **Congress** [2] - 56:3,
56:10
    **connection** [2] -
13:19, 86:12
    **conscientious** [1] -
91:9
    **conservatism** [1] -
44:9
    **consider** [2] - 21:24,
66:13
    **consideration** [1] -
29:24
    **considerations** [1] -
33:14
    **considered** [1] -
35:22
    **considering** [1] -
47:18
    **consistent** [3] -
21:12, 44:5, 46:10
    **consists** [2] - 47:19,

66:10
**consolidated** [1] - 34:19
**consolidation** [2] - 34:10, 34:11
**constantly** [1] - 41:3
**constitutes** [1] - 41:3
**construct** [4] - 12:20, 53:9, 92:5, 92:6
**constructed** [1] - 90:10
**constructive** [4] - 48:5, 90:15, 92:2, 92:18
**consulted** [1] - 36:3
**consume** [1] - 65:1
**consumer** [23] - 11:20, 17:20, 53:12, 58:7, 58:10, 64:1, 64:16, 64:19, 69:10, 72:19, 72:21, 73:24, 74:4, 74:5, 74:7, 75:18, 79:19, 80:20, 82:3, 83:16, 86:17, 93:17
**Consumer** [23] - 1:5, 1:16, 1:19, 1:24, 2:5, 3:6, 3:17, 3:21, 3:23, 4:16, 4:20, 4:22, 4:24, 21:20, 25:17, 27:18, 30:3, 30:8, 32:1, 62:11, 79:13, 84:24, 93:23
**consumers** [31] - 7:19, 11:20, 11:21, 11:23, 22:6, 22:7, 22:24, 24:1, 25:12, 26:13, 29:5, 29:13, 29:22, 29:24, 30:2, 30:22, 30:23, 31:9, 31:11, 31:12, 41:21, 64:25, 65:5, 69:23, 73:15, 74:10, 78:22, 80:18, 85:15
**Consumers** [1] - 87:20
**CONT** [2] - 1:25, 2:1
**contacted** [2] - 34:17, 76:10
**contained** [1] - 53:1
**containing** [1] - 30:14
**contend** [1] - 22:3
**contends** [1] - 26:10
**context** [5] - 7:24, 9:2, 23:3, 24:1, 25:5
**continue** [3] - 12:2, 75:17, 77:13
**continued** [1] - 28:12

**continues** [1] - 22:11
**continuum** [3] - 8:7, 8:10, 90:3
**conversation** [2] - 49:19, 53:25
**convinced** [2] - 23:2, 28:20
**convincing** [1] - 24:7
**copy** [6] - 38:8, 39:2, 39:12, 57:21, 89:4, 96:13
**corporate** [1] - 61:24
**corporation** [1] - 98:18
**correct** [9] - 28:13, 56:5, 57:8, 82:7, 82:9, 82:19, 84:3, 93:11, 99:11
**corresponded** [1] - 34:16
**cost** [1] - 18:20
**COUNSEL** [1] - 99:6
**counsel** [28] - 4:1, 5:9, 5:25, 23:18, 27:19, 31:25, 35:2, 36:11, 36:16, 37:9, 40:11, 44:2, 44:3, 44:6, 44:9, 44:10, 46:13, 48:20, 57:5, 62:11, 67:5, 90:12, 93:24, 95:12, 95:13, 97:3, 97:4
**Counsel** [13] - 27:7, 30:4, 31:10, 32:4, 34:5, 58:17, 61:22, 62:13, 87:20, 92:12, 94:4, 94:8, 98:17
**Counsel's** [2] - 34:2, 46:8
**counted** [2] - 15:13
**counter** [4] - 51:19, 65:3, 72:8, 76:18
**counterpoints** [1] - 37:23
**country** [2] - 41:4, 41:25
**counts** [1] - 34:14
**couple** [4] - 5:17, 53:17, 87:21, 97:10
**course** [10] - 7:6, 7:17, 8:25, 14:24, 15:11, 16:8, 19:12, 20:1, 47:10, 95:18
**COURT** [246] - 1:1, 3:2, 3:18, 4:8, 4:13, 5:2, 5:10, 6:5, 6:13, 6:22, 8:6, 8:13, 9:11, 9:14, 9:22, 10:2, 10:16, 10:19, 10:21, 11:5, 12:6, 12:9, 13:3,

13:9, 13:13, 13:23, 14:9, 14:11, 14:14, 14:18, 14:21, 15:25, 16:2, 16:13, 16:16, 16:21, 16:24, 17:1, 17:4, 17:10, 17:14, 17:22, 17:25, 18:7, 19:3, 19:8, 19:11, 19:20, 20:8, 20:12, 20:16, 20:20, 21:18, 25:13, 25:16, 27:10, 28:1, 28:8, 28:19, 31:16, 31:21, 31:23, 32:5, 32:8, 32:10, 32:14, 32:19, 32:22, 33:3, 33:17, 35:3, 35:13, 35:24, 36:6, 36:10, 36:13, 36:22, 37:2, 37:6, 37:9, 37:12, 38:6, 38:13, 38:19, 38:24, 39:2, 39:7, 39:21, 40:14, 40:24, 42:9, 42:11, 44:16, 44:21, 44:23, 45:2, 45:7, 45:10, 45:12, 45:14, 45:18, 46:3, 46:7, 46:23, 47:3, 47:6, 49:2, 49:5, 49:8, 49:11, 49:14, 49:16, 49:23, 50:1, 50:4, 50:7, 50:8, 50:10, 50:23, 51:11, 51:17, 51:24, 52:22, 53:4, 54:21, 55:1, 55:24, 56:2, 56:7, 56:10, 56:13, 57:6, 57:12, 57:21, 57:24, 58:14, 61:11, 61:14, 61:16, 61:19, 63:6, 63:9, 63:13, 63:16, 65:14, 65:21, 65:24, 67:6, 67:15, 67:19, 67:22, 68:1, 68:3, 68:7, 68:11, 68:14, 68:23, 69:1, 70:12, 70:15, 71:2, 71:5, 71:9, 71:17, 71:21, 72:13, 73:1, 73:4, 73:12, 73:22, 74:1, 74:3, 75:2, 75:4, 75:7, 75:9, 75:14, 77:10, 77:20, 77:24, 78:2, 78:5, 79:25, 80:24, 81:3, 81:7, 81:21, 81:24, 82:6, 82:21, 83:3, 83:5, 83:9, 83:15, 83:18, 83:20, 83:23, 84:1, 84:4, 84:14, 84:17, 84:21, 85:5, 85:7, 85:9,

85:16, 85:23, 86:3, 86:8, 86:11, 86:16, 86:19, 87:3, 87:10, 87:17, 87:19, 88:4, 88:14, 88:16, 88:19, 88:23, 88:25, 89:3, 89:23, 90:9, 90:22, 91:5, 91:17, 92:4, 92:7, 93:1, 94:1, 94:6, 94:23, 95:2, 95:8, 96:9, 97:8, 97:11, 97:14, 97:16, 98:23, 99:7
**Court** [38] - 2:21, 6:15, 7:11, 7:17, 21:20, 21:23, 22:12, 22:18, 22:24, 23:2, 24:2, 24:15, 25:25, 26:12, 26:21, 28:3, 31:14, 31:19, 33:19, 33:24, 46:11, 48:9, 48:22, 50:19, 61:3, 61:5, 61:21, 62:3, 74:16, 76:2, 89:2, 90:6, 90:19, 92:22, 97:24, 99:8, 99:17
**court** [6] - 3:1, 3:11, 29:13, 43:17, 56:24, 69:11
**Court's** [5] - 6:19, 11:3, 29:15, 90:6, 91:8
**Courthouse** [1] - 2:21
**courtroom** [4] - 3:9, 88:21, 89:20, 97:6
**courts** [6] - 23:14, 46:14, 46:17, 47:24, 48:9, 48:10
**cover** [5] - 27:5, 27:9, 35:15, 87:23
**coverage** [1] - 60:25
**covered** [1] - 60:10
**covering** [1] - 79:4
**crafting** [1] - 63:25
**create** [1] - 22:18
**created** [4] - 12:4, 22:16, 24:3, 72:22
**creates** [1] - 63:21
**credit** [27] - 8:18, 24:2, 41:8, 41:9, 41:17, 51:4, 53:15, 53:16, 54:4, 54:7, 54:8, 55:2, 55:5, 55:18, 56:21, 58:8, 59:2, 62:4, 72:17, 80:11, 81:4, 81:17, 81:22, 82:5, 82:16, 83:23, 83:24
**critical** [1] - 36:24

**criticizes** [1] - 98:3
**critique** [1] - 63:2
**crop** [1] - 5:23
**cross** [2] - 85:11, 85:21
**cross-examination** [1] - 85:11
**cross-examine** [1] - 85:21
**crosscheck** [4] - 9:25, 33:13, 47:15, 47:22
**crosswalk** [1] - 77:7
**CRR** [2] - 2:20, 99:17
**Crush** [1] - 76:3
**crystal** [4] - 26:21, 27:8, 29:1, 50:18
**CSR** [2] - 2:20, 99:17
**cup** [2] - 72:17, 73:5
**cure** [1] - 12:25
**curiosity** [1] - 10:23
**current** [7] - 44:20, 52:3, 52:4, 52:12, 63:17, 63:20, 67:7
**customer** [3] - 66:13, 84:10, 86:18
**customers** [15] - 57:16, 57:20, 65:3, 66:6, 66:9, 66:10, 66:11, 66:12, 66:14, 66:15, 75:23, 84:6, 84:12, 86:6
**cyber** [2] - 19:8, 19:16

## D

**damage** [4] - 68:17, 79:4, 89:16, 89:17
**damages** [1] - 34:13
**dark** [2] - 35:22, 55:9
**DATA** [1] - 1:4
**Data** [5] - 3:5, 19:4, 23:19, 93:22
**data** [36] - 8:3, 9:2, 19:13, 22:16, 23:16, 24:1, 26:20, 28:7, 30:5, 30:8, 30:18, 31:9, 33:24, 34:1, 34:24, 35:10, 36:3, 36:19, 36:20, 40:16, 41:4, 41:18, 52:13, 52:25, 53:14, 64:10, 70:10, 72:20, 73:14, 81:5, 81:19, 84:22, 87:2, 89:10
**data-breach** [1] - 33:24
**date** [2] - 43:9, 97:2

**Date** [1] - 99:19

**days** [8] - 13:7, 13:9, 13:11, 13:22, 55:5, 55:6, 57:9, 70:24

**DC** [1] - 2:13

**dead** [1] - 97:17

**deal** [11] - 38:21, 49:16, 54:1, 60:13, 63:2, 69:16, 73:10, 73:17, 86:7, 90:10

**dealing** [1] - 55:22

**dealt** [2] - 26:13, 98:6

**debate** [2] - 41:19, 62:22

**debit** [3] - 24:3, 73:3, 81:25

**December** [1] - 87:9

**decide** [2] - 71:12, 79:7

**decided** [9] - 23:20, 24:17, 26:2, 45:21, 45:25, 46:1, 57:18, 82:11, 98:13

**deciding** [1] - 24:18

**decision** [5] - 52:21, 57:10, 64:4, 69:12, 92:16

**decisions** [1] - 23:16

**declaration** [13] - 16:8, 16:11, 35:16, 36:6, 36:7, 36:12, 38:7, 38:9, 38:12, 39:4, 39:11, 85:10, 91:21

**Declaration** [1] - 35:7

**declarations** [3] - 15:8, 18:19, 38:12

**dedicated** [1] - 66:25

**deduct** [1] - 47:11

**deducting** [1] - 47:16

**deductions** [1] - 45:20

**defacing** [1] - 88:25

**defend** [2] - 58:6, 58:8

**defendant** [4] - 37:20, 47:23, 67:14, 69:13

**Defendant** [4] - 2:18, 3:25, 4:4, 4:6

**defendant's** [3] - 22:21, 37:23, 43:19

**Defendant's** [1] - 24:2

**defends** [1] - 58:6

**defense** [4] - 58:5, 67:5, 71:11, 93:24

**deficiencies** [1] -

17:4

**deficiency** [3] - 12:23, 13:4, 13:20

**deficient** [1] - 13:22

**definitely** [1] - 91:15

**definition** [1] - 65:5

**degrees** [1] - 30:16

**delays** [1] - 13:16

**deliberately** [1] - 8:6

**delivered** [1] - 8:23

**demand** [2] - 20:8, 20:9

**demonstrated** [1] - 85:19

**denied** [1] - 80:17

**denominator** [1] - 65:23

**dependents** [1] - 51:7

**deposed** [1] - 40:12

**deposit** [1] - 51:9

**deposition** [2] - 40:9, 42:8

**Depot** [5] - 21:6, 45:23, 45:24, 55:5, 93:19

**deprived** [1] - 92:24

**Deputy** [1] - 3:1

**deputy** [1] - 21:3

**description** [1] - 67:12

**desktop** [1] - 81:15

**despite** [1] - 29:14

**detailed** [1] - 34:7

**details** [1] - 63:23

**determination** [1] - 24:21

**determined** [3] - 12:9, 12:10, 48:17

**developing** [1] - 37:23

**DEVER** [2] - 2:3, 4:23

**Dever** [1] - 4:23

**devil** [1] - 63:22

**devoted** [1] - 98:17

**Dick** [1] - 57:23

**difference** [3] - 16:2, 25:16, 84:13

**different** [28] - 10:5, 24:18, 26:13, 30:12, 30:13, 30:14, 30:15, 30:16, 34:15, 36:4, 36:18, 40:3, 43:25, 46:4, 56:17, 67:9, 68:3, 69:22, 70:21, 72:4, 72:8, 72:16, 72:20, 72:21, 87:15

**differentiated** [1] - 30:22

**differently** [3] - 51:18, 65:2, 82:3

**difficult** [4] - 70:22, 72:1, 98:9, 98:18

**dig** [1] - 35:21

**direct** [7] - 20:24, 51:9, 52:3, 54:23, 75:22, 87:13, 90:1

**directed** [1] - 80:20

**directly** [4] - 7:19, 47:23, 49:20, 96:23

**disagreed** [1] - 23:24

**disagrees** [1] - 59:10

**disclosures** [1] - 37:21

**disconnect** [1] - 66:16

**discount** [4] - 31:2, 72:25, 73:7, 77:1

**discovering** [2] - 62:2, 80:7

**discovery** [4] - 37:14, 71:14, 79:11, 86:22

**discrepancy** [1] - 16:12

**discussed** [6] - 25:6, 30:24, 33:14, 43:14, 56:6, 79:15

**discusses** [1] - 85:3

**discussion** [5] - 62:9, 62:22, 63:7, 69:14, 89:21

**dismiss** [9] - 23:1, 24:19, 43:19, 45:25, 46:1, 64:4, 70:1, 70:21, 80:17

**disproportion** [1] - 91:19

**disproportionate** [1] - 10:9

**dispute** [3] - 11:13, 40:20, 48:4

**dissatisfied** [1] - 29:16

**disseminated** [1] - 62:20

**dissenting** [1] - 23:6

**distinct** [2] - 74:22, 74:24

**distinction** [1] - 84:12

**distributed** [2] - 7:19, 98:4

**distribution** [3] - 9:25, 47:13, 88:12

**district** [1] - 46:14

**District** [4] - 23:17, 34:15, 40:2

**DISTRICT** [2] - 1:1,

1:2

**districts** [1] - 23:14

**Dittman** [20] - 22:2, 22:8, 22:12, 22:18, 23:2, 23:12, 23:22, 23:25, 24:22, 25:3, 25:4, 29:24, 58:2, 58:3, 69:6, 69:7, 69:11, 69:25, 72:2, 74:12

