**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
|  | : | **CIVIL ACTION** |
|  | : |  |
|  | : |  |
| **IN RE WAWA, INC.** | : | **This document applies to the** |
| **DATA SECURITY LITIGATION** | : | **Consumer Track.** |
|  | : |  |
|  | : |  |
|  | : | **No. 19-6019** |
|  | : | **and all related cases.** |

**M E M O R A N D U M**

PRATTER, J.                                                    APRIL 20, 2022

Wawa's payment card system suffered a data breach in December 2019. Class action litigation ensued when this data breach spawned multiple lawsuits, which the Court consolidated into one action with three tracks: financial institutions, employees, and consumers. The consolidated complaint asserts claims again Wawa based on negligence, negligence per se, breach of implied contract, unjust enrichment, and violations of state consumer protection and data privacy laws.

The Consumer Track Plaintiffs filed claims based on the compromise of their payment card information. After targeted initial discovery, Wawa and the Consumer Track Plaintiffs reached a proposed settlement in September 2020. The Court granted preliminary approval of the settlement on July 30, 2021, pending a fairness hearing, which was held on January 26, 2022. Consumer Track Plaintiffs now seek the Court's final approval of the Consumer Track class action settlement agreement ("Settlement Agreement"), as well as approval of requested attorneys' fees and Class Representative awards. The Court grants final approval of the Settlement Agreement, attorneys' fees, and Class Representative awards.

1

## BACKGROUND

The Proposed Settlement Class, estimated at 22 million class members, includes U.S. residents who used a payment card at a Wawa convenience store location between March and December 2019. Six settlement class members have opted out. The Settlement Agreement provides for three tiers of relief among the class members.

- **Tier I** – $5 Wawa Gift Card.[1] This is available to customers who used a debit or credit card to make a purchase at Wawa between March 4, 2019 and December 12, 2019 and who attest that they spent at least some time monitoring their credit card. Total Tier I compensation is subject to a $6 million cap and a $1 million floor.

- **Tier II** – $15 Wawa Gift Card. This is available to customers who used a payment card at Wawa during the relevant time period, had a subsequent fraudulent charge on their card, and spent at least some time addressing the fraudulent transaction or otherwise monitoring their account. Total Tier II compensation is subject to a $2 million cap and no floor.

- **Tier III** – Cash payments up to $500. This is available to customers who can demonstrate certain expenditures or other out-of-pocket losses resulting from the data breach. Total Tier III compensation is subject to a $1 million cap and no floor.

The Settlement Agreement also includes injunctive relief provisions. These will require Wawa to strengthen its data security systems as well as its in-store and fuel dispenser payment terminals to prevent future data breaches. Other enhancements will include an annual compliance audit and vulnerability testing. The upgraded systems and other security measures are valued approximately $35 million.

The settlement notice program included signage at all Wawa cash registers and fuel pumps, an announcement on Wawa's website, a nationwide press release, and a dedicated settlement website and toll-free automated phone line administered by the Claims Administrator. The Claims Administrator is KCC LLC. In order to maximize notice, the parties also reached an agreement

---

[1] Gift cards will be fully transferable and usable toward the purchase of any item sold in a Wawa convenience store (except tobacco products), including fuel, if payment is completed inside the store. Pursuant to a December 21, 2021 stipulation agreed to by the parties after Court interaction, the gift cards will not expire.

for Wawa to keep the signs up for "several more weeks beyond the initial four week period," issue a second press release on September 30, 2021, include a video message on all Wawa fuel pumps equipped with video screens, send reminders to in-store employees about the sign placement, and increase the prominence of the settlement announcement's placement. Doc. No. 272, at 20–21. The press releases have already received considerable publicity, including features in the *Philadelphia Inquirer*, *Philly Voice*, and *NJ.com*, as well as several other local news stations. Wawa asserts that the press release received over 136 million views, which grows to 235 million media impressions from overall press coverage of the settlement.

As of December 21, 2021, the settlement website had received visits from 258,902 users and the toll-free phone number had received 1,367 calls. Wawa also notes that foot traffic through Wawa stores during the time period in which notices were posted greatly exceeded its preliminary estimate: there were 130,312,639 transactions during the period when the signs were displayed, which is more than double the original estimate of 64 million asserted at the preliminary approval stage (and far exceeds the 22 million class members).

The Settlement Agreement has been amended to: (1) verify that the gift cards will not expire; (2) eliminate a fee reversion such that any difference in attorneys' fees requested versus attorneys' fees awarded would be redistributed to Tier One and Tier Two gift card holders; and (3) grant automatic eligibility for Tier One gift cards to Wawa app users with valid email addresses. *See* Doc. No. 264-1 ¶ 36(a). KCC determined that 556,271 app users were eligible to automatically receive the Tier One gift card.

Consumer Track Plaintiffs also filed a motion for attorneys' fees, litigation expenses, and Class Representative awards. Class counsel seek a lump sum award of $3.2 million separate from the $9 million made available to the class, which includes $3,040,060 in attorneys' fees, $45,940

in litigation expenses, approximately $100,000 in settlement administration fees, and $14,000 in Class Representative awards.

Two sets of objectors appeared at the fairness hearing. First, the Employee Track Plaintiffs object to the inclusion of employees in the settlement in their capacities as consumers. Second, an individual named Theodore H. Frank initially objected to settlement approval and the request for attorneys' fees, but has since withdrawn the portion of his objection relating to settlement approval after the amendments to the Settlement Agreement. Mr. Frank continues to maintain his objection to the requested attorneys' fees, arguing that the amount is disproportionately high as compared to the benefits obtained by the class.

