**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| | : | **CIVIL ACTION** |
| | : | |
| | : | |
| **IN RE WAWA, INC.** | : | **This document applies to the** |
| **DATA SECURITY LITIGATION** | : | **Consumer Track.** |
| | : | |
| | : | |
| | : | **No. 19-6019** |
| | : | **and all related cases.** |

**M E M O R A N D U M**

PRATTER, J.                                                                                    APRIL 9, 2024

A good lawyer wears many hats. The multifaceted nature of lawyering is so fundamental that it occupies the opening passages of the Model Rules of Professional Conduct:

> As a representative of clients, a lawyer performs various functions. As advisor, a lawyer provides a client with an informed understanding of the client's legal rights and obligations and explains their practical implications. As advocate, a lawyer zealously asserts the client's position under the rules of the adversary system. As negotiator, a lawyer seeks a result advantageous to the client but consistent with requirements of honest dealings with others. As an evaluator, a lawyer acts by examining a client's legal affairs and reporting about them to the client or to others.

Model Rules of Prof. Conduct Preamble (Am. Bar Ass'n 2023). A panel of the Third Circuit Court of Appeals has instructed the Court to re-examine its award of attorneys' fees in this class action settlement to determine whether the lawyers too readily removed one of these hats during the negotiation process, namely that of the so-called zealous advocate. In re-examining the fee award, the Court is also mindful that the lawyer as negotiator ought not blindly battle with their opponents' every request under the banner of "zealous advocacy." To arrive at an agreement, and to bring that agreement to fruition, zealous advocacy gives way to the "requirements of honest dealings with

1

others," including a measure of cooperation with the lawyers sitting across the negotiating table.[1] The ability to cooperate when appropriate is a lawyerly asset.

**BACKGROUND**

After a December 2019 data breach at Wawa, multiple lawsuits were filed against the convenience store chain, which the Court consolidated into one action with three tracks: financial institutions, employees, and consumers. In September 2020, the consumer plaintiffs negotiated a preliminary settlement agreement with Wawa. Retired United States Magistrate Judge Diane Welsh mediated these negotiations. The Court granted preliminary approval of the settlement in July 2021, pending a fairness hearing, which was held in January 2022. The Court granted final approval of the consumer track class action settlement in April 2022.

As part of its final approval, the Court approved an attorneys' fee award of $3.2 million over the objections of one class member, Theodore Frank. In November 2023, a panel of the Third Circuit Court of Appeals vacated this fee award and remanded so the Court could re-consider its reasonableness through the lens of two considerations: (1) whether the funds made available to the class or the amount actually claimed by the class is the best measure of reasonableness under the circumstances of this case and (2) whether unargued appellate suspicion of putative "side agreements" renders the fee award unreasonable. After holding two post-remand hearings and reviewing counsel's detailed sworn declarations regarding the negotiation process, the Court finds that the originally awarded fee is indeed reasonable and does not deserve being considered the result of any "side agreements."

---

[1]     *See generally* Carol L. Zeiner, *Getting Deals Done: Enhancing Negotiation Theory and Practice Through a Therapeutic Jurisprudence/Comprehensive Law Mindset*, 21 Harv. Negot. L. Rev. 279 (2016); Carrie Menkel-Meadow, "Toward Another View of Legal Negotiation: The Structure of Problem Solving," 31 UCLA L. Rev. 754 (1984).

## I.     The First Final Approval Process

The Proposed Settlement Class includes: "All residents of the United States who used a credit or debit card at a Wawa location at any time during the Period of the Data Security Incident of March 4, 2019 through December 12, 2019." The class includes about 22 million people, only six of whom opted out of the class.[2] Among the class members, the Settlement Agreement provides for three tiers of relief.

- **Tier I** – $5 Wawa Gift Card.[3]  This is available to customers who used a debit or credit card to make a purchase at Wawa between March 4, 2019 and December 12, 2019 and who attest that they spent at least some time monitoring their credit card.  Total Tier I compensation is subject to a $6 million cap and a $1 million floor.

- **Tier II** – $15 Wawa Gift Card.  This is available to customers who used a payment card at Wawa during the relevant time period, had a subsequent fraudulent charge on their card, and spent at least some time addressing the fraudulent transaction or otherwise monitoring their account.  Total Tier II compensation is subject to a $2 million cap and no floor.

- **Tier III** – Cash payments up to $500.  This is available to customers who can demonstrate certain expenditures or other out-of-pocket losses resulting from the data breach.  Total Tier III compensation is subject to a $1 million cap and no floor.

Third Amended Settlement Agreement ¶ 36, Doc. No. 301-1.

The Settlement Agreement also includes injunctive relief provisions, which the parties valued at approximately $35 million. According to counsel for Wawa, "[t]he injunctive relief was discussed early and often in the negotiations. It was heavily negotiated and detailed." Decl. of

---

[2]     As the Court fully explained when it first granted final approval of the class action settlement, the settlement notice program was fulsome and legally adequate. *See In re Wawa, Inc. Data Security Litigation*, No. 19-6019, 2022 WL 1173179, at *2 (E.D. Pa. Apr. 20, 2022). The appellate court did not instruct the Court to re-examine the notice procedures in this case, and the Court does not re-describe them here.

[3]     Gift cards will be fully transferable and usable toward the purchase of any item sold in a Wawa convenience store (except tobacco products), including fuel, if payment is completed inside the store. Pursuant to a December 21, 2021 stipulation agreed to by the parties after Court interaction, the gift cards will not expire.

Gregory Parks ¶ 15, Doc. No. 427. These negotiated provisions require Wawa to: (1) encrypt payment card information at point of sale terminals in Wawa stores; (2) implement Europay, Mastercard, and Visa security procedures at point of sale terminals; (3) maintain written policies regarding information security; (4) retain, on an annual basis, a qualified security assessor; (5) conduct yearly penetration testing and remediate vulnerabilities thereby discovered; and (6) issue a compliance report evidencing Wawa's compliance with these requirements. Third Amended Settlement Agreement ¶ 40, Doc. No. 301-1; Decl. of Richard Dorough ¶ 3, Doc. No. 428-1. These measures exceed both the regulatory requirements applicable to Wawa and its contractual obligations with its payment processor. Decl. of Gregory Parks on Injunctive Relief ¶ 4, Doc. No. 274. The appellate court panel's discussion of the settlement did not include material references to these equitable elements of the settlement.

These actions may have been taken by Wawa in the absence of a court order: objector's counsel notes that, as early as February 2020, Wawa told members of the media that it was already implementing some of what would later become the Court's injunctive relief. Decl. of Adam Schulman ¶¶ 12-13, Doc. No. 429. In fact, Wawa's Board approved expenditures of $25 million in the wake of the data breach to address security concerns. *Id.* ¶ 65. Nonetheless, this litigation converted Wawa's voluntary remedial measures into measures required by order of the Court. In fact, "[i]f it were not for the Consumer Track Action[,] . . . Wawa would not have agreed to having these measures be compelled as injunctive relief." Decl. of Gregory Parks on Injunctive Relief ¶ 7, Doc. No. 274.

Since implementing these security enhancements, no data breach has occurred. Joint Decl. of Co-Lead Counsel ¶ 47, Doc. No. 428. Given the nature of the defendants' business, "many of Wawa's customers are repeat, loyal customers," and "[c]lass members who repeatedly shop at

Wawa or pump gas at Wawa . . . have benefitted from the fact that they now know that their credit and debit cards are secure," *Id.* ¶¶ 48, 50. This injunctive relief is a central feature of this settlement agreement.

Class counsel sought a lump-sum $3.2 million fee award consisting of $3,040,060 in attorneys' fees, $45,940 in litigation expenses, $100,000 in settlement administration fees, and $14,000 in class representative awards. A single class member, Theodore Frank, objected to both the settlement agreement itself and to the request for attorneys' fees.

Several amendments to the settlement agreement led to the withdrawal of Mr. Frank's objection to the settlement agreement. First, the agreement was amended to allow approximately 633,000 users of Wawa's mobile application to "automatically be qualified to receive the Tier One benefit of a $5 Wawa Gift Card without needing to submit proof of purchase unless they affirmatively decide to decline[.]" Stipulated Order of November 22, 2021 at 1, Doc. No. 266. Second, the parties clarified that, "if the Court does not award the full $3,200,000 to class counsel set forth in the Settlement Agreement," then "any difference between $3,200,000 and the amount awarded will be distributed equally among and added to the total value of each of the Tier One and Tier Two Wawa Gift Cards." Stipulated Order of December 28, 2021 at 1, Doc. No. 276. Third, the agreement was amended to reflect that Wawa Gift Cards issued pursuant to the settlement agreement would not expire. *Id.* at 2. These amendments demonstrate class counsel's ongoing commitment to working for the benefit of the class, "even after submitting their application for attorney's fees." Joint Decl. of Co-Lead Counsel ¶ 58, Doc. No. 428.

Following these amendments, Mr. Frank withdrew his objection to the settlement agreement, but he maintained his objection to the request for attorneys' fees. Stipulated Order of December 28, 2021 at 2, Doc. No. 276. He argued that class counsel's requested fee was

disproportionately large when compared to the value of claims actually made by the class, as opposed to the larger amount that the settlement agreement made available to the class. Specifically, the total value distributed to class members upon final approval would be about $2.9 million, and Mr. Frank argued that the rough equivalence between that number and class counsel's requested $3.2 million fee rendered the latter unreasonable. Response of Theodore Frank to Settlement Amendments at 1, Doc. No. 278.  Mr. Frank also argued that paragraph 78 of the settlement agreement constituted a so-called "clear-sailing" agreement, which, according to Mr. Frank, is a "telltale indication of an unfair deal." Objection of Theodore Frank at 14, Doc. No. 263. Finally, though Mr. Frank had taken issue with the segregation of the fee award from the class fund because "any reduction in excess fees would revert to Wawa rather than augment class relief," the parties' twin agreements to distribute any court-ordered fee reduction to class members and to stop Wawa gift cards from expiring "resolve[d] [Mr.] Frank's objection to settlement approval[.]" Response of Theodore Frank to Settlement Amendments at 1–2, Doc. No. 278.

The Court approved the fee award over Mr. Frank's objections. In examining the reasonableness of the fee award, the Court determined that, when evaluating the requested fee award in light of the size of the fund and number of people benefited, it was proper to consider "the entire constructive fund rather than the claims filed." *In re Wawa, Inc. Data Security Litigation*, No. 19-6019, 2022 WL 1173179, at *10 (E.D. Pa. Apr. 20, 2022) ("*Wawa I*"). The Court calculated the $12.2 million size of this constructive fund by adding the $3.2 million fee award to the $9 million made available directly to the class. *Id.* at *9. Mr. Frank objected to this $12.2 million denominator because class members only claimed about $2.9 million out of the $9 million made available to the class. *Id*; Decl. of Jeff Moore ¶ 5, Doc. No. 313. Nonetheless, the Court adopted this $12.2 million denominator in light of the Supreme Court's guidance in *Boeing*

*Co. v. Van Gemert*, 444 U.S. 472, 480 (1980), the Third Circuit's guidance in *In re Baby Prod Antitrust Litig.*, 708 F.3d 163, 178 (3d Cir. 2013), and the district court's on-point analysis in *In re Comcast Corp. Set-Top Cable Television Box Antitrust Litig.*, 333 F.R.D. 364, 385–87 (E.D. Pa. 2022). *See Wawa I*, 2022 WL 1173179, at *9–10.

The Court also found that "clear-sailing provisions are common in class action settlements" and credited class counsel's argument "that there is no suggestion of collusion because the proposed settlement was negotiated with an independent mediator[,] and attorneys' fees were only discussed *after* all other terms were agreed upon." *Id.* at *10. Indeed, the independent and well-regarded mediator, former United States Magistrate Judge Diane Welsh, confirmed that the fee award and class relief were negotiated separately. Decl. of Hon. Diane Welsh ¶ 15, Doc. No. 181-2.