**divined** [1] - 38:7

**docket** [3] - 11:4, 38:18, 38:21

**Docket** [2] - 50:20, 66:7

**docketed** [1] - 3:6

**Document** [1] - 35:17

**document** [4] - 25:24, 26:1, 28:23, 37:15

**documentary** [1] - 94:11

**documentation** [1] - 37:19

**documents** [6] - 12:20, 17:6, 34:22, 37:16, 37:19

**dollar** [4] - 12:18, 90:11, 93:6, 93:9

**dollars** [2] - 90:24, 93:2

**Don** [2] - 4:9, 61:21

**DONALD** [1] - 2:7

**DONALDSON** [1] - 1:13

**DONALDSON-SMITH** [1] - 1:13

**done** [5] - 27:12, 43:24, 45:17, 72:11, 76:5

**door** [4] - 59:4, 78:7, 80:6, 80:9

**double** [1] - 98:25

**down** [9] - 15:20, 16:10, 16:14, 25:16, 63:16, 79:21, 80:14, 81:9, 86:12

**dozens** [1] - 34:18

**drafted** [3] - 34:10, 34:23, 43:15

**drafting** [4] - 5:18, 38:1, 38:2, 38:3

**drawers** [2] - 59:8

**dreams** [1] - 59:21

**drilling** [1] - 86:12

**dual** [3] - 62:12, 67:12, 77:13

**due** [4] - 18:14, 60:1, 69:17, 72:5

**duplication** [1] - 43:24

**duplicative** [6] - 24:24, 25:1, 74:23, 78:24, 78:25

**during** [8] - 30:5, 30:7, 30:18, 31:6, 44:19, 52:16, 64:8, 82:17

**duties** [3] - 22:18, 22:20, 90:20

**duty** [19] - 22:17, 23:13, 23:22, 23:25, 24:5, 24:8, 25:12, 29:25, 31:9, 58:4, 58:5, 58:7, 58:19, 69:14, 72:9, 73:25, 74:3, 74:14

---

**E**

**e-mail** [11] - 13:18, 13:19, 13:20, 13:25, 14:1, 42:22, 52:7, 53:2, 82:11, 88:12, 88:18

**e-mails** [6] - 14:4, 76:8, 76:9, 76:10, 96:1

**E.K** [1] - 1:10

**early** [2] - 44:15, 45:21

**earned** [1] - 18:17

**ears** [1] - 71:2

**easier** [1] - 3:11

**easily** [1] - 39:10

**EASTERN** [1] - 1:2

**easy** [1] - 76:20

**echelon** [1] - 72:3

**economic** [2] - 90:13, 90:22

**edited** [1] - 63:17

**edition** [1] - 65:11

**effects** [1] - 64:10

**effectuate** [1] - 18:17

**efficient** [3] - 5:21, 18:18, 44:1

**efficiently** [1] - 43:24

**effort** [3] - 74:21, 80:7, 98:17

**efforts** [2] - 36:12, 37:21

**Eggs** [1] - 46:12

**Eighth** [1] - 46:3

**either** [6] - 42:13, 60:17, 86:13, 87:20, 92:18, 92:20

**elaborate** [1] - 29:3

**eligible** [1] - 14:25,

53:5

**employ** [1] - 33:19
**employed** [2] - 31:1, 48:22
**employee** [40] - 12:2, 22:5, 24:23, 26:6, 26:9, 26:15, 26:16, 26:17, 26:25, 29:8, 30:2, 43:21, 58:11, 58:15, 59:10, 59:15, 59:16, 64:2, 68:22, 69:5, 69:23, 72:7, 72:10, 72:15, 72:18, 72:25, 73:23, 74:1, 75:18, 77:1, 77:16, 78:21, 79:20, 83:10, 83:14, 83:16, 86:14, 86:16, 88:8
**Employee** [24] - 2:9, 4:10, 4:18, 5:4, 21:23, 22:11, 24:19, 25:3, 25:19, 26:10, 26:11, 27:12, 27:24, 28:5, 28:16, 28:18, 29:6, 29:20, 31:15, 43:19, 58:2, 61:22, 63:24, 77:11
**employee's** [2] - 71:24, 74:21
**employee-specific** [5] - 22:5, 26:6, 26:9, 26:25, 30:2
**Employees** [4] - 23:21, 29:3, 30:22, 66:12
**employees** [75] - 10:13, 11:22, 12:1, 15:18, 21:24, 22:6, 23:10, 25:2, 26:14, 29:5, 29:12, 29:14, 29:17, 29:19, 29:22, 29:25, 30:2, 30:25, 31:11, 50:17, 51:6, 51:18, 51:23, 52:1, 52:3, 52:4, 52:6, 52:8, 52:10, 52:12, 52:14, 52:15, 53:10, 59:12, 60:9, 62:12, 62:18, 64:22, 65:1, 66:14, 66:17, 66:19, 66:22, 67:7, 69:8, 69:22, 69:24, 72:3, 73:17, 74:10, 75:23, 76:2, 76:5, 76:9, 76:12, 76:25, 77:6, 77:17, 78:13, 78:18, 79:9, 79:14, 80:22, 80:23, 84:8, 84:10, 84:21, 84:23, 85:20, 86:24, 87:13, 89:7

**employees'** [1] - 24:22
**employer's** [1] - 23:23
**employer/ employee** [6] - 22:3, 22:10, 22:19, 23:3, 23:8, 24:11
**employers** [1] - 23:10
**Employment** [2] - 26:7, 43:16
**employment** [3] - 5:3, 30:6, 51:7
**enamored** [1] - 78:15
**encompass** [1] - 26:20
**encountered** [1] - 42:3
**end** [10] - 11:25, 18:15, 32:3, 34:2, 36:17, 42:21, 77:19, 80:15, 92:19, 96:24
**ended** [2] - 19:14, 60:23
**ends** [1] - 6:8
**engage** [2] - 37:14, 55:15
**engaged** [1] - 37:21
**engagement** [1] - 75:25
**engineer** [1] - 93:2
**English** [1] - 28:22
**enhanced** [1] - 75:20
**enhancements** [3] - 7:20, 42:18, 42:21
**enjoy** [1] - 43:1
**ensuing** [1] - 27:23
**ensure** [1] - 44:4
**enticed** [1] - 56:3
**entire** [2] - 78:20, 93:7
**entirely** [2] - 94:13, 94:15
**entitled** [1] - 99:12
**entitling** [1] - 98:18
**entwined** [1] - 77:13
**environment** [3] - 63:1, 65:18, 81:12
**equal** [2] - 29:25, 98:21
**equally** [2] - 22:24, 74:20
**err** [1] - 17:22
**erred** [1] - 17:20
**ESI** [1] - 35:1
**especially** [1] - 14:6
**espionage** [1] - 55:16
**ESQUIRE** [13] - 1:14,

1:14, 1:18, 1:21, 1:22, 2:3, 2:3, 2:7, 2:7, 2:12, 2:15, 2:16, 2:16
**essentially** [3] - 12:25, 72:14, 82:6
**establish** [1] - 22:9
**established** [2] - 26:12, 94:21
**et** [2] - 28:10, 28:17
**ethical** [1] - 91:9
**evaluated** [1] - 48:23
**evaluating** [1] - 33:25
**evaporate** [1] - 68:4
**event** [1] - 7:14
**evidence** [10] - 19:22, 20:6, 20:12, 77:3, 77:5, 85:7, 85:13, 87:4, 94:12, 95:23
**evidentiary** [1] - 77:2
**exactly** [3] - 27:4, 45:16, 58:11
**examination** [1] - 85:11
**examine** [1] - 85:21
**example** [4] - 18:16, 21:4, 90:14, 98:11
**examples** [2] - 34:9, 98:11
**exceed** [2] - 98:4, 98:6
**exceeded** [3] - 15:5, 19:1, 61:4
**excellent** [4] - 8:11, 90:4, 96:5, 96:6
**except** [1] - 68:16
**excess** [1] - 90:7
**excessive** [1] - 44:5
**exchange** [1] - 87:22
**excluded** [1] - 83:15
**exclusive** [1] - 26:17
**exclusively** [2] - 22:10, 22:19
**excuse** [2] - 9:9, 35:3
**exercise** [4] - 22:17, 48:21, 61:20, 90:20
**exercised** [1] - 48:19
**exercising** [1] - 44:8
**exhibits** [1] - 38:2
**existing** [1] - 22:20
**exists** [4] - 51:3, 54:18, 83:16, 90:17
**expand** [1] - 69:8
**expectation** [1] - 37:2
**expectations** [2] - 15:5, 61:5
**expected** [6] - 15:6, 66:18, 66:19, 76:1,

76:24, 93:13
**expecting** [2] - 14:7, 96:12
**expeditiously** [1] - 12:11
**expended** [1] - 45:14
**expense** [2] - 32:20, 44:3
**expenses** [17] - 6:25, 17:2, 32:2, 32:6, 32:17, 33:5, 35:4, 35:8, 35:9, 36:23, 39:3, 42:12, 47:16, 47:22, 49:19, 68:18
**experience** [13] - 54:20, 64:7, 68:22, 69:5, 69:10, 69:13, 69:22, 71:24, 72:10, 75:18, 79:1, 80:21, 86:23
**experienced** [4] - 14:2, 33:8, 54:3, 91:9
**expert** [4] - 34:25, 35:7, 35:23, 66:18
**expertise** [1] - 36:4
**experts** [8] - 35:5, 35:10, 35:13, 35:19, 36:4, 36:19, 39:5, 85:22
**expiration** [1] - 43:9
**explain** [4] - 10:22, 55:1, 94:13, 94:15
**explained** [1] - 48:13
**explains** [1] - 56:16
**exposed** [4] - 30:13, 30:15, 70:8, 70:9
**exposures** [1] - 30:15
**expressly** [4] - 13:21, 22:4, 26:24, 30:1
**extend** [1] - 23:25
**extensive** [1] - 98:17
**extent** [5] - 11:21, 15:17, 28:15, 29:3, 72:9
**extra** [2] - 19:22, 53:17

## F

**face** [1] - 11:18
**fact** [19] - 22:12, 24:9, 29:24, 33:24, 55:7, 56:16, 56:18, 57:11, 58:9, 61:4, 62:6, 64:15, 68:4, 69:24, 77:6, 91:3, 94:14, 94:20, 98:3

**factor** [1] - 10:12
**factored** [1] - 7:14
**factors** [2] - 7:24, 33:14
**facts** [3] - 22:20, 35:21, 79:7
**factual** [1] - 30:12
**failed** [2] - 40:9, 48:21
**fair** [13] - 7:7, 7:16, 8:9, 13:15, 15:23, 42:17, 50:12, 50:16, 53:9, 56:15, 71:23, 85:14, 96:4
**fairly** [4] - 11:6, 73:9, 74:20, 79:22
**Fairness** [1] - 79:13
**fairness** [2] - 6:16, 7:5
**FAIRNESS** [1] - 2:11
**faith** [1] - 91:18
**falls** [1] - 54:11
**familiar** [4] - 8:2, 22:13, 24:12, 24:15
**fan** [2] - 46:24, 50:23
**far** [11] - 3:14, 6:15, 14:14, 15:4, 18:9, 18:11, 18:13, 19:1, 25:21, 69:11, 74:12
**fascinating** [1] - 56:15
**fashioned** [1] - 18:18
**fault** [1] - 95:5
**favors** [1] - 10:12
**Federal** [1] - 25:1
**federal** [1] - 18:24
**fee** [32] - 6:24, 32:4, 33:10, 33:11, 33:15, 33:18, 34:8, 36:24, 37:3, 37:5, 42:17, 46:16, 46:19, 47:8, 47:14, 47:15, 48:1, 48:23, 49:8, 49:18, 91:25, 92:1, 92:11, 92:19, 92:23, 93:7, 98:3, 98:7, 98:14, 98:19, 98:20
**fees** [22] - 7:4, 10:10, 28:10, 32:2, 32:5, 32:13, 34:1, 35:7, 35:19, 36:7, 42:5, 42:12, 47:13, 47:21, 47:23, 48:2, 48:5, 48:15, 63:3, 90:7, 90:16, 97:25
**FELDMAN** [1] - 2:20
**Feldman** [2] - 57:24, 99:17
**Feleccia** [1] - 24:16
**fell** [1] - 90:4

**felt** [3] - 40:5, 80:16, 90:3
**fender** [1] - 68:24
**few** [2] - 24:14, 54:19
**FI** [1] - 79:10
**Fickinger** [1] - 48:13
**fides** [1] - 73:5
**fiduciary** [2] - 58:19, 90:20
**field** [1] - 55:21
**fight** [12] - 27:20, 57:12, 57:13, 57:15, 57:19, 58:13, 59:13, 62:18, 77:14
**fighting** [2] - 74:11, 79:11
**figure** [3] - 12:19, 33:7, 68:19
**figured** [1] - 9:16
**figures** [1] - 18:21
**file** [1] - 25:1
**filed** [6] - 8:15, 8:16, 34:10, 34:11, 80:16, 98:8
**filing** [1] - 90:1
**filings** [1] - 87:23
**final** [16] - 6:17, 7:11, 10:12, 12:10, 16:16, 27:5, 28:11, 28:23, 29:21, 32:24, 34:3, 60:8, 60:12, 60:13, 62:5
**FINAL** [1] - 1:11
**Final** [8] - 11:14, 27:2, 29:2, 31:15, 43:22, 46:18, 50:20, 89:1
**finally** [5] - 6:2, 6:23, 12:9, 26:2, 42:20
**financial** [1] - 22:15
**Financial** [4] - 23:1, 26:16, 69:9, 70:20
**financially** [2] - 55:14, 55:17
**financially-motivated** [1] - 55:14
**FINE** [1] - 2:2
**fine** [3] - 3:13, 6:6, 73:17
**finished** [2] - 14:19, 68:8
**finishes** [1] - 49:22
**finite** [2] - 71:11, 78:16
**firm** [5] - 36:15, 39:10, 45:2, 45:3, 45:8
**firm's** [5] - 36:7, 36:12, 38:12, 39:4, 39:11

**firms** [1] - 44:6
**first** [11] - 13:24, 22:2, 22:8, 32:2, 33:18, 34:9, 39:24, 50:16, 52:12, 65:10, 97:15
**fits** [1] - 70:11
**five** [14] - 66:8, 66:20, 67:1, 67:2, 67:3, 71:23, 72:5, 76:19, 78:19, 83:7, 83:18, 96:18, 98:24
**fix** [1] - 68:24
**fixes** [1] - 90:19
**flaws** [1] - 10:10
**floor** [1] - 19:1
**focus** [2] - 28:12, 39:21
**focused** [8] - 17:5, 19:15, 24:20, 25:14, 36:13, 49:18, 65:20, 67:2
**folder** [1] - 96:2
**folks** [9] - 12:22, 14:25, 27:16, 64:25, 73:9, 75:24, 76:15, 81:13, 94:7
**follow** [1] - 88:7
**followed** [1] - 24:13
**following** [2] - 86:12, 86:19
**footing** [2] - 29:25, 67:8
**footnote** [1] - 46:19
**footnotes** [1] - 99:1
**footsteps** [1] - 24:13
**FOR** [2] - 1:2, 2:11
**forbidden** [1] - 84:1
**forego** [1] - 43:8
**foregoing** [1] - 99:11
**foreseeable** [2] - 22:16, 24:3
**forget** [1] - 40:1
**forgot** [1] - 97:11
**form** [5] - 12:15, 59:20, 61:2, 76:11, 94:10
**former** [7] - 51:6, 52:3, 52:6, 52:7, 52:10, 52:12, 52:15
**formulation** [1] - 24:8
**forth** [3] - 17:11, 27:7, 34:8
**fortunate** [1] - 64:14
**fortunately** [1] - 20:11
**forward** [6] - 21:9, 42:16, 60:4, 64:5, 66:18, 77:11