After the fairness hearing, the settlement administrator submitted final claims numbers on April 8, 2022. *See* Doc. No. 313.

## LEGAL STANDARD

A settlement represents the result of a process in which opposing parties attempt to weigh and balance the factual and legal issues, with neither side ultimately choosing to risk taking the case to trial. The settlement of a class action requires court approval. Fed. R. Civ. P. 23(e)(2). Under Federal Rule of Civil Procedure 23(e), a district court may approve a settlement agreement only "after a hearing and on finding that it is fair, reasonable, and adequate." *Id.* "Significant weight should be attributed to the belief of experienced counsel that settlement is in the best interest of the class." *Lake v. First Nationwide Bank*, 900 F. Supp. 726, 732 (E.D. Pa. 1995). "The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." *In re Nat'l Football League Players Concussion Inj. Litig.*, 821 F.3d 410, 436 (3d Cir. 2016) (quoting *In re Prudential Ins. Co. Am. Sales Practices Litig.*, 148 F.3d 283, 299 (3d Cir. 1998)).

DISCUSSION

## I.   Class Certification

Before turning to the fairness of the Settlement Agreement, the Court notes that its analysis regarding class certification for settlement purposes under Rule 23 remains unchanged. *See* Doc. No. 234, at 4–10.  First, Consumer Plaintiffs satisfy the four prerequisites of Rule 23(a)— numerosity, commonality, typicality, and adequacy—because (1) the class includes 22 million payment card users, (2) Consumer Plaintiffs present common claims regarding use of a payment card at a Wawa facility and whether Wawa breached its fiduciary duties to its consumers, (3) the circumstances of the Class Representatives reflect those of payment card users at Wawa generally, and (4) the Court accepts Plaintiffs' representations that they are committed to pursuing the interests of the class and finds that they and Class Counsel are qualified and do not present any apparent conflict of interest.

Second, Plaintiffs satisfy at least one subsection of Rule 23(b).  Specifically, Rule 23(b)(3) provides for certification if common questions of law or fact predominate over any questions affecting only individual members *and* a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  When examining whether certain issues predominate, a court looks to see if "common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (internal quotation marks omitted).  An action can properly be considered under Rule 23(b)(3) if "one or more of the central issues in the action are common to the class and can be said to predominate . . . even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Id.*

Here, as this Court previously noted at the provisional certification stage for settlement purposes, common questions of both law and fact include: whether Wawa owed a duty to class members to safeguard their payment card information; whether Wawa breached that duty; whether Wawa violated state consumer protection laws; whether Wawa knew or should have known that its payment processing systems were susceptible to attack; whether Wawa complied with industry standards; and whether Wawa's conduct or failure to act was the proximate cause of the breach. The Court finds that common issues predominate in this case. *See In re NFL Players Concussion Inj. Litig.*, 821 F.3d 410, 427 (3d Cir. 2016) (finding commonality existed even if plaintiffs' "particular injuries are unique [because] their negligence and fraud claims still depend on the same common questions regarding [defendant's] conduct").

Therefore, the Court finds that class certification for settlement is proper.

## II.     Settlement Approval

The Court now turns to Consumer Track Plaintiffs' motion for final settlement approval. The Third Circuit Court of Appeals has established nine "*Girsh* factors" to assess the fairness of a proposed settlement:

(1) the complexity, expense and likely duration of the litigation;
(2) the reaction of the class to the settlement;
(3) the stage of the proceedings and the amount of discovery completed;
(4) the risks of establishing liability;
(5) the risks of establishing damages;
(6) the risks of maintaining the class action through trial;
(7) the ability of the defendants to withstand a greater judgment;
(8) the range of reasonableness of the settlement fund in light of the best possible recovery;
(9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation

*Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975) (internal quotations omitted). The Third Circuit Court of Appeals has also identified additional non-exclusive "*Prudential* factors" for courts to

consider for a "thoroughgoing analysis of settlement terms." *In re Pet Food Prods. Liab. Litig.*,

629 F.3d 333, 350 (3d Cir. 2010). Those factors include:

> [1] the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages;
> [2] the existence and probable outcome of claims by other classes and subclasses;
> [3] the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved – or likely to be achieved – for other claimants;
> [4] whether class or subclass members are accorded the right to opt out of the settlement;
> [5] whether any provisions for attorneys' fees are reasonable; and
> [6] whether the procedure for processing individual claims under the settlement is fair and reasonable.

*Prudential*, 148 F.3d at 323. While the Court must make findings as to the "*Girsh* factors," the

Court should also consider the "*Prudential* factors" when appropriate. *In re Pet Food Prods.*, 629

F.3d at 350. "The proponents of the settlement bear the burden of proving that these factors weigh

in favor of approval." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55

F.3d 768, 785 (3d Cir. 1995).

## A. *Girsch* Factors

To assess the fairness of the proposed class settlement, the Court will assess each *Girsch*

factor in turn.

### 1. *The Complexity, Expense and Likely Duration of the Litigation*

The Third Circuit Court of Appeals has explained that the first factor favors settlement

where "continuing litigation through trial would have required additional discovery, extensive

pretrial motions addressing complex factual and legal questions, and ultimately a complicated,

lengthy trial." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 536 (3d Cir. 2004).

Consumer Track Plaintiffs argue that this case would result in lengthy and expensive continued litigation. Thus, this factor weighs in favor of settlement. *See, e.g., Fulton-Green v. Accolade, Inc.*, No. 18-cv-274, 2019 WL 4677954, at *10 (E.D. Pa. Sept. 24, 2019) (analyzing the same factor in data breach litigation that settled prior to formal discovery and concluding this factor weighed in favor of approving settlement).