Finally, in response to Mr. Frank's argument that the amendment process reflected negatively on the skill and efficiency of class counsel, *see* Response of Theodore Frank to Settlement Amendments at 3, Doc. No. 278, the Court concluded that class counsel's "flexibility in negotiating amendments as needed should be applauded rather than censured," *Wawa I*, 2022 WL 1173179, at *11. Furthermore, the Court found class counsel's blended hourly rate of $653 to be reasonable, that the litigation was complex, and that class counsel risked non-payment by working on a contingency basis, all of which supported the reasonableness of the fee award. *Id.* The lodestar cross-check, which yielded a negative lodestar of 0.78, underscored the Court's conclusion that the requested fee award was reasonable. *Id.* at *12.

## II.    Third Circuit Court of Appeals Opinion Vacating Fee Award

Mr. Frank appealed, and a panel of the Third Circuit Court of Appeals vacated the Court's grant of class counsel's fee request. *In re Wawa, Inc. Data Security Litigation*, 85 F.4th 712, 727

(3d Cir. 2023) ("*Wawa II*"). The Third Circuit panel explained "the takeaway" of its opinion vacating the Court's fee award as follows:

> Two considerations must play central roles in the assessment of a fee award under Rule 23(h): 1) how the amount awarded stacks up against the benefit given to the class, using either the amounts paid or the sums promised; and 2) whether side agreements between class counsel and the defendant suggest an unreasonable attorney's fee award.

*Id.* at 718–19. The panel first noted "the text of Rule 23(h): 'the court may award *reasonable* attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement.'" *Id.* at 719 (emphasis in original) (quoting Fed. R. Civ. P. 23(h)). Thus, these two considerations are part of the Court's reasonableness analysis of a fee award under Rule 23(h).

With respect to the first consideration, the panel highlighted that, under Supreme Court precedent, district courts have the discretion to decide whether to measure the benefit to the class by the amounts made available to the class or the amounts claimed by the class. *See id.* at 721–22 (citing *Boeing*, 444 U.S. at 480) (explaining that the Supreme Court declined to require either approach). The appellate court's history of fee awards in common fund[4] cases demonstrates that jurists have disagreed over whether the "total funds the defendant made available" or "the amount of the fund *claimed* by class members" is the best measure of reasonableness as a general matter. *See id.* at 721–22 (emphasis in original) (quoting *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 177 (3d Cir. 2013)). However, in particular cases, the Supreme Court has left that decision to the sound discretion of the district courts. *See id.* at 722 (explaining that, after "[t]he Supreme Court entered the fray in *Boeing*[,] . . . [t]hat choice remained with the district courts.").

---

[4]     The panel recounted at some length the history of the so-called "common fund"—a long-recognized exception to the American Rule whereby parties pay their own litigation expenses—which is "rooted in the equitable principle that a 'lawyer who recovers a common fund for the benefit of persons other than himself . . . is entitled to a reasonable attorney's fee from the fund as a whole.'" *Wawa II*, 85 F.4th at 719–21 (quoting *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)).

This discretion is "not without detailed demands." *Id.* at 723. When evaluating the benefit afforded to the class, the inquiry "needs to be, as much as possible, practical and not abstract." *Id.* at 722 (quoting *Baby Prods.*, 708 F.3d at 174). This inquiry is "case-by-case" and "may consider, among other things, the claims rate." *Id.* at 722–23 (internal quotation marks omitted) (quoting *Baby Prods.*, 708 F.3d at 174). For example, "[i]n cases where defendants keep any unclaimed funds, . . . courts must place greater weight on the claims rate." *Id.* at 723. Additionally, if members of the class "must do more than raise their hands to get their payment, the claims rate offers valuable insight into the 'effectiveness' of 'the method of processing class-member claims'" under Rule 23(e). *Id.* (quoting Fed. R. Civ. P. 23(e)(2)(C)(ii)). Because "class members naturally value cash over gift cards," district courts "should take special notice when class members are offered discounts and tickets while others—like counsel—get cash." *Id.*

None of the factors guiding the district courts' discretion in this regard is dispositive. *See id.* at 724 (citing Fed. R. Civ. P. 23, advisory committee's note to 2003 amendments) ("[D]etermining the reasonableness of an award turns on a 'variety of factors,' including the calculation of the award using either the lodestar or percentage-of-recovery method."). The panel did advise, though, that a consideration of "the amounts distributed to and expected to be claimed by the class" would be "a sensible starting line to begin the fee award analysis." *Id.* at 725.  Still, "courts can evaluate the reasonableness of a percentage-based award by reference to *either* amounts paid *or* amounts made available." *Id.* at 724 (emphasis in original). Thus, because the panel opined that the Court incorrectly "saw itself as bound to consider only the funds made available to the class," the panel "remand[ed] for consideration of the amounts distributed to and expected to be claimed by the class." *Id.* at 725.

The presence (or absence) of so-called "side agreements" also plays a "central role" in evaluating the reasonableness of a fee award under Rule 23(h). *Id.* at 718–19. The Third Circuit panel flagged two putative side agreements for the Court to consider. First, the appellate court suspected that the settlement agreement contained a so-called "clear-sailing provision," whereby Wawa "promised as part of the settlement not to challenge class counsel's request for an agreed-upon attorney's fee award." *Id.* at 725. As the panel explained, "'[t]he concern with a clear sailing provision is collusion,' and class counsel's desire to maintain its expected fees could tempt it to take money from the class in return for a defendant's agreement to swiftly settle." *Id.* (quoting *In re Nat'l Football League Players Concussion Injury Litigation*, 821 F.3d 410, 447 (3d Cir. 2016)). The Court must therefore "satisfy itself that the agreement does not indicate collusion[.]" *Id.* (quoting *NFL Concussion Litig.*, 821 F.3d at 447).

According to the Third Circuit panel, the presence of an independent mediator during the negotiations, "while not irrelevant, is alone insufficient [to establish non-collusion], because 'the mere presence of a neutral mediator, though a factor weighing in favor of a finding of non-collusiveness, is not on its own dispositive[.]'" *Id.* at 726 (quoting *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 948 (9th Cir. 2011)). Similarly, the bifurcation of fee negotiations from class compensation negotiations is also insufficient to support a finding of "non-collusiveness" because both class and defense counsel presumably have the impending selfish fee negotiation in mind while negotiating class compensation. *Id.* Thus, neither the presence of a neutral mediator nor the bifurcation of fee and class compensation negotiations "end[s] the inquiry." *Id.* The Court will therefore undertake a "close and careful review" of the clear-sailing provision issue. *See id.*

The second side agreement to be considered is the so-called "fee reversion," whereby a reduction in court-ordered attorney's fees would return to Wawa instead of being awarded to the

class. *See id.* Such a provision would deter class members from challenging fee awards "because the excessive fees wind up back in the *defendant's* pockets," not class members' pockets. *Id.* (emphasis added) (quoting *Briseño v. Henderson*, 998 F.3d 1014, 1027 (9th Cir. 2021)). Such a provision—a "gimmick" according to the appellate court's terminology—could "strip[] class members of their standing to challenge the fee award, because any action taken by the court would not redress the class member's purported injury." *Id.* (citations and internal quotation marks omitted). This deterrent feature of a fee reversion is not cured by its removal from the settlement agreement, "so courts should investigate potential collusion by considering the 'evidence in the negotiation process or the final terms of the settlement.'" *Id.* at 726–27 (quoting *NFL Injury Litig.*, 821 F.3d at 447).

The Third Circuit Court of Appeals vacated the Court's fee award and remanded this case to allow the Court to: (1) decide whether to evaluate the reasonableness of this fee award in light of the amounts made available to the class or claimed by it, and (2) examine how and whether a clear-sailing clause and fee reversion impact the reasonableness of class counsel's requested fee award.

### III.    Post-Remand Factfinding Regarding "Side Agreements"

Following the Third Circuit Court of Appeals opinion vacating the Court's fee award, the Court held two hearings with class counsel, counsel for Wawa, and counsel for the objector, the first of which took place on December 5, 2023. After the December hearing, class counsel, counsel for Wawa, and counsel for the objector submitted sworn declarations addressing the Third Circuit Court of Appeals' concerns regarding the fee award. Ahead of the Court's second post-remand hearing, the parties were informed that, during that hearing, they would have the opportunity to present testimonial evidence and cross-examine anyone who submitted a sworn declaration. The

parties declined the invitation to present testimonial evidence. However, on February 2, 2024, the Court heard further argument concerning the fee award in light of counsel's sworn declarations. The Court now turns to the concerns of the Third Circuit panel.

### A. Clear-Sailing Provision

The settlement agreement does not contain and never did contain a "clear-sailing" provision. The Third Circuit Court of Appeals defines a clear-sailing agreement as an agreement by the defense "not to contest class counsel's request for attorneys' fees up to an agreed amount." *Wawa II*, 85 F.4th at 717 n.3. The alleged clear-sailing provision in this case reads as follows: "Wawa shall cooperate with class counsel, if and as necessary, in providing information class counsel may reasonably request from Wawa in connection with preparing the petition." Settlement Agreement ¶ 78, Doc. No. 301-1. Facially, this agreement to "cooperate in providing information" would not prevent Wawa from objecting to class counsel's fee petition. Notably, the settlement agreement also contains an integration clause, which explains that the written agreement "constitutes the entire agreement . . . and supersedes any and all prior contemporaneous understandings of Plaintiffs and Wawa in connection herewith. In entering into this Agreement, Plaintiffs and Wawa have not relied upon any representation or promise made by Plaintiffs or Wawa not contained in this Agreement." Third Amended Settlement Agreement ¶ 105, Doc. No. 301-1. Thus, the plain language of the settlement agreement itself strongly suggests that it did not contain a clear-sailing agreement. Nonetheless, pursuant to the appellate court's guidance, the Court undertakes a "close and careful review." *Wawa II*, 85 F.4th at 726.

Class counsel and counsel for Wawa deny that any provision of the settlement agreement, including paragraph 78, prevented Wawa from contesting class counsel's fee petition. Joint Decl. of Co-Lead Counsel ¶ 14, Doc. No. 428; Decl. of Gregory Parks ¶ 27, Doc. No. 427. Other than

the terms of the settlement agreement itself, "class counsel and Wawa made no side agreements pertaining to class counsel's fee request." Joint Decl. of Co-Lead Counsel ¶ 10, Doc. No. 428; Decl. of Gregory Parks ¶ 23, Doc. No. 427 ("There was no discussion of Wawa not opposing the attorney's fees and no discussion of Wawa supporting the attorney's fees amount."). The Court fully credits the sworn declarations of class counsel and defense counsel, both of which underscore the plain language of the settlement agreement itself, which does not contain a clear-sailing provision.

Of course, Wawa in fact did not contest class counsel's fee request, even though the settlement agreement did not prevent Wawa from doing so. A knee-jerk adversarial lawyer might balk at defense counsel's decision not to contest the fee award. However, lawyering is not an exclusively adversarial endeavor. The Court finds that Wawa's counsel made a strategic decision not to contest the fee, and this strategic decision was advantageous to Wawa. *Cf.* Model Rules of Prof. Conduct Preamble (Am. Bar Ass'n 2023) ("As negotiator, a lawyer seeks a result advantageous to the client but consistent with requirements of honest dealings with others."). Counsel for Wawa explained:

> In a class settlement like this, one alternative is for the parties not to agree to the amount of attorney's fees and to leave that as a contested matter to be resolved by the Court. As the lead negotiator for Wawa, I believed that would not be in the best interest of Wawa or the class. I was very concerned that approach could lead to an award of a very large amount. . . . Wawa had agreed to $44 million in value to the class. I was afraid that Lead Counsel would point to that $44 million and ask the Court for 25% of that amount, or approximately $11 million.