**four** [3] - 43:4, 50:14, 53:13
**fourth** [2] - 54:13, 60:8
**Fourth** [1] - 51:1
**Francisco** [1] - 19:13
**Frank** [12] - 2:13, 5:1, 6:7, 10:15, 11:10, 33:11, 42:14, 48:2, 49:21, 88:1, 97:4, 97:12
**Frank's** [2] - 32:3, 91:21
**frankly** [7] - 8:11, 15:4, 15:9, 18:15, 21:13, 21:15, 92:8
**fraud** [18] - 8:17, 8:18, 14:24, 17:8, 19:16, 19:22, 20:7, 41:2, 41:15, 41:16, 54:16, 54:18, 54:20, 54:23, 56:15, 94:14, 94:16
**fraudulent** [4] - 15:1, 17:13, 53:20, 54:3
**free** [3] - 26:7, 26:18, 29:16
**freely** [2] - 66:2, 74:11
**freeze** [1] - 41:9
**frequently** [2] - 56:12, 58:23
**front** [4] - 15:3, 59:4, 95:15, 95:23
**frontload** [1] - 7:9
**full** [6] - 5:2, 40:20, 67:19, 71:19, 79:2, 89:10
**fully** [5] - 37:17, 40:4, 41:12, 41:19, 62:1
**fulsome** [1] - 64:2
**Fulton** [3] - 9:3, 21:8, 34:1
**Fulton-Green** [3] - 9:3, 21:8, 34:1
**fund** [8] - 33:21, 33:22, 48:5, 48:22, 90:15, 92:2, 92:18
**funds** [2] - 90:7, 98:4
**fungible** [1] - 90:23
**future** [2] - 8:25, 69:20
**fuzzy** [1] - 14:4

---

## G

**gamut** [1] - 10:25
**gather** [1] - 34:22

**GENE** [1] - 1:10
**General** [2] - 9:9, 10:7
**general** [2] - 17:18, 78:19
**Generals** [1] - 9:9
**GERARD** [1] - 2:3
**gerry** [1] - 4:23
**gift** [18] - 9:20, 16:3, 21:14, 31:3, 42:23, 43:9, 47:20, 52:23, 53:3, 53:18, 82:3, 82:4, 83:10, 88:11, 93:10, 95:19, 95:24, 95:25
**Ginsburg** [1] - 69:17
**Girsh** [2] - 7:7, 7:24
**given** [10] - 8:11, 8:19, 44:8, 56:15, 56:18, 81:22, 94:21, 95:23
**gladly** [2] - 38:15, 39:13
**GM** [2] - 90:15, 92:15
**God's** [1] - 71:2
**good-bye** [1] - 99:7
**goods** [2] - 65:1
**Government** [1] - 56:12
**grant** [2] - 7:11, 31:15
**granted** [2] - 42:2
**granting** [1] - 10:12
**grants** [1] - 7:17
**great** [9] - 8:7, 21:18, 31:18, 31:21, 39:14, 41:24, 50:4, 59:25, 69:15
**greater** [1] - 73:18
**Green** [3] - 9:3, 21:8, 34:1
**Greg** [1] - 3:24
**gREGORY** [1] - 2:15
**gross** [2] - 90:11, 92:24
**ground** [1] - 21:23
**GROUP** [1] - 1:17
**group** [15] - 9:14, 9:15, 36:18, 52:19, 55:13, 55:14, 55:16, 70:8, 70:9, 76:14, 77:9, 78:16, 79:17, 79:19
**guardian** [1] - 92:11
**guess** [6] - 8:10, 13:3, 17:2, 35:22, 62:20, 69:3
**Gunter** [1] - 33:13
**guys** [7] - 55:5, 55:8, 56:9, 59:4, 59:6,

59:11, 62:2

---

## H

**hackers** [1] - 58:24
**Hadgis** [1] - 4:4
**HADGIS** [2] - 2:16, 4:3
**ham** [1] - 80:11
**ham-handed** [1] - 80:11
**HAMILTON** [1] - 2:11
**hand** [2] - 21:2, 89:2
**handed** [1] - 80:11
**handle** [1] - 87:2
**handout** [1] - 5:8
**happy** [5] - 10:18, 18:5, 21:2, 38:16, 61:10
**hard** [3] - 41:17, 65:6, 80:2
**harm** [16] - 24:4, 29:11, 30:16, 30:17, 41:7, 50:17, 57:4, 57:10, 57:15, 58:2, 58:9, 58:10, 59:24, 64:12, 74:15
**hassle** [1] - 20:10
**hasten** [1] - 8:4
**hate** [2] - 10:25, 11:1
**Haverford** [1] - 1:15
**HAVILAND** [82] - 2:6, 2:7, 4:9, 5:6, 61:17, 61:20, 63:8, 63:11, 63:15, 63:20, 65:16, 65:22, 65:25, 67:11, 67:17, 67:21, 67:25, 68:2, 68:6, 68:10, 68:13, 68:16, 68:25, 69:3, 70:14, 70:17, 71:4, 71:7, 71:10, 71:19, 71:22, 72:22, 73:2, 73:7, 73:13, 73:25, 74:2, 74:6, 75:3, 75:6, 75:8, 75:12, 75:15, 77:15, 77:23, 77:25, 78:4, 78:6, 80:1, 81:2, 81:6, 81:8, 81:23, 82:1, 82:10, 82:23, 83:4, 83:8, 83:11, 83:17, 83:19, 83:21, 83:24, 84:3, 84:5, 84:16, 84:20, 85:1, 85:6, 85:8, 85:12, 85:18, 86:1, 86:4, 86:9, 86:15, 86:18, 86:21, 87:5, 87:11, 87:18, 88:15

**Haviland** [25] - 4:10, 6:1, 6:21, 11:11, 15:17, 20:22, 25:10, 27:16, 31:17, 42:13, 49:17, 58:3, 58:16, 58:21, 59:10, 61:16, 61:21, 61:22, 82:19, 83:5, 88:8, 89:6, 89:18

**Haviland's** [1] - 11:14

**heading** [1] - 36:14

**headline** [2] - 63:11, 66:8

**headquarters** [2] - 52:5, 61:25

**hear** [5] - 5:14, 5:24, 6:1, 6:6, 10:11, 14:7, 42:13, 49:17, 50:1, 50:24, 67:5, 70:22, 78:15

**heard** [4] - 21:1, 53:14, 55:19, 57:1

**hearing** [18] - 3:4, 7:1, 12:12, 25:7, 25:9, 28:14, 30:25, 31:16, 43:18, 43:20, 43:22, 69:14, 72:6, 77:2, 77:7, 78:13, 97:2

**HEARING** [1] - 1:11

**Hearing** [1] - 79:13

**hearings** [1] - 43:17

**held** [1] - 52:11

**hello** [2] - 3:2, 3:18

**help** [1] - 18:17

**Herb** [1] - 64:15

**hesitant** [1] - 88:2

**high** [4] - 32:3, 32:5, 33:15, 94:20

**higher** [3] - 46:17, 72:3, 93:21

**highlighted** [1] - 89:9

**highly** [1] - 33:8

**himself** [1] - 4:12

**hired** [3] - 35:20, 36:15, 36:18

**historical** [3] - 44:18, 45:1, 45:11

**hit** [1] - 33:15

**Hmm** [2] - 53:15, 53:20

**hoagies** [1] - 66:15

**Holbrook** [7] - 3:21, 6:20, 11:16, 19:9, 21:17, 21:20, 41:20

**HOLBROOK** [14] - 1:14, 3:20, 21:19, 25:15, 26:4, 27:21, 28:2, 28:15, 28:25,

31:18, 31:22, 88:3, 88:6, 88:17

**hold** [3] - 47:24, 48:9, 53:24

**holders** [1] - 42:22

**holding** [3] - 22:2, 22:11, 23:7

**home** [2] - 31:8, 43:8

**Home** [5] - 21:6, 45:23, 45:24, 55:5, 93:19

**Honor** [109] - 3:16, 3:20, 3:22, 3:24, 4:3, 4:5, 4:9, 4:16, 4:17, 4:19, 4:21, 4:23, 4:25, 5:6, 6:12, 6:14, 7:8, 8:2, 8:8, 9:2, 10:6, 10:25, 12:11, 13:14, 13:18, 14:13, 14:17, 16:7, 16:8, 17:18, 18:3, 18:25, 19:6, 19:25, 21:16, 21:19, 22:22, 22:25, 23:4, 23:10, 24:17, 24:18, 26:4, 26:22, 27:21, 28:15, 28:25, 29:14, 30:11, 31:13, 31:22, 31:24, 32:7, 36:8, 37:4, 40:23, 45:16, 50:3, 50:9, 50:11, 50:15, 50:22, 50:24, 52:1, 52:10, 55:15, 55:20, 56:5, 58:1, 59:13, 60:11, 60:13, 60:16, 61:10, 61:13, 61:17, 62:10, 63:12, 64:3, 64:14, 64:23, 66:7, 69:7, 77:18, 77:23, 78:12, 78:16, 78:25, 80:17, 81:6, 82:2, 86:9, 86:22, 88:3, 88:8, 88:18, 88:22, 89:15, 89:22, 89:25, 90:13, 95:15, 95:23, 97:1, 97:9, 99:5, 99:6

**Honor's** [7] - 24:5, 24:11, 58:12, 72:6, 77:8, 84:11, 89:5

**HONORABLE** [1] - 1:10

**hook** [1] - 54:10

**hope** [2] - 80:15, 96:23

**hopeful** [1] - 27:21

**hopefully** [1] - 96:1

**host** [1] - 24:12

**hour** [3] - 45:15, 46:10, 75:22

**hourly** [4] - 44:16,

46:8, 46:15, 46:16

**hours** [13] - 34:5, 34:6, 41:10, 42:18, 44:11, 44:13, 45:19, 45:23, 45:24

**housekeeping** [1] - 6:15

**huge** [3] - 41:13, 46:24, 65:22

**Hughes** [2] - 4:10, 61:22

**HUGHES** [1] - 2:6

**hum** [5] - 39:8, 68:2, 68:25, 81:2, 86:15

**human** [1] - 99:1

**humanly** [1] - 28:22

**humor** [1] - 28:1

**hundreds** [2] - 15:13, 78:17

**hundredths** [3] - 93:18, 94:17, 95:17

**hung** [1] - 76:13

**hurdle** [1] - 94:21

**hurt** [1] - 68:9

**husbanding** [1] - 50:5

**hypothetical** [4] - 72:6, 72:23, 76:3, 80:1

---

**I**

**i.e** [1] - 28:6

**ice** [1] - 56:22

**idea** [5] - 60:2, 77:7, 78:15, 92:7, 93:9

**identifying** [3] - 26:10, 26:15, 26:18

**identity** [1] - 64:9

**II** [1] - 2:7

**imagine** [3] - 38:6, 38:23, 38:25

**immaterial** [1] - 48:14

**impacted** [1] - 21:10

**imparts** [1] - 23:12

**imperfect** [1] - 40:8

**implementing** [1] - 38:4

**important** [3] - 7:13, 10:7, 65:4

**importantly** [1] - 25:2

**imposed** [1] - 22:20

**Imprelis** [1] - 46:12

**impressions** [5] - 15:7, 15:12, 15:13, 18:20, 80:20

**improve** [1] - 75:17

**improved** [1] - 95:20

**improvements** [1] - 15:11

**IN** [2] - 1:1, 1:4

**inactive** [1] - 62:15

**Inc** [3] - 3:25, 4:4, 4:7

**INC** [1] - 1:4

**incentive** [1] - 6:25

**inch** [1] - 98:25

**incidence** [3] - 8:17, 14:24, 41:2

**incident** [3] - 52:25, 53:14, 55:8

**incidents** [1] - 56:14

**include** [5] - 36:1, 64:3, 78:23, 79:18, 82:8

**included** [7] - 37:22, 47:10, 47:24, 48:2, 81:4, 82:18, 84:23

**includes** [1] - 51:23

**including** [9] - 22:6, 29:22, 31:11, 40:2, 44:2, 46:11, 47:25, 48:9, 51:23

**inclusion** [1] - 34:19

**inconsistent** [1] - 21:14

**incorrect** [1] - 97:24

**increased** [2] - 43:7, 55:3

**incurred** [2] - 44:13, 44:14

**indeed** [1] - 97:8

**independent** [1] - 23:13

**indicated** [1] - 41:25

**individual** [1] - 36:12

**individually** [1] - 20:4

**individuals** [1] - 30:4

**inextricably** [1] - 77:13

**informal** [1] - 37:14

**information** [35] - 22:15, 24:3, 24:24, 26:10, 26:14, 26:15, 26:18, 27:1, 50:18, 51:4, 51:5, 51:8, 51:9, 51:16, 53:11, 56:9, 57:11, 58:8, 59:1, 59:2, 59:7, 59:10, 59:12, 59:16, 62:4, 78:23, 81:4, 81:13, 81:22, 82:20, 83:13, 89:14, 96:13

**informed** [1] - 37:17

**inherent** [2] - 91:6, 91:22

**initial** [3] - 37:21,

43:17, 92:21

**injunctive** [5] - 7:20, 20:24, 33:23, 47:14, 47:18

**injured** [1] - 94:7

**injuries** [1] - 29:4

**injury** [6] - 67:23, 68:11, 68:19, 69:2, 79:3, 79:23

**inquiry** [1] - 24:20

**instead** [3] - 24:1, 55:18, 94:10

**INSTITUTE** [1] - 2:11

**Institution** [3] - 23:1, 26:16, 69:9, 70:20

**institution** [1] - 41:16

**instructions** [2] - 51:11, 51:20

**insurance** [4] - 40:7, 68:6, 68:7, 79:4

**intact** [2] - 80:16, 96:14

**intellectually** [1] - 40:15

**intent** [3] - 26:7, 26:19, 27:4

**interest** [3] - 30:20, 91:18, 94:7

**interested** [1] - 96:7

**interesting** [10] - 19:11, 19:14, 19:16, 32:23, 40:14, 40:22, 56:13, 62:18, 62:22, 79:12

**interestingly** [2] - 55:8, 55:13

**Interim** [1] - 61:22

**interpret** [1] - 95:8

**interrupting** [2] - 5:20, 35:3

**interviews** [1] - 34:20

**introduce** [1] - 4:1

**introduced** [1] - 4:12

**inventive** [1] - 65:15

**investigated** [1] - 12:7

**investigation** [1] - 19:20

**investigator** [4] - 34:25, 35:20, 36:3, 36:20

**invitation** [1] - 29:15

**invite** [1] - 64:24

**involve** [2] - 24:25, 33:21

**involved** [2] - 21:5, 91:10

**involvement** [1] -

91:8
**involving** [1] - 28:6
**irrelevant** [1] - 17:6
**issue** [28] - 5:11, 7:6, 10:16, 11:17, 12:1, 18:11, 25:13, 27:13, 27:18, 28:2, 40:15, 40:19, 41:19, 42:12, 49:18, 60:14, 62:3, 62:8, 63:5, 63:9, 70:6, 74:7, 74:16, 82:13, 85:12, 91:19, 92:1, 94:24
**issued** [2] - 37:15, 43:5
**issues** [12] - 6:24, 7:3, 34:13, 34:16, 43:15, 46:4, 58:10, 58:11, 63:12, 71:10, 72:1
**issuing** [1] - 96:11
**items** [2] - 35:14, 63:25
**iteration** [3] - 26:1, 63:20, 67:7
**iterations** [1] - 26:22
**itself** [5] - 7:6, 46:24, 60:25, 89:8, 89:9