2. *The Reaction of the Class to the Settlement*

The second factor, the reaction of the class, "attempts to gauge whether members of the class support the settlement." *In re Prudential*, 148 F.3d at 318. Here, the Consumer Track Class is estimated at 22 million members. Of the estimated roughly half a million settlement recipients, only six Consumer Class members have chosen to opt out. None of the six members who opted out raised objections to the Settlement Agreement.

The Employee Track Plaintiffs and one individual, Mr. Frank, have raised objections to the Settlement Agreement. Mr. Frank has since withdrawn his objection to final approval. The Employee Plaintiffs object based on the low number of claims relative to the number of Wawa employees and the low claim rate.

First, the Employee Plaintiffs express concern at the low number of claims relative to the number of Wawa employees, who are considered to also typically be customers. Wawa points out, however, that no employee has opted out of the Consumer Track Class. Wawa also argues that notice to current employees is sufficiently established because the notices were posted at all Wawa locations, by employees.

Second, the Employee Plaintiffs argue that the claims rate would be much lower without the app-based expansion for automatic Tier One gift cards. The claims rate is roughly no more than 2.6 percent after adding the automatic gift cards for Wawa mobile app users, but only 0.035

8

percent using claims filed without the automatic gift cards. Although the claims rate is not impressive as an indicator of class member enthusiasm, the range of 0.035 percent (without the expansion) to 2.6 percent (with the expansion) actually compares favorably with other data breach settlements. *See, e.g.*, *Schneider v. Chipotle Mexican Grill, Inc.*, 336 F.R.D. 588, 599 (N.D. Cal. 2020) ("Here, the 0.83% claims rate . . . is on par with other consumer cases, and does not otherwise weigh against approval."); *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 321 (N.D. Cal. 2018) (finding that a 1.8% claims rate reflects a positive reaction by the class*); In re Target Corp. Customer Data Sec. Breach Litig.*, No. 14-md-2522, 2017 WL 2178306, at *1–2 (D. Minn. May 17, 2017), *aff'd*, 892 F.3d 968 (8th Cir. 2018) (approving settlement with 225,000 claims submitted out of "nearly 100 million American consumers", producing a claims rate of roughly 0.23 percent). As the Third Circuit Court of Appeals has observed, sometimes "the class members' individual damages are simply too small to motivate them to submit claims." *In re Baby Prod. Antitrust Litig.*, 708 F.3d 163, 178 (3d Cir. 2013). Moreover, these are not gift cards that are likely to sit unused once they are distributed. Wawa argues that its gift cards are generally redeemed at especially high rates. For example, it asserts that 97.2 percent of the value of Wawa gift cards issued in the last two years have been redeemed.[2]

The Court finds that the low number of objections and the lack of strong arguments regarding a negative reaction weigh in favor of final approval. *See In re Cendant Corp. Litig.*, 264

---

[2]   The Employee Track Plaintiffs also argued at the fairness hearing that Wawa employees are disproportionately unlikely to be registered as Wawa mobile app users who will receive the automatic $5 gift card because the Wawa employee discount is not available when a consumer pays via the Wawa mobile app. But, in the same presentation, the Employee Track Plaintiffs also objected that Wawa should have used the Wawa mobile app to advertise the claims process to its employees. And in the Employee Track Plaintiffs' January 2022 objections to final settlement approval, they cite the addition of notice emails to Wawa mobile app users as an action that was taken to *address* their prior objections. Therefore, the Court does not credit the objection that the app-based extension of automatic gift cards was unfair to Wawa employees acting as consumers.

F.3d 201, 235 (3d Cir. 2001) ("The vast disparity between the number of potential class members who received notice of the Settlement and the number of objectors creates a strong presumption that this factor weighs in favor of the Settlement, and the objectors' arguments otherwise are not convincing."). Plus, the claim rate is in the range of other data breach cases. Thus, this factor, too, weighs in favor of approving the Settlement Agreement.

### 3.  *The Stage of the Proceedings and the Amount of Discovery Completed*

Analyzing the stage of the proceedings and the amount of discovery completed, "courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *In re Gen. Motors Corp.*, 55 F.3d at 813. The parties here reached the Settlement Agreement after engaging in targeted informal discovery. The limited discovery included 3,596 pages of documents from Wawa, including a report on the Data Security Incident and 212 pages from the Consumer Track Plaintiffs including their credit card history showing fraudulent charges after the event. Such targeted discovery is an efficient means to gather "adequate appreciation of the merits of the case before negotiation." *In re Gen. Motors Corp.*, 55 F.3d at 813; *see also In re Processed Egg Prod. Antitrust Litig.*, 284 F.R.D. 249, 267 (E.D. Pa. 2012) (granting final approval where "no formal discovery was conducted" prior to settlement but counsel conducted informal discovery including their investigation prior to filing the complaint and review of records produced by a co-defendant). The Court notes, with approval, that these parties and their counsel did not engage in "discovery for discovery's sake," but rather resisted undertaking routinized, unfocused discovery that would only have been costly and sluggish. Considering the importance of promoting efficiency through early settlement, this factor weighs in favor of approval.

*4.   5. & 6. The Risks of Establishing Liability, Establishing Damages and Maintaining the Class Action Through Trial*

Next, the Court considers the three risk factors. In evaluating the risk factors, "the Court need not delve into the intricacies of the merits of each side's arguments, but rather may give credence to the estimation of the probability of the success proffered by class counsel, who are experienced with the underlying case, and the possible defenses which may be raised to their causes of action." *Perry v. FleetBoston Fin. Corp.*, 229 F.R.D. 105, 115 (E.D. Pa. 2005) (internal quotation marks omitted).