Decl. of Gregory Parks ¶ 20, Doc. No. 427. During negotiations, Wawa also learned through Judge Welsh that class counsel had "already incurred fees of about $3 million," leading Wawa's counsel to be "concerned that [class counsel] would argue that a two to three times multiplier on this

lodestar would justify an award of $6 million to $9 million." *Id.* ¶ 21. Thus, counsel for Wawa

concluded:

> Against these benchmarks of $9 million to $11 million, it was in
> Wawa's best interest, and the best interests of the class, to reach an
> arrangement where the amount of attorney's fees and related costs
> would be capped at $3.2 million. That cap: (a) prevented [class
> counsel] from seeking . . . up to $11 million or more; (b) limited
> [class counsel] to that amount regardless of how long or detailed the
> class notice, objection, approval, and appeal process may take; and
> (c) established certainty about the amount of the fees. As a defense
> lawyer, I know that flat fees or capped fees can provide a lot of value
> to clients, especially when proceedings proliferate beyond
> expectations.

*Id.* ¶ 22. During the Court's second post-remand hearing, counsel for Wawa re-affirmed this

explanation:

> [T]he reason we did not object [to the fee award] was not because
> of paragraph 78, it's because we thought it would be futile. We
> thought the [$]3.2 [million] was a pretty good deal . . . . I was
> concerned that these plaintiffs' lawyers might seek something like 9
> to 11 million dollars . . . . And in fact when we first started
> negotiating, that's what they asked for. They asked for 10 or 11
> [million dollars].

Hrg. Tr. of Feb. 2, 2024, 25:25–26:10.

Neither Wawa nor class counsel understood paragraph 78 to prevent Wawa from contesting

class counsel's fee request. Wawa's counsel explained:

> [T]he way I viewed paragraph 78 was that Wawa would cooperate
> in providing information that was uniquely available to Wawa, like
> the redemption rate on Wawa gift cards . . . . That was information
> only Wawa could provide. So we had to cooperate. We had to agree
> to cooperate to provide that information.

*Id.* at 24:24–25:8. Class counsel shared that understanding of paragraph 78. Joint Decl. of Co-Lead

Counsel ¶ 14 ("During the settlement negotiations and at all subsequent times, Wawa never agreed

not to contest class counsel's fee petition. Neither paragraph 78 nor any other provision in the

Settlement Agreement precluded Wawa from contesting class counsel's fee petition."); *see also* Hrg. Tr. of Feb. 2, 2024, 20:13–17 ("[L]ooking at the clear language of paragraph 78, it merely states that Wawa is required to cooperate to provide certain information upon reasonable requests by plaintiffs' counsel in preparation of their fee petition."). The Court fully credits the sworn declarations and oral representations of class and defense counsel: paragraph 78 does not constitute an agreement not to contest class counsel's fee petition, there was no "side agreement" not to contest class counsel's fee petition, and neither class counsel nor counsel for Wawa understood there to be an agreement not to contest the fee petition. There is no clear-sailing clause here.

Nonetheless, Mr. Frank doubts the veracity of class counsel and counsel for Wawa regarding whether the settlement agreement contains a clear-sailing provision. *See* Decl. of Adam Schulman ¶ 141, Doc. No. 429 (stating class counsel's position that there was no clear-sailing provision is "contrary to class counsel's own positions taken throughout this litigation."). To support these doubts, Mr. Frank emphasizes the failure of Wawa's counsel to deny the existence of a clear-sailing provision while the settlement agreement was being revised. *See id.* ¶¶ 41 ("At no time in these conversations did [Wawa's counsel] deny that the agreement had [a] clear-sailing . . . clause[].")." However, it does not follow from the fact that Wawa's counsel failed to be argumentative with Mr. Frank's counsel regarding the objector's characterizations of the settlement agreement that Wawa's counsel agreed with all of those characterizations. Though a lawyer with the zealous advocate hat fastened too tightly to their head might quibble with opposing counsel at every turn, a lawyer wearing their negotiator hat may employ a measure of cooperation while working with opposing counsel to arrive at "a result advantageous to the client but consistent with requirements of honest dealings with others." Model Rules of Prof. Conduct Preamble (Am. Bar Ass'n 2023). Wawa's counsel was *negotiating* with Mr. Frank's counsel about how to amend

the settlement agreement and finally resolve this case for his client—a result that Wawa was anxious to bring about. *See* Hrg. Tr. of Feb. 2, 2024 ("Wawa definitely has incident fatigue because it has been dealing with this since November of 2019 now, and they want to get it behind them."). The Court will not adversely evaluate the credibility of counsel for Wawa because he declined to be obstinate while trying to efficiently negotiate a resolution for his client, who was eager to have the matter resolved.

Casting about for evidence of a clear-sailing clause that does not exist, Mr. Frank points out that one section-header of class counsel's briefing[5] on the fee award asks the Court to "approve the attorneys' fee award *agreed to by the parties*." Decl. of Adam Schulman ¶ 51, Doc. No. 429 (emphasis added) (quoting Mem. of L. in Supp. of Mot. for Attorneys' Fees at 5, Doc. No. 258). Objector's counsel asserts that a fee request "agreed to by the parties . . . is the very definition of a clear-sailing agreement." *Id.* In fact, the definition of a clear-sailing agreement is an agreement by the defense "*not to contest* class counsel's request for attorneys' fees up to an agreed amount." *Wawa II*, 85 F.4th at 717 n.3 (emphasis added). Thus, the hallmark of a clear-sailing provision is that it removes the defendant's right to *contest* the fee request. Parties may agree to the amount that will be requested without further agreeing that the defendant will forfeit their right to contest that request, and such an agreement would be advantageous to the defendant because it caps the defendant's liability without stipulating to a floor. Here, the parties agreed to a cap on the fees class counsel could request, which was valuable to Wawa. *See* Decl. of Gregory Parks ¶ 22, Doc. No. 427 (explaining that the $3.2 million cap "prevented [class counsel] from seeking more than that amount" under any circumstances, thereby "establish[ing] certainty about the amount of fees."). A defendant in this position may have negotiated class counsel down as far as possible but

---

[5]     The Court seriously doubts that the section-headers of a brief constitute evidence at all. However, for the sake of a thorough review, the Court addresses Mr. Frank's argument.

could still appeal to the Court for a further reduction. In this particular case, Wawa strategically decided not to appeal to the Court for such a reduction because Wawa believed $3.2 million to be a good result. Hrg. Tr. of Feb. 2, 2024, 25:25–26:3 ("[T]he reason we did not object [to the fee award] was . . . because we thought it would be futile. We thought the [$]3.2 [million] was a pretty good deal[.]"). Thus, even assuming that class counsel's section-header is competent evidence, it is not evidence of a clear-sailing agreement.

During the second post-remand hearing, Mr. Frank's counsel himself appeared to suggest that paragraph 78 represented something other than a clear-sailing provision, arguing that "the cooperation language [of paragraph 78] is actually stronger than a clear sailing provision. I think it's an affirmative obligation of some sort for Wawa." Hrg. Tr. of Feb. 2, 2024, 9:17–20. While the plain language of paragraph 78 created an affirmative obligation for Wawa to cooperate "in providing information class counsel may reasonably request," Third Amended Settlement Agreement ¶ 78, Doc. No. 301-1, it does not follow that this affirmative obligation also included a *different*, negative obligation not to contest class counsel's fee request. The duty to cooperate in providing information is not a "stronger" version of the duty not to object. They are two discrete duties, and the settlement agreement only imposed the duty to cooperate in providing limited information upon Wawa while remaining silent about any supposed duty not to object.

Mr. Frank asks the Court to imply an *agreement* not to object from both Wawa's *strategic decision* not to object and its compliance with the plain language of its paragraph 78 obligations. He points out that counsel for Wawa "submitted a declaration . . . that class counsel used in efforts to justify their fee award[,] . . . filed an appellee's brief against [Mr.] Frank's appeal," and "made arguments in furtherance of Plaintiff's fee request" at the post-remand hearing of December 5. Decl. of Adam Schulman ¶ 93, Doc. No. 429. The declaration to which Mr. Frank refers was

17

submitted pursuant to Wawa's paragraph 78 obligation to cooperate in providing information. Joint Decl. of Co-Lead Counsel ¶¶ 17–18, Doc. No. 428 ("Pursuant to its cooperation obligation in Paragraph 78, counsel for Wawa provided information about the settlement's value, which was relevant to class counsel's fee petition. For example, Wawa provided information concerning the value of the injunctive relief agreed to in the settlement."). Consistent with counsel for Wawa's understanding of paragraph 78, *see* Hrg. Tr. of Feb. 2, 2024, 24:24–25:2 ("[T]he way I viewed paragraph 78 was that Wawa would cooperate in providing information that was uniquely available to Wawa."), this declaration included information about the cost to Wawa of implementing the injunctive relief as well as how Wawa's position concerning the injunctive relief evolved through litigation, *see* Decl. of Gregory Parks on Injunctive Relief ¶¶ 5, 7, Doc. No. 278. Also pursuant to Wawa's paragraph 78 obligations, counsel for Wawa informed class counsel that: (a) Wawa's regular customer-base routinely makes repeat purchases at its stores, (b) Wawa gift cards have a redemption rate of 97.2%, and (c) over 3,000 products sold in Wawa stores, or 78% of Wawa's inventory, cost less than 5 dollars. Joint Decl. of Interim Co-Lead Counsel in Supp. of Preliminary Approval ¶ 27, Doc. No. 181. All of this is consistent with the plain language of paragraph 78, which requires Wawa to cooperate with reasonable information requests from class counsel. It is certainly reasonable for class counsel to request information from Wawa that is both relevant to class counsel's fee request and exclusively in Wawa's possession. This reasonable compliance with Wawa's paragraph 78 obligations does not demonstrate that the parties came to a side agreement about Wawa's ability to contest class counsel's fee petition.

Finally, the Court declines to imply a side agreement regarding Wawa's ability to contest the fee petition based on Wawa's decisions to oppose Mr. Frank's appeal of the fee award and to

"ma[k]e arguments in furtherance of Plaintiffs' fee request" during the post-remand hearing.[6] Decl. of Adam Schulman ¶ 93, Doc. No. 429. Assuming that either of these averments constitutes evidence of anything, the fact that Wawa disagrees with Mr. Frank's assessment of this settlement agreement is hardly suspicious. According to counsel for Wawa, "[t]he negotiations that led to the Settlement of this case were characterized by aggressive and zealous advocacy on both sides. There was no 'coordinated' advocacy, no collusion, and nothing other than honest hard-fought negotiations throughout a long process of discussing, negotiating, and executing this sophisticated Settlement of a large matter." Decl. of Gregory Parks ¶ 4, Doc. No. 427. By contrast, according to Mr. Frank, the lawyers in those same negotiations "structure[d] the settlement to benefit class counsel at the expense of the class," Decl. of Adam Schulman ¶ 4, Doc. No. 429, "sought to obscure the relative allocations between lawyers and class members by artificially inflating the settlement's apparent value," Opening Br. of Appellant Theodore Frank, No. 22-1950, 2022 WL 424481, at *18 (3d Cir. Sep. 8, 2022), "deployed" the injunctive relief provisions of the agreement "as background flavor to support their fee request" in order "to inflate the perceived value of the settlement," *id.* at *21, and "extract[ed] a disproportionate share of the settlement value as fees," *id.* at *23. Wawa's decision to oppose these unsavory characterizations of class and defense counsel is completely unsurprising and fails to demonstrate the existence of a clandestine clear-sailing agreement.