### J

**January** [1] - 34:4
**JANUARY** [1] - 1:8
**job** [3] - 61:6, 91:13, 91:14
**Joe** [4] - 72:6, 72:7, 72:14, 76:2
**JOHNS** [45] - 1:14, 3:16, 6:12, 6:14, 6:23, 8:8, 8:14, 9:13, 9:16, 9:24, 10:4, 10:18, 10:20, 10:24, 11:7, 12:8, 12:11, 13:7, 13:11, 13:14, 14:13, 14:17, 14:19, 14:22, 16:1, 16:7, 16:15, 16:18, 16:23, 16:25, 17:3, 17:6, 17:11, 17:17, 17:24, 18:1, 18:10, 19:6, 19:9, 19:19, 19:25, 20:11, 20:15, 20:18, 20:21
**Johns** [6] - 3:16, 3:18, 6:10, 23:17, 90:3, 93:19
**join** [1] - 96:23
**joined** [2] - 3:25, 70:1
**joining** [1] - 4:13
**Joint** [1] - 35:6
**joint** [1] - 35:15
**jointly** [1] - 36:17
**jON** [1] - 1:22
**Jon** [1] - 4:21
**Jones** [2] - 23:23, 24:5
**JR** [1] - 2:7
**Judge** [28] - 23:23, 24:5, 33:8, 37:25, 48:13, 62:25, 63:5, 65:5, 65:25, 68:21, 69:4, 69:16, 70:4, 73:8, 74:18, 75:21, 76:12, 77:2, 79:15, 80:13, 83:11, 84:6, 87:15, 92:15, 93:24, 98:6, 98:13, 98:16
**judge's** [2] - 40:21, 91:13
**judges** [1] - 19:15
**judgment** [3] - 8:1, 44:8, 71:1
**Judgment** [1] - 89:2
**judicial** [1] - 96:17
**judiciary** [1] - 18:24
**Judy** [1] - 56:20
**July** [1] - 66:7
**junk** [3] - 14:2, 14:3, 96:1
**Justice** [6] - 22:13, 23:4, 23:8, 24:6, 24:7, 64:24

### K

**KAPLAN** [1] - 2:2
**kATHLEEN** [1] - 2:20
**Kathleen** [1] - 99:17
**KCC** [10] - 9:24, 12:14, 16:8, 36:24, 43:21, 75:24, 77:5, 83:13, 84:7, 88:10
**Kearney** [1] - 93:24
**keep** [7] - 5:11, 38:24, 62:16, 69:14, 71:9, 96:18, 97:16
**keeps** [1] - 68:14
**kept** [4] - 43:2, 43:4, 82:13
**key** [2] - 54:15, 84:11
**kicks** [1] - 68:7
**kind** [13] - 5:12, 11:6, 17:14, 20:9, 20:10, 25:22, 25:24, 41:7, 50:14, 56:16, 56:19, 73:5, 80:2
**Kline** [1] - 70:24
**knowable** [1] - 83:14
**knowing** [3] - 36:14, 41:23, 72:12
**knowledge** [1] - 94:9
**known** [5] - 36:25, 62:14, 66:1, 68:12, 94:18
**knows** [3] - 16:8, 30:12, 73:1
**KRINER** [1] - 1:13
**Kristin** [1] - 4:3
**KRISTIN** [1] - 2:16

### L

**lack** [2] - 94:7, 94:14
**Lackawanna** [1] - 24:16
**lacking** [1] - 30:20
**LAMBIRAS** [2] - 1:22, 4:21
**Lambiras** [1] - 4:22
**Lancaster** [1] - 1:15
**Landfill** [1] - 24:16
**language** [13] - 25:14, 25:21, 26:3, 26:24, 27:3, 27:5, 28:3, 28:22, 63:18, 64:19, 64:22, 74:22, 84:11
**large** [5] - 15:9, 41:16, 48:11, 70:9, 98:25
**larger** [4] - 68:20, 70:8, 86:24, 87:6
**largest** [1] - 42:25
**last** [12] - 18:10, 19:4, 20:18, 25:21, 25:25, 29:21, 34:3, 44:22, 55:22, 56:23, 84:14, 95:13
**late** [2] - 64:14, 64:15
**latest** [1] - 25:20
**laugh** [1] - 96:17
**LAW** [2] - 1:17, 2:11
**law** [10] - 7:22, 8:19, 18:14, 22:20, 23:12, 25:6, 45:3, 56:4, 57:9, 74:24
**lawyer** [2] - 58:6, 65:10
**lawyering** [1] - 95:6
**lawyers** [11] - 11:1, 46:13, 63:4, 69:19, 80:18, 82:13, 88:1, 88:20, 91:10, 92:9, 95:5
**laying** [1] - 91:21
**lead** [7] - 23:18, 26:5, 31:25, 36:11, 44:2,
44:5, 46:13
**lead's** [1] - 44:9
**leadership** [2] - 34:12, 43:18
**learn** [1] - 8:16
**learned** [2] - 8:5, 8:15
**least** [9] - 7:5, 14:14, 14:15, 15:1, 18:10, 18:11, 34:20, 41:6, 96:20
**leave** [2] - 75:16, 80:15
**left** [6] - 10:14, 11:10, 58:24, 59:3, 62:19, 79:8
**legal** [3] - 24:5, 34:12, 34:14
**legally** [3] - 24:24, 74:22, 78:25
**legion** [1] - 98:2
**length** [2] - 33:15, 96:16
**lengthy** [1] - 34:20
**lenient** [2] - 17:19, 43:10
**lens** [1] - 56:17
**less** [1] - 65:17
**letter** [1] - 13:4
**letters** [2] - 10:24, 12:23
**level** [5] - 32:3, 32:5, 35:12, 85:21, 94:12
**LEWIS** [1] - 2:15
**Lewis** [3] - 3:25, 4:4, 4:6
**liability** [2] - 25:7, 69:15
**liable** [1] - 59:24
**Liebenberg** [1] - 4:16
**LIEBENBERG** [2] - 2:3, 4:15
**life** [1] - 44:17
**light** [1] - 63:14
**likely** [3] - 7:11, 23:7, 82:16
**limited** [7] - 22:2, 22:9, 23:3, 23:7, 23:22, 23:25, 59:5
**LINCOLN** [1] - 2:11
**LINDA** [1] - 1:18
**Linda** [1] - 4:20
**line** [7] - 9:10, 21:11, 22:9, 35:14, 73:8, 74:18, 96:17
**lineage** [1] - 61:21
**link** [2] - 41:18, 51:14
**lips** [1] - 71:2
**list** [2] - 16:13, 88:12
**listed** [1] - 35:6
**listen** [4] - 19:4, 27:17, 47:6
**litem** [1] - 92:11
**litigants** [1] - 74:7
**litigate** [4] - 40:4, 40:5, 59:15, 73:14
**litigated** [7] - 26:18, 28:16, 41:13, 41:20, 69:6, 69:7, 91:25
**litigating** [1] - 7:25
**Litigation** [2] - 3:5, 23:19
**litigation** [11] - 26:11, 29:6, 29:9, 34:6, 35:4, 44:15, 45:22, 46:25, 48:17, 57:16, 62:17
**LITIGATION** [1] - 1:4
**live** [1] - 59:13
**lived** [1] - 44:24
**living** [1] - 64:17
**LLC** [1] - 2:6
**LLP** [2] - 1:13, 2:15
**loaded** [1] - 95:25
**Loading** [1] - 98:14
**loads** [1] - 82:3
**loathe** [1] - 96:14
**lodestar** [5] - 33:12, 33:19, 33:25, 34:2
**lodged** [1] - 6:21
**look** [15] - 10:9, 28:3, 28:4, 53:20, 61:5, 66:21, 68:17, 68:18, 74:8, 74:17, 80:3, 92:14, 92:15, 93:5, 95:13
**Look** [1] - 60:13
**looked** [5] - 23:4, 65:6, 66:5, 66:8, 66:23
**looking** [8] - 12:19, 29:25, 32:5, 65:18, 72:13, 77:4, 82:23, 86:20
**looks** [1] - 61:3
**lose** [2] - 67:8, 68:4
**lousy** [2] - 8:7, 90:4
**love** [7] - 11:8, 57:17, 57:25, 76:21, 77:15, 83:6, 96:8
**loves** [2] - 56:21, 57:17
**low** [19] - 8:17, 14:15, 14:24, 41:2, 41:15, 54:17, 54:22, 56:15, 56:17, 59:19, 65:9, 65:19, 73:9, 87:11, 93:17, 93:18, 94:22, 95:4, 98:20

**lower** [6] - 4:11, 44:13, 45:24, 46:20, 47:10, 97:19
**luck** [1] - 54:10
**lump** [2] - 32:12, 47:21, 95:21
**lumping** [1] - 74:9
**lunch** [2] - 31:7, 81:16
**lurking** [1] - 20:14

## M

**machine** [1] - 62:3
**mail** [14] - 13:13, 13:18, 13:19, 13:20, 13:24, 13:25, 14:1, 42:22, 52:3, 52:7, 53:2, 82:11, 88:12, 88:18
**mailed** [1] - 13:11
**mailing** [3] - 52:9, 52:11, 87:13
**mailings** [1] - 66:4
**mails** [6] - 14:4, 76:8, 76:9, 76:10, 96:1
**main** [2] - 34:9, 41:1
**maintain** [1] - 71:19
**major** [1] - 71:7
**majority** [7] - 22:13, 24:9, 54:14, 54:16, 56:20, 57:2, 57:9
**majority's** [1] - 23:7
**managed** [1] - 66:13
**management** [1] - 86:5
**manager** [3] - 66:13, 78:19, 85:3
**managers** [2] - 86:6, 86:25
**maple** [1] - 2:8
**March** [1] - 62:7
**margins** [1] - 98:25
**Market** [3] - 1:22, 2:17, 2:22
**market** [1] - 55:9
**mask** [1] - 3:13
**masks** [1] - 3:11
**massive** [1] - 15:12
**material** [3] - 5:7, 5:11, 9:17
**materially** [1] - 10:5
**materials** [2] - 7:2, 38:10
**math** [2] - 32:24, 65:21
**matter** [4] - 10:22, 17:18, 62:13, 99:13
**mattered** [1] - 25:10

**matters** [1] - 77:3
**McGlade** [5] - 76:10, 84:18, 86:9, 86:24, 88:10
**McGlade's** [1] - 85:2
**McGlades** [6] - 64:6, 66:12, 75:2, 77:12, 79:2, 97:3
**mean** [12] - 9:22, 35:25, 38:11, 46:22, 63:6, 67:22, 83:9, 83:15, 93:3, 95:8, 96:16, 97:17
**means** [3] - 9:24, 54:18, 71:5
**meant** [2] - 49:12, 69:6
**measured** [1] - 48:7
**measures** [2] - 22:23, 47:5
**mechanical** [1] - 2:24
**media** [2] - 15:13, 18:17
**mediation** [16] - 25:8, 25:10, 25:11, 30:10, 35:8, 35:19, 37:17, 37:18, 37:21, 37:22, 37:24, 37:25, 38:1, 41:22, 70:19, 79:10
**mediator** [1] - 33:8
**meet** [1] - 5:16
**meets** [3] - 5:15, 50:12, 61:7
**melody** [1] - 6:5
**Member** [3] - 33:10, 48:18, 97:5
**Members** [14] - 8:23, 9:6, 11:11, 14:7, 18:24, 30:9, 30:13, 30:17, 34:17, 43:6, 48:25, 52:20, 57:2, 98:8
**members** [3] - 48:20, 63:2, 82:12
**mentioned** [5] - 9:7, 10:6, 26:22, 79:15, 96:2
**merchandise** [1] - 20:3
**Merck** [1] - 24:17
**mere** [1] - 57:11
**merely** [2] - 39:11, 86:19
**meritless** [1] - 11:18
**merits** [1] - 25:14
**merry** [3] - 59:14, 62:14, 78:14
**message** [1] - 43:5

**metaphysically** [1] - 67:16
**method** [7] - 33:12, 33:19, 33:20, 33:23, 33:25
**Middle** [1] - 23:17
**might** [12] - 12:9, 21:1, 41:12, 49:25, 52:9, 52:20, 54:21, 59:7, 68:4, 75:9, 90:4
**milestone** [1] - 70:21
**million** [33] - 7:18, 11:11, 15:7, 18:23, 32:6, 32:12, 33:7, 33:11, 47:17, 47:19, 47:20, 47:21, 54:19, 56:20, 60:19, 60:20, 60:23, 60:24, 61:1, 63:1, 66:24, 73:15, 74:13, 79:8, 93:12, 95:21, 96:4, 97:22, 98:5, 98:7, 98:15
**million-size** [1] - 74:13
**millions** [2] - 7:13, 15:13
**mind** [3] - 32:15, 93:6, 93:12
**minded** [1] - 91:18
**mindful** [1] - 75:22
**minimum** [2] - 5:12, 19:1
**miniscule** [1] - 93:14
**minute** [1] - 97:16
**minutes** [6] - 53:17, 53:24, 53:25, 87:21, 97:10, 98:22
**misled** [1] - 86:14
**misread** [1] - 22:11
**miss** [3] - 88:4, 88:5, 88:6
**missed** [3] - 87:24, 88:2, 88:22
**missing** [1] - 85:5
**misuse** [1] - 8:18
**mitigating** [1] - 41:10
**mobile** [3] - 52:22, 52:25, 95:18
**mode** [1] - 40:20
**modified** [1] - 87:7
**moment** [1] - 11:17
**monetary** [2] - 12:15, 12:16
**money** [10] - 55:6, 60:1, 62:19, 68:24, 75:10, 76:21, 78:18, 87:14, 90:23, 91:13
**monitor** [1] - 47:13
**Montague** [1] - 31:25
**MONTAGUE** [1] -

1:21
**Montague's** [1] - 38:14
**monthly** [2] - 44:1, 44:3
**months** [4] - 46:2, 54:6, 64:19, 89:19
**Morgan** [3] - 3:25, 4:4, 4:6
**mORGAN** [1] - 2:15
**morning** [18] - 3:16, 3:20, 3:22, 3:24, 4:3, 4:5, 4:9, 4:15, 4:17, 4:19, 4:21, 4:23, 4:25, 6:14, 21:19, 50:5, 61:17, 81:9
**most** [5] - 11:25, 19:16, 23:7, 40:15, 43:1
**mostly** [1] - 43:15
**motion** [10] - 22:25, 24:19, 32:1, 43:19, 43:21, 45:25, 46:1, 64:4, 70:20, 80:17
**motivated** [1] - 55:14
**move** [1] - 14:12
**MR** [176] - 3:16, 3:24, 4:9, 4:17, 4:21, 4:23, 4:25, 5:6, 6:4, 6:12, 6:14, 6:23, 8:8, 8:14, 9:13, 9:16, 9:24, 10:4, 10:18, 10:20, 10:24, 11:7, 12:8, 12:11, 13:7, 13:11, 13:14, 13:17, 14:6, 14:10, 14:13, 14:17, 14:19, 14:22, 16:1, 16:7, 16:15, 16:18, 16:23, 16:25, 17:3, 17:6, 17:11, 17:17, 17:24, 18:1, 18:10, 19:6, 19:9, 19:19, 19:25, 20:11, 20:15, 20:18, 20:21, 50:9, 50:11, 50:24, 51:13, 51:22, 51:25, 52:24, 53:6, 54:25, 55:2, 56:1, 56:5, 56:8, 56:11, 56:14, 57:8, 57:14, 57:23, 57:25, 58:15, 61:13, 61:15, 61:17, 61:20, 63:8, 63:11, 63:15, 65:16, 65:22, 65:25, 67:11, 67:17, 67:21, 67:25, 68:2, 68:6, 68:10, 68:13, 68:16, 68:25, 69:3, 70:14, 70:17, 71:4, 71:7, 71:10, 71:19, 71:22, 72:22, 73:2,