Consumer Track Plaintiffs argue that "data breach cases are particularly risky given challenges relating to causation and damages, among other issues." Doc. No. 272, at 20 (citing *In re Citrix Data Breach Litig.*, No. 19-cv-61350, 2021 WL 2410651, at *3 (S.D. Fla. June 10, 2021) ("Data breach cases in particular present unique challenges with respect to issues like causation, certification, and damages.")). In support of the settlement, Wawa argues that, based on its fraud detection software, it estimates that more than 97% of the consumer class did not actually experience fraudulent activity attributable to the Wawa data breach.

In considering the risk factors, the Court also considers how the maturity of the underlying substantive issues affects the complexity of the litigation. *Prudential*, 148 F.3d at 323. The Consumer Plaintiffs argue that there is a dearth of precedent on data breach actions due to the frequency of settlement, and point to one case in this District, *Browne v. US Fertility, LLC*, No. 21-cv-367, 2021 WL 2550643, at *3 (E.D. Pa. June 22, 2021), that was recently dismissed for, among other reasons, failure to allege more than "hypothetical future injuries."

Thus, the risk factors also weigh in favor of settlement approval.

7. *The Ability of The Defendants to Withstand A Greater Judgment*

"The ability of the Defendants to withstand a greater judgment generally only comes into play when 'a settlement in a given case is less than would ordinarily be awarded but the defendant's financial circumstances do not permit a greater settlement.'" *McDonough v. Toys R Us, Inc.*, 80 F. Supp. 3d 626, 645 (E.D. Pa. 2015) (quoting *Reibstein v. Rite Aid Corp.*, 761 F. Supp. 2d 241, 254 (E.D. Pa. 2011)).  Wawa reports $11 billion in annual revenue and could certainly afford to pay more.  *Wawa*, Forbes, https://www.forbes.com/companies/wawa/?sh=6bab4bb92644 (last accessed Apr. 20, 2022).  Nonetheless, courts "regularly find[] a settlement to be fair even though the defendant has the practical ability to pay greater amounts."  *McDonough*, 80 F. Supp. 3d at 645 (internal quotation marks omitted).

Given the millions of consumers alleged to have been affected by the data breach and Wawa's resources, formulaically this factor weighs slightly against approval.

8.  & 9. *The Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and the Attendant Risks of Litigation*

As to the last two factors regarding settlement reasonableness, the Court notes that class action settlements are presumptively fair where "(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *In re Warfarin*, 391 F.3d at 535 (internal quotation marks omitted).

The Consumer Track Plaintiffs argue that the negotiations were conducted at arms-length and in good faith with an experienced mediator, Judge Diane Welsh (Ret., JAMS), and are thus presumptively fair.  They introduce a declaration by Judge Welsh to support the statements regarding the negotiations.  They also argue that the targeted informal discovery was sufficient to

investigate the claims, given that Class Counsel are experienced in data breach class action litigation.

The settlement amount here compares favorably with other data breach settlements, many of which are quite modest. Being modest does not make a settlement insufficient or unsupportable. *See, e.g., Linnins v. Haeco Ams., Inc.*, No. 16-cv-486, 2018 WL 5312193, at *1 (M.D.N.C. Oct. 26, 2018) (settlement included $312,500 claim fund for reimbursement of specified expenses to employees whose personally identifiable information was accessed in data breach); *Brady v. Due N. Holdings, LLC*, No. 17-cv-1313, Doc. No. 59, at 4 & Doc. No. 65, at 2 (S.D. Ind. Oct. 16, 2018) (settlement provided extension of identity theft protection services and reimbursement of out-of-pocket expenses of up to $150, $250, $350, or $500 depending on settlement tier); *In re Zappos Sec. Breach Litig.*, No. 12-cv-325, 2019 WL 12026706, ¶ 2(D) (D. Nev. Dec. 23, 2019) (data breach settlement provided "10% coupon" for Zappos goods); *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, No. 11-md-2258, Doc. No. 240-1, at 6–7 & Doc. No. 211 (S.D. Cal. May 4, 2015) (providing data breach reimbursement of actual identity theft losses with $1 million aggregate cap and choice of items from mix of Sony games, online display themes, or 3-month subscription to Sony PlayStation service).

There are no objections to the reasonableness of the proposed settlement itself, except to the extent that Mr. Frank argues that the attorneys' fees are high compared with the final amount to be distributed to consumers. The Court must apply the presumption of reasonableness as to the arms-length negotiation and weigh the settlement amount against the alternative of no recovery and the understandably diminished nature of each Wawa consumer's interest in the litigation from a financial motivation standpoint. Weighing these considerations, the reasonableness factors favor approval.

**B. *Prudential* Factors**

Several of the *Prudential* factors are relevant to this settlement. When evaluating class action settlements where there are other subclasses, courts assess "the existence and probable outcome of claims by other classes and subclasses" and the "results achieved–or likely to be achieved–for other claimants." *Prudential*, 148 F.3d at 323.

Here, the Court considers both (1) the results achieved for the Consumer Track relative to the other two litigation tracks and (2) the treatment of subclasses among the three Consumer Track tiers. The Financial Institution and Employee tracks are both still in the discovery phase. Compared to those other two tracks, the Consumer Plaintiffs reached an early, efficient resolution. Wawa and the Consumer Plaintiffs argue that this settlement timing is reasonable because the consumers' claims are the most attenuated of the three subclasses. With regard to the consumer subclasses, the tiered compensation structure fairly distinguishes between levels of severity by tier: (1) those who did not experience fraud, (2) those who experienced fraud, and (3) those who both experienced fraud and incurred expenses because of it.