The Court finds that this settlement agreement does not contain, and never did contain, a clear-sailing provision. Mr. Frank contends that such a finding is "contrary to this Court's findings in its first approval . . . [and] to the Third Circuit's decision." Decl. of Adam Schulman ¶ 141, Doc. No. 429. However, the Court's April 2022 memorandum opinion granting final approval to this

---

[6]   Both of these arguments are again premised on the questionable assumption that legal argument is competent evidence to demonstrate a factual predicate.

settlement agreement never found that a clear-sailing clause actually existed in the settlement agreement. Prior to receiving the direction from the Third Circuit Court of Appeals to undertake a "close and careful review" of clear-sailing agreements, *Wawa II*, 85 F.4th at 726, the Court simply assumed that the clear-sailing clause to which Mr. Frank objected existed and determined that such clauses do not bar final approval, *see Wawa I*, 2022 WL 1173179, at *10 ("Mr. Frank also objects to the inclusion of a so-called clear-sailing clause in the Settlement Agreement, arguing that Wawa's decision not to object to the fee request is a product of this clause. But clear-sailing provisions are common in class action settlements."). Having now had occasion to review the putative clear-sailing clause closely and carefully, the Court concludes that, in fact, there is no clear-sailing clause at all. Similarly, the Court does not read the opinion of the Third Circuit Court of Appeals to affirmatively find that a clear-sailing clause exists here either. The appellate court merely explained why the Court's original analysis of the clear-sailing clause issue, which focused on the presence of a neutral mediator and the bifurcation of negotiations over class relief and attorneys' fees, was insufficient, and remanded "for closer scrutiny based on our refreshed guidance." *See Wawa II*, 85 F.4th at 726. The Court concludes that this settlement agreement does not contain and never did contain a clear-sailing clause.

## B. Fee Reversion

There is no dispute that the final Settlement Agreement does not contain a fee reversion. *Wawa II*, 85 F.4th at 726. However, an earlier version of the settlement agreement did not specify how to allocate the difference between the requested $3.2 million fee and any smaller fee that the Court may ultimately award. *See* Decl. of Adam Schulman ¶ 83, Doc. No. 429; Decl. of Gregory Parks ¶ 30, Doc. No. 427. This omission was rectified when class counsel and counsel for Wawa jointly stipulated to amend the settlement agreement to specify that "any difference between

$3,200,000 and the amount awarded will be distributed equally among and added to the total value of each of the Tier One and Tier Two Wawa Gift Cards." Third Amendment to Settlement Agreement ¶ 1, Doc. No. 269-1. The appellate panel described this amendment as "[a] welcome change, but not as welcome as if the fee reversion had never existed." *Wawa II*, 85 F.4th at 726. Thus, the Third Circuit Court of Appeals has instructed the Court to "explore how the reversion arrived, what purpose it served, and whether its presence, even temporary, suggests coordinated rather than zealous advocacy[.]" *Id.* at 727.

The lawyers have now thoroughly described the process by which this omission and amendment came to be. From the outset of negotiations, class counsel "made it clear . . . that a condition of the negotiation would be that the discussion of any attorney's fees for them would have to be deferred until after relief to the class had been negotiated. Wawa respected this condition." Decl. of Gregory Parks ¶ 7, Doc. No. 427 (emphasis removed); *see also* Joint Decl. of Co-Lead Counsel ¶ 53, Doc. No. 428 ("[T]he attorneys' fees and expenses and Service Awards for the Class Representatives were not negotiated until after all substantive relief for the class was agreed to[.]"). By the time attorneys' fees were discussed, retired United States Magistrate Judge Diane Welsh was serving as a mediator between class and defense counsel. *See* Decl. of Gregory Parks ¶ 9–11, Doc. No. 427. Judge Welsh "rigorously enforced the separation of the negotiation of class relief and attorney's fees." *Id.* ¶ 9. Significantly, Judge Welsh was privy to *all* of the communications that took place between class and defense counsel during the 12-hour negotiations:

> Judge Welsh participated in all discussions between the parties. She mostly engaged in shuttle diplomacy – taking one side's message to the other. In a few circumstances early in the day, Judge Welsh supervised a direct discussion between [Wawa's counsel] and [class counsel] about the nature of the relief to the class . . . None of these discussions touched on attorney's fees.

*Id.* ¶ 11. The parties negotiated class relief, including gift cards and injunctive relief, from 10:00 a.m. until "the early evening hours." *See id.* ¶¶ 9, 12–13, 15–17. As counsel for Wawa explained:

> When the negotiations turned to attorney's fees, Judge Welsh handled all of the negotiations and discussions between the parties. She communicated each demand from the Plaintiffs and each of Wawa's responses through shuttle diplomacy. . . Neither I nor any other Wawa representative ever had any negotiation directly with [class counsel] or any other lawyer for Plaintiffs relating to attorney's fees. All such negotiations occurred through Judge Welsh with Judge Welsh as the sole communicator between the parties.

*Id.* ¶ 18. "There was never any discussion of any tradeoff, such as reducing the recovery to the class in order to increase the amount of attorney's fees." *Id.* ¶ 19.

Having observed counsel for Wawa for years and never once having any reason to doubt his candor to this Court, the Court has the utmost confidence in the trustworthiness of this account and fully credits defense counsel's sworn declarations regarding the negotiation process. Judge Welsh was a party to *all* communications between class and defense counsel throughout this negotiation and explained that these "negotiations . . . were performed in good faith without collusion or other improper conduct." Decl. of Hon. Diane Welsh ¶ 2, Doc. No. 181-2. At the end of this 12-hour mediation, class and defense counsel arrived at a $3.2 million figure for attorneys' fees. *Id.* ¶ 15 ("This lump sum payment was agreed to with my assistance, at the end of the mediation after the substantive terms for the class relief were already agreed upon."). Because all of the communications between class counsel and counsel for Wawa regarding the fee award went through Judge Welsh, there was no opportunity for the parties to come to any so-called "side agreement" regarding a fee reversion. And there is no contemporaneous evidence that the parties agreed to include a fee reversion when they negotiated the attorneys' fee award. On the other hand, there is a mountain of credible evidence demonstrating that the parties made no such agreement.

The Court has the utmost confidence that counsel for Wawa, class counsel, and Judge Welsh did not intentionally "attempt[] to structure the settlement to benefit class counsel at the expense of the class[.]" Decl. of Adam Schulman ¶ 4, Doc. No. 429.

The parties' first draft of the settlement agreement did contain an important omission: there was no provision explaining what to do if the Court ultimately awarded less than $3.2 million in fees. This was because, in the course of the negotiations, "there was never any discussion of what would happen if the Court approved less than the $3.2 million in attorney's fees that was agreed upon as a cap." Decl. of Gregory Parks ¶ 24, Doc. No. 427. The original agreement lacked a provision specifying where any difference might go because "the parties to the Settlement never anticipated an amount less than $3.2 million being awarded." *Id.* ¶ 32; *see also id.* ¶ 25 ("Frankly, given the value of the settlement to the class . . . of $44 million, and given [class counsel's] lodestar position at $3 million as of the mediation date, I did not anticipate any possibility that the District Court would not approve a $3.2 million attorney's fee award. There was therefore no discussion of what would happen in that event."). Counsel for Wawa further explained that the omission served no purpose and was the result of "an absence of contemplating a possibility that never came to pass." *Id.* ¶ 34. In other words, human error resulted in an omission, which created an unintended, de facto fee reversion. Class counsel agreed that the fee reversion was the result of the negotiating parties' failure to discuss the eventuality of a reduced fee, but class counsel also clarified that "[t]he Settling Parties did not intend, discuss, or agree that any portion of the $3,200,000 not awarded . . . would revert to Wawa." Joint Decl. of Co-Lead Counsel ¶ 21, Doc. No. 428. The Court credits these declarations of class counsel and counsel for Wawa.

Once Mr. Frank's counsel flagged this omission and identified the need to specify how to handle the eventuality of a reduced fee award, "the parties were willing to discuss addressing that

possibility in a way that benefited the class." Decl. of Gregory Parks ¶ 32, Doc. No. 427; *see also* Joint Decl. of Co-Lead Counsel ¶ 23, Doc. No. 428 ("From the outset of these discussions, [counsel for Wawa] and class counsel agreed to amending the Settlement Agreement to clarify that any reduction by the Court of the $3,200,000 would go to the class."). Not only were the parties willing to discuss addressing the omission, but they took action to address it, ultimately amending the settlement agreement "to make clear their intention as to the use of any amount [of the fee request] not awarded by the Court." Joint Decl. of Co-Lead Counsel ¶ 21, Doc. No. 428. In the Court's experience, this cooperative process of revision is common in the class action context. *Accord id.* ¶ 29 ("In counsel's experience, it is common for parties to revise settlement agreements in response to the court's or objectors' concerns.").

By contrast, Mr. Frank's counsel asserts that counsel for Wawa "understood that the fee reversion was intended to be a benefit for class counsel at the expense of the class." Decl. of Adam Schulman ¶ 83, Doc. No. 429. In other words, the objector contends that counsel for Wawa and class counsel intentionally neglected to specify what would happen in the event of a reduced fee in order to create a de facto fee reversion. Mr. Frank's evidence for this contention is unconvincing. He cites the fact that, when he was discussing what became the Third Amendment to the settlement agreement with Wawa's counsel, Wawa's counsel "suggested that he did not believe class counsel would currently endorse such an amendment because they would not want to appear to suggest that their fee request is excessive." *Id.* According to the objector, "[t]he fact that [counsel for Wawa] was concerned that class counsel would reject an amendment" demonstrates that counsel for Wawa *knew* the fee reversion was *intended* as a "benefit for class counsel at the expense of the class." *Id.* This is a stretch. Counsel for Wawa's comment could also, much more

straightforwardly, illustrate his belief at the time that class counsel would not endorse an amendment that could be interpreted as suggesting that the fee request was too large.

Moreover, class counsel has submitted a sworn declaration that, "[f]rom the outset" of discussions with Mr. Frank regarding the de facto fee reversion, class and defense counsel "agreed to amending the Settlement Agreement to clarify that any reduction by the Court of the $3,200,000 would go to the class." Joint Decl. of Co-Lead Counsel ¶ 23, Doc. No. 428. This sworn declaration by an officer of the Court is highly credible. Mr. Frank asks the Court to make an adverse credibility finding against class counsel based on the fact that, in a legal brief, class counsel wrote that the $3.2 million "payment by Wawa will not reduce any settlement benefits made available to the Class." *See* Decl. of Adam Schulman ¶¶ 52–53, Doc. No. 429 (quoting Mem. of L. in Supp. of Mot. for Attorneys' Fees at 1, Doc. No. 258). According to objector's counsel, this statement "directly contradicts class counsel's claims at the post-remand December 5 hearing that they thought any reduction in fees would go to the class." *Id.* ¶ 53. Not so. Class counsel's brief accurately stated that the attorneys' fee award would not *reduce* the $9 million made available to the class. It is a distinct and consistent proposition that any reduction in that attorneys' fee award would *increase* the amount claimed by the class. The lawyers characterize the facts in a favorable light. This does not reflect negatively on a lawyer's credibility but instead amplifies the observation that lawyers wear many hats—including that of the zealous advocate. *Cf.* Model Rules of Prof. Conduct Preamble (Am. Bar Ass'n 2023). The Court unreservedly credits the sworn declaration of class counsel.

Thirdly, the Court notes that defense counsel's assessment of class counsel's position was *wrong*: class counsel did not object to the proposed amendment. Decl. of Adam Schulman ¶ 86, Doc. No. 429. The Court is not aware of any direct evidence that class counsel ever actually

opposed the amendment.[7] Unable to muster evidence of class counsel's opposition, Mr. Frank's counsel makes a bare allegation, "[o]n information and belief," that counsel for Wawa "persuaded class counsel that it was in the settlement's ultimate interest to remove the fee reversion." *Id.* ¶ 137. This bare allegation fails to compensate for a dearth of evidence. The Court finds that class counsel did *not* oppose the proposed amendment to nix the de facto fee reversion.