73:7, 73:13, 73:25, 74:2, 74:6, 75:3, 75:6, 75:8, 75:12, 75:15, 77:15, 77:23, 77:25, 78:4, 78:6, 81:2, 81:6, 81:8, 81:23, 82:1, 82:2, 82:7, 82:10, 82:11, 82:23, 82:25, 83:4, 83:8, 83:11, 83:17, 83:19, 83:21, 83:24, 84:3, 84:5, 84:16, 84:20, 85:1, 85:6, 85:8, 85:12, 85:18, 86:1, 86:4, 86:9, 86:15, 86:18, 86:21, 87:5, 87:11, 87:18, 88:15, 88:22, 88:24, 89:1, 89:4, 89:25, 90:13, 91:2, 91:15, 91:18, 92:6, 92:10, 93:5, 94:3, 94:8, 95:1, 95:7, 95:10, 97:1, 99:5
**MS** [78] - 3:20, 3:22, 4:3, 4:5, 4:15, 4:19, 21:19, 25:15, 26:4, 27:21, 28:2, 28:15, 28:25, 31:18, 31:22, 31:24, 32:7, 32:9, 32:11, 32:16, 32:20, 33:2, 33:4, 33:18, 35:9, 35:20, 36:1, 36:8, 36:11, 36:17, 37:1, 37:4, 37:7, 37:11, 37:13, 38:11, 38:15, 38:23, 39:1, 39:3, 39:8, 39:13, 39:15, 39:19, 39:24, 40:23, 40:25, 42:10, 42:16, 44:18, 44:22, 44:24, 45:5, 45:8, 45:11, 45:13, 45:16, 45:19, 46:6, 46:8, 47:2, 47:8, 49:4, 49:7, 49:10, 49:12, 49:15, 49:20, 49:25, 50:3, 50:6, 88:3, 88:6, 88:17, 97:9, 97:12, 97:15, 97:18
**Mullane** [1] - 66:1
**Mullane-type** [1] - 66:1
**multiplier** [4] - 46:20, 46:22, 47:9
**must** [4] - 48:17, 64:24, 87:22, 89:19
**Myers** [1] - 16:5

## N

nail [1] - 16:14
named [3] - 34:21, 37:18, 37:20
names [4] - 24:15, 66:3, 76:7, 77:7
narrow [1] - 78:16
narrowed [4] - 16:10, 21:22, 64:1, 78:1
narrowly [1] - 22:11
nature [7] - 17:4, 64:2, 65:14, 70:12, 91:6, 91:11, 96:16
near [1] - 3:10
nearly [3] - 7:18, 9:7, 20:23
necessary [3] - 34:6, 94:10, 95:16
need [10] - 24:14, 25:25, 30:22, 38:8, 52:2, 52:10, 52:18, 60:1, 70:7, 78:23
needed [1] - 40:5
negative [3] - 46:20, 47:9, 85:25
negligence [2] - 25:5, 25:7
negotiated [6] - 31:10, 33:7, 35:1, 43:8, 80:19, 93:24
negotiating [1] - 92:7
neighbor [1] - 56:20
neighborhood [1] - 73:6
never [14] - 32:14, 40:18, 52:15, 57:1, 58:5, 58:6, 69:4, 69:23, 69:24, 70:16, 71:3, 74:20, 81:16, 86:10
new [5] - 5:3, 22:18, 41:8, 50:20, 50:25
New [1] - 1:19
Newberg [3] - 64:15, 65:11, 65:12
news [1] - 57:24
next [1] - 32:10
nice [1] - 61:6
night [1] - 38:24
nightmare [1] - 92:9
nilly [1] - 44:7
nine [4] - 34:15, 40:1, 89:19
NO [1] - 1:4
nonclass [1] - 63:2
none [3] - 20:5, 75:6, 78:18

normal [1] - 41:15
normally [2] - 33:23, 81:21
notably [3] - 22:24, 24:5, 48:22
note [5] - 9:11, 18:2, 20:25, 88:9, 97:1
notebooks [1] - 35:16
nothing [10] - 11:2, 20:14, 31:4, 31:5, 54:16, 56:22, 57:2, 57:3, 80:25, 84:24
notice [37] - 6:18, 7:12, 14:16, 15:4, 15:7, 15:20, 18:11, 18:17, 38:4, 38:5, 42:19, 42:24, 49:3, 51:21, 52:1, 54:5, 60:8, 60:9, 60:11, 60:15, 60:16, 60:17, 61:2, 61:3, 61:6, 65:5, 65:7, 65:9, 66:2, 66:5, 66:16, 66:18, 75:22, 75:23, 86:13, 97:3
needed [1] - 13:20, 52:12, 65:6
notified [1] - 85:20
notify [2] - 76:6, 80:22
notifying [1] - 42:22
notion [1] - 81:3
nowhere [1] - 74:25
number [9] - 10:2, 15:3, 16:4, 16:10, 32:20, 32:24, 33:4, 52:14, 52:19
Number [4] - 35:17, 50:20, 81:1, 84:15
numbers [1] - 10:5, 15:2, 16:7, 32:23, 51:8, 59:11, 63:25, 76:22, 89:20
Nussbaum [1] - 4:20
NUSSBAUM [3] - 1:17, 1:18, 4:19
NW [1] - 2:12
NY [1] - 1:19

## O

object [5] - 11:12, 64:13, 75:13, 75:17, 95:2
objected [3] - 11:12, 33:10, 94:23
objecting [1] - 64:16
Objection [2] - 81:1, 84:15

objection [10] - 11:15, 81:1, 85:17, 85:19, 85:24, 87:6, 94:1, 94:18, 95:14
objections [9] - 6:21, 7:4, 15:17, 21:22, 21:25, 31:14, 32:3, 49:21, 97:6
Objector [1] - 2:13
objector [5] - 5:1, 48:1, 49:17, 97:4, 97:5
objectors [3] - 9:8, 91:16, 91:19
obligation [3] - 93:8, 97:17
obligations [2] - 5:16, 47:12
observation [1] - 88:16
observations [1] - 19:12
obtained [2] - 47:19, 48:16
obviously [11] - 7:3, 10:10, 12:20, 13:23, 15:18, 18:3, 36:25, 45:3, 52:3, 71:8, 95:20
occasion [1] - 34:21
occurred [1] - 54:24
odd [1] - 32:20
OF [1] - 1:2
offense [1] - 96:7
offer [1] - 78:19
offered [6] - 47:20, 48:8, 49:16, 77:17, 98:1, 98:2
office [1] - 13:16
official [1] - 2:21
Official [1] - 99:17
old [4] - 18:18, 21:23, 52:9, 72:17
old-fashioned [1] - 18:18
omitting [1] - 97:19
once [2] - 3:19, 21:24
One [6] - 2:4, 9:15, 10:3, 16:3, 43:10, 66:10
one [61] - 6:10, 8:14, 8:15, 10:7, 10:17, 14:23, 16:3, 18:19, 19:22, 20:18, 21:10, 23:16, 26:1, 28:23, 33:9, 36:16, 39:24, 40:8, 41:1, 42:21, 43:9, 53:13, 53:14, 55:14, 57:6, 57:18,

65:19, 67:13, 67:16, 67:19, 68:1, 68:14, 68:16, 70:11, 70:16, 71:7, 75:9, 78:12, 80:3, 80:8, 80:24, 81:11, 86:5, 87:4, 88:10, 88:22, 91:23, 93:15, 93:18, 94:17, 94:19, 95:17, 98:22, 98:24, 98:25
one's [1] - 57:7
one-inch [1] - 98:25
one-tenth [2] - 65:19, 94:19
one-year [1] - 43:9
ones [3] - 28:6, 71:4, 80:11
opened [1] - 3:1
operates [1] - 34:24
opinion [2] - 23:1, 23:5, 23:6, 24:6, 24:9, 52:18
opponents [1] - 41:14
opportunity [2] - 8:22, 12:25
opposed [4] - 8:24, 17:15, 94:7, 98:1
opposite [1] - 77:6
opt [8] - 10:13, 10:16, 10:21, 20:5, 29:17, 75:10, 75:14, 75:15
opt-out [1] - 10:16
opt-outs [3] - 10:13, 10:21, 20:5
opted [4] - 20:3, 29:14, 75:8, 75:9
opting [1] - 10:22
orange [1] - 76:3
order [12] - 5:14, 6:15, 18:20, 35:1, 53:24, 66:6, 74:18, 74:22, 84:11, 88:25, 96:11
Order [4] - 27:2, 29:15, 50:21, 89:2
orders [1] - 81:16
originally [2] - 43:3, 94:23
otherwise [2] - 73:18, 87:25
ought [1] - 50:13
out-of-pocket [2] - 17:2, 68:18
outperformed [1] - 60:23
outs [3] - 10:13, 10:21, 20:5
overage [1] - 37:10

overinclusive [2] - 52:13, 52:19
overlap [3] - 9:14, 9:18, 79:1
overrule [1] - 31:14
overruled [2] - 22:1, 98:12
oversee [1] - 47:13
overseeing [1] - 38:4
overview [1] - 32:4
owe [2] - 72:8, 74:14
owed [3] - 22:17, 31:8, 36:24
owes [1] - 73:25
own [2] - 36:11, 78:14
owners [1] - 57:19

## P

P.C [1] - 1:17
PA [7] - 1:7, 1:15, 1:23, 2:4, 2:9, 2:17, 2:22
pack [1] - 31:7
page [2] - 43:8, 46:19
pages [3] - 34:8, 37:15, 37:19, 46:16, 48:1, 48:12, 96:18, 98:24
paid [5] - 12:20, 12:21, 13:1, 39:5, 47:23
pain [2] - 68:20, 69:2
panels [1] - 19:12
panoply [1] - 71:19
paper [1] - 81:10
paragraph [3] - 74:19, 85:2, 89:8
paragraphs [1] - 85:2
pardon [1] - 6:4
parentheses [1] - 27:3
parenthetical [1] - 50:22
parentheticals [1] - 50:23
park [1] - 41:9
parks [14] - 12:17, 25:8, 28:14, 29:2, 50:8, 61:23, 63:4, 66:2, 72:25, 78:7, 79:7, 87:20, 94:13, 96:25
PARKS [38] - 2:15, 3:24, 6:4, 13:17, 14:6, 14:10, 50:9, 50:11,

50:24, 51:13, 51:22, 51:25, 52:24, 53:6, 54:25, 55:2, 56:1, 56:5, 56:8, 56:11, 56:14, 57:8, 57:14, 57:23, 57:25, 58:15, 61:13, 61:15, 82:2, 82:7, 82:11, 82:25, 88:22, 88:24, 89:1, 89:4, 97:1, 99:5

**Parks** [2] - 3:24, 72:5

**part** [16] - 15:9, 19:16, 27:1, 36:8, 48:5, 51:13, 53:7, 60:4, 67:11, 70:18, 76:16, 86:10, 87:21, 92:2, 95:7, 97:2

**participated** [2] - 37:24, 85:20

**participating** [1] - 72:18

**participation** [1] - 59:19

**particular** [4] - 27:20, 49:13, 59:6, 92:6

**particularly** [7] - 7:25, 9:2, 11:18, 14:10, 17:7, 19:21, 21:13

**parties** [9] - 18:16, 24:4, 26:20, 27:6, 51:2, 61:6, 62:24, 63:1, 81:11

**partner** [2] - 4:11, 81:15

**passable** [1] - 90:5

**pause** [1] - 84:17

**pay** [5] - 31:3, 32:11, 37:7, 41:17, 56:4

**paycheck** [1] - 83:7

**paying** [2] - 33:5, 55:25

**payment** [34] - 21:6, 21:7, 22:23, 23:13, 24:24, 26:14, 26:20, 26:25, 28:6, 30:4, 30:7, 30:18, 31:1, 31:4, 31:9, 33:5, 44:14, 47:21, 50:18, 52:14, 52:16, 53:11, 53:13, 58:25, 59:7, 64:2, 64:3, 64:5, 67:18, 72:10, 73:18, 78:23, 89:10, 89:14

**payments** [1] - 66:24

**PC** [1] - 1:21

**Peek** [1] - 76:4

**penalized** [1] - 48:20

**pending** [1] - 7:4

**PENNSYLVANIA** [1] - 1:2

**Pennsylvania** [5] - 23:12, 23:17, 25:6, 47:25, 48:10

**people** [42] - 7:13, 8:17, 9:8, 9:19, 11:12, 14:1, 15:14, 20:23, 21:9, 41:6, 41:17, 42:7, 43:1, 51:7, 52:19, 52:20, 54:19, 56:19, 57:14, 57:17, 60:3, 60:4, 60:18, 60:19, 60:20, 60:24, 61:1, 62:15, 66:1, 70:9, 73:11, 73:15, 74:9, 76:6, 76:23, 76:24, 77:5, 82:16, 95:24, 95:25

**per** [2] - 46:10, 92:17

**percent** [20] - 19:1, 21:5, 21:6, 21:7, 44:10, 44:11, 47:17, 54:17, 65:17, 65:19, 93:18, 93:20, 93:22, 93:23, 93:25, 94:17, 94:19, 95:17, 97:22

**percentage** [2] - 33:12, 47:15, 77:5

**performed** [3] - 34:12, 37:14, 39:10

**performing** [1] - 43:22

**perhaps** [3] - 8:24, 20:22, 42:13

**period** [10] - 7:22, 13:1, 13:7, 30:5, 30:8, 30:18, 44:20, 52:16, 59:5, 82:17

**periods** [1] - 30:16

**permission** [1] - 6:19

**person** [7] - 54:11, 56:24, 67:16, 67:19, 67:22, 68:1, 97:3

**personal** [10] - 22:15, 26:9, 26:15, 26:17, 39:4, 67:23, 68:11, 68:19, 79:3, 79:23

**perspective** [1] - 93:6

**persuaded** [2] - 23:11, 24:9

**phase** [1] - 8:25

**phenomenon** [1] - 56:13

**Philadelphia** [4] - 1:23, 2:4, 2:17, 2:22

**PHILADELPHIA** [1] - 1:7

**philosophically** [1] - 57:7

**phone** [3] - 5:17, 34:20, 81:15

**Phone** [1] - 6:3

**physically** [1] - 56:24

**pick** [2] - 41:5, 68:9

**Pick** [1] - 92:15

**Pick-Up** [1] - 92:15

**picks** [1] - 81:16

**picture** [2] - 32:8, 32:9

**piece** [4] - 46:25, 67:18, 75:18, 79:21

**piecemeal** [1] - 25:22

**PII** [1] - 63:25

**piles** [1] - 38:10

**pirating** [1] - 62:4

**placard** [2] - 65:8, 76:13

**placards** [2] - 66:17, 84:5

**place** [4] - 72:4, 74:10, 79:18, 97:2

**plain** [1] - 72:17

**plaintiff** [3] - 24:25, 67:13, 69:12

**Plaintiff** [1] - 48:17

**plaintiffs** [12] - 9:5, 30:21, 34:21, 34:23, 37:20, 41:5, 42:6, 59:21, 60:7, 63:4, 70:17, 70:19

**Plaintiffs** [27] - 1:16, 1:19, 1:24, 2:5, 2:9, 3:6, 3:17, 3:21, 3:23, 4:11, 4:16, 4:18, 4:20, 4:22, 4:24, 5:4, 21:21, 25:19, 27:12, 30:9, 34:11, 43:16, 51:3, 61:23, 69:9, 70:20, 79:10

**plaintiffs'** [7] - 37:18, 40:10, 43:21, 44:2, 78:22, 82:13, 86:1

**Plaintiffs'** [3] - 25:17, 27:18, 58:17

**plan** [5] - 13:20, 38:4, 42:19, 42:24, 87:6

**Platt** [2] - 4:11, 4:18

**PLATT** [2] - 2:7, 4:17

**play** [2] - 5:14, 30:11

**played** [1] - 18:23

**pleading** [1] - 81:8

**pleadings** [2] - 24:21, 87:8

**pleased** [1] - 18:23

**plenty** [2] - 9:4,

62:19

**PLI** [1] - 19:4

**plus** [4] - 20:24, 40:1, 47:21, 97:21

**pocket** [3] - 17:2, 68:18, 92:23

**podium** [1] - 6:12

**point** [47] - 7:8, 8:25, 10:6, 13:15, 20:19, 22:8, 25:25, 26:5, 27:20, 29:1, 29:21, 34:8, 38:17, 39:1, 40:20, 42:15, 47:9, 48:4, 48:11, 49:6, 49:8, 52:6, 54:9, 58:1, 59:1, 59:18, 60:8, 62:21, 65:4, 70:15, 71:11, 71:12, 74:25, 77:3, 78:5, 81:19, 82:7, 84:14, 85:5, 86:22, 88:7, 88:8, 88:13, 91:22, 93:15, 96:3