Other *Prudential* factors also weigh in favor of settlement approval. Courts may consider "whether class or subclass members are accorded the right to opt out of the settlement; whether any provision for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable." *Prudential*, 148 F.3d at 323. Here, members of the Consumer Class had the option to opt-out, and only six consumers exercised this option. The attorneys' fees are provided for in a separate fund and the Court finds they are reasonable, as discussed below. Lastly, the procedure outlined for processing individual claims is fair and reasonable. The parties hired a claims administrator, KCC, and supervised the claims process carried out by KCC to determine when revisions were necessary. In particular, the

decision to expand Tier One benefits as automatic gift cards for Wawa mobile app users registered as of the date of the data breach ensures that those with the least incentive to file a claim (namely, those who do not claim fraud) will still receive compensation.

Balancing the *Girsch* factors and the relevant *Prudential* factors, the Court finds that the proposed Consumer Track settlement is fair and reasonable. Therefore, the Court approves the proposed settlement.

## III.   Attorneys' Fees and Litigation Expenses

Class Counsel seek attorneys' fees of $3,040,060, litigation expenses of $45,940, and "approximately" $100,000 for KCC's settlement administration expenses.[3]   The Settlement Agreement sets the $3.2 million lump sum amount for fees, expenses, and class representative service awards to be paid by Wawa separate from, and in addition to, the $9 million made available to consumers.

### A.   Attorneys' Fees

Under the common fund doctrine, "a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). "In assessing attorneys' fees, courts typically apply either the percentage-of-recovery method or the lodestar method." *In re Rite Aid Corp. Secs. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005). "The percentage-of-recovery method is generally favored in common fund cases because it allows courts to award fees from the fund in

---

[3]   In the most recent claims processing update, KCC's representative asserted a total estimate for fee administration of $112,770. Doc. No. 313 ¶ 7. Class Counsel previously explained that "[i]f the final fee amount is higher or lower than $100,000, the excess or shortfall will be taken from or allocated to Class Counsel's attorneys' fees." Doc. No. 257, at 1 n.1. Therefore, the Court will allow KCC and Class Counsel to allocate this $12,770 amount among themselves.

a manner that rewards counsel for success and penalizes it for failure." *In re Rite Aid Corp.*, 396 F.3d at 300 (internal quotation marks omitted).

Class Counsel argue that this is not a common fund case because they have reached an agreement with Wawa on attorneys' fees separate from the claim awards. Nevertheless, they argue that using the overall settlement value (including the fee award) allows analysis as a constructive common fund. Using the percentage-of-recovery method, Class Counsel seek a lump sum for fees and expenses that corresponds to 24.9% of the total $12.2 million class recovery. This is in line with the 20 to 30% range typically allowed by courts, as well as the "benchmark" of 25% cited by courts in this District. *See In re SmithKline Beckman Corp. Secs. Litig.*, 751 F. Supp. 525, 533 (E.D. Pa. 1990); *Fulton-Green*, 2019 WL 4677954, at *12.

In common fund settlements, courts in the Third Circuit also apply the following "*Gunter* factors" to assess if this amount is reasonable: "(1) the size of the fund created and the number of persons benefited; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases." *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000). These factors "need not be applied in a formulaic way . . . and in certain cases, one factor may outweigh the rest." *Id.*

### 1. Size of the Fund and Number of Persons Benefitted

In evaluating the size of the fund created and the number of persons benefitted, courts consider the funds made available to class members rather than the amount actually claimed during the claims process. *See Boeing Co*, 444 U.S. at 480 (Class members' "right to share the harvest

of the lawsuit upon proof of their identity, whether or not they exercise it, is a benefit in the fund created by the efforts of the class representatives and their counsel.").

Consumer Plaintiffs argue that the total of $3.2 million for fees and expenses should be added to the $9 million made available to the class directly, resulting in an overall settlement value of $12.2 million for the "constructive" common fund.[4]   Doc. No. 258, at 17–19 (citing *Hall v. Best Buy Co.*, 274 F.R.D. 154, 171-73 (E.D. Pa. 2011); *Rose v. Travelers Home & Marine Ins. Co.*, No. 19-cv-977, 2020 WL 4059613, at *9 (E.D. Pa. July 20, 2020)). This settlement value is made available to 563,955 claimants.

Mr. Frank objects that the attorneys' fees request is excessive because it is roughly equal to the consumer claims actually paid. In response, Consumer Track Plaintiffs argue that this Court should look to the settlement approval in *In re Comcast Corp. Set-Top Cable TV Box Antitrust Litig.*, 333 F.R.D. 364 (E.D. Pa. 2019). *Comcast* involved a $15.5 million common fund for the benefit of 3.5 million consumers, but on a "claims-made" basis. Ultimately, only 20,262 consumers filed claims for a total of $211,255 in cash payments and $286,986.50 in in-kind relief. *Id.* at 385. Despite this cash payment amount, the court approved the $1.1 million attorneys' fee sought by class counsel based on "the entire" $15.5 million made available to the class, as opposed to the amounts ultimately claimed by class members. *Id.* at 387, 390. The court reasoned that class counsel had "adequately prioritized the direct benefit to the Class" and "it appear[ed] that the compensation for individual damages was simply too small to motivate many Class Members to

---

[4]  The Consumer Plaintiffs also argue that the Court should add the estimate of $35 million in value from the injunctive relief in considering the total settlement value. Mr. Frank counters that Wawa would have made the relevant improvements with or without this litigation. But Consumer Track Plaintiffs cite case law rejecting arguments that injunctive relief is illusory if it was in the company's interest to institute the changes anyways because, as is the case here, "the Settlement will make the injunctive relief both binding and enforceable, ensuring that Defendants maintain such practices until two years following the date of the Preliminary Approval Order." *Zepeda v. PayPal, Inc.*, No. 10-cv-1668, 2017 WL 1113293, at *13 (N.D. Cal. Mar. 24, 2017). The Court agrees that the non-monetary benefits weigh in favor of approval.