Finally, Mr. Frank attacks the credibility of counsel for Wawa. He points out that objector's counsel in the present case also represented objectors to an unrelated 2016 settlement in which a distinct defendant was also represented by counsel for Wawa. *Id.* ¶ 41. In that separate case before another judge, a different defendant "agreed to remove [a different] fee reversion from [a different] settlement to address" different objectors' concerns. *See id.* Based on this prior experience, according to objector's counsel, counsel for Wawa "would have been familiar with" the fee reversion issue. *Id.* Mr. Frank appears to argue that this familiarity casts doubt upon whether counsel for Wawa truly "did not anticipate any possibility that the District Court would not approve a $3.2 million attorney's fee award." Decl. of Gregory Parks ¶ 24, Doc. No. 427. The Court declines to impugn the credibility of a trustworthy court officer's sworn declaration because, when negotiating a settlement agreement, he failed to anticipate an issue that cropped up in a different case years before. There is a yawning gap between (a) the proposition that counsel for Wawa is

---

[7] The circumstantial evidence mustered by Mr. Frank of class counsel's alleged opposition is unconvincing. After objector's counsel spoke with defense counsel, the former sent the latter an email, which stated in part: "My understanding from our call is that [class counsel] would not currently endorse such an amendment [because] they do not want to appear to be suggesting that their fee request is excessive." Decl. of Adam Schulman ¶ 85, Doc. No. 429. Counsel for Wawa "did not contest any of the characterizations" in that email. *Id.* Setting aside the fact that counsel for Wawa was incorrect about class counsel's position, Mr. Frank apparently invites the Court to infer that *class* counsel opposed the fee because *defense* counsel failed to be argumentative about Mr. Frank's lawyer's characterizations. The impropriety of such a dubious inference is underscored by the fact that, when defense counsel did respond to objector's counsel, it was to share that "[c]lass counsel ha[s] now advised that they have no objection" to the amendment. *Id.* ¶ 86.

familiar with fee reversions from prior experience with settlement agreements and (b) the proposition that counsel for Wawa lied to the Court about intentionally including a fee reversion in *this* settlement agreement. Mr. Frank has failed to provide the Court with convincing evidence to bridge that gap.[8] Thus, the Court unreservedly credits defense counsel's declaration.

Taking a step back, the Court metaphorically scratches its head about the supposed problem with this amendment process. Objector's counsel has declined to expressly accuse class counsel and counsel for Wawa of collusion. *See* Hrg. Tr. of Dec. 5, 2023, 6:16–18 ("We didn't use the word 'collusion' in our briefing . . . . We never used the word 'collusion.'"). Indeed, there is no evidence of collusion before the Court, and the Court finds in no uncertain terms that there has been no collusion between class and defense counsel in the negotiation of this settlement agreement. It appears to the Court that Mr. Frank implies that the following sequence of events occurred, but a distinct lack of evidence has held him back from doing so outright: Mr. Frank suggests that class counsel and counsel for Wawa intentionally omitted a provision for dealing with a reduced fee in order to create a de facto fee reversion that would benefit the lawyers "at the expense of the class." *Id.* ¶ 83. According to this account, which is not supported by evidence, when Mr. Frank's lawyer caught the omission and flagged it to Wawa's counsel, the latter lawyer lobbied allegedly reluctant class counsel to remove the fee reversion, and class counsel ultimately caved. *See id.* ¶ 137. The Court of course recognizes that collusion between class and defense

---

[8]     Objector's counsel states, "[a]t no point did Wawa contest my characterization of the settlement as containing a 'fee reversion.'" Decl. of Adam Schulman ¶ 43, Doc. No. 429. The Court is unable to draw any inference at all from the fact that defense counsel failed to be argumentative with objector's counsel about the existence of a fee reversion. Once objector's counsel identified the possibility of a fee reversion in the event of a reduced fee, defense counsel explained that Wawa was "flexible about the difference . . . being used for the benefit of the class[.]" Decl. of Gregory Parks ¶ 31, Doc. No. 427. In other words, Wawa did not dispute that the settlement agreement contained a de facto fee reversion and was open to addressing it in a way that benefited the class. Thus, acrimony concerning the existence of the fee reversion would have served no productive purpose in the negotiation process.

counsel to surreptitiously create a fee reversion at the class's expense would call into question the reasonableness of the fee award. But no one is actually contending that there was collusion, there is no evidence of collusion, and the Court finds that no collusion has taken place. Assuming both that class counsel was actually reluctant to amend the original settlement agreement (an assumption that is contrary to this record), and that counsel for Wawa had to convince class counsel to overcome that reluctance in order to preserve the settlement agreement against the sole objector's concerns (an assumption that finds no support in this record), the resulting amendment would appear to represent a success of the final approval process. The objector raised a concern and a possible solution to an issue that the parties missed, class counsel and counsel for Wawa weighed that solution, the solution was adopted by stipulation, and the Court approved that reasonable stipulation. Without entertaining bare allegations of unsubstantiated malfeasance or misfeasance, the Court cannot conclude that the tale of the fee reversion in this case represents anything other than human error that was diligently corrected through the good-faith participation of class counsel, defense counsel, and objector's counsel in the final approval process.

The Court firmly rejects the notion that class counsel and counsel for Wawa intentionally omitted reference to the prospect of a fee reduction in order to benefit counsel at the expense of the class. After observing and interacting with class counsel and counsel for Wawa over the course of this nearly five-year litigation, the Court has the utmost confidence in counsel's integrity and loyalty to their respective clients. Based on the Court's experience with these parties, and noting that class counsel and counsel for Wawa are officers of this Court, the Court unreservedly credits their declarations regarding how the fee reversion came about through omission and was ultimately removed from the Settlement Agreement. The Court also fully credits the declaration of former United States Magistrate Judge Diane Welsh, who supervised this negotiation process with the

highest integrity. Cognizant of the fact that honest lawyers make human errors, the Court finds that the original omission of a provision regarding the prospect of a reduced fee was the product of an oversight. The de facto fee reversion served no purpose because it was unintended. When objector's counsel brought the oversight to the attention of the negotiating parties, they acted in good faith to address it. This exemplifies the cooperative aspect of the class action settlement negotiation process at work.

## IV.    The Amount Claimed Versus The Amount Made Available

In determining the reasonableness of a fee award, the Court has *discretion* to consider "how the amount awarded stacks up against the benefit given to the class, using *either* the amounts paid *or* the sums promised." *Wawa II*, F.4th at 718 (emphasis added). Here, the settlement agreement made $9 million available to the settlement class, and the class claimed $2.9 million of these available funds. Because the appellate court believed that the Court "saw itself as bound to consider only the funds made available to the class," namely the $9 million figure, the Third Circuit Court of Appeals remanded "for consideration of the amounts distributed to and expected to be claimed by the class." *Id.* at 725. Though Rule 23 does not require the Court to wait for claims to be distributed before assessing the reasonableness of a fee request, the appellate court observed that "it seems a sensible starting line to begin the fee award analysis." *Id.* The Court therefore begins by considering the sums claimed by the class members in the present case.

As of April 2022, the class claimed $2,905,194.71 total in Wawa gift cards. Decl. of Jeff Moore ¶¶ 4–5, Doc. No. 313. There were 563,015 Tier 1 claimants, 686 Tier 2 claimants, and 254 Tier 3 claimants. *Id.* Wawa gift cards have a 97.2% redemption rate, and 78% of products sold in Wawa convenience stores cost five dollars or less. Joint Decl. of Interim Co-Lead Counsel in Supp. of Preliminary Approval ¶ 27, Doc. No. 181. This high redemption rate and high proportion of

Wawa products that can be purchased for the lowest gift-card value under this settlement underscores defense counsel's argument that a gift card to Wawa is closely analogous to cash:

> This is not like a gift card to Louis Vuitton or someplace that people only shop once every couple of years . . . . This is Wawa where people go. People who go to Wawa go there every day or every week. And so it's more like cash than a gift card to a more luxury or less frequented retailer.

Hrg. Tr. of Feb. 2, 2024, 31:12–17. The Court agrees that Wawa gift cards without expiration dates approximate cash more closely than gift cards to less frequented and more expensive retailers. However, gift cards are not cash, and "non-cash relief . . . is recognized as a prime indicator of suspect settlements." *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 803 (3d Cir. 1995); *see Wawa II*, 85 F.4th 712, 723 (3d Cir. 2023) ("Courts should take special notice when class members are offered discounts and tickets while other—like counsel—get cash.").

Not all non-cash relief is equally indicative of a suspect settlement. For example, the non-cash relief at issue in *General Motors Corp.* was "$1,000 coupons redeemable toward the purchase of any new GMC Truck or Chevrolet light duty truck." *In re General Motors Corp.*, 55 F.3d at 780. The Third Circuit Court of Appeals found that these coupons "arguably did not maximize the class members' interests" because the full value of those coupons "could only be realized by purchasing a new truck." *Id.* at 803. New trucks—an expensive purchase infrequently made—all cost considerably more than $1,000, so there was a serious financial impediment to realizing the value of those coupons. By contrast, Wawa is a convenience store selling thousands of products at over 900 stores, 78% of which cost less than five dollars. *See* Joint Decl. of Interim Co-Lead Counsel in Supp. of Preliminary Approval ¶ 27, Doc. No. 181. There is very little impediment to realizing the full value of a $5 or $15 Wawa gift card at one of these locations. Even if a class

member does not frequent Wawa very often, their gift card will never expire, and they will always be able to redeem it if they go to Wawa. In fact, for those who otherwise would not make purchases at Wawa, a five- or fifteen-dollar gift card could be sufficient motivation to make a purchase at Wawa. If the motivation is light, this is no great hindrance, because they have a lifetime to cash in. Thus, although most of the non-injunctive relief in this settlement agreement comes in the form of Wawa gift cards, the Court is satisfied that these gift cards closely approximate cash and do not render this settlement agreement suspect.

The most-injured class members—those 254 Tier Three claimants who incurred out-of-pocket costs due to the data breach—will receive cash totaling $79,829.71. This tiered relief-structure, in which some class members receive cash-like gift cards and others receive cash itself, is reasonable under the circumstances of this case. Class members from Tier One and Tier Two were chiefly injured because they spent some time monitoring their credit card statements after their data was breached or fraudulently used. In other words, their injury was non-monetary. Although Tier Two class members must have had a subsequent fraudulent charge, one distinctive feature of this multi-track settlement is that plaintiffs on the *financial institutions* track lost money when plaintiffs on the *consumer track* suffered from fraudulent charges. *See In re Wawa, Inc. Data Sec. Litig.*, No. 19-6019, 2023 WL 6690705, at *1–2 (E.D. Pa. Oct. 12, 2023) (describing tiered relief in financial track settlement whereby financial institutions can receive cash for the cost of replacement cards and for "[f]raudulent charges up to $4,000 per financial institution"); Decl. of Gregory Parks ¶ 13, Doc. No. 427 ("The class relief included $5 gift cards for class members who suffered no economic harm but spent time monitoring the situation . . . [and] $15 gift cards for class members who experienced but did not have to pay a fraudulent charge[.]"). For this reason, under the terms of the preliminarily approved financial track settlement, financial institutions will be able to receive cash relief upon submitting documentation of "reimbursement to a cardholder

of fraudulent charges on impacted cards[.]" *Id.* at *2. Thus, under the circumstances, Tier One and Tier Two consumer plaintiffs have not suffered direct financial harm. And if a consumer class member's financial institution did not reimburse them for a fraudulent charge, then he or she is eligible for Tier Three cash relief. *See* Decl. of Gregory Parks ¶ 13, Doc. No. 427 (explaining settlement agreement provides for "full cash reimbursement of up to $500 for any class member that experienced any actual economic harm."). This tiered system of relief elegantly allocates cash-like and cash relief to consumer track plaintiffs according to their injuries.