**pointed** [1] - 81:11

**pointing** [1] - 70:2

**points** [6] - 33:15, 41:1, 50:14, 61:8, 75:21, 97:10

**policy** [1] - 68:7

**pop** [1] - 31:17

**portion** [3] - 37:8, 39:5, 90:12

**POS** [1] - 81:13

**position** [16] - 5:7, 23:21, 25:3, 41:21, 49:9, 58:18, 64:18, 69:25, 72:2, 73:21, 74:24, 75:1, 77:12, 84:18, 86:6, 87:15

**positions** [1] - 43:25

**positive** [1] - 9:7

**Posner** [2] - 98:13, 98:16

**possibilities** [1] - 56:2

**possibility** [4] - 53:19, 54:2, 78:3, 92:12

**possible** [3] - 28:22, 31:10, 43:1

**possibly** [1] - 44:1

**post** [5] - 13:15, 23:12, 37:25, 55:17, 57:9

**posted** [2] - 51:12, 51:20

**potential** [2] - 34:18, 48:24

**potentially** [1] - 59:19

**powerful** [1] - 98:18

**PowerPoint** [4] - 5:8, 5:11, 70:5, 80:21

**practicable** [1] - 61:7

**practical** [1] - 27:10

**practically** [1] - 66:23

**practice** [1] - 40:18

**PRATTER** [1] - 1:10

**pre** [1] - 34:10

**pre-consolidation** [1] - 34:10

**precedent** [1] - 98:19

**precise** [2] - 33:2, 33:4

**precisely** [1] - 37:1

**predicted** [1] - 18:22

**preferred** [2] - 24:8, 33:20

**prejudice** [1] - 70:2

**preliminary** [20] - 7:8, 7:10, 7:15, 15:5, 18:4, 18:25, 25:6, 25:9, 26:23, 30:25, 38:3, 43:20, 52:2, 52:8, 52:11, 59:14, 60:10, 60:11, 60:12, 78:8

**Preliminary** [1] - 29:15

**prepared** [2] - 37:20, 43:16

**preparing** [2] - 7:1, 37:22

**present** [3] - 25:11, 69:21, 97:6

**presentation** [5] - 5:6, 5:15, 5:25, 25:22, 70:18

**presentations** [1] - 6:16

**presented** [2] - 25:24, 28:4

**presenting** [1] - 93:19

**preserve** [2] - 26:8, 78:2

**preserved** [1] - 29:6

**preset** [1] - 14:1

**press** [5] - 18:17, 43:5, 60:21, 61:1

**pressed** [1] - 83:13

**presumably** [2] - 31:3, 88:17

**pretty** [6] - 8:21, 14:4, 14:15, 53:25, 58:22, 80:10

**pretzel** [1] - 76:18

**pretzels** [1] - 96:8

**prevailed** [1] - 71:13

**previous** [1] - 60:21
**primarily** [1] - 24:10
**primary** [2] - 22:1, 33:25
**privacy** [1] - 57:7
**private** [3] - 34:25, 36:3, 36:20
**pro** [1] - 17:20
**problem** [10] - 14:16, 32:24, 39:15, 53:16, 61:19, 62:24, 65:25, 66:5, 68:21, 92:21
**procedure** [1] - 12:23
**proceedings** [1] - 99:12
**process** [14] - 12:24, 15:11, 18:14, 38:5, 43:13, 47:13, 59:19, 60:2, 60:3, 60:4, 63:21, 94:11, 94:21, 95:15
**processed** [1] - 43:12
**Processed** [1] - 46:12
**produce** [1] - 37:18
**produced** [5] - 2:24, 37:15, 37:19, 94:4, 94:11
**product** [1] - 94:4
**products** [2] - 30:14, 96:8
**professed** [1] - 69:24
**professional** [4] - 35:6, 35:18, 36:14, 39:7
**professionally** [1] - 91:10
**progeny** [1] - 69:18
**program** [1] - 66:19
**prominence** [1] - 43:7
**proof** [4] - 17:1, 17:8, 17:10, 17:12
**property** [4] - 67:24, 68:4, 68:8, 79:3
**proponent** [1] - 85:13
**proportional** [2] - 90:21, 92:20
**proposed** [4] - 27:2, 50:20, 77:18, 89:1
**protect** [4] - 58:7, 72:9, 72:11, 79:22
**protected** [1] - 79:20
**protective** [1] - 35:1
**protocol** [2] - 35:1, 44:2
**provability** [1] -

16:19
**prove** [2] - 16:5, 89:18
**proved** [1] - 59:23
**proven** [2] - 60:1, 91:3
**provide** [2] - 9:10, 13:18
**Prudential** [1] - 33:14
**public** [1] - 91:18
**public-interest-minded** [1] - 91:18
**pumps** [1] - 43:5
**purchase** [1] - 64:25
**purely** [1] - 59:16
**purposes** [5] - 11:15, 25:8, 25:11, 30:23
**pursuant** [4] - 7:23, 10:11, 51:20, 88:11
**pursue** [4] - 12:2, 26:7, 27:12, 29:20
**pursued** [1] - 20:3
**push** [6] - 21:13, 58:3, 66:23, 73:16, 76:20, 87:14
**pushed** [1] - 87:16
**pushing** [2] - 63:1, 82:13
**put** [15] - 8:10, 11:3, 15:15, 15:19, 16:13, 55:9, 55:10, 55:11, 60:22, 66:17, 71:17, 76:13, 80:1, 83:7, 88:1
**puts** [2] - 29:24, 56:17

### Q

**QR** [1] - 51:14
**qua** [2] - 79:19, 83:16
**qualifies** [1] - 11:15
**quality** [3] - 67:9, 94:3, 95:5
**quantity** [2] - 62:15, 67:10
**quarterly** [1] - 34:4
**quash** [1] - 43:21
**questioning** [1] - 39:11
**questions** [14] - 5:17, 5:22, 15:24, 16:19, 21:16, 31:19, 41:11, 42:12, 42:15, 47:7, 49:6, 50:15, 61:10, 90:1
**quick** [3] - 20:18,

75:21, 97:10
**quickly** [1] - 11:6
**quite** [2] - 73:22, 80:13
**quoted** [1] - 70:6
**quoting** [1] - 48:24

### R

**R.P.C** [1] - 2:2
**radically** [1] - 30:12
**raise** [1] - 91:19
**raised** [3] - 20:23, 43:15, 85:19
**ramifications** [1] - 19:23
**randomly** [1] - 96:1
**range** [1] - 37:1
**ranged** [1] - 46:9
**ransom** [2] - 20:9, 55:20, 55:22, 55:25, 56:4
**ransomware** [1] - 56:14
**RAs** [1] - 86:23
**rate** [34] - 12:10, 20:21, 41:15, 44:22, 45:3, 45:14, 46:16, 48:9, 54:18, 54:23, 55:25, 56:15, 56:17, 59:20, 65:9, 65:19, 87:12, 93:14, 93:16, 93:17, 93:21, 94:13, 94:16, 94:19, 95:4, 95:17, 95:22, 95:24, 96:6, 97:18, 97:23, 98:1
**rates** [20] - 20:25, 44:16, 44:18, 44:19, 44:20, 45:5, 45:11, 45:12, 46:8, 46:9, 46:10, 46:14, 46:15, 46:18, 54:17, 65:11, 87:8, 93:17, 93:19, 95:13
**rather** [4] - 22:19, 24:22, 29:5, 29:11
**ratio** [2] - 95:2, 95:20
**rationale** [2] - 48:4, 98:16
**rattle** [1] - 24:14
**RE** [1] - 1:4
**Re** [1] - 23:18
**reach** [4] - 8:25, 24:18, 24:21, 25:19
**reached** [1] - 22:25
**reaching** [1] - 23:3
**read** [4] - 8:8, 80:21, 81:17, 99:1

**reader** [1] - 16:6
**reading** [4] - 7:2, 23:24, 81:11, 89:5
**real** [1] - 65:6
**realistic** [1] - 13:25
**reality** [5] - 67:13, 90:14, 90:22
**reallocate** [2] - 90:7, 90:21
**really** [37] - 7:9, 13:24, 14:3, 18:8, 25:9, 25:13, 25:22, 25:24, 28:9, 28:20, 29:1, 30:10, 35:11, 36:13, 38:20, 38:25, 40:11, 40:17, 41:1, 56:19, 57:4, 58:1, 62:6, 63:11, 65:19, 69:18, 80:6, 80:22, 83:9, 83:20, 84:9, 85:23, 87:4, 87:22, 96:10, 96:12, 98:11
**reason** [11] - 12:3, 16:12, 19:17, 41:4, 52:20, 61:5, 64:11, 84:23, 86:11, 91:7
**reasonable** [22] - 7:7, 7:17, 8:9, 13:1, 13:5, 13:7, 15:23, 17:12, 22:15, 22:17, 33:12, 33:18, 42:17, 44:4, 46:9, 47:8, 47:14, 50:12, 50:16, 71:24, 85:14, 98:10
**reasonableness** [1] - 44:12
**reasonably** [1] - 23:13
**reasons** [2] - 22:1, 31:13
**rebuttal** [1] - 49:25
**recalibrate** [1] - 69:3
**receipt** [1] - 13:9
**receive** [1] - 42:23
**received** [1] - 9:6
**receiving** [1] - 83:10
**recent** [3] - 11:19, 11:25, 21:13
**recently** [4] - 5:18, 13:13, 14:2, 25:20
**recipients** [2] - 10:3, 88:11
**recognize** [2] - 6:6, 24:4
**recognized** [2] - 7:8, 92:13
**recognizes** [2] - 7:12, 90:14
**recognizing** [1] - 31:8

**record** [10] - 18:5, 36:9, 38:16, 74:25, 88:9, 91:20, 94:9, 97:7, 97:8, 99:12
**records** [1] - 38:7
**recovered** [1] - 48:18
**recovery** [1] - 8:24
**redeem** [1] - 96:3
**redemption** [2] - 95:22, 95:24
**reduce** [2] - 33:6, 90:6
**reduced** [2] - 44:9, 44:10
**reduction** [1] - 92:22
**reductions** [1] - 44:12
**reference** [4] - 35:4, 35:15, 35:17, 84:25
**referenced** [1] - 21:2
**reflection** [1] - 44:12
**regarding** [1] - 43:15
**regardless** [4] - 30:5, 30:6, 48:6, 60:6
**registered** [1] - 86:14
**regular** [1] - 13:24
**relate** [1] - 14:15
**Related** [1] - 1:5
**related** [5] - 24:23, 26:17, 49:2, 78:22, 89:10
**relates** [2] - 94:3, 94:6
**relating** [3] - 26:9, 26:20, 49:8
**relation** [1] - 71:24
**relationship** [7] - 22:3, 22:10, 22:19, 23:8, 23:9, 23:23, 24:11
**relatively** [2] - 44:15, 56:17
**release** [46] - 7:3, 11:17, 11:20, 18:9, 22:4, 25:14, 25:21, 26:3, 26:6, 26:19, 27:1, 27:3, 27:6, 27:8, 27:23, 28:4, 28:21, 29:18, 30:1, 43:6, 50:19, 50:21, 53:10, 58:15, 58:23, 60:15, 60:21, 61:1, 63:17, 63:22, 67:8, 77:15, 77:17, 77:21, 78:21, 79:5, 79:22, 89:5, 89:6, 89:8, 89:9, 89:11, 89:13, 89:14, 89:15
**released** [3] - 51:10,

60:25, 77:16
**releases** [2] - 60:21, 89:9
**releasing** [3] - 11:20, 50:17, 51:4
**relevant** [4] - 7:21, 15:16, 18:14, 42:5
**relied** [1] - 24:9
**relief** [7] - 7:20, 9:8, 20:24, 33:23, 47:14, 47:19, 96:7
**relying** [1] - 84:10
**remain** [1] - 27:24
**remaining** [3] - 6:21, 28:16, 31:14
**remarkable** [1] - 88:20
**remember** [4] - 64:13, 65:12, 65:16, 81:10
**reminded** [2] - 35:5, 39:10
**reminding** [1] - 43:6
**remotely** [1] - 4:13
**remove** [3] - 3:11, 3:13, 78:21
**removed** [1] - 90:12
**reorient** [1] - 61:23
**reply** [2] - 29:2, 60:22
**report** [1] - 34:4
**reported** [1] - 45:20
**Reporter** [2] - 2:21, 99:17
**reporter** [1] - 3:12
**reports** [1] - 44:3
**represent** [5] - 30:21, 69:19, 69:24, 75:16, 92:11
**representation** [2] - 85:25, 95:14
**representations** [1] - 77:4
**representative** [3] - 40:5, 79:17, 86:25
**Representatives** [1] - 34:19
**representatives** [1] - 40:7
**represented** [6] - 22:7, 29:23, 30:3, 41:20, 69:21, 69:23
**represents** [1] - 47:17
**Reps** [1] - 39:23
**request** [7] - 31:14, 32:4, 33:10, 33:11, 46:19, 47:16, 48:23
**requested** [2] - 12:15, 50:22

**requests** [1] - 37:15
**require** [1] - 94:15
**required** [9] - 7:21, 13:18, 18:13, 31:1, 31:4, 31:5, 53:7, 59:20, 94:11
**requirement** [1] - 17:9
**requirements** [1] - 50:13
**reread** [1] - 62:10
**research** [1] - 34:12
**reserve** [1] - 61:8
**reserved** [2] - 29:9, 78:9
**reserving** [1] - 26:25
**resolution** [4] - 26:11, 29:10, 96:20
**resolved** [4] - 28:5, 28:17, 41:12, 58:5
**resolves** [2] - 66:9, 94:25
**respect** [7] - 15:22, 63:3, 69:17, 72:5, 75:24, 77:3, 85:16
**respectfully** [1] - 31:13
**responding** [1] - 13:5
**response** [5] - 9:5, 11:14, 14:11, 42:25, 72:13
**responsible** [1] - 91:10
**rest** [2] - 18:6, 99:3
**resubmitted** [1] - 50:19
**result** [10] - 8:3, 8:11, 8:22, 27:11, 54:23, 60:5, 65:21, 96:5, 98:10
**results** [2] - 21:12, 46:19
**retailer** [1] - 55:17
**retained** [2] - 34:24, 34:25
**retaining** [1] - 24:2
**retired** [1] - 23:23
**returning** [1] - 90:2
**reversal** [1] - 46:5
**reverse** [1] - 93:1
**reversed** [1] - 46:4
**reversion** [1] - 94:24
**review** [1] - 17:19
**reviewed** [1] - 37:16
**reviewing** [1] - 96:21
**revised** [1] - 50:21
**revision** [1] - 5:18
**revisit** [1] - 52:21
**revisited** [1] - 41:3

**rhetorically** [1] - 75:10
**rid** [1] - 93:7
**righto** [2] - 31:23, 50:7
**rights** [13] - 25:3, 48:19, 66:19, 69:5, 71:20, 73:11, 73:13, 73:14, 74:5, 79:2, 79:20, 80:16, 82:14
**ring** [1] - 6:3
**risk** [7] - 22:16, 22:21, 22:22, 24:3, 41:2, 41:14, 41:23
**risk-causing** [2] - 22:21, 22:22
**risks** [7] - 7:25, 8:1, 8:11, 8:19, 41:23, 42:3
**risky** [1] - 9:4
**road** [1] - 79:22
**ROBERTA** [1] - 2:3
**Roebuck** [1] - 98:14
**ROGs** [1] - 86:23
**role** [1] - 91:16
**room** [5] - 2:21, 69:4, 69:16, 70:3, 72:4
**roundtable** [1] - 19:4
**RPR** [2] - 2:20, 99:17
**rubber** [2] - 17:20, 17:23
**rule** [1] - 22:9
**Rule** [10] - 7:9, 7:25, 20:1, 37:21, 50:13, 70:24, 70:25, 71:13, 74:9, 91:16
**Rules** [1] - 25:1
**ruling** [1] - 77:19
**run** [3] - 11:6, 82:22, 93:3
**running** [2] - 81:24, 82:6
**runs** [2] - 10:24, 82:4
**Rutter's** [3] - 23:19, 23:20, 23:24