17

file a claim." *Id.* at 387.  The court cited the primary Third Circuit Court of Appeals case that discussed this issue:

> There are a variety of reasons that settlement funds may remain even after an exhaustive claims process—including if the class members' individual damages are simply too small to motivate them to submit claims. Class counsel should not be penalized for these or other legitimate reasons unrelated to the quality of representation they provided. Nor do we want to discourage counsel from filing class actions in cases where few claims are likely to be made but the deterrent effect of the class action is equally valuable.

*Id.* at 387 (quoting *In re Baby Prod. Antitrust Litig.*, 708 F.3d 163, 178 (3d Cir. 2013)).

As in *Comcast*, the awards ultimately distributed here fall short of the total fund made available.  Of the $9 million cap, the claims fall just under $3 million.  And of the 22 million potential class members, there are fewer than 600,000 claimants (which are also largely the Wawa mobile app users receiving automatic gift cards).  Mr. Frank argues that this gap justifies reducing the attorneys' fee, but he does not address the Third Circuit precedent to the contrary.  Because attorney's fees should be analyzed based the entire constructive fund rather than the claims filed (and counsel should not be discouraged from filing such class action lawsuits), this factor weighs in favor of the requested fee award.

### 2. Objections

Wawa does not object to the fee award.  Only Mr. Frank does.  Mr. Frank argues that (1)"[a]pportioning a settlement's recovery 50/50 between the class and class counsel does not satisfy Rule 23(e)" and that (2) segregating the attorneys' fee fund so that any reduction in excess fees would revert to Wawa "deprive[s] the Court of the ability to rectify the imbalance." Doc. No. 278, at 1.  The Third Amended Settlement Agreement, however, eliminated the fee reversion, and Mr. Frank acknowledges that this resolves his second concern.[5]

---

[5] The Third Amended Settlement Agreement distributes any difference between the $3.2 million in fees requested and the fees awarded to the Tier One and Tier Two gift card holders.

As to the ratio between the claims made and the attorneys' fee award, Mr. Frank argues that the Court should (1) limit class counsel's recovery to 25% of the "common fund," which would result in a reduced fee award of $1.6 million, and (2) reciprocally increase class member recovery. But Mr. Frank incorrectly calculates the "common fund" as only the $6.4 million in claims actually made and fees and expenses requested. Using the entire amount made available to the class, *In re Comcast*, 333 F.R.D. at 387, the total constructive common fund value is $12.2 million and the attorneys' fees request is 24.9% of the total settlement value. Thus, even under Mr. Frank's request to limit class counsel's recovery to 25% of the common fund, the $3.2 million total requested (including $3,040,060 in attorneys' fees) is reasonable when using the correct common fund total.

Mr. Frank also objects to the inclusion of a so-called clear-sailing clause in the Settlement Agreement, arguing that Wawa's decision not to object to the fee request is a product of this clause. But clear-sailing provisions are common in class action settlements. "A district court faced with such a provision in a class action settlement should review the process and substance of the settlement and satisfy itself that the agreement does not indicate collusion or otherwise pose a problem." *In re Nat'l Football League Players Concussion Inj. Litig.*, 821 F.3d 410, 447 (3d Cir. 2016). Class Counsel argue that there is no suggestion of collusion because the proposed settlement was negotiated with an independent mediator and attorneys' fees were only discussed *after* all other terms were agreed upon. Judge Welsh's declaration confirms that she assisted in the fees and expenses agreement "after the substantive terms for the class relief were already agreed upon." Doc. No. 181-2 ¶ 15. The Court is satisfied that the euphemistically named "clear-sailing" clause does not suggest collusion or other problems.

Therefore, the Court finds that Mr. Frank's objections do not weigh against approval of the fee request.

### 3. *Skill and Efficiency of Attorneys Involved*

As the Court noted in appointing Class Counsel as interim counsel, the attorneys involved here have substantial experience in complex class actions generally and in data breach litigation in particular. *See* Doc. Nos. 78-2, 78-3, 78-4 & 78-5 (counsel resumes). Mr. Frank argues that the need for several amendments and his own contributions call into question the skill and efficiency of Class Counsel. But the Court finds that the parties' flexibility in negotiating amendments as needed should be applauded rather than censured.

Mr. Frank also objects to Class Counsel's blended hourly rate of $653 as "astronomical." Doc. No. 263, at 24. The blended hourly rate is a product of averaging the partner, associate, and support staff rates across law firms. In contrast to Mr. Frank's characterization, courts in the Third Circuit have accepted blended hourly rates in this $600+ range. *See e.g.*, *Sweda v. Univ. of Pa.*, No. 16-cv-4329, 2021 WL 5907947, at *7 (E.D. Pa. Dec. 14, 2021) (approving class action fee award with blended hourly rate of $756, when lodestar amount is divided by 8,144 hours spent); *Pfeifer v. Wawa, Inc.*, No. 16-cv-497, 2018 WL 4203880, at *14 (E.D. Pa. Aug. 31, 2018) (approving class action fee award with "blended hourly rate of approximately $685"). The cases cited by Mr. Frank do not, as Mr. Frank suggests, determine that similar rates are "too high." *Compare* Doc. No. 263, at 24, *with In re Domestic Drywall Antitrust Litig.*, No. 13-md-2437, 2019 WL 1258832, at *2 (E.D. Pa. Mar. 19, 2019) (discussing insufficient documentation without criticizing the requested blended rate itself), *and Skeen v. BMW of N. Am., LLC*, No. 13-cv-1531, 2016 WL 4033969, at *22 (D.N.J. July 26, 2016) (addressing a dispute regarding whether the

comparator counsel rates should be practice-based or geography-based in a vehicle defect class action).