Injunctive relief is central to this settlement agreement *because* the injuries of consumer plaintiffs were primarily non-monetary. Most consumer plaintiffs did not suffer pocketbook injuries, and, accordingly, "Wawa believed that there was likely little or no harm to the class arising from the data security incident[.]" *Id.* ¶ 14. However, Wawa was also committed to "mak[ing] its customers (who are members of the class) whole for any actual harm they might have sustained." *Id.* To make class members who did not suffer monetary damages whole, the parties negotiated, in addition to cash-like gift cards, non-monetary relief in the form of an injunction. This approach was eminently reasonable under the circumstances of this case.

There is no dispute that Wawa acted to improve its data security system before it was enjoined to do so. *See* Decl. of Adam Schulman ¶ 30, Doc. No. 429; Decl. of Gregory Parks ¶ 15, Doc. No. 427. In January 2020, one month after the data breach came to light, Wawa issued several press releases stating that it would enhance security. *See* Decl. of Adam Schulman ¶¶ 11–12, Doc. No. 429. The following month, Wawa's board allocated $25 million "to improve Wawa's data security posture." Third Amended Settlement Agreement ¶ 38, Doc. No. 301-1. Mr. Frank argues that this evidence of remedial action preceding the settlement agreement renders the injunctive relief an illusory benefit to the class. *See* Decl. of Adam Schulman ¶ 65, Doc. No. 429 ("The

putative injunctive relief . . . did not obligate Wawa to do anything it was not already doing."); *id.*

¶ 30 ("[T]he injunctive relief provided for in the settlement . . . merely subjects certain . . .

preexisting practices to a two-year period of semi-annual monitoring that is enforceable by judicial

mechanisms."). In other words, according to Mr. Frank, Wawa would have implemented the

injunctive relief irrespective of a court order, rendering such an order superfluous.

The Court does not share Mr. Frank's sanguine outlook that Wawa would certainly

implement all aspects of the agreed-upon injunctive relief absent a court order. Notably, Wawa

*resisted* the conversion of its voluntary security-enhancement efforts into the requirements of a

court order:

> Prior to the mediation, Wawa had committed to improve its data
> security. [Class counsel] insisted that Wawa's commitment be
> reduced to a court order mandating specific efforts that Wawa would
> undertake to fulfil that commitment. In the absence of litigation, and
> in the absence of [class counsel] pushing the issue, Wawa would not
> have agreed to have these requirements made part of a Court Order.

Decl. of Gregory Parks ¶ 15, Doc. No. 427; *see also* Third Amended Settlement Agreement ¶ 38,

Doc. No. 301-1 ("Wawa further acknowledges that it would not have agreed to have the actions

reflected in this Settlement Agreement imposed as a court order in the absence of the filing of the

Consumer Track Action[.]"). The fickle assurances of large corporations in damage-control mode

immediately following a large-scale security breach are pale shadows of an order by the Court

requiring those assurances to be fulfilled. The eagerness of Wawa to issue the former and its

reluctance to become subject to the latter helps to demonstrate this difference. It would be peculiar

to punish Wawa for acting swiftly.

The certitude provided by an order of the Court is especially valuable under the

circumstances of this case: Wawa's customers lost trust in Wawa when their data was breached.

Many of these customers are frequent visitors to Wawa, which is demonstrated by the large number

of claimants who are Wawa mobile application users. Though most class members may not have suffered pecuniary harm from this breach of trust, those same class members were unsure whether it was safe to use their credit cards at Wawa. Court-ordered injunctive relief is distinctly valuable to such class members, who now need not place their trust in Wawa, which so recently breached it. Instead, class members may place their trust in the Court—a neutral third party that will certainly see security enhancements done. And class members did not need to lift a finger to enjoy this benefit of the settlement agreement. Accordingly, the notice distributed following preliminary approval assured class members that Wawa was required to take remedial actions pursuant to an injunction:

> For a period of two years after the Settlement is approved by the Court, Wawa agrees to an injunction which requires it to: (a) retain a qualified security assessor on an annual basis to assess compliance with payment card industry requirements and issue a Report on Compliance evidencing compliance with all requirements; (b) conduct annual penetration testing and remediate critical vulnerabilities or implement compensating controls; (c) encrypt payment card information and comply with EMV security procedures at point of sale terminals in Wawa stores; (d) implement EMV security procedures at Wawa fuel pumps; and (e) maintain written information security programs, policies, and procedures . . . Class Members do not need to submit a claim form in order to receive this benefit under the settlement.

Order of July 30, 2024, Ex. A at 4, Doc. No. 234-1.[9] The Court thus concludes that, under the circumstances of this data breach class action, injunctive relief provided a significant, non-monetary benefit to class members. This injunctive relief was rationally designed to address the particular, non-monetary harm suffered by many class members under the circumstances of this case, namely worry about, and time spent insuring, the privacy of financial information.

---

[9]   The first paragraph of this notice also flagged the injunctive relief to class members. *See* Order of July 30, 2024, Ex. A at 1, Doc. No. 234-1 ("In addition to the Gift Cards and monetary compensation described below, Wawa has implemented and agreed to further implement significant data security enhancements[.]").

Attempting to monetize this non-pecuniary relief, the parties valued this injunctive relief at $35 million. Settlement Agreement ¶ 39, Doc. No. 301-1. Mr. Frank takes issue with the $35 million valuation of this injunctive relief. First, he points out that Wawa's board approved $25 million for the improvement of its security apparatus in February 2020. Decl. of Adam Schulman ¶ 14, Doc. No. 429; *accord* Third Amended Settlement Agreement ¶ 38, Doc. No. 301-1. Assuming that these pre-agreement expenditures should be deducted from the value of the injunctive relief to calculate its value, the difference between the board's approved expenditures and the agreed-upon value of the injunctive relief is still $10 million. Additionally, the settlement agreement sets the value of this injunctive relief "at *no less than* $35 million," Third Amended Settlement Agreement ¶ 39, Doc. No. 301-1 (emphasis added), and Wawa has now "spent more than double the $35 million" on investments in data security, Decl. of Gregory Parks ¶ 16, Doc. No. 427. The Court declines to pick a number for the value of the injunctive relief. These widely disparate numbers simply underscore the fact that the dollar-value of non-monetary relief is difficult to calculate with anything resembling mathematical accuracy. Mr. Frank' next argument further illustrates this basic point.

One way to calculate the value of injunctive relief would be to simply ask how much it cost the defendant to implement, but Mr. Frank argues that "it is legal error to value [the] benefit [of injunctive relief] based on the costs imposed on the defendant." Decl. of Adam Schulman ¶ 67, Doc. No. 429. His lawyer's facetious illustration of this argument runs thus: "an injunction to spend $6 million on a Super Bowl ad where the Wawa CEO wears a dunce hat and tells viewers that he is 'very very very very very very sorry about the data breach' would be of tremendous expense to Wawa, but of infinitesimal benefit to the class." *Id.* This point is well-taken, if flippantly made. Because attorneys' fees "must be analyzed against the *benefits* to the class case-by-case,"

*Wawa II*, 85 F.4th at 722, it would indeed be inappropriate to analyze attorneys' fees solely against the *cost incurred* to the defendant. However, the Court is not being asked to do so. In this case, the question before the Court is *not* whether to analyze the requested fee award against the parties' agreed-upon $35 million value for injunctive relief. Instead, the question before the Court is whether to analyze the requested fee award against the $2.9 million claimed or the $9 million made available.

Under the circumstances of this data breach class action, the Court determines that this beneficial but difficult-to-value injunctive relief weighs strongly in favor of analyzing the fee award against the amounts made available to the class instead of the amounts claimed by the class. This is a case about Wawa's breach of its customers' trust. The harm suffered by each individual customer appeared to be so small that "Wawa believed that there was likely little or no harm to the class arising from the data security incident that is the subject of this action." Decl. of Gregory Parks ¶ 14, Doc. No. 427. The claims made pursuant to the tiered relief structure negotiated by the parties supported Wawa's skepticism to the extent that "harm" is understood to mean exclusively *pecuniary* harm. Indeed, the vast majority of claimants—over 99.95%[10] of claimants under this settlement agreement—did not suffer any pecuniary harm from this data breach. Instead, their entitlement to cash-like gift card relief is based on having monitored their credit and dealt with fraudulent charges. In light of Wawa's well-based skepticism about the magnitude of the pecuniary harm, it is a commendable achievement that class counsel, as "a matter of negotiation," Decl. of Adam Schulman ¶ 111, Doc. No. 429, managed to make $8 million[11] in gift cards available to Tier One and Tier Two class members—none of whom suffered any pecuniary harm at all. This

---

[10]     Out of 563,955 total claimants, 563,015 claims were brought under Tier One and 686 were brought under Tier Two.

[11]     This figure excludes the $1 million made available to Tier Three class members, who did suffer pecuniary harm.

achievement is especially notable because Wawa values *certainty*. Decl. of Gregory Parks ¶ 22, Doc. No. 427. Nonetheless, class counsel litigated an outcome whereby Wawa would *risk* up to $9 million, $8 million of which was available to class members who did not lose a single cent.

What those customers did lose, however, was *their certainty* that they could continue safely shopping at Wawa. Gift cards, though highly beneficial to class members, are powerless to restore that certainty. Therefore, class counsel further litigated injunctive relief that would restore class members' certainty that they could continue shopping at Wawa. Given the type of non-pecuniary harm suffered by Tier One and Tier Two class members, this difficult-to-monetize restoration of trust facilitated by court-ordered injunctive relief was a central feature of the overall relief provided to the class. Wawa resisted this injunctive relief, but class counsel "insisted that Wawa's commitment [to improve data security] be reduced to a court order mandating specific efforts that Wawa would undertake to fulfil that commitment." *Id.* ¶ 15. Regardless of how much was claimed by the class, these court-ordered commitments directly address the actual harm suffered by the vast majority of class members. The lion's share of the amounts made available to the class were made available to class members who had lost no amount of money. The injunctive relief, which by contrast did address those class members' actual injuries moving forward, is both extremely difficult to monetize and a central achievement of this class action. Under these circumstances, it is reasonable to consider the amount of money that class counsel induced Wawa to risk by making it available to customers who suffered precisely the type of loss that injunctive relief was designed to redress.

Finally, the Court turns to the claims rate. Out of a class of about 22 million, 563,955 claims were made, which means that the claims rate was about 2.56%. At first glance, this appears to be an extremely low claims rate. However, it actually compares favorably to the claims rates in other

data breach class actions. *See, e.g.*, *Schneider v. Chipotle Mexican Grill, Inc.*, 336 F.R.D. 588, 599 (N.D. Cal. 2020) ("Here, the 0.83% claims rate . . . is on par with other consumer cases, and does not otherwise weigh against approval); *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 321 (N.D. Cal. 2018) (finding 1.8% claims rate reflects positive reaction by class); *In re Target Corp. Customer Data Sec. Breach Litig.*, No. 14-md-2522, 2017 WL 2178306, at *1–2 (D. Minn. May 17, 2017), *aff'd*, 892 F.3d 968 (8th Cir. 2018) (approving settlement with roughly 0.23 percent claims rate). Nonetheless, the Third Circuit Court of Appeals has declared that, in cases like this one, "where defendants keep any unclaimed funds, making their liabilities 'contingent upon the presentation of individual claims,' courts must place greater weight on the claims rate." *Wawa II*, 85 F.4th at 723 (quoting *Boeing*, 444 U.S. 472 n.5).[12] Accordingly, the Court puts "greater weight" on the 2.56% claims rate than it would if Wawa did not keep $6.1 million in unclaimed funds.