## S

**safeguard** [1] - 31:9
**sake** [1] - 40:6
**salaries** [1] - 66:25
**salary** [1] - 76:21
**sale** [4] - 55:9, 59:1, 81:19, 82:7
**sAMANTHA** [1] - 1:14
**Samantha** [2] - 3:20, 21:20
**San** [1] - 19:13

**satisfied** [1] - 7:16
**satisfies** [1] - 18:14
**SAVETT** [63] - 1:21, 3:22, 31:24, 32:7, 32:9, 32:11, 32:16, 32:20, 33:2, 33:4, 33:18, 35:9, 35:20, 36:1, 36:8, 36:11, 36:17, 37:1, 37:4, 37:7, 37:11, 37:13, 38:11, 38:15, 38:23, 39:1, 39:3, 39:8, 39:13, 39:15, 39:19, 39:24, 40:23, 40:25, 42:10, 42:16, 44:18, 44:22, 44:24, 45:5, 45:8, 45:11, 45:13, 45:16, 45:19, 46:6, 46:8, 47:2, 47:5, 47:8, 49:4, 49:7, 49:10, 49:12, 49:15, 49:20, 49:25, 50:3, 50:6, 97:9, 97:12, 97:15, 97:18
**Savett** [12] - 3:23, 6:23, 28:10, 28:20, 31:20, 31:25, 38:20, 47:4, 49:5, 59:23, 70:1, 97:16
**saw** [8] - 51:23, 54:7, 55:7, 56:22, 56:25, 60:24, 81:8
**Saylor** [2] - 23:8, 24:7
**Saylor's** [2] - 23:4, 24:6
**Scalia** [1] - 64:24
**scenario** [2] - 30:12, 60:7
**scheme** [1] - 78:17
**SCHIRESON** [2] - 2:16, 4:5
**Schireson** [1] - 4:6
**SCHULAN** [1] - 91:18
**SCHULMAN** [14] - 2:12, 4:25, 89:25, 90:13, 91:2, 91:15, 92:6, 92:10, 93:5, 94:3, 94:8, 95:1, 95:7, 95:10
**Schulman** [4] - 5:1, 20:22, 89:23, 90:9
**SCHWARTZ** [1] - 1:13
**scope** [7] - 23:6, 27:7, 28:12, 30:1, 58:13, 58:22, 60:14
**score** [1] - 20:10
**script** [1] - 5:21

**scrutinized** [2] - 10:9, 44:4
**se** [1] - 92:17
**Sears** [1] - 98:14
**seated** [1] - 3:10
**seats** [1] - 3:3
**second** [7] - 22:4, 26:5, 43:5, 48:7, 68:17, 87:3, 93:16
**Second** [2] - 53:7, 83:1
**secure** [3] - 23:13, 62:25, 81:12
**security** [11] - 7:20, 19:8, 19:13, 22:16, 22:23, 34:25, 51:8, 55:3, 59:11, 63:25, 89:19
**SECURITY** [1] - 1:4
**Security** [2] - 3:5, 23:19
**see** [20] - 4:11, 15:2, 15:3, 15:8, 18:19, 20:4, 25:13, 28:5, 38:21, 43:24, 52:4, 54:6, 60:19, 60:20, 64:24, 64:25, 65:2, 65:7, 68:20
**seek** [1] - 30:21
**seeking** [1] - 34:11
**seeks** [1] - 21:23
**seem** [2] - 14:14, 81:11
**self** [1] - 88:25
**self-defacing** [1] - 88:25
**sell** [4] - 55:6, 55:10, 55:11, 55:12
**send** [11] - 9:19, 12:23, 13:20, 14:1, 16:9, 52:2, 52:18, 57:23, 95:18, 96:15, 96:19
**sending** [2] - 7:12, 42:22
**sends** [1] - 66:24
**sense** [5] - 48:14, 56:18, 65:1, 68:20, 86:24
**sensible** [1] - 8:22
**sent** [1] - 96:1
**separate** [13] - 12:3, 26:12, 29:8, 29:9, 35:7, 36:7, 50:14, 51:5, 51:25, 70:10, 90:16, 91:24, 92:1
**separately** [3] - 23:9, 24:8, 92:7
**September** [1] - 64:8
**series** [1] - 85:2

**serious** [1] - 97:17
**serve** [1] - 66:15
**service** [2] - 32:6, 32:17
**serviced** [1] - 66:14
**services** [3] - 35:6, 35:18, 36:15
**serving** [2] - 23:18, 65:3
**set** [4] - 16:3, 17:11, 20:1, 34:7
**sets** [2] - 21:3, 92:9
**setting** [1] - 7:2
**settings** [1] - 17:8
**settle** [4] - 41:13, 57:12, 57:20, 71:1
**settled** [6] - 30:4, 44:15, 45:21, 45:25, 46:1, 73:15
**settlement** [90] - 3:5, 5:15, 6:17, 7:5, 7:6, 7:12, 7:16, 9:7, 10:8, 11:15, 15:19, 15:20, 15:23, 16:20, 21:9, 21:25, 22:4, 22:7, 25:17, 25:20, 26:8, 26:19, 27:1, 27:4, 27:9, 27:15, 28:6, 28:13, 29:10, 29:11, 29:16, 29:23, 30:3, 30:8, 30:23, 30:24, 31:10, 32:17, 33:6, 33:9, 33:21, 33:22, 33:23, 34:7, 34:18, 38:1, 38:3, 41:22, 42:4, 42:25, 43:2, 43:6, 43:7, 43:20, 47:12, 47:18, 47:19, 47:24, 48:3, 48:7, 49:1, 50:12, 50:16, 54:15, 56:16, 57:5, 60:6, 60:25, 63:10, 63:14, 64:16, 66:9, 66:10, 72:19, 74:8, 74:16, 79:14, 80:25, 84:24, 90:4, 90:21, 91:4, 91:6, 91:24, 91:25, 92:17, 92:21, 92:25, 93:23, 98:7
**SETTLEMENT** [1] - 1:11
**Settlement** [17] - 6:18, 7:23, 11:23, 13:21, 17:11, 18:2, 26:23, 28:24, 42:19, 42:20, 48:19, 50:25, 51:1, 51:15, 53:8, 83:2, 96:14
**Settlement's** [1] - 85:14

**settlements** [2] - 10:10, 21:1
**seven** [3] - 18:21, 43:4, 93:20
**Seventh** [2] - 98:12, 98:13
**several** [3] - 37:16, 44:14, 46:11
**Shapiro** [1] - 48:13
**shared** [3] - 5:8, 23:14, 24:5
**Shawn** [1] - 84:18
**Sherrie** [2] - 3:22, 31:24
**SHERRIE** [1] - 1:21
**shop** [1] - 31:5
**short** [1] - 63:6
**shorthand** [1] - 2:24
**shot** [1] - 72:20
**shots** [1] - 70:25
**show** [2] - 40:9, 73:4
**showed** [2] - 54:4, 60:22
**showing** [1] - 94:16
**shown** [2] - 40:12, 97:5
**shows** [1] - 96:6
**shut** [1] - 78:7
**shy** [1] - 5:19
**side** [7] - 17:20, 17:22, 19:16, 65:3, 72:8, 79:23, 98:24
**sides** [1] - 95:11
**sign** [8] - 19:3, 51:13, 51:14, 51:21, 56:23, 60:20, 83:25, 84:1
**signals** [1] - 29:7
**signed** [3] - 14:7, 42:20, 52:24
**significant** [5] - 10:14, 15:16, 20:7, 62:8, 85:21
**significantly** [5] - 23:10, 25:4, 29:14, 29:17, 30:24
**signs** [7] - 15:15, 15:19, 15:20, 43:3, 51:12, 51:23, 56:25
**similar** [5] - 21:1, 23:21, 44:14, 46:15, 48:22
**simple** [4] - 45:3, 84:7, 94:10, 95:15
**simply** [5] - 35:14, 72:17, 72:24, 84:10, 87:14
**single** [1] - 37:22
**single-spaced** [1] - 37:22

**site** [1] - 51:19
**sits** [1] - 81:15
**situated** [1] - 65:2
**situation** [3] - 72:12, 72:23, 73:18
**situations** [1] - 98:20
**six** [4] - 10:21, 11:5, 20:5, 43:17
**size** [2] - 70:11, 74:13
**sizzlies** [1] - 66:14
**Slide** [1] - 77:19
**slight** [1] - 91:12
**slightly** [1] - 36:4
**slushy** [1] - 76:19
**small** [1] - 52:19
**smart** [1] - 80:10
**SMITH** [1] - 1:13
**Smith** [3] - 72:6, 72:7, 72:14
**Smiths** [1] - 76:3
**snag** [1] - 40:24
**social** [4] - 51:8, 59:11, 63:24, 89:19
**sole** [1] - 26:17
**solely** [4] - 24:10, 24:20, 26:14, 26:19
**solution** [1] - 62:5
**someone** [4] - 51:14, 72:7, 82:19, 83:12
**sometimes** [3] - 17:8, 40:4, 59:3
**somewhere** [4] - 64:6, 72:23, 81:17, 82:24
**sophisticated** [1] - 95:12
**sorry** [5] - 14:19, 32:14, 32:22, 37:12, 83:1
**Sorry** [1] - 53:22
**sort** [8] - 9:20, 9:22, 14:16, 54:22, 60:11, 73:23, 81:25, 94:18
**sorts** [1] - 11:1
**sounds** [1] - 31:18
**South** [1] - 2:4
**spaced** [2] - 37:22, 98:25
**speaking** [4] - 5:24, 63:23, 71:15, 87:19
**speaks** [4] - 69:18, 70:4, 70:6, 75:23
**special** [2] - 23:9, 73:24
**specials** [1] - 68:18
**specific** [7] - 22:5, 26:6, 26:9, 26:25, 30:2, 44:7, 63:25
**specificity** [1] - 6:20

**Specter** [1] - 70:25
**speed** [1] - 26:2
**spend** [3] - 5:12, 53:23, 79:9
**spending** [1] - 80:7
**spends** [1] - 41:10
**spent** [4] - 34:5, 34:6, 42:5, 53:16
**Spokeo** [1] - 57:9
**squabble** [1] - 5:13
**squawking** [1] - 20:13
**stage** [1] - 92:12
**stages** [2] - 44:15, 45:22
**stamping** [2] - 17:20, 17:23
**stand** [2] - 42:7, 87:25
**standalone** [1] - 25:24
**standard** [7] - 7:10, 8:9, 17:10, 17:18, 18:24, 54:17, 61:7
**standards** [3] - 7:22, 35:11, 40:3
**standing** [16] - 34:13, 40:13, 40:14, 40:19, 40:20, 41:3, 41:11, 42:7, 57:4, 63:13, 64:12, 64:13, 65:4, 72:1, 74:14, 75:13
**standpoint** [4] - 40:21, 74:9, 91:7, 95:9
**start** [5] - 3:9, 3:15, 22:8, 76:7, 90:2
**started** [3] - 14:23, 62:4, 80:15
**state** [5] - 23:14, 34:14, 39:25, 40:6, 40:8
**statement** [7] - 37:23, 37:24, 53:15, 53:16, 54:4, 78:12, 85:24
**statements** [2] - 17:17, 87:23
**states** [3] - 34:15, 34:24, 40:1
**STATES** [1] - 1:1
**status** [5] - 5:18, 29:5, 30:6, 43:17, 74:21
**statutes** [1] - 40:4
**stay** [2] - 43:19, 75:17
**steal** [3] - 55:5, 55:18, 59:2

**steps** [2] - 38:1, 43:23
**sticks** [1] - 32:25
**still** [18] - 12:7, 15:17, 26:18, 28:22, 36:22, 36:23, 43:11, 47:11, 59:15, 60:1, 62:1, 63:21, 73:22, 74:16, 89:16, 89:17, 95:2, 95:20
**stimulating** [1] - 40:16
**stipulation** [1] - 82:25
**stolen** [2] - 24:23, 51:9
**stood** [2] - 70:1, 89:1
**stop** [2] - 40:18, 89:10
**stopped** [2] - 55:12, 55:16
**store** [10] - 15:14, 43:3, 51:22, 52:4, 60:19, 60:20, 60:24, 72:16, 78:20
**storing** [1] - 22:15
**straight** [4] - 14:3, 58:25, 59:1, 59:6
**strategy** [1] - 42:10
**Street** [5] - 1:22, 2:4, 2:12, 2:17, 2:22
**street** [1] - 31:7
**strictly** [2] - 23:2, 28:6
**stronger** [2] - 25:3, 58:4
**strongly** [1] - 25:10
**structural** [2] - 70:3, 70:6
**structure** [2] - 90:19, 92:20
**study** [1] - 18:24
**stuff** [2] - 79:12, 80:11
**style** [1] - 64:23
**sub** [1] - 65:18
**subclass** [3] - 64:21, 70:11, 75:19
**subclasses** [1] - 40:5
**subclassing** [1] - 70:8
**subjected** [2] - 81:4, 81:18
**submission** [2] - 5:4, 11:25
**submissions** [2] - 88:9, 96:21
**submit** [8] - 7:15, 27:5, 38:16, 38:17,