The Court finds that Class Counsel seek a reasonable blended hourly rate for the skill and efficiency they have contributed to the early resolution of the Consumer Track litigation.

### 4.  Complexity and Duration of Litigation

As discussed above, data breach litigation is inherently complex. *Fulton-Green*, 2019 WL 4677954, at *8.  While this supports the fee award, the Court considers the short duration of the litigation in determining whether the amount of time devoted was reasonable (factor 6, *infra*).

### 5.  Risk of Nonpayment

Class Counsel took on this case on a contingent basis, risking nonpayment if the case was not successful.  Taking that risk on behalf of the class lends weight to the fee request.  *See Fulton-Green*, 2019 WL 4677954, at *13 ("Class Counsel invested considerable resources into this case with no guarantee that they would recover those costs given that they were retained on a contingency fee basis.").  Thus, this weighs in favor of the requested attorneys' fees.

### 6.  Amount of Time Devoted

Class Counsel detail 5,942 billed hours in their fee petition after reducing the amount by 25% for Class Counsel and by 30% for all other Consumers Plaintiffs' counsel.  They support this time with affidavits in a joint declaration.  This amount does not include time spent preparing for final approval and also does not include future work, such as monitoring the injunctive relief.

The reported number of hours (5,942) is lower than early settlements in similar payment card breach cases.  *See In re Home Depot, Inc. Customer Sec. Breach Litig.*, No. 14-md-2583, Doc. No. 227-1, at 10, 25 (N.D. Ga.) (consumer track counsel devoted 10,186 hours in reaching settlement before motion to dismiss was decided); *In re Target Corp. Customer Data Sec. Breach*

*Litig.*, No. 14-md-2522, Doc. No. 483, at 23 (D. Minn.) (consumer track counsel devoted 20,482 hours in reaching settlement three months after motion to dismiss was decided); *In re TJX Cos. Retail Sec. Breach Litig.*, No. 07-cv-10162, Doc. No. 353, at 4 (D. Mass.) (consumer track counsel devoted 7,400 hours in reaching settlement before motion to dismiss was decided). The relatively lower number of hours could weigh against approving the proposed fee due to less time actually spent on the matter, but counsel have exercised their judgment in imposing billing reductions and should not be discouraged from working efficiently to reach an early resolution. Although this factor could weigh against the fee request, the lodestar cross-check below balances the number of hours with the success achieved.

      7. *Awards in Similar Cases*

Lastly, other data breach class action litigation has resulted in attorneys' fee awards significantly higher than the $3,040,060 fee requested here. *See, e.g.*, *In re Home Depot, Inc., Customer Data Sec. Breach Litig.*, No. 14-md-2583, 2016 WL 11299474, at *1 (N.D. Ga. Aug. 23, 2016) ($7,536,497.80 fee award for class action involving 40 million payment cards settled before motion to dismiss stage); *In re Target Corp. Customer Data Sec. Breach Litig.*, No. 14-md-2522, 2015 WL 7253765, at *4 (D. Minn. Nov. 17, 2015) ($6.75 million fee award for class action involving 110 million payment cards settled three months after motion to dismiss denied in part), *rev'd and remanded on other grounds*, 847 F.3d 608 (8th Cir. 2017). Thus, the *Gunter* factors collectively support approval of the requested fee.

In addition to the *Gunter* factors, the Court considers a lodestar cross-check. The Third Circuit Court of Appeals has "suggested it is sensible for a court to use a second method of fee approval to cross-check its initial fee calculation." *In re Rite*, 396 F.3d at 300. Here, a lodestar cross-check produces a lodestar of $3,877,271, based on 5,942 hours multiplied by each attorney's

hourly rates (which results in an effective blended hourly rate of $653). This leads to a "negative" multiplier of 0.78 for the requested attorneys' fees of $3,040,060 relative to the lodestar amount. The Third Circuit Court of Appeals has noted that multipliers "ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." *In re Prudential*, 148 F.3d at 341. Because the lodestar here is actually higher than the requested fee, this cross-check provides support for the fee request. *See Dickerson v. York Int'l Corp.*, No. 15-cv-1105, 2017 WL 3601948, at *11 (M.D. Pa. Aug. 22, 2017) ("A negative multiplier reflects that counsel is requesting only a fraction of the billed fee; negative multipliers thus 'favor[ ] approval.'") (quoting *Altnor v. Preferred Freezer Servs.*, 197 F. Supp. 3d 746, 767 (E.D. Pa. 2016)).

Based on the *Gunter* factors and the lodestar cross-check, the Court will grant the motion for attorneys' fees of $3,040,060 as part of the $3.2 million lump sum payment.

### B. Litigation Expenses

Class Counsel also seek $45,940 for their litigation expenses and "approximately" $100,000 for KCC's settlement administration expenses. "Attorneys who create a common fund for the benefit of a class are entitled to reimbursement of reasonable litigation expenses from the fund." *In re Aetna Inc.*, No. MDL-1219, 2001 WL 20928, at *13 (E.D. Pa. Jan. 4, 2001). In some cases, courts in this District have reduced the reimbursement of expenses where the notice sent to class members anticipated a lower reimbursement request. *Id.* at *13.

Class Counsel's litigation expenses include their filing fees, service of process fees, expert and professional services fees, mediation fees, Westlaw/LEXIS fees, and PACER fees. These types of expenses are commonly approved by courts in this Circuit. *See, e.g., In re Am. Inv'rLife Ins. Co. Annuity Mktg. & Sales Pracs*. Litig., 263 F.R.D. 226, 245 (E.D. Pa. 2009) (approving class counsel's request for reimbursement of expenses including "expert witness fees; mediation fees;

. . . legal research; . . . and service of process"); *Cunningham v. Wawa*, Inc., No. 18-cv-3355, 2021 WL 1626482, at *8 (E.D. Pa. Apr. 21, 2021) (approving class counsel's request for reimbursement of "filing fees, . . . mediation fees, and other similar, ordinary litigation expenses").

The Court finds that Class Counsel exercised appropriate discretion in trimming the requested expenses. For example, in-house administrative expenses such as printing are excluded. The largest line items in the requested expenses are $19,154 in legal research fees (Westlaw, Lexis, and Pacer) and $9,257.55 for professional services, which consist of private investigator fees, expert witness fees, and other vendor and marketing fees. Separately, the estimate of $100,000 in claims administration fees includes services for maintaining the Settlement Website, maintaining an automated call center, fielding inquiries from claimants, corresponding with claimants about deficiencies in claim submissions, mailing settlement checks to valid Tier Three claimants, and compiling a list of eligible claimants for Wawa to email gift cards.

In the notice provided to consumer class members, Class Counsel also stated that they would request the same $3.2 million lump sum amount for fees and expenses that they request in the present motion. *See* Doc. No. 234-1, at 7. Therefore, the notice sent to class members did not anticipate a lower reimbursement request. *Cf. In re Aetna Inc.*, 2001 WL 20928, at *13.

Finally, the request for $45,940 in litigation expenses and $100,000 for the settlement administrator compares favorably to other data breach settlements. *See, e.g., In re Home Depot*, 2016 WL 11299474, at *2 (approving $166,925 expense reimbursement in case involving theft of 40 million payment cards settled before motion to dismiss decided). The Court finds that the requested litigation expenses are reasonable.

## IV.  Class Representative Awards

Plaintiffs also request awards of $1,000 each for 14 named Class Representatives.[6] "Incentive awards are not uncommon in class action litigation and particularly where, as here, a common fund has been created for the benefit of the entire class." *In re Flonase Antitrust Litig.*, 291 F.R.D. 93, 106 (E.D. Pa. 2013) (internal quotation marks omitted). "Named plaintiffs play an important role in class actions, and it is surely proper to provide reasonable incentives to individual plaintiffs whose willingness to participate as lead plaintiffs allows class actions to proceed and so confer benefits to broader classes of plaintiffs." *In re CertainTeed Corp. Roofing Shingle Prods. Liab. Litig.*, 269 F.R.D. 468, 486 (E.D. Pa. 2010) (internal quotation marks omitted).

Courts assessing class representative awards consider the following factors: "[t]he risk to the plaintiff in commencing suit, both financially and otherwise; the notoriety and/or personal difficulties encountered by the representative plaintiff; the extent of the plaintiff's personal involvement in the lawsuit in terms of discovery responsibilities and/or testimony at depositions or trial; the duration of the litigation; and the plaintiff's personal benefit (or lack thereof) purely in his [or her] capacity as a member of the class." *Ribstein v. Rite Aid Corp.*, 761 F. Supp. 2d 241, 257 (E.D. Pa. 2011).

The Consumer Track Class Representatives faced little risk, but they seek relatively little reward. Courts have considered awards around 3.1 to 3.5 percent of the total recovery as proportional. *Id.* at 8. Here, the aggregate request of $14,000 comes out to a mere 0.11% of the $12.2 million total recovery. The Class Representatives performed discovery responsibilities including researching their transactions with Wawa, checking their bank accounts for fraudulent

---

[6] This count includes 13 Class Representatives in this action and another Class Representative in a related action in the Superior Court of New Jersey that was stayed pending the resolution of this case and will be jointly dismissed upon settlement approval. *See* Doc. No. 301-1 ¶ 76.

activity, conforming to document preservation obligations, reviewing case filings, communicating with counsel, and approving the Settlement Agreement. The Court finds that the requested Class Representative service awards of $1,000 per class representative are proportionate to the efforts expended. *See, e.g., In re CertainTeed Corp.*, 269 F.R.D. at 476, 490 (awarding $2,500 to class representatives who were not deposed, in contrast to $5,000 to class representatives who were deposed); *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-md-2752, 2020 WL 4212811, at *44 (N.D. Cal. July 22, 2020) (same).

Although the number of class representatives (14) is somewhat high relative to other types of cases, the class representatives reflect the interstate nature of the class of Wawa consumers and data breach class action litigation in general. At the hearing, Class Counsel explained that they sought two representatives in each state where Wawa conducted business in order to address potential standing issues. Relative to other data security litigation, the total amount of $14,000 in service awards to 14 class representatives is low. *See, e.g., In re Anthem, Inc. Data Breach Litig.*, No. 15-md-2617, 2018 WL 3960068, at *31 (N.D. Cal. Aug. 17, 2018) (approving a total of $597,500 in service awards for 105 named plaintiffs); *In re Home Depot*, 2016 WL 11299474, at *1 (approving an $88,000 service award for 88 named plaintiffs).

Therefore, the Court approves the requested expenses and class representative awards.

## CONCLUSION

For the foregoing reasons, the Court grants final approval of the Consumer Track Settlement Agreement and the requested attorneys' fees, litigation expenses, and Class Representative awards.  An appropriate order follows.

BY THE COURT:

**GENE E.K. PRATTER**
**UNITED STATES DISTRICT JUDGE**