There are well-recognized reasons that the 2.56% claims rate should not determine the Court's exercise of discretion under the circumstances of this case. "[T]his is a data breach case in which the vast majority of class members have very small claims." Joint Decl. of Co-Lead Counsel ¶ 36, Doc. No. 428. The Third Circuit Court of Appeals has recognized that "settlement funds may remain even after an exhaustive claims process . . . if the class members' individual damages are simply too small to motivate them to submit claims." *In re Baby Prods.*, 708 F.3d at 178. This argument strikes with particular force in light of the fact that over 99.95% of claimants from this class have the smallest possible damages in terms of dollar-value: zero dollars. Moreover, class members' non-pecuniary concerns about the security of Wawa's payment terminals moving

---

[12]     This requirement appears to be premised upon dicta from a Supreme Court footnote penned in 1980. *See Boeing*, 444 U.S. at 479 n.5 ("Nothing in the court's order made Boeing's liability for this amount contingent upon the presentation of individual claims. Thus, we need not decide whether a class-action judgment that simply requires the defendant to give security against all potential claims would support a recovery of attorney's fees under the common fund doctrine.").

forward were automatically addressed by injunctive relief. There was no need to make a claim in order to enjoy those benefits, so the damages actually suffered by most class members were addressed absent a claim.

Additionally, the Court is mindful of its duty to "consider the level of direct benefit provided to the class in calculating attorneys' fee awards," in a manner that is, "as much as possible, practical and not abstract." *Wawa II*, 85 F.4th at 722 (quoting *In re Baby Prods.*, 708 F.3d at 174). Practically speaking, very few, if any, class members would file suit individually in a data breach class action like this one. Thus, non-claiming class members' loss of the right to sue is minimally weighty under the circumstances. Given the extremely small pecuniary value ($0) of the vast majority of class members' claims, from a practical perspective, a data breach action like this one will be litigated by class action or not at all. This same practical reasoning applies equally to help explain the 2.56% claims rate: class members who suffered zero pecuniary harm are not motivated to claim pecuniary relief. These practical dynamics mitigate the Third Circuit's concern that a low claims rate could call into question "the effectiveness of the method of processing class-member claims." *Id.* at 723 (internal quotation marks omitted) (quoting Fed. R. Civ. P. 23(e)(2)(C)(ii)).

Still, notwithstanding the small pecuniary value of the class's injuries, class counsel persuaded Wawa to risk $9 million by making it available to the class, and "[c]lass counsel should not be penalized for . . . reasons unrelated to the quality of representation they provided." *In re Baby Prods.*, 798 F.3d at 178. In the context of this case, class counsel should not be penalized because many class members neglected to claim gift cards premised upon non-pecuniary injuries. This is especially true when the most widespread injury to the class comes in the form of time and

worry about data security, and class counsel negotiated a solution to that injury for everyone by securing court-ordered changes to Wawa's behavior.

The Court has discretion to decide whether to assess the reasonableness of class counsel's requested fee award in light of either the amounts claimed or the amounts made available. Under the circumstances of this data breach class action, in which difficult-to-monetize injunctive relief is a central feature of class relief, the Court exercises its discretion to evaluate the fee in light of the amounts made available.

## VI. The *Gunter* Factors Re-Visited

With this context in mind, the Court now turns to applying the following "*Gunter* factors" to assess if class counsel's requested $3.2 million fee award is reasonable: "(1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases." *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000). These factors "need not be applied in a formulaic way . . . and in certain cases, one factor may outweigh the rest." *Id.*

### 1. *Size of the Fund and Number of Persons Benefitted*

Lawyers "who recover[] a common fund for the benefit of persons other than [themselves] or [their] client[s] are entitled to a reasonable attorney's fee from the fund as a whole." *Wawa II*, 85 F.4th at 720 (quoting *Boeing*, 444 U.S. at 478). In determining what constitutes a "reasonable attorney's fee," the Court has discretion to compare the size of the requested fee to either the amount the defendant makes available to the class or the amount the class claims from the

defendant. *Id.* at 721–22. For the reasons discussed above, the Court performs this analysis against the amount Wawa made available to the class under the terms of this settlement agreement. Accordingly, the total of $3.2 million for fees and expenses shall be added to the $9 million made available to the class, resulting in an overall settlement value of $12.2 million for the constructive common fund. Even if the $3.2 million award were not added to the $9 million made available to the class to arrive at a so-called "constructive common fund," the Court would still find that $9 million of funds made available to class members who almost all suffered no pecuniary harm is an extraordinary benefit to the class. *Cf. id.* at 716 n.2 ("[W]hether the settlement here is structured as a 'constructive common fund' is secondary to our inquiry into whether the attorney's fees as part of that common fund are reasonable[.]"). Although the Court does not add the parties' $35 million valuation of the injunctive relief provisions of the settlement agreement to the total value of this common fund, the Court does find that the injunctive relief provided by this settlement weighs strongly in favor of considering the $9 million made available to the class instead of the $2.9 million the class claimed. The size of the fund is large, and the fund is highly beneficial to the class, especially in relation to the harm they suffered.

This settlement value was made available to a class of roughly 22 million people, out of whom 563,955 individuals made a claim. Thus, over 560,000 individuals received non-expiring gift cards and cash relief through this settlement agreement, and every class member benefited from the injunctive relief provisions of this settlement agreement.

This factor weighs in favor of approval.

### 2. *Objections*

Mr. Frank is the sole objector to this fee award, and the Court has exhaustively examined his objections above. The Court notes Mr. Frank' argument that, because "[i]t is economically

burdensome and irrational to object, . . . it is not surprising that no other absent class members" objected. Decl. of Adam Schulman ¶ 110, Doc. No. 429. The Court also notes the vociferousness of Mr. Frank' objections, as demonstrated by his sustained engagement in this litigation through appeal and remand. *Cf. In re General Motors*, 55 F.3d at 813 (explaining that one indication of negative reaction was fact that "those who did object did so quite vociferously"). The Court certainly does not dismiss Mr. Frank' objections merely because he is the sole objector, but the Court also agrees that, in the final analysis, "[i]t is the cogency of the objections that matters, not the quantity." Decl. of Adam Schulman ¶ 110, Doc. No. 429.

The Court has now fully engaged with Mr. Frank's objections to this attorneys' fee award and found them to be unconvincing. The Court examined the evidence closely and determined that there was no clear-sailing clause in this settlement agreement. Furthermore, the process through which the de facto fee reversion entered and exited the stage of this litigation cannot be interpreted as reflecting negatively upon the reasonableness of this fee award.

Finally, notwithstanding Mr. Frank' vociferous objection, the Court has discretion to consider either the amounts made available to the class or the amounts claimed by the class when considering the reasonableness of a fee award. Under the circumstances of this case, it would be unfair to consider only the amounts claimed by the class. First, this would blind the Court to the economic reality of class action data breach litigation, in which class members have little motivation to make a claim no matter how effectively class counsel represented them. *See Gascho v. Global Fitness Holdings, LLC*, 822 F.3d 269, 288 (6th Cir. 2016) ("devaluing the available relief if it goes unclaimed could in many cases unduly penalize class counsel and have the lasting effect of discouraging the filing of class actions in cases where few claims are likely to be made but the

deterrent effect of such a suit would be socially desirable."). Second, it would require the Court to completely ignore the injunctive relief class counsel obtained for the class.

The Court understands that the organization to which Mr. Frank and his attorney belong "takes the institutional position that it is legal error . . . to ever award fees or value claims-made settlements based upon amounts 'made available[.]'" Decl. of Adam Schulman ¶ 144, Doc. No. 429. However, this institutional position is not the law of the land. The Third Circuit Court of Appeals declined to create a per se rule against awarding fees based upon amounts made available in this very case. *See Wawa II*, 85 F.4th at 722–23. The Sixth Circuit has also rejected the request to create such a per se rule. *See Gascho*, 822 F.3d at 288 ("Such a rule would require us to jettison the Supreme Court's guiding principles and our own circuit's past acknowledgement that there is value in providing a class member the ability to make a claim, whether she takes advantage of it or not. We do not abandon that foundational principle."). It is the Court's duty to evaluate the cogency of objections in light of the law, which gives the Court discretion. The Court exercises this discretion to consider the amount made available to the class under the circumstances of this case. Because the Court has exhaustively examined why Mr. Frank's objections fail to render this fee award unreasonable, the Court finds that Mr. Frank's objections do not weigh against approval of the fee request.

### 3. *Skill and Efficiency of Attorneys Involved*

As the Court noted in appointing class counsel as interim counsel, these attorneys have substantial experience in complex class actions generally and in data breach litigation in particular. *See* Doc. Nos. 78-2, 78-3, 78-4 & 78-5 (counsel resumes). Mr. Frank argues that the need for several amendments and his own contributions call into question the skill and efficiency of class counsel. *See* Decl. of Adam Schulman ¶ 90, Doc. No. 429 (arguing that class counsel's

effectiveness is impugned "in light of the fact that class counsel needed 'four tries and the involvement of [Mr.] Frank'" to arrive at a final settlement agreement). The Court rejects Mr. Frank's characterization of the amendment process and finds that the parties' flexibility in negotiating amendments as needed should be applauded rather than censured. Moreover, even after submitting their request for fees, class counsel "monitored and expanded the notice procedures and monitored the implementation of the security practices and procedures established by the injunctive relief." Joint Decl. of Co-Lead Counsel ¶ 58, Doc. No. 428. Class counsel demonstrated efficiency both through the negotiation of amendments to the settlement agreement and by continuing to facilitate the successful implementation of that agreement after they submitted a request for attorneys' fees.

Mr. Frank also objects to class counsel's blended hourly rate of $653 as "astronomical." The blended hourly rate is a product of averaging the partner, associate, and support staff rates across law firms.  In contrast to Mr. Frank's characterization, courts in the Third Circuit have accepted blended hourly rates in this $600+ range. *See, e.g.*, *Sweda v. Univ. of Pa.*, No. 16-cv-4329, 2021 WL 5907947, at *7 (E.D. Pa. Dec. 14, 2021) (approving class action fee award with blended hourly rate of $756, when lodestar amount is divided by 8,144 hours spent); *Pfeifer v. Wawa, Inc.*, No. 16-cv-497, 2018 WL 4203880, at *14 (E.D. Pa. Aug. 31, 2018) (approving class action fee award with "blended hourly rate of approximately $685").  The cases cited by Mr. Frank do not, as Mr. Frank suggests, determine that similar rates are "too high."  *Compare* Doc. No. 263, at 24, *with In re Domestic Drywall Antitrust Litig.*, No. 13-md-2437, 2019 WL 1258832, at *2 (E.D. Pa. Mar. 19, 2019) (discussing insufficient documentation without criticizing the requested blended rate itself), *and Skeen v. BMW of N. Am., LLC*, No. 13-cv-1531, 2016 WL 4033969, at *22 (D.N.J. July 26, 2016) (addressing a dispute regarding whether the comparator counsel rates

44

should be practice-based or geography-based in a vehicle defect class action). The Court accepts $653 as a reasonable hourly rate.

This factor weighs in favor of approving the fee award.

### 4.  *Complexity and Duration of Litigation*

Data breach litigation is inherently complex. *See Fulton-Green*, No. 18-274, 2019 WL 4677954, at *8 (E.D. Pa. Sep. 24, 2019) ("This is a complex case in a risky field of litigation because data breach class actions are uncertain and class certification is rare."). This litigation involved a variety of classes of plaintiffs, and this litigation therefore involved the disaggregation of consumer, employee, and financial institution claims. While this complexity supports the fee award, the Court also considers the short duration of the litigation in determining whether the amount of time devoted was reasonable under *Gunter* factor six below.

As a general matter, the complexity of this data breach class action appears to be offset by the relatively short duration of this litigation and the speedy arrival at a settlement agreement. Thus, this factor neither weighs in favor of nor against the fee award.

### 5.  *Risk of Nonpayment*

Class counsel took on this case on a contingent basis, risking nonpayment if the case was not successful.  Taking that risk on behalf of the class lends weight to the fee request.  *See Fulton-Green*, 2019 WL 4677954, at *13 ("Class Counsel invested considerable resources into this case with no guarantee that they would recover those costs given that they were retained on a contingency fee basis.").  Thus, this weighs in favor of the requested attorneys' fees.

### 6.  *Amount of Time Devoted*

Class counsel detail 5,942 billed hours in their fee petition after reducing the amount by 25% for class counsel and by 30% for all other Consumers Plaintiffs' counsel. This amount does

not include time spent preparing for final approval and also does not include work undertaken since the attorneys' fee request, such as monitoring the injunctive relief and litigating the appeal and remand.

The reported number of hours (5,942) is lower than early settlements in similar payment card breach cases. *See In re Home Depot, Inc. Customer Sec. Breach Litig.*, No. 14-md-2583, Doc. No. 227-1, at 10, 25 (N.D. Ga. 2014) (consumer track counsel devoted 10,186 hours in reaching settlement before motion to dismiss was decided); *In re Target Corp. Customer Data Sec. Breach Litig.*, No. 14-md-2522, Doc. No. 483, at 23 (D. Minn. 2014) (consumer track counsel devoted 20,482 hours in reaching settlement three months after motion to dismiss was decided); *In re TJX Cos. Retail Sec. Breach Litig.*, No. 07-cv-10162, Doc. No. 353, at 4 (D. Mass. 2007) (consumer track counsel devoted 7,400 hours in reaching settlement before motion to dismiss was decided). The relatively lower number of hours could weigh against approving the proposed fee due to less time actually spent on the matter, but counsel have exercised their judgment in imposing billing reductions and should not be discouraged from working efficiently to reach an early resolution.[13]

Although this factor could weigh against the fee request, the lodestar cross-check below illustrates the agreement between this number of hours and the results achieved for the class.

### 7.  *Awards in Similar Cases*

Other data breach class action litigation has resulted in attorneys' fee awards significantly higher than the $3,040,060 fee requested here.  *See, e.g.*, *In re Home Depot, Inc., Customer Data*

---

[13]      This "early resolution" has not panned out in light of this appeal and remand. According to class counsel, the lost value of their fee award due to the delay of appeal was approximately $408,492 as of December 19, 2023. *See* Joint Decl. of Co-Lead Class Counsel ¶ 59, Doc. No. 258. Notably, while the value of their requested fee award diminished, class counsel also expended more hours to litigate Mr. Frank's appeal and the resulting remand. However, the Court mentions these practical dynamics only in passing. It does not weigh the hours expended on appeal and remand when evaluating a fee award that was requested prior to—and constituted the subject of—that appeal and remand.

*Sec. Breach Litig.*, No. 14-md-2583, 2016 WL 11299474, at *1 (N.D. Ga. Aug. 23, 2016) ($7,536,497.80 fee award for class action involving 40 million payment cards settled before motion to dismiss stage); *In re Target Corp. Customer Data Sec. Breach Litig.*, No. 14-md-2522, 2015 WL 7253765, at *4 (D. Minn. Nov. 17, 2015) ($6.75 million fee award for class action involving 110 million payment cards settled three months after motion to dismiss denied in part), *rev'd and remanded on other grounds*, 847 F.3d 608 (8th Cir. 2017).

When compared to the total common fund value of $12.2 million, the $3.2 million lump-sum award constitutes 26.2% of the common fund, and the $3,040,060 attorneys' fee constitutes 24.9% of the common fund. Although Mr. Frank believes the denominator should be smaller, he agrees that class counsel's recovery should be 25% of the common fund. *See* Decl. of Adam Schulman ¶ 69, Doc. No. 429. This comports with counsel's fees in other common fund class actions. *See In re Safety Components, Inc. Sec. Litig.*, 166 F. Supp. 2d 72, 101-02 (D.N.J. 2001) (charting seven cases where district courts in Third Circuit approved settlements with fee percentages ranging from 30% to 33.8% on class funds ranging from $1.46 million to $24.3 million).

Thus, the *Gunter* factors collectively support approval of the requested fee.

### 8. Lodestar Cross Check

In addition to the *Gunter* factors, the Court considers a lodestar cross-check.[14] The Third Circuit Court of Appeals has "suggested it is sensible for a court to use a second method of fee approval to cross-check its initial fee calculation." *In re Rite Aid*, 396 F.3d at 300. Here, a lodestar

---

[14]    The Third Circuit Court of Appeals did not remand for the Court to re-consider its lodestar analysis. *See Wawa II*, 85 F.4th at 722 n.18 ("The District Court conducted both percentage-of-recovery and lodestar analyses. But because we remand based only on the former calculation, we express no opinion on the propriety of its lodestar analysis[.]"). Thus, the Court's cross-check is the same as that contained in its original final approval opinion.

cross-check produces a lodestar of $3,877,271, based on 5,942 hours multiplied by each attorney's hourly rates (which results in an effective blended hourly rate of $653). This leads to a "negative" multiplier of 0.78 for the requested attorneys' fees of $3,040,060 relative to the lodestar amount. The Third Circuit Court of Appeals has noted that multipliers "ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." *In re Prudential*, 148 F.3d at 341. Because the lodestar here is higher than the requested fee, this cross-check provides support for the fee request. *See Dickerson v. York Int'l Corp.*, No. 15-cv-1105, 2017 WL 3601948, at *11 (M.D. Pa. Aug. 22, 2017) ("A negative multiplier reflects that counsel is requesting only a fraction of the billed fee; negative multipliers thus 'favor[ ] approval.'") (quoting *Altnor v. Preferred Freezer Servs.*, 197 F. Supp. 3d 746, 767 (E.D. Pa. 2016)).

Based on the *Gunter* factors and the lodestar cross-check, the Court will grant the motion for attorneys' fees of $3,040,060 as part of the $3.2 million lump sum payment.

### A. Litigation Expenses

Class counsel also seek $45,940 for their litigation expenses and "approximately" $100,000 for KCC's settlement administration expenses. As of April 2022, the settlement administrator estimated that its total fee would be $112,770. "Attorneys who create a common fund for the benefit of a class are entitled to reimbursement of reasonable litigation expenses from the fund." *In re Aetna Inc.*, No. MDL-1219, 2001 WL 20928, at *13 (E.D. Pa. Jan. 4, 2001). In some cases, courts in this District have reduced the reimbursement of expenses where the notice sent to class members anticipated a lower reimbursement request. *Id.* at *13.

Class counsel's litigation expenses include their filing fees, service of process fees, expert and professional services fees, mediation fees, Westlaw/LEXIS fees, and PACER fees. These types of expenses are approved by courts in this Circuit with regularity. *See, e.g.*, *In re Am. Inv'r*

*Life Ins. Co. Annuity Mktg. & Sales Pracs.* Litig., 263 F.R.D. 226, 245 (E.D. Pa. 2009) (approving class counsel's request for reimbursement of expenses including "expert witness fees; mediation fees; . . . legal research; . . . and service of process"); *Cunningham v. Wawa*, Inc., No. 18-cv-3355, 2021 WL 1626482, at *8 (E.D. Pa. Apr. 21, 2021) (approving class counsel's request for reimbursement of "filing fees, . . . mediation fees, and other similar, ordinary litigation expenses").

The Court finds that class counsel exercised appropriate discretion in trimming the requested expenses. For example, in-house administrative expenses such as printing are excluded. The largest line items in the requested expenses are $19,154 in legal research fees (Westlaw, Lexis, and Pacer) and $9,257.55 for professional services, which consist of private investigator fees, expert witness fees, and other vendor and marketing fees.

In the notice provided to consumer class members, class counsel also stated that they would request the same $3.2 million lump sum amount for fees and expenses that they request in the present motion. *See* Order of July 30, 2022, Ex. A at 7, Doc. No. 234-1. Therefore, the notice sent to class members did not anticipate a lower reimbursement request.[15] *Cf. In re Aetna Inc.*, 2001 WL 20928, at *13.

Finally, the request for $45,940 in litigation expenses and approximately $100,000 for the settlement administrator compares favorably with other data breach settlements. *See, e.g.*, *In re Home Depot*, 2016 WL 11299474, at *2 (approving $166,925 expense reimbursement in case involving theft of 40 million payment cards settled before motion to dismiss decided).

The Court finds that the requested litigation expenses are reasonable.

---

[15]   Because the settlement administrator's $112,770 will be taken out of the $3.2 million lump sum, this modest increase in the fee does not impact whether class members would have anticipated a lower fee for settlement administration.

### I.  Class Representative Awards

Plaintiffs also request awards of $1,000 each for 14 named Class Representatives.[16] "Incentive awards are not uncommon in class action litigation and particularly where, as here, a common fund has been created for the benefit of the entire class." *In re Flonase Antitrust Litig.*, 291 F.R.D. 93, 106 (E.D. Pa. 2013) (internal quotation marks omitted).  "Named plaintiffs play an important role in class actions, and it is surely proper to provide reasonable incentives to individual plaintiffs whose willingness to participate as lead plaintiffs allows class actions to proceed and so confer benefits to broader classes of plaintiffs." *In re CertainTeed Corp. Roofing Shingle Prods. Liab. Litig.*, 269 F.R.D. 468, 486 (E.D. Pa. 2010) (internal quotation marks omitted).

Courts assessing class representative awards consider the following factors:  "[t]he risk to the plaintiff in commencing suit, both financially and otherwise; the notoriety and/or personal difficulties encountered by the representative plaintiff; the extent of the plaintiff's personal involvement in the lawsuit in terms of discovery responsibilities and/or testimony at depositions or trial; the duration of the litigation; and the plaintiff's personal benefit (or lack thereof) purely in his [or her] capacity as a member of the class." *Ribstein v. Rite Aid Corp.*, 761 F. Supp. 2d 241, 257 (E.D. Pa. 2011).

The Consumer Track Class Representatives faced little risk, but they seek relatively little reward. Courts have considered awards around 3.1 to 3.5 percent of the total recovery as proportional. *Id.* at 8. Here, the aggregate request of $14,000 comes out to a mere 0.11% of the $12.2 million total recovery. The Class Representatives performed discovery responsibilities, including researching their transactions with Wawa, checking their bank accounts for fraudulent

---

[16]      This includes 13 Class Representatives in this action and another Class Representative in a related action in the Superior Court of New Jersey that was stayed pending the resolution of this case and will be jointly dismissed upon settlement approval.  *See* Third Amended Settlement Agreement ¶ 76, Doc. No. 301-1.

activity, conforming to document preservation obligations, reviewing case filings, communicating with counsel, and approving the Settlement Agreement. The Court finds that the requested Class Representative service awards of $1,000 per class representative are proportionate to the relatively light efforts expended. *See, e.g.*, *In re CertainTeed Corp.*, 269 F.R.D. at 476, 490 (awarding $2,500 to class representatives who were not deposed, in contrast to $5,000 to class representatives who were deposed); *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-md-2752, 2020 WL 4212811, at *44 (N.D. Cal. July 22, 2020) (same).

Although the number of class representatives (14) is somewhat high relative to other types of cases, the class representatives reflect the interstate nature of the class of Wawa consumers and data breach class action litigation in general. Class counsel explained that they sought two representatives in each state where Wawa conducted business in order to address potential standing issues. Relative to other data security litigation, the total amount of $14,000 in service awards to 14 class representatives is low. *See, e.g.*, *In re Anthem, Inc. Data Breach Litig.*, No. 15-md-2617, 2018 WL 3960068, at *31 (N.D. Cal. Aug. 17, 2018) (approving a total of $597,500 in service awards for 105 named plaintiffs); *In re Home Depot*, 2016 WL 11299474, at *1 (approving an $88,000 service award for 88 named plaintiffs).

Therefore, the Court approves the requested expenses and class representative awards.

## CONCLUSION

Noting that this post-remand process has been undeniably costly to all counsel and litigants, after re-examining the reasonableness of the requested fee award in light of the concerns explained by the Third Circuit Court of Appeals, the Court is assured of the reasonableness of this fee award.

The Court grants the requested attorneys' fees, litigation expenses, and Class Representative awards.  An appropriate order follows.


**BY THE COURT:**


<u>**s/ Gene E.K. Pratter**</u>
**GENE E.K. PRATTER**
**UNITED STATES DISTRICT JUDGE**