38:18, 48:25, 75:4, 95:19

**submitted** [12] - 15:8, 26:23, 27:2, 34:3, 34:4, 44:3, 44:11, 50:20, 52:7, 75:7, 82:25, 94:9

**subpoena** [1] - 43:21

**subro** [2] - 79:3, 79:21

**subrogation** [1] - 68:6

**subsequent** [2] - 38:2, 98:13

**subset** [1] - 73:8

**substance** [1] - 80:25

**substantive** [2] - 33:9, 41:19

**substantively** [1] - 11:2

**subsumed** [2] - 27:14, 64:18

**subtracted** [1] - 32:18

**succeeded** [1] - 59:21

**success** [1] - 91:20

**sue** [2] - 66:11

**suffer** [1] - 57:15

**suffered** [4] - 29:4, 29:12, 30:17, 64:9

**suffering** [2] - 68:20, 69:2

**sufficiency** [1] - 24:20

**sufficient** [4] - 30:19, 63:18, 75:11, 75:12

**suggest** [6] - 14:16, 73:9, 83:9, 83:11, 91:23, 92:16

**suggested** [3] - 59:14, 78:11, 89:6

**suggestion** [1] - 62:23

**suitable** [1] - 55:18

**Suite** [3] - 1:23, 2:8, 2:12

**sum** [5] - 15:22, 29:18, 32:12, 47:21, 95:21

**summarizes** [1] - 5:7

**summary** [1] - 70:25

**Sunday** [1] - 85:4

**super** [2] - 74:4, 74:7

**superiors** [1] - 87:1

**supplement** [1] - 13:22

**supplemented** [2] - 5:25, 42:24

**support** [1] - 48:11

**suppose** [1] - 55:1

**supposed** [2] - 19:12, 43:3

**Supreme** [1] - 48:9

**surgery** [1] - 68:8

**surgically** [1] - 90:12

**survived** [1] - 70:24

**suspect** [1] - 74:11

**sweeping** [3] - 63:22, 89:6, 89:13

**swiping** [1] - 81:13

**switch** [1] - 54:4

**system** [3] - 58:24, 80:12, 82:8

**systemic** [1] - 54:22

**systems** [3] - 23:13, 59:1, 80:5

---

**T**

**tab** [1] - 82:6

**tabbed** [1] - 89:9

**table** [2] - 4:1, 30:10

**tailor** [1] - 46:25

**tailor-made** [1] - 46:25

**talks** [1] - 87:1

**tangible** [1] - 57:10

**Target** [6] - 21:6, 45:20, 45:22, 45:25, 55:4, 93:19

**targeted** [3] - 49:19, 89:14, 89:15

**tasks** [4] - 34:6, 34:7, 37:13, 43:23

**tea** [1] - 56:22

**tearing** [1] - 70:5

**tears** [1] - 6:8

**technical** [3] - 35:12, 36:19, 91:7

**teeing** [1] - 17:15

**tellers'** [1] - 59:8

**temporally** [1] - 64:8

**ten** [4] - 53:24, 53:25, 93:20, 97:22

**tenth** [2] - 65:19, 94:19

**terese** [1] - 4:5

**TERESE** [1] - 2:16

**terminal** [1] - 81:19

**terms** [12] - 12:6, 18:8, 29:25, 33:9, 39:7, 64:7, 66:16, 67:9, 68:22, 69:12, 73:19, 91:12

**terrific** [1] - 72:22

**territory** [1] - 42:4

**terrorism** [1] - 19:17

**tertiary** [1] - 5:13

**THE** [246] - 1:1, 1:2, 1:10, 3:2, 3:18, 4:13, 5:2, 5:10, 6:5, 6:13, 6:22, 8:6, 8:13, 9:11, 9:14, 9:22, 10:2, 10:16, 10:19, 10:21, 11:5, 12:6, 12:9, 13:3, 13:9, 13:13, 13:23, 14:9, 14:11, 14:14, 14:18, 14:21, 15:25, 16:2, 16:13, 16:16, 16:21, 16:24, 17:1, 17:4, 17:10, 17:14, 17:22, 17:25, 18:7, 19:3, 19:8, 19:11, 19:20, 20:8, 20:12, 20:16, 20:20, 21:18, 25:13, 25:16, 27:10, 28:1, 28:8, 28:19, 31:16, 31:21, 31:23, 32:5, 32:8, 32:10, 32:14, 32:19, 32:22, 33:3, 33:17, 35:3, 35:13, 35:24, 36:6, 36:10, 36:13, 36:22, 37:2, 37:6, 37:9, 37:12, 38:6, 38:13, 38:19, 38:24, 39:2, 39:6, 39:9, 39:14, 39:17, 39:21, 40:14, 40:24, 42:9, 42:11, 44:16, 44:21, 44:23, 45:2, 45:7, 45:10, 45:12, 45:14, 45:18, 46:3, 46:7, 46:23, 47:3, 47:6, 49:2, 49:5, 49:8, 49:11, 49:14, 49:16, 49:23, 50:1, 50:4, 50:7, 50:8, 50:10, 50:23, 51:11, 51:17, 51:24, 52:22, 53:4, 54:21, 55:1, 55:24, 56:2, 56:7, 56:10, 56:13, 57:6, 57:12, 57:21, 57:24, 58:14, 61:11, 61:14, 61:16, 61:19, 63:6, 63:9, 63:13, 63:16, 65:14, 65:21, 65:24, 67:6, 67:15, 67:19, 67:22, 68:1, 68:3, 68:7, 68:11, 68:14, 68:23, 69:1, 70:12, 70:15, 71:2, 71:5, 71:9, 71:17, 71:21, 72:13, 73:1, 73:4, 73:12, 73:22, 74:1, 74:3, 75:2, 75:7, 75:9, 75:14, 77:10, 77:20, 77:24, 78:2, 78:5,

79:25, 80:24, 81:3, 81:7, 81:21, 81:24, 82:6, 82:21, 83:3, 83:5, 83:9, 83:15, 83:18, 83:20, 83:23, 84:1, 84:4, 84:14, 84:17, 84:21, 85:5, 85:7, 85:9, 85:16, 85:23, 86:3, 86:8, 86:11, 86:16, 86:19, 87:3, 87:10, 87:17, 87:19, 88:4, 88:14, 88:16, 88:19, 88:23, 88:25, 89:3, 89:23, 90:9, 90:22, 91:5, 91:17, 92:4, 92:7, 93:1, 94:1, 94:6, 94:23, 95:2, 95:8, 96:9, 97:8, 97:11, 97:14, 97:16, 98:23, 99:7

**theft** [4] - 50:18, 51:4, 64:9, 89:10

**themselves** [2] - 4:2, 75:15

**Theodore** [3] - 2:13, 5:1, 97:4

**theories** [1] - 26:13

**theory** [1] - 91:3

**thereby** [1] - 90:7

**therefore** [2] - 22:17, 29:7

**they've** [4] - 58:5, 59:25, 79:20, 95:12

**thick** [1] - 83:4

**thinking** [7] - 13:6, 18:8, 40:10, 40:19, 42:10, 70:18, 93:12

**third** [2] - 22:6, 24:4, 25:23, 54:2, 59:18, 90:17, 91:3, 92:22

**Third** [11] - 23:15, 24:13, 33:13, 46:17, 46:21, 46:22, 48:10, 83:1, 90:14, 91:23, 92:13

**thoroughly** [1] - 18:3

**thousand** [1] - 62:20

**thousands** [3] - 7:13, 78:17

**threat** [2] - 55:13, 55:14

**three** [19] - 12:3, 15:15, 16:2, 22:1, 26:12, 38:2, 45:2, 45:21, 46:2, 54:6, 70:25, 71:3, 71:5, 71:6, 93:18, 94:17, 95:17, 97:10

**Three** [7] - 12:13,

12:21, 16:21, 43:11, 54:11, 64:6, 66:11

**three-hundredths** [3] - 93:18, 94:17, 95:17

**threshold** [1] - 7:16

**throughout** [3] - 23:14, 24:13, 43:14

**throw** [1] - 63:14

**throwaway** [1] - 9:10

**throwing** [1] - 5:21

**tie** [1] - 94:1

**tied** [1] - 18:8

**Tier** [21] - 9:15, 10:3, 12:13, 12:21, 14:12, 14:25, 16:3, 16:21, 43:10, 43:11, 54:11, 64:6, 66:10, 66:11, 75:4, 88:11, 94:15

**tiers** [1] - 12:6

**tiers'** [1] - 12:7

**ties** [2] - 14:23, 79:1

**timing** [2] - 5:24, 46:5

**tinkering** [1] - 13:25

**TJX** [2] - 45:23, 45:24

**today** [12] - 6:7, 7:1, 12:12, 47:12, 64:16, 73:14, 78:9, 78:10, 79:13, 87:16, 87:23

**today's** [1] - 43:22

**together** [2] - 39:4, 51:2

**took** [6] - 15:19, 23:20, 36:11, 43:23, 44:19, 45:5

**tools** [1] - 90:20

**total** [2] - 10:2, 34:2

**totalling** [1] - 98:8

**totally** [2] - 46:4, 56:14

**touch** [1] - 10:20

**Tough** [1] - 54:10

**tough** [1] - 56:8

**track** [4] - 29:9, 35:2, 78:14, 91:20

**Track** [35] - 1:5, 2:9, 3:6, 4:10, 4:16, 5:4, 21:23, 22:11, 23:1, 23:21, 25:4, 25:17, 25:19, 26:7, 26:10, 26:12, 26:16, 27:12, 27:18, 27:25, 28:5, 28:16, 28:18, 29:6, 29:20, 30:3, 30:8, 31:15, 43:16, 43:19, 61:22, 62:11, 63:24, 77:11, 79:14

**Track's** [1] - 24:19

tracking [1] - 80:14
tracks [3] - 12:3, 26:12, 79:17
traditional [1] - 33:21
train [1] - 81:9
transaction [2] - 17:13, 81:17
transactions [1] - 15:14
transcript [2] - 57:22, 99:11
Transcript [1] - 2:24
transfer [1] - 20:16
transparent [1] - 27:8
tread [1] - 21:23
treat [1] - 70:10
treated [6] - 70:11, 70:15, 70:16, 73:23, 74:19, 75:19
treating [2] - 46:24, 74:17
trial [1] - 59:22
tried [4] - 40:13, 43:25, 77:18, 94:13
trouble [1] - 41:8
troubles [1] - 53:17
Truck [1] - 92:15
Trucks [2] - 90:15, 92:15
true [1] - 89:7
truly [1] - 49:5
truth [1] - 85:9
try [4] - 63:13, 64:23, 71:12, 96:18
trying [8] - 24:25, 33:2, 35:14, 42:25, 55:15, 71:16, 79:24, 79:25
turn [5] - 21:17, 31:19, 39:21, 59:2, 87:25
turns [2] - 32:16, 32:24
tutorial [1] - 40:17
two [22] - 7:22, 9:20, 11:12, 15:8, 36:3, 36:18, 39:25, 40:7, 40:10, 41:25, 47:14, 47:22, 53:19, 55:22, 63:11, 68:3, 77:17, 78:11, 92:9, 97:9, 98:22
Two [5] - 14:12, 14:25, 43:11, 64:6, 66:11
type [5] - 54:23, 66:1, 72:22, 76:1, 98:25

typical [1] - 33:22
typically [2] - 13:7, 35:14

U

U.S [1] - 2:21
ultimate [2] - 36:24, 95:17
ultimately [1] - 23:11
um-hum [5] - 39:8, 68:2, 68:25, 81:2, 86:15
uncertain [1] - 8:24
uncovered [1] - 53:1
under [19] - 5:16, 6:1, 7:6, 7:21, 14:15, 24:22, 25:3, 25:5, 33:12, 33:18, 36:14, 42:17, 47:15, 48:19, 67:7, 75:19, 91:15, 93:9, 96:19
understandable [1] - 25:18
understandably [1] - 36:23
understood [3] - 17:24, 56:11
undertook [1] - 37:25
undo [1] - 41:10
unfair [1] - 92:17
unfavorable [1] - 9:5
unique [3] - 29:4, 29:20, 64:21
UNITED [1] - 1:1
unity [1] - 30:19
unless [5] - 15:24, 16:19, 18:4, 21:16, 31:18
unlike [1] - 81:13
unlocks [1] - 90:18
unscrupulous [1] - 24:4
unusually [1] - 93:18
up [43] - 5:23, 14:7, 15:15, 15:19, 17:15, 19:14, 20:1, 26:2, 27:19, 29:18, 31:17, 40:9, 42:7, 43:4, 52:8, 52:24, 54:4, 57:5, 60:23, 61:16, 63:14, 66:17, 67:11, 67:18, 68:15, 69:1, 70:1, 79:21, 81:16, 83:25, 84:2, 84:8, 86:12, 86:19, 87:25, 88:7, 89:1, 89:2, 91:13, 95:25, 96:11, 97:5

Up [1] - 92:15
UPMC [2] - 22:17, 24:10
UPMC's [1] - 22:14
upshot [1] - 11:7
urged [1] - 23:6
urges [1] - 25:4
user [3] - 83:21, 83:23, 83:24
users [1] - 95:18
uses [1] - 56:21
utilities [1] - 62:23
utilized [2] - 64:11, 80:10
utter [1] - 77:12

V

valid [1] - 95:22
valuable [1] - 47:18
valuation [1] - 93:10
value [11] - 47:18, 47:19, 47:24, 48:3, 48:7, 68:17, 75:20, 90:18, 92:25, 93:6, 93:9
various [2] - 26:22, 37:13
vast [5] - 54:13, 54:15, 56:19, 57:2, 57:8
vastly [2] - 60:22, 61:4
vault [2] - 59:9
vehicle [1] - 84:8
vendor [1] - 81:22
versus [3] - 34:1, 96:4, 98:5
vertebrae [2] - 68:9, 69:2
vested [1] - 48:21
vet [1] - 41:5
vetted [1] - 34:18
vetting [1] - 42:6
via [1] - 2:24
video [2] - 4:13, 43:5
view [3] - 23:14, 24:6, 90:18
vigorously [1] - 41:21
Villanova [1] - 61:20
violation [1] - 56:3
vis [4] - 12:1, 69:13
vis-a-vis [2] - 12:1, 69:13
visibility [1] - 15:12
volume [1] - 18:20

W

wait [1] - 50:1
waiting [2] - 12:12, 80:10
waived [1] - 43:10
waiving [1] - 73:11
walk [2] - 78:19, 80:21
walking [3] - 11:21, 11:22, 29:12
Walton [1] - 24:23
wants [3] - 58:3, 62:18, 89:18
warm [1] - 14:4
warn [1] - 99:2
warrant [1] - 11:2
Washer [1] - 98:14
Washington [1] - 2:13
waves [1] - 37:16
Wawa [97] - 3:5, 3:25, 4:4, 4:6, 5:25, 7:21, 11:8, 12:13, 15:8, 15:15, 18:19, 20:9, 25:11, 27:6, 27:15, 27:19, 28:17, 29:1, 29:3, 29:7, 30:7, 30:18, 31:2, 31:3, 31:6, 31:8, 32:11, 34:14, 34:24, 35:1, 37:15, 39:25, 40:6, 41:14, 42:22, 43:2, 43:8, 50:11, 51:18, 51:22, 51:23, 52:14, 52:16, 52:22, 52:25, 53:13, 55:17, 55:19, 56:21, 56:22, 57:15, 57:16, 57:17, 57:19, 58:7, 59:12, 59:15, 59:24, 60:25, 61:25, 62:6, 62:11, 63:23, 65:2, 66:24, 69:14, 70:1, 72:11, 72:16, 72:20, 73:5, 73:20, 73:25, 74:10, 74:11, 74:15, 76:6, 76:14, 76:24, 77:5, 80:5, 81:12, 82:2, 82:4, 82:12, 82:16, 82:20, 83:6, 84:21, 90:23, 90:25, 91:4, 93:6, 96:7
WAWA [1] - 1:4
Wawa's [8] - 11:25, 12:4, 22:22, 29:25, 33:5, 43:8, 92:23, 93:23
ways [3] - 63:16,

63:17, 80:22
web [1] - 35:22
website [1] - 51:16
week [4] - 19:5, 56:23, 96:15, 98:24
weekend [1] - 72:15
weeks [3] - 15:15, 43:4
Welsh [4] - 33:8, 37:25, 69:5, 79:16
whacked [1] - 91:13
whereas [1] - 33:20
whole [2] - 12:3, 79:23
widespread [1] - 20:7
wild [1] - 58:20
wildest [1] - 59:21
WILLIAM [1] - 2:7
willing [2] - 87:24, 90:6
willy [1] - 44:7
willy-nilly [1] - 44:7
win [1] - 9:1
window [1] - 64:9
wish [2] - 3:13, 5:25
won [1] - 59:25
wonder [1] - 64:17
wondering [1] - 46:7
Wood [1] - 57:23
word [4] - 8:6, 11:12, 66:6, 96:18
words [2] - 27:17, 44:19
works [3] - 50:24, 81:21, 82:2
world [3] - 75:24, 77:12, 91:11
worse [1] - 70:23
worth [2] - 11:24, 20:3
wrap [1] - 96:11
wrapped [1] - 68:15
wrecked [1] - 67:24
writing [1] - 22:13
written [1] - 28:21
wrote [3] - 9:3, 18:3, 22:25, 23:8, 24:7

Y

Yahoo [1] - 93:21
year [4] - 34:3, 43:9, 76:16, 80:13
years [4] - 7:23, 45:2, 47:14, 55:22
yellow [1] - 63:14
yesterday [3] - 27:2, 50:19, 53:21

**York** [1] - 1:19
**young** [1] - 65:10
**yourself** [2] - 66:13, 76:18
**yourselves** [1] - 3:3

## Z

**zealously** [2] - 30:9, 69:19
**Zoom** [2] - 19:14, 97:4

## À

**à** [1] - 79